```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF ARKANSAS

 3                      CENTRAL DIVISION

 4

 5   SOUTHEASTERN EMERGENCY PHYSICIANS, LLC,

 6                    Plaintiff,

 7      V.                              No. 4:17-CV-492-BSM

 8   ARKANSAS HEALTH & WELLNESS HEALTH PLAN,   August 6, 2020
     INC.; CELTIC INSURANCE COMPANY d/b/a      Little Rock, Arkansas
 9   ARKANSAS HEALTH & WELLNESS INSURANCE
     COMPANY; NovaSys HEALTH, INC.; and
10   CENTENE CORPORATION,

11                    Defendants.

12

13                 TRANSCRIPT OF TRIAL, DAY 4
                BEFORE THE HONORABLE BRIAN S. MILLER,
14            UNITED STATES DISTRICT JUDGE, and a jury

15

16   APPEARANCES:

17   On Behalf of the Plaintiff:

18        JUDY SIMMONS HENRY
          BAXTER D. DRENNON
19        MICHAEL A. THOMPSON
             Wright, Lindsey & Jennings
20           200 W Capitol Avenue, Suite 2300
             Little Rock, Arkansas 72201-3699
21
          JOHN ZAVITSANOS
22        MICHAEL KILLINGSWORTH
          PATRICK KEVIN LEYENDECKER
23           Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing PC
             1221 McKinney Street, Suite 2500
24           Houston, Texas 77010

25   (APPEARANCES CONTINUED ON NEXT PAGE)
```

1   APPEARANCES (CONTINUED):

2

3   On Behalf of the Plaintiff (Continued):

4        COLLIN D. KENNEDY
             Hanshaw Kennedy Hafen LLP
5            1415 Legacy Drive, Suite 350
             Frisco, Texas 75034

6

7   On Behalf of the Defendants:

8        LYN PEEPLES PRUITT
         GRAHAM CAUGHMAN TALLEY
9            Mitchell, Williams, Selig, Gates & Woodyard PLLC
             425 W Capitol Avenue, Suite 1800
10           Little Rock, Arkansas 72201

11       STEVEN M. CADY
             Williams & Connolly LLP
12           725 Twelfth Street, N.W.
             Washington, DC 20005-5901

13

14

15

16

17

18

19

20

21

22

23

24       Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
25   transcription.

```
 1                   INDEX - (August 6, 2020)

 2

 3   WITNESSES FOR PLAINTIFF:   Direct   Cross   Redirect   Recross

 4   JOHN RYAN                    39

 5   STANLEY THOMPSON, M.D.       84      115     183, 186     185

 6   KIM SUGGS                   187

 7   KENT BRISTOW                221     263

 8

 9

10

11

12   EXHIBITS RECEIVED:

13   Plaintiff's Exhibit 28. . . . . . . . . . . . . . . p. 212

14   Plaintiff's Exhibit 131 . . . . . . . . . . . . . . p. 241

15   Plaintiff's Exhibit 133 . . . . . . . . . . . . . . p. 241

16

17

18

19

20

21

22

23

24

25
```

```
1         (Proceedings commenced in chambers at 8:15 a.m.)
2              THE COURT:  Hey, come on in.  Have a seat,
3    Mr. Estell.
4              JUROR ESTELL:  Oh, boy.
5              THE DEPUTY:  Do you want me to close the door, Judge?
6              THE COURT:  What's that?
7              THE DEPUTY:  Do you want me to close the door?
8              THE COURT:  No.  We're not talking about anything in
9    particular.
10             JUROR ESTELL:  Do I need this on?
11             THE COURT:  No, no.  You can take it off.  And I
12   think we're far enough away where you don't have to worry about
13   me breathing on you.
14       I've got a question for you.  I know you're going to
15   Florida on the -- first, we're on the record, and the reason
16   why we're on the record because, if anybody ever questions what
17   our conversation is --
18             JUROR ESTELL:  Right.
19             THE COURT:  -- back here, they need to read it --
20             JUROR ESTELL:  Fair enough.
21             THE COURT:  -- and see what we talked about.
22             JUROR ESTELL:  Yeah.
23             THE COURT:  You're scheduled to leave on Saturday for
24   Florida.  How long is your trip?
25             JUROR ESTELL:  Six days.  I come back Friday --
```

1    Saturday until Friday.

2              THE COURT:  So you're gonna be gone -- it's a

3    week-long trip?

4              JUROR ESTELL:  Right.

5              THE COURT:  Okay.  I've been talking to the lawyers

6    about how we accommodate this.

7              JUROR ESTELL:  Uh-huh.

8              THE COURT:  We lost Dixon, and so we don't have an

9    alternate.

10             JUROR ESTELL:  Uh-huh.

11             THE COURT:  And so if we don't finish, then I have to

12   start all back over with a new jury.

13             JUROR ESTELL:  Uh-huh.

14             THE COURT:  My -- the lawyers have talked about maybe

15   flying you down a couple days late.  I have thought about

16   recessing the case, and when you get back, finish up.  We're

17   just trying to brainstorm to figure out what to do and whether

18   that is a problem.

19        I've had jurors in the past who've said, "Judge, no.  I'll

20   stay and see it through."

21        I want to ask you:  What are your thoughts on it?

22             JUROR ESTELL:  Man.

23             THE COURT:  And be honest and be very frank with me.

24   Be honest.

25             JUROR ESTELL:  I will.

1          THE COURT:  You told us in jury selection that you
2     had this trip.
3          JUROR ESTELL:  Yeah, and I told them probably -- I've
4     got the e-mail on my phone.  I just don't have it.  But it was
5     early July, I think I told them.  And they wrote me back.
6        Man, I hate -- I really hate to say, "No," because I know
7     everything that goes into it for everybody, but there is kind
8     of a lot in it for me.  I really think it might cloud my
9     judgment; it really might.  And I'm not just saying that.  I
10    can give you some backstory, not that you care but --
11         THE COURT:  Actually, I do care.
12         JUROR ESTELL:  The schedule is to propose to my
13    girlfriend on the beach this weekend.
14         THE COURT:  Wow.
15         JUROR ESTELL:  So it's --
16         THE COURT:  You've got to go.
17         JUROR ESTELL:  I don't have to go.  She doesn't know
18    that, obviously.  But it -- there is a lot going on, I mean.
19         THE COURT:  I understand.
20         JUROR ESTELL:  But everybody's got a life going on.
21    I get that.
22         THE COURT:  Let me ask you this:  You know, I asked
23    you in jury selection if it was paid for, and you told me,
24    "Yeah."
25         JUROR ESTELL:  Oh, yeah.

1          THE COURT:  "I already paid for this.  I paid for
2    everything."
3          JUROR ESTELL:  Uh-huh.
4          THE COURT:  Give me your thoughts.  What would you --
5    to try to get us through this trial, what would you propose?
6    Not that I'm giving you --
7          JUROR ESTELL:  Honestly, I don't even know the
8    options.  Anything I propose I feel like is out of line.  I
9    really -- I don't --
10          THE COURT:  Well, give me your best shot.
11          JUROR ESTELL:  Um.
12          THE COURT:  I'm serious.
13          JUROR ESTELL:  Yeah.
14          THE COURT:  I really am.
15          JUROR ESTELL:  We're really in a predicament.  So a
16    fair option for all parties is -- honestly, it's either do what
17    I think is fair for me or do what I think is fair for everybody
18    else?  I don't like being put in that spot.  Truthfully, I
19    don't -- I don't -- it's a bad situation.  And it's like every
20    factor in the world kind of came against us to put us all back
21    against the wall -- is kind of the way I see it.
22          THE COURT:  I don't know that we have an either-or.
23    If we don't get through the trial and you're allowed to go --
24    and you go on your trip that you have planned, you know, if I
25    were to declare a mistrial, because we don't have a juror, then

1  everybody has to reconvene and come back.

2           JUROR ESTELL:  Uh-huh.

3           THE COURT:  And they have a lot of expense in the

4  case.

5           JUROR ESTELL:  Oh, yeah.

6           THE COURT:  All of these people -- some of these

7  lawyers are from out of town.

8           JUROR ESTELL:  Uh-huh.

9           THE COURT:  We have the management teams from out of

10  town.  I wouldn't want to do that and start all back over.  At

11  the same time, you told us that you had this trip planned and

12  you've paid for it.

13           JUROR ESTELL:  Uh-huh.

14           THE COURT:  Like I said, one of the options that the

15  lawyers have talked about would we maybe buy him a ticket and

16  put him on a plane down to that -- to the destination.  That

17  way -- I think you said you were driving.

18           JUROR ESTELL:  No.  We're flying.  We're flying out

19  Saturday morning at 8:15.

20           THE COURT:  Okay.  All right.  And so -- all right.

21  I get it.

22       The other -- so one side is declare a mistrial.  We all go

23  home and just reconvene some other time with a new jury.  The

24  other part is, when you get back, we come back and do another

25  day or two and --

1           JUROR ESTELL:  How unorthodox is that?

2           THE COURT:  It never happens.  Never.  But here --

3    but here's the thing.  Some of the -- and I don't want to get

4    into the details of it, but some of the things that would lead

5    a judge not to allow a recess of a jury trial for a week are

6    not present here.

7           JUROR ESTELL:  Come again with that.

8           THE COURT:  Okay.  And I'll explain it to you.  For

9    me -- and I know the lawyers -- well, I don't want to get into

10   too much detail.  I'll just say that, if this were a criminal

11   case, where issues of jury tampering, witness tampering, and

12   all of those things come into effect sometimes -- you know,

13   because when somebody is on trial for a crime, you never know

14   if somebody is going to try to reach out to a juror and talk to

15   them and that type of thing.

16          JUROR ESTELL:  Yeah.

17          THE COURT:  Not to hurt them or anything --

18          JUROR ESTELL:  Right.

19          THE COURT:  -- but just, "Hey, look, that didn't

20   really happen."

21       We don't really have that here.

22       Issues where, you know, sometimes where you have a

23   personal injury case where there's been a big explosion or big

24   accident somewhere, people might try to actually go to the

25   scene and look.

1          JUROR ESTELL:  Uh-huh.

2          THE COURT:  You know, if you have a break.

3          JUROR ESTELL:  Right.

4          THE COURT:  It's a contract case.  And so I think the

5  passion that would be wrapped up in a criminal case or some

6  type of products liability case or something like that may not

7  be present here.  And so I feel -- I'm a little more

8  comfortable with recessing and coming back, but I am not sure

9  yet, and I have to talk to the lawyers.

10          JUROR ESTELL:  Uh-huh.

11          THE COURT:  And I am sure the lawyers may not want to

12  do that.  And, you know, of course, if I'm trying the case, I

13  want to go straight through, get it to the jury, --

14          JUROR ESTELL:  Of course.

15          THE COURT:  -- and be done with it.  And I respect

16  that.

17          JUROR ESTELL:  Uh-huh.

18          THE COURT:  I think everybody's positions here --

19  yours, the lawyers, the parties, everybody's positions are good

20  positions.  And so I am just trying to make the right decision.

21          JUROR ESTELL:  I get it.  I get it.

22          THE COURT:  So but what I want to do is I did not

23  want to -- and the lawyers, we talked about it.  We thought

24  this case would move faster than it has.  We had set aside five

25  days to try it, and here we are at day four --

```
 1              JUROR ESTELL:  Got one -- one -- what? -- one witness
 2   down, I think?
 3              THE COURT:  At the beginning of day four.
 4              JUROR ESTELL:  Yeah.
 5              THE COURT:  And I don't want to force the lawyers --
 6              JUROR ESTELL:  Uh-huh.
 7              THE COURT:  Here's the thing.  I don't want to force
 8   anybody to move fast or force anybody to do anything, and
 9   they -- you know, when you prepare for a trial, you could
10   estimate how long it will take, but you don't know until you
11   get in the courtroom.
12              JUROR ESTELL:  Right.
13              THE COURT:  There are no dress rehearsals here.
14              JUROR ESTELL:  I get it.
15              THE COURT:  And so I think all of this is very
16   legitimate.  It just moved slower than we thought.  So what I
17   don't want to do is I have a juror who tells me on the front
18   end he's paid for a trip.  None of us in this courtroom want to
19   have you sitting on that jury missing your trip and thinking
20   more about what you're missing than paying attention to the
21   evidence.
22              JUROR ESTELL:  Right.
23              THE COURT:  And so that's why I wanted to call you in
24   and just get your thoughts.
25              JUROR ESTELL:  I appreciate it, because you don't
```

```
 1   have to -- you didn't have to do that.
 2            THE COURT:  Well -- well, but the lawyers --
 3            JUROR ESTELL:  Right.
 4            THE COURT:  -- also wanted me to.
 5            JUROR ESTELL:  Right.
 6            THE COURT:  I mean, everybody collectively said,
 7   "Let's talk to him and see what his thoughts are."
 8        Okay.  All right.  Thank you.
 9            JUROR ESTELL:  Good enough?
10            THE COURT:  And I'll report back to the lawyers with
11   what our conversation was.
12            JUROR ESTELL:  Again, I appreciate it.
13            THE COURT:  Yes, sir.
14            JUROR ESTELL:  Sorry to be a hassle.
15            THE COURT:  No, no, no.
16            JUROR ESTELL:  I really don't enjoy that at all.
17            THE COURT:  No.
18            JUROR ESTELL:  And I appreciate it.
19            THE COURT:  I understand.
20            JUROR ESTELL:  Am I good to go here?
21            THE COURT:  Yes, sir.
22        (Proceedings now commenced in the courtroom at 8:33 a.m.)
23            THE COURT:  Well, I met with Mr. Estell this morning,
24   and before I characterize or explain our conversation, I think
25   I'll probably let you -- I need to let y'all read the
```

1    transcript because I would like you to see what it reads like.

2    He's proposing to his girlfriend this weekend in Florida.

3            MR. CADY:  Wow.

4            THE COURT:  And that's why he had it planned.  And

5    he's not driving; he's flying.  And I thought he was driving,

6    but he said he was flying.  And it's a funny thing, and it's

7    something you won't pick up on in the transcript, but looking

8    at him in his face, he seemed to understand his responsibility

9    as a juror to see the case through, but at the same time said

10   that he probably would not be fair if he had to say.

11           And I want to read it to see exactly what he said because

12   I'm looking at him in his face, and maybe I'm thinking more

13   about what I'm saying than what I'm hearing.  He was very happy

14   or very --

15           Suzanne, I'm trying to think of how to say this.

16           He was appreciative because I said the lawyers wanted me

17   to have this conversation.  He was saying, "Y'all didn't have

18   to get my opinion, and I appreciate that," so he was extremely

19   appreciative that we at least asked him.

20           And he said that what's fair to him may not be fair to

21   everybody else, something like that.  And so he recognizes that

22   trying to accommodate him might not be fair for everybody.  I

23   don't know if we get anymore clarity from that conversation.

24           Here's my thought, and this is -- and I know y'all don't

25   like this idea.  You know, when you have -- I have a RICO case

1   coming up, and it's a case where I have 50-something defendants

2   who's part one of one of these Aryan Brotherhood groups that

3   was running meth out of Russellville.  And they were from

4   California, and they moved to Arkansas so they could set up on

5   I-40 and run meth between California and the East Coast.

6        And now I say, "Aryan Brotherhood groups."  It's a funny

7   thing, although they were -- it's like 55 people, so it's

8   not -- they're not all part of the same group.  They're

9   different groups that came together.  So one little part of the

10  group is supposedly part of the Aryan Brotherhood or the Aryan

11  something.  But it seems like, every time they walk in the

12  courtroom, they have black girlfriends or black half brothers

13  or whatever.  So I don't really know.  You know, you get these

14  names, and then you see everybody that has black friends and

15  stuff with them in the courtroom, and it makes you wonder what

16  is going on.

17       But in that case, we will end up trying maybe 30

18  defendants, because a lot of them are pleading guilty.  One is

19  the one I took the plea on yesterday.  But that case is

20  supposed to last maybe a month.  And so I started thinking

21  about what is our schedule going to be like for a month if you

22  have 12 jurors, 14 jurors, or how many do we have because we

23  need alternates.

24       Am I really going to make those people come into the

25  courtroom and take a month out of their lives to try this case

1    straight?  And the likelihood is no, what we'll probably do is

2    we have some weeks where we don't go the entire week to allow

3    people to have some semblance of a life through that.  So I

4    started thinking about that last night.

5        So I wanted to know from Estell what time -- what day next

6    week he's getting back.  Because if we didn't come on Monday

7    and Tuesday and we came back and started back up on Wednesday,

8    I don't think that's that bad.  But he said he's going to be

9    gone until next Friday.  His trip is scheduled from Saturday to

10   Friday.

11       So then I started thinking, if we were all going to

12   reconvene Monday to continue on with the trial, anyway, why

13   don't we just convene the next Monday.  Now, that puts a week

14   in between the time we recess and the time we start back up.

15   And I don't know if the lawyers would object to that, and I

16   don't know if any of the other jurors have other things they

17   are obligated for, but they didn't tell us that in jury

18   selection.

19       It may be that we recess tomorrow.  Instead of coming back

20   on Monday, we come back the next Monday.  That's just something

21   for you to chew on, and I know you don't -- from the

22   plaintiff's perspective is we put on our case, and it's going

23   to go put a week between the time they heard our evidence and

24   the time we come back.

25       You know, those are just thoughts.  I think those thoughts

1    are better than mistrying the case, because I think that guy is
2    going to be on that plane Saturday.  And I did mention that we
3    had thought about maybe flying him down a couple days later,
4    and he said, "Judge, I'm supposed to be proposing this
5    weekend."  And so that didn't -- he didn't say, "No," but that
6    didn't seem to be an option, so --
7              MR. ZAVITSANOS:  Your Honor, I have a couple of
8    thoughts here.  First, I think both sides very much appreciate
9    you doing this, and I know how much it's weighing on you, and I
10   know it's -- as much as it is weighing on us, it's probably
11   ten-fold with you.
12             THE COURT:  I just don't want to try it again.
13             MR. ZAVITSANOS:  Yeah.  No.  Of course.  Of course.
14   So a couple of thoughts, Your Honor.  You know, we had talked
15   about the idea of maybe proceeding to trial on Saturday and
16   paying for this gentleman to leave on Sunday.  That's still
17   part of the weekend.  And we would not -- we would not want or
18   recommend or suggest about where, you know, how it was
19   arranged.  We can split it.  I mean, gosh, we'll pay, and you
20   can tell him we split it.  I don't really care.  We just don't
21   want a mistrial.
22        The second thing I would say is we've been talking about
23   this on our side.  I have substantially cut down what we're
24   going to do.  I had planned to go about a half a day with
25   Mr. Ryan.  It's going to be considerably shorter.  The other

1    thing I will say is, you know, you said we put on our case

2    yesterday; well, they put on their case yesterday as well.  I

3    mean, the issues are out there, and as Your Honor knows, from

4    having tried more cases than anybody in the courtroom here as a

5    judge --

6              THE COURT:  I don't think that's true.

7              MR. ZAVITSANOS:  Well, I think --

8              THE COURT:  I looked at some of your bios, and I

9    think some of you have tried many more cases than I did.

10             MR. ZAVITSANOS:  Well, then I'll just speak for

11   myself.

12             THE COURT:  I always read the bios of the lawyers in

13   the courtroom.

14             MR. ZAVITSANOS:  So two things that are always true

15   with me:  I always underestimate how long the first witness is

16   going to be, and I always overestimate how long the trial is

17   going to be, because the one thing that I know jurors get

18   extremely irritated by is repetition.  They hate that.  And I

19   know my colleague over here, she's an excellent trial lawyer.

20   She knows that as well.

21        And so what I'm saying is I think there is -- as long

22   as -- as long as nobody is deliberately dragging their feet,

23   which I don't think she will -- or I don't think they will.

24   There is a chance we can finish tomorrow.

25             THE COURT:  We're going to be pushing up to the last

1   moment to see what happens.  I don't think --

2            MR. ZAVITSANOS:  Yeah -- no.  I think --

3            THE COURT:  We can see what happens.  But I don't

4   think we're going to call it quits today and go home.  We're

5   going to keep moving, and we'll see where we are tomorrow.

6            MR. ZAVITSANOS:  So I have a suggestion.  If we could

7   maybe cut lunch today to 30 minutes and go to 6:30, Your Honor,

8   we will -- we will get done tomorrow as long as we don't have

9   this perpetual thing of bunch conferences and we're not trying

10  to drag our feet and constant motions for mistrials and all of

11  this stuff, I mean, we can get this done.  We can get this

12  done.

13      I commit to you -- I mean, we've eliminated even more

14  witnesses.  I mean, we are pairing it down because I think now

15  they got the issues.  They understand where the dilemma is and

16  whatever gaps are left, I'm going to cover with Mr. Ryan today.

17  I've been anxiously waiting for that, these little gap fillers.

18  And then once that's done, I think all the issues are out

19  there.  And after that it's -- so I think we can get this done

20  by tomorrow if we can work late tonight.

21      And in the alternative, if, maybe, we could, maybe,

22  arrange to have this gentleman go out on Sunday, it's not --

23  it's not particularly appealing to us to wait a week because,

24  you know, when you're in the zone and you're thinking about it

25  and it's in front of you, you have a lot more clarity than you

1  go back to your other life, you got all of this other stuff
2  that's accumulated while you've been out, and you block this
3  out of your mind.
4          THE COURT:  I understand.
5          MR. ZAVITSANOS:  I mean, if that's what we have to
6  do, that's what we're going to do.  And I would rather have
7  that than a mistrial, but that would be a distant, distant
8  third.
9          THE COURT:  What I would not do is rush either side
10  and put on your cases.  And I haven't done it so far.
11          MR. ZAVITSANOS:  No, of course not.
12          THE COURT:  Hold on.  And because never would I want
13  a client to look at the lawyer at some point and say, "Why
14  didn't you put on this?"  And I know how that goes.  And, you
15  know, as lawyers sometimes, we make decisions to pare down
16  cases and do things, and then that's good when you're in the
17  heat of battle, but when the clients have been depending on how
18  the case turns out, it always looks beautiful if you get a
19  different result.
20      But if you don't get a good result then the client says,
21  "Why didn't you do this?" -- because I've had it happen.  And I
22  can try to explain a million times that that little piece of
23  evidence you thought was so important was really not relevant.
24  But that's not what we have here.
25      And so what I'm not going to do is force the plaintiffs to

1    say, "Let's push out all of this stuff that we would have put
2    in," and I'm not going to tell the defendant that you're not
3    going to have time to put on your case and risk either one of
4    you having to face your clients and say, "We were trying to
5    rush it, and the result we got was not due to us paring down
6    the case."
7        And I just won't do that.
8            MR. ZAVITSANOS:  No.  I understand that.  And, Your
9    Honor -- and I'm not suggesting in any way, shape, or form that
10   the Court is doing that.  In fact, quite the opposite.
11           THE COURT:  No.
12           MR. ZAVITSANOS:  What I'm telling the Court is we are
13   consciously making a decision to do that.  Not only because --
14   not only because -- well, I'll just be candid not only because
15   we want to get this trial done, but we're feeling pretty good
16   right now.
17           THE COURT:  I understand.
18           MR. ZAVITSANOS:  And so I don't want to keep
19   repeating ourselves.
20           THE COURT:  Okay.  Ms. Pruitt?
21           MS. PRUITT:  Your Honor, first, I don't think -- the
22   Court can do what the Court chooses to do, obviously, and we'll
23   respect it and abide by it.
24       But asking this young man to go even a day later when he's
25   got a proposal weekend planned is -- and I haven't read the

1    transcript, of course, Judge, but it could affect the

2    deliberations and how he feels about specific parties.

3         And our strategy decisions and what we make strategic

4    decisions about in putting on our case, you know, what we

5    decide to do and how we decide to do it, he could see that and

6    view that as, you know -- and we get the brunt of it.  And I --

7    so I think that's not a good option.

8         The other option -- and by the way, Judge, the Court knows

9    I think that I'm not going to intentionally drag things out,

10   but it's clear that, you know -- and I know the Court knows

11   this.  We're going to do exactly what we think we need to do.

12   And I am not going to play games, but I am going to spend the

13   time that I need to put in all the additional documents I want

14   to, to talk about them.  And that was done with this witness

15   here for two solid days.

16        And Mr. Cady tried to examine him and did relatively

17   quickly, and there were tons of objections.  And I am not

18   complaining about any of that.  That is part of trial.  To

19   suggest that all of a sudden today it's going to change and

20   we're going to be quick and we're not going to have to have

21   bench conferences, Your Honor, we still have a lot of evidence

22   to come in.  And we still have to talk about a lot of things.

23        And so I hate to sound like a pessimist, but I don't think

24   that there is any way we can get finished.  There is directed

25   verdict motions.  There's all kinds of things.  And it's just,

1  in my humble opinion, it's not going to happen.  So to suggest
2  that we work through 6:30 tonight just to see if we can get it
3  done is -- I mean, we -- I think the Court needs to consider
4  what that looks like, how that feels to this jury if they're
5  going to have to come back.
6          THE COURT:  Let me say this -- I don't meant to cut
7  you off.  I was talking to -- I think it was Suzanne or maybe
8  my court clerk.  I think it's my clerk.  And I said, "Well, you
9  know, I don't see a way to get finished tomorrow, even if we go
10  almost around the clock.  I just don't see it."
11         And so the question is do we stay late and do all of these
12  things, because I had this conversation, if we know we're
13  coming back?  And I almost think we take the opposite tact that
14  now we know or we kind of see the writing on the wall, we start
15  adjusting how we put on the evidence and not adjusting how but
16  adjusting the schedule to be one where we know we're coming
17  back.
18         And I say this -- and I mean this for real.  If this were
19  a criminal case, there is no way I would come back later.  If
20  this were a products liability case or a case involving a lot
21  of passion or a case where I thought the jury might want to go
22  to the scene and take a look at it or do independent research,
23  I wouldn't do it because the more time you take off the more
24  time it gives them to start looking around checking on things.
25         I don't know where they go to try to find out about this

```
1    contract.  I think everything they can find about this contract
2    and about the agreements of the parties and what that agreement
3    meant is right here.  And so I think this is -- if you're going
4    to have a case, if you give a jury a little time or recess the
5    jury and bring them back, this would be that type of case,
6    because everything they can learn about this will be here.
7         And I don't think just going on the exchange -- I guess
8    they could go on the exchange and see how everything looks, but
9    I don't see them doing that.
10         MS. PRUITT:  Judge, we are -- as the Court knows, our
11    position is the Court is going to have to mistry the case,
12    because even coming back -- I am not arguing with the Court.  I
13    am just stating our position.
14         THE COURT:  I understand.
15         MS. PRUITT:  Even coming back with a week in between,
16    it's going to affect strategy decisions.  And before the
17    witnesses even get on the stand today, there is some strategic
18    calls that need to be made by my client and the lawyers
19    representing my client.
20         So we would like to know what is going to happen.  We
21    think that given everything that's happened with mistrials that
22    we've asked for up to this point -- and we'll be filing a paper
23    after we see the transcript.  And we think that is the remedy.
24    And I know that the Court --
25         THE COURT:  You know, I am resistant to a mistrial.
```

```
 1            MS. PRUITT:  But the prejudice to the defendants to
 2   chop -- to carry it over is that we're going to have to change
 3   strategic decisions that I and Counsel have already made if we
 4   come back a week.  And the Court had mentioned today and said
 5   the jurors hadn't said anything about conflicts.  But we aren't
 6   telling them we're going to be in the third week, you know,
 7   when we were talking.  So I am not saying that they do.
 8        But it would be our position that either thing is
 9   prejudicial.  The first one -- particularly, about a personal
10   situation, I just can't see that is much of an option.  The
11   second one is prejudicial and especially in light of the fact
12   that we've already raised these other issues on mistrial, Your
13   Honor, and it's not disrespectful to the Court --
14            THE COURT:  No.
15            MS. PRUITT:  -- or the Court's thoughts about how it
16   should be handled.  Of course, you know that.  But it is going
17   to affect certain things in the trial if there is a delay a
18   week.
19            MR. ZAVITSANOS:  Your Honor --
20            MS. PRUITT:  It is prejudicial.
21            MR. ZAVITSANOS:  -- very briefly -- very briefly,
22   Your Honor, non-repetitive.  I promise.  Okay.  Three things,
23   first, if you go with option three, which is to reset us, there
24   is no doubt about it that hurts the plaintiff and only the
25   plaintiff, because they had forgotten what they heard from us
```

1    and then we come in and they put on the defendant's case.

2    That's point one.

3        Point two, I would request that you would ask this juror

4    about moving it to Sunday, you know, at least make the offer as

5    gently as possible and see if he's amenable to that.  I didn't

6    understand Your Honor to suggest that he was drawing a line in

7    the sand.

8        The third thing I will say and -- Your Honor, there is --

9    there is a lot going on in the background, and there is

10   national --

11           THE COURT:  There are always issues.

12           MR. ZAVITSANOS:  And there is a national tug-of-war

13   going on right now between insurance companies and Celtic

14   providers.  This case here -- this is ground zero.  This is the

15   tip of the dispute.  This is the first case in the country to

16   go to trial.  Now, it's not as -- it's not going to have quite

17   the ripple effect that we thought because of Your Honor's

18   ruling.  It's just a contract case now.  But everybody's

19   monitoring this case.

20       The other thing I will say is our doctors' group has

21   spent, I think, somewhere in the order of -- I don't know -- $3

22   million -- $2 to $3 million on this case.  Judge, this is -- I

23   mean, we are hemorrhaging here.  We've got to get this case

24   done.

25       And, finally, I'm a little anxious just continuing to talk

1    about it here.  I know that, if the parties wanted to get it

2    done and get all the evidence in and try a good case, I know we

3    can get it done by close of business tomorrow if we can work

4    late tonight.  I know it.  Okay?  I mean, look, Ms. Pruitt has

5    been through a lot of trials, and repetition is the death knell

6    for a party.  No doubt about it.  Jurors hate that.

7        And we're not going to be repetitive today.  We're going

8    to move at a very brisk pace.  You are going to see it.  It's

9    going to be a like a turnstile up there.  And, you know, what I

10   am hearing, this is constant request for a mistrial because,

11   like I said, there's a lot going on in the background.

12       So I would like to press forward.  I would like to get the

13   jury in here.  I know Mr. -- my friend here has a request here,

14   a one-point exhibit that we need to take up, but I would like

15   to press on, work late tonight, and let's see if we can get it

16   done.

17           MS. PRUITT:  Your Honor, I want to put on the record

18   the suggestion and implication or the inference is that I have

19   some corporate -- as he suggested yesterday, improperly to the

20   witness, "Because St. Louis told you to do it?"  Number 1,

21   there is no evidence of that.

22       But, Number 2, that is not entering into my "me" factor of

23   this.  We don't have somebody out here telling us what to do.

24       I made those motions for a mistrial, Your Honor, because

25   of behavior and because of what happened just prior to me

1    making those motions.  And I don't want -- I want to get
2    finished.  My client wants to get finished.  But I can't just
3    let all of that go by just to get finished, and I am not going
4    to.
5        And I know the Court doesn't expect me to, but to suggest
6    that we're -- because this is a "big case," which we can debate
7    about whether that is going to have any impact at all on these
8    other cases they filed.
9        But this is a trial.  And we attack it issue by issue, and
10    I know the Court will continue to do that.
11            THE COURT:  Let's say this just so everybody in the
12    courtroom knows this.  One of Ms. Pruitt's law partners, or
13    former law partners, was one of my mentors.  I worked with the
14    Mitchell Williams firm trying cases, in Blytheville trying
15    cases.  And I would never believe -- Ms. Pruitt, you don't have
16    to stand here -- and the record Counsel is making, never take
17    that as though I am going to be swayed to believe you are doing
18    anything improper.
19        Baxter Drennon is from my hometown.  I've known him and
20    his family for years.  I've worked with Wright, Lindsey &
21    Jennings in practice trying cases.  Great law firm.  Some Of
22    the most honorable people.  In fact, one of the young
23    associates over there was one of my law clerks, Deviate.  Love
24    him to death.
25        There is nothing -- there is nothing you could say about

1    Baxter or any of his people or anything that would lead me to
2    believe they are trying to do something wrong.
3        I know these folks.  You don't ever have to -- now, you
4    can make a record on it.  So if the Eighth Circuit is looking
5    at it on a cold sheet of paper.  No, no, no.
6        Here's what I understand.  This is a case where there is a
7    lot on the line.  Not only the relationship, the money that
8    plaintiff's claim is owed, but the future relationship.  What
9    the rate is going to be going forward, and I think that is
10   probably the bigger issue in all of this.
11               MR. ZAVITSANOS:  Yes.
12               THE COURT:  You know, what -- how are we going to get
13   reimbursed?  How will our people get reimbursed from this point
14   forward?  You know, I get the defense could always say to SEP,
15   "We don't want to use you again."  Maybe they're not in a
16   position to say that, you know, because SEP provides good
17   service and they have wanted to keep them in-network.
18       And I don't think all these -- or I don't think any of
19   that -- or has been on the record and put in evidence, but I am
20   looking at it, and there is more here than just $9 million that
21   plaintiff claims is owed.  It's the future.
22               MR. ZAVITSANOS:  Right.
23               THE COURT:  I get all of that.  And so with all of
24   that comes -- and these are honest disputes.  I can tell what
25   you my take on all of this is, but I'll keep it to myself.

1   These are honest disputes.  That's why they're hard fought;

2   right?  If they weren't honest disputes, they wouldn't be so

3   hard fought -

4           MR. ZAVITSANOS:  Right.

5           THE COURT:  -- because somebody would fold, and you

6   could sell it.  These are one of the cases you can try.  The

7   question is how do we get through this.  I am new to the case.

8   I don't know every little fact in the case.  But I think we

9   push through.  We push through today.

10          Neither side wants to recess where we can come back, but I

11  think, when you look at it broadly, what is best for everybody?

12  I think it's the best thing for everybody to finish this -- to

13  finish.

14          MR. ZAVITSANOS:  Yep.

15          THE COURT:  Now, do we finish Saturday?  I disagree

16  with you Mr. "Z" on one thing.  I am not sure we get through

17  with one extra day.  Maybe we do.

18          MR. ZAVITSANOS:  Oh, absolutely

19          THE COURT:  I don't know if that is absolutely.  I

20  can't -- and if I were to bring this jury back in on Saturday

21  and then we not finish, then who knows.  And I am not going to

22  force the defendant to get on a fast schedule, moving the case.

23          MS. PRUITT:  Your Honor, let's just take this

24  scenario.  What if you go back and talk to this gentleman and

25  he reluctantly changes everything, flies out, misses the first

1   day of when he was going to propose to his girlfriend, and then

2   we don't finish, and he has to come back again?  Now, we just

3   can't do that.

4           THE COURT:  I think at that point I would not bring

5   them back.

6           MS. PRUITT:  And --

7           THE COURT:  And if we -- I would not bring the jury

8   back after going into the weekend.

9           MS. PRUITT:  And so I think that, you know, we'll

10  read the transcript.  Would appreciate the Court giving us time

11  to do so.  It is we object and don't think another conversation

12  with this person that would potentially create even more stress

13  about his situation and put more pressure on him is

14  appropriate.  I mean, the Court, I know, talked to him like the

15  Court thought you needed to and read his body language, which

16  you're very good at.

17          THE COURT:  Read the transcript.  You might say,

18  "Judge, you said too much.  But let's read the transcript

19  first."  And let's get moving.

20          MR. ZAVITSANOS:  Yeah.

21          THE COURT:  Last word?

22          MR. ZAVITSANOS:  No, Your Honor.  Let's go.

23          THE COURT:  Mr. Drennon?

24          MR. ZAVITSANOS:  The only request is let's go a

25  little bit today.

1          THE COURT:  Let's see what it looks like.

2          MS. PRUITT:  Your Honor?

3          THE COURT:  I'm sorry.  Let Ms. Pruitt finish, and

4    then Mr. Drennon.

5          MS. HENRY:  Your Honor, before you bring the jury in,

6    can we have a few minutes to consult about a couple of issues

7    regarding this discussion?

8          THE COURT:  Yes.  But Mr. Drennon has an issue he

9    has.  Have you shared it with them?

10         MR. DRENNON:  Well, sort of.  I think it will be

11   brief.  Your Honor, before the trial started, the parties

12   agreed that we would try to provide 24 hours' notice on

13   witnesses.  Yesterday, at noon, I let opposing Counsel know

14   that our plan for today was Mr. Ryan, Ms. Suggs, and

15   Mr. Bristow.

16         Whenever we finished last night, we had a brief

17   conversation as we were walking back.  We attempted to change

18   the order, let Counsel know we would like to start with

19   Ms. Suggs, primarily -- well, we want to get through her, but

20   we also -- there is also an exhibit that she is the person who

21   can lay the appropriate foundation for.  Counsel is going to

22   hold us to our 24 hours.  That's fine.

23         But the exhibit, we would like under Rule 104 for the

24   Court to take notice that it will come in through Ms. Suggs,

25   after Mr. Ryan's testimony, and allow it to be used with

1   Mr. Ryan.  The exhibit for reference is plaintiff's 28.  It is

2   an e-mail to Ms. Suggs with the PowerPoint where Ms. Suggs was

3   a speaker twice during the meeting.  She's got about ten action

4   items that were assigned to her.

5              THE COURT:  You want to use that in the examination

6   and show it to the jury?

7              MR. DRENNON:  Correct.  And 104 would allow the Court

8   to do that, and then we'll get it fully admitted through

9   Ms. Suggs after that.

10             THE COURT:  Yeah.

11             MR. ZAVITSANOS:  Your Honor, we would want to use it

12  with Mr. Ryan.  You can conditionally admit it, subject to

13  foundation later.

14             THE COURT:  Mr. Talley, what is your position on it?

15             MR. TALLEY:  I am going to consult real fast with

16  Mr. Cady if that's okay, Judge.

17             MR. CADY:  Your Honor, this is a PowerPoint that's

18  attached to an e-mail chain that Mr. Ryan is not on.  Mr. Ryan

19  is not mentioned in the PowerPoint.  I see don't see how it

20  could be used with him.

21             MR. ZAVITSANOS:  He's the president.

22             THE COURT:  And what they're saying is that Ms. Suggs

23  would have laid the foundation for it; right?

24             MR. DRENNON:  Correct.  And if they want to have her

25  come up first, we're glad to take it that way.  But since we

1    had an agreement and they want to hold us to that, on the

2    24 hours, we're okay with doing it.

3              THE COURT:  If Ms. Suggs can lay the foundation for

4    the document, I would let them use it with Mr. Ryan.  I mean,

5    it won't be received into evidence.  But he can be asked about

6    the exhibit.  And if he knows something about it, he can

7    testify to it.  Or if he doesn't, he'll say, "I don't know

8    anything about that."

9              MR. TALLEY:  I think that's right, Judge.  You handle

10   it like any other piece of paper.

11             THE COURT:  Yes.

12             MR. ZAVITSANOS:  Well, no.

13             THE COURT:  Yeah.

14             MR. TALLEY:  Make them lay a foundation and see what

15   happens and --

16             THE COURT:  What they want to do is they want to

17   publish it to the jury, let the jury follow along.

18             MR. ZAVITSANOS:  Right.  That's right.

19             THE COURT:  And their position is have Ms. Suggs come

20   up and testify an hour earlier.  It would be in evidence.  And

21   they can show it to the jury and let the jury see what it is.

22   And she can lay the foundation for it.  I don't know that she

23   can --

24             MR. ZAVITSANOS:  She can.

25             THE COURT:  But if she can, I think I will let them

1    show it to Mr. Ryan and talk about it.  And I think I would let
2    them show it to the jury, and I just won't receive it into
3    evidence until --
4            MS. PRUITT:  Your Honor, the thing that I would say
5    is I learned something new in every single trial.  Under 104, I
6    get that 104 might allow a witness to talk about a document.
7    But if the document doesn't come into evidence and the jury has
8    handled it and read it and looked at it, does 104 allow the
9    Court -- and I'm asking because I still --
10           THE COURT:  Yeah.
11           MS. PRUITT:  -- learn something in every trial.  Does
12   104 allow the Court to let it be published?
13           THE COURT:  Typically -- typically, I would not allow
14   something to be published to the jury unless it has been
15   received into evidence.  In the circumstance like this, where I
16   have a witness who is going to come in and lay the foundation
17   for it, unless there is the thought that the person cannot do
18   it -- well, hold on just a second.
19       I would allow it to be put up on the screen and published
20   to allow them to go through it with Mr. Ryan.  I just wouldn't
21   receive it in evidence.  And if Ms. Suggs ultimately cannot lay
22   the foundation for it.  I will instruct the jury that that
23   document that we looked at is not going to be received into
24   evidence and you have to disregard it.  And I know -- and I
25   know parties always blame the juries -- the juries cannot

1    disregard what they've already seen.  But if I instruct them to
2    and say, "Look, that document was not received in evidence, and
3    you cannot consider it in your deliberations" --
4            MR. TALLEY:  And I guess, Judge, the concern that we
5    would have about using that document with Mr. Ryan would be
6    whether or not he can even offer competent testimony on it
7    under Rule 604 because he doesn't have firsthand knowledge of
8    it.
9            THE COURT:  Right.  That's the issue.  That's the
10   rub.  If he -- even if it were in evidence and he doesn't know
11   anything about it and he's asked about it and he says, "I don't
12   know anything about that," then your point is what's the point?
13           MR. TALLEY:  We can't unring the bell.
14           THE COURT:  I can hear it in the air, "He's the
15   president."
16           MR. ZAVITSANOS:  Your Honor --
17           THE COURT:  "He should be bound by these documents
18   that are flowing back and forth in his company."  But I don't
19   know what the document is, if it's -- if it's some e-mails
20   between some people talking about the dollars, then he would
21   have no -- he would not be bound by that document.  If it's a
22   contract offer and acceptance or something like that, then
23   maybe he would be.
24           MR. ZAVITSANOS:  It's the policy of the company for
25   which he is the president, and if he says, "I don't know," that

1   is music to my ears

2          THE COURT:  And when you say, "the policy," are they

3   the written policies of the company, or is it somebody telling

4   somebody else, "This is what our policy is."

5          MR. ZAVITSANOS:  It is a meeting of all of the people

6   involved with the Ambetter product of which he has the P&L

7   responsibility for the State of Arkansas to talk about what the

8   best practices are for that product.  And he has a P&L

9   responsibility for the State of Arkansas for that product.  And

10  he is the president of the company, and Ms. Suggs reports to

11  him.

12         THE COURT:  Okay.  Who is Ms. Suggs?

13         MR. DRENNON:  Ms. Suggs is the vice president of

14  operations.

15         THE COURT:  This would be an area that she did as

16  well.

17         MR. DRENNON:  Your Honor, she was a presenter in

18  this.  It's a February 2014, so six weeks after the

19  implementation of the Ambetter product.  It is a lessons

20  learned post-go live review that discusses lessons learned,

21  best practices, and what they'll do differently going forward.

22         MR. ZAVITSANOS:  And it relates directly to the key

23  issue in this case.  And I'm going to stop there.

24         MR. TALLEY:  One point --

25         THE COURT:  One-hour seminar or something?

1          MR. DRENNON:  Well, I don't know that I recall it a
2    seminar of approximately 30 people.
3          THE COURT:  In the business?  In the company?
4          MR. KILLINGSWORTH:  Yes.
5          MR. DRENNON:  Yes.
6          THE COURT:  In the corporate training?
7          MR. DRENNON:  Correct.
8          MR. TALLEY:  One piece on this document is national
9    in scope.  It's one that covers not just the State of Arkansas,
10   but State of Mississippi, the State of Illinois.  And because
11   of that, I have concerns if Mr. Ryan was not copied on that
12   e-mail, read that document, whether he can be questioned about
13   things he doesn't have personal knowledge on not just within
14   the State of Arkansas, but it might be national in scope.  That
15   gives me concern that the jury could be misled as to his role
16   within Arkansas vis-a-vis things that were going on elsewhere
17   in the country.
18         THE COURT:  If the document were in evidence, he
19   could be asked about it.  And so I think it's reasonable for
20   him to be asked about it and the things he does know about.  He
21   can say, "This is the role I played."  And the things he
22   doesn't know, he can say, "That's something I didn't deal
23   with," and I think that's how he deals with it.  I will let
24   them use it.  And I understand the question is asking -- you
25   know, and I understand how this case is going to have somebody

1   on the witness stand dealing with something -- or asking about

2   areas that they don't deal with to say.  Have them say, "I

3   don't know."  But I think that is appropriate, and he'll just

4   have to say what he knows and what he doesn't know.

5            MR. TALLEY:  Judge, I think, to the extent that is

6   going to be permitted or they're going to be permitted to use

7   that, I would like to approach the bench and just make a

8   contemporaneous objection to that document being viewed by the

9   jury for the reasons I've already said.

10            THE COURT:  And your objection is made.  I understand

11   that you don't want that document shown to the jury before it's

12   received into evidence.  And, Mr. Talley, like I said, if it's

13   ultimately not received into evidence, I'll instruct the jury

14   that it should not have been shown to them.

15            MR. TALLEY:  So my objection is noted, Your Honor?

16            THE COURT:  It is noted and --

17            MR. TALLEY:  Thank you.

18            THE COURT:  And I'll overrule it so you have a

19   record.

20            MR. TALLEY:  That's all I need.  Thank you, Judge.

21            THE COURT:  Give me five minutes before.

22       (A brief recess was taken.)

23            THE COURT:  Just so we're clear, there's a

24   continuing objection of the use of the exhibit with

25   Mr. Watters.

```
1          (The jury entered the courtroom.)
2               THE COURT:  All right.  You can be seated.  Call your
3    next witness.
4               MR. ZAVITSANOS:  May it please the Court?  Your
5    Honor, we call John Ryan.
6               THE COURT:  Mr. Ryan, come on down.
7          Mr. Ryan, do you swear to tell the truth, the whole truth,
8    and nothing but the truth, so help you God, under penalty of
9    perjury?
10              THE WITNESS:  I'm sorry?
11              THE COURT:  Do you swear to tell the truth --
12              THE WITNESS:  Yes, I will.  I do.
13              THE COURT:  -- the whole truth, and --
14              THE WITNESS:  I do.
15              THE COURT:  -- and nothing but the truth under
16   penalty of perjury?
17              THE WITNESS:  Yes, sir, I do.
18              MR. ZAVITSANOS:  May I proceed, Your Honor?
19              THE COURT:  Yes, sir.
20                         DIRECT EXAMINATION
21   BY MR. ZAVITSANOS:
22   Q.   Good morning, sir.
23   A.   Good morning.
24   Q.   Would you please introduce yourself to the jury?
25   A.   My name is John Ryan.
```

1   Q.   Would you pull the microphone just a little closer?
2   A.   Okay.
3   Q.   Thank you.
4   A.   Is that good?
5   Q.   Yes, sir.
6        And, Mr. Ryan, you are the president of NovaSys Health;
7   right?
8   A.   Correct.  You are the president of Arkansas Health &
9   Wellness; right?
10  A.   Correct.
11  Q.   Which is a dba of Celtic; right?
12  A.   Yes, sir.
13  Q.   And you're also a Centene employee?
14  A.   I am.
15  Q.   Do you have -- do you have a title in your Centene when
16  you wear your Centene hat?
17  A.   I'm the president of the Centene market for Arkansas.
18  Q.   All right.  And you are here wearing three hats at the
19  same time; right?
20  A.   Sure.
21  Q.   Yeah.  I mean, you are the only representative for those
22  three names, those three Centene-related entities --
23  A.   Right.
24  Q.   -- in this courtroom?
25  A.   My primary focus is Arkansas, though, yes.

1   Q.   I understand, sir.  I understand.  But you're here on
2   behalf of the three defendants; right?
3   A.   Yes, sir.
4   Q.   Okay.  And your income is paid by Centene; right?
5   A.   Yes, sir.
6   Q.   That's who's on your W-2?
7   A.   Yes, sir.
8   Q.   And you have been -- you have been the president of this
9   NovaSys Health entity, which we're going to talk about in just
10   a minute, the entire time that Centene has had it; right?
11   A.   That is correct.
12   Q.   Okay.  And I think the jury gets this, but the provider
13   network -- the provider network for the Ambetter product on the
14   Arkansas Marketplace is NovaSys Health; right?
15   A.   NovaSys Health Marketplace Network, yes, sir.
16   Q.   Yeah.  NovaSys Health has never been a stand-alone
17   insurance company?
18   A.   That's correct.
19   Q.   Okay.  NovaSys Health, as we saw -- and I don't need to
20   put it back up.  They're the only name identified on the
21   contract; right?
22   A.   Which contract?
23   Q.   The contract, the Exhibit 1 to both exhibit lists, the one
24   at issue in this case.
25   A.   The Letter of Agreement --

```
1    Q.   Yes.
2    A.   -- from 2011?
3    Q.   Yes, sir.  The one with SEP.
4    A.   Yes.
5    Q.   And my apologies.  I didn't mean to talk over you.
6    A.   Okay.
7    Q.   Okay.  All right.  So you're also the president, I think
8    we said, of Arkansas Health & Wellness; right?
9    A.   Yes, sir.
10   Q.   That's the entity that collects the premiums for the
11   insurance; right?
12   A.   That's Celtic Insurance, dba Arkansas Health & Wellness,
13   yes, sir.  That is the insurance company regulating it.
14   Q.   Okay.  So I'm going to ask you one favor.
15   A.   Okay.
16   Q.   I found out that the court reporter is from Chicago [sic],
17   so we've got a little Kumbaya thing going, because I'm from
18   Chicago.
19   A.   Uh-huh.  Chicago, so I get it.
20   Q.   Join the club.
21   A.   Yes.
22   Q.   You can join the club.
23   A.   I can't.  I'm an Arkansas guy.
24   Q.   All right.
25   A.   I get you.
```

1   Q.   So you talk a little bit fast, so I'm going to ask you to
2   just dial it down just a little bit.
3   A.   No a problem.
4   Q.   Because we don't want to -- listen, respectfully, Judge,
5   she's probably the most important person in the courtroom.
6   Okay?
7   A.   Okay.  I understand.
8   Q.   We've got to get a record.
9   A.   Please remind me if I --
10  Q.   No.  It's okay.  It's okay.  I talk fast just as well.
11  We're gonna dial it down a little bit.  Okay?  Thank you very
12  much.
13       And Centene is a national company; right?
14  A.   Yes, sir.
15  Q.   It's a public company; right?
16  A.   Yes, sir.
17  Q.   Now,  I guess, just as a general proposition, Mr. Ryan,
18  you would agree with me it would be wrong to disregard
19  contractual obligations in order to make more money.  That
20  would be wrong; right?
21  A.   On face value, yes.
22  Q.   Okay.  Just as a general matter, you ought to keep your
23  word; right?
24  A.   No question.
25  Q.   All right.  And what I want to do is I want to get a

1   couple -- I want to start with a foundation.  As we go through

2   a couple of things, there may be a little bit of overlap with

3   what we discuss with Mr. Meldrum, but I'm going to cover some

4   areas that we have not covered yet, that I personally think is

5   kind of the key to this case, and I've been waiting to talk to

6   you about it.  Okay?

7   A.   Okay.

8   Q.   So let's start with just -- before we get there, I want to

9   get just some basic understandings.  Because NovaSys Health has

10  never itself been an insurance company, it never had insurance

11  of its own; right?

12  A.   It had members, yes.

13  Q.   Well, NovaSys Health is not an insurance company; right?

14  A.   That's correct.

15  Q.   And an insured is an insured of an insurance company;

16  right?

17  A.   It's a policyholder.

18  Q.   Policyholder.  Okay.  So NovaSys Health did not ever have

19  policyholders that had NovaSys Health insurance; right?

20  A.   Yes, sir.  I think that's fair.

21  Q.   Okay.  And I'm going to refine my question.  It had no

22  policyholders between 2011 and 2013; correct?

23  A.   Yes, sir.

24  Q.   And I can go through the documents if we need to.  But

25  another word for "policyholder" is "member"; right?

1    A.    I don't think the two necessarily equate 100 percent

2    equally.

3    Q.    Well, huh, let's take a look.  A policyholder is someone

4    that is entitled to receive covered services under the

5    insurance products; right?

6    A.    I would agree with that.

7    Q.    Okay.  And let's go to Exhibit 19, Page 2, please.  This

8    is the deemer contract.

9          And you know what I mean by that; right?

10   A.    I do.

11   Q.    That's a -- that's not my term.  That is a term that y'all

12   use; right?

13   A.    It is an industry standard term.

14   Q.    Okay.  So Exhibit 19, Michelle, Page 2.

15         Your Honor, are we on?

16             THE COURTROOM DEPUTY:  It should be on.

17             THE COURT:  We show that it is on here.

18             MR. ZAVITSANOS:  There we go.

19         Okay.  Michelle, will you please pull out the bottom

20   third, please?

21   Q.    Now, this is -- this is this deemer contract.

22         Michelle, highlight "member," please.

23         And do you see "member"?

24         All the way through, please.

25         That's the way y'all define "member" in the deemer

1    contract?

2    A.    Okay.

3    Q.    Okay.  And I just asked you if a policyholder is someone

4    entitled to receive covered services, and you said, "Yes";

5    right?

6    A.    Right.

7    Q.    And that's the same as "member" at least here; right?

8    A.    Okay.  In your context, yes.

9    Q.    Okay.  Next point.

10         Okay.  You can take it down, Michelle.

11         Today, after 2013, NovaSys Health doesn't have any

12   policyholders or members like this from 2014 to the present;

13   right?

14   A.    I believe that's correct, yes.

15   Q.    Okay.  You can take it down, please, Michelle.  Thank you.

16         Okay.  All right.  Next point.  Let's put up Exhibit 1,

17   please, Page 1.

18         This is the contract with SEP.  Okay?

19   A.    Yes, sir.

20   Q.    And let's pull out the top third, please, Michelle.

21         Now, yesterday, we spent some time talking with your vice

22   president -- and how long have y'all worked together?

23   A.    Probably 15-plus years.

24   Q.    15-plus years.  Okay.  So, yesterday, we spoke with your

25   vice president about --

1          In Number 1, Michelle, just highlight "NovaSys Health" in
2     the second line.
3          We talked to him --
4          Not "member," not "member."  Tighten it up just a little
5     bit.  Thank you.  Okay.  Thanks, Michelle.  Thank you very
6     much.
7          Okay.  So, yesterday, we spent some time talking to him
8     about what NovaSys Health was and whether it was limited to a
9     product or not, and you saw that; right?
10    A.   Yes, sir.
11    Q.   Now, what I did not ask him -- and I've been waiting for
12    you -- is the other part of the sentence --
13         Close this out and highlight "member."
14         -- the word "members."  Okay?
15         Keep that open.  Number 1, I want you to highlight the
16    word "members" in the second sentence -- there you go.  Thanks,
17    Michelle.
18         Okay.  Do you see that?
19    A.   Yes, sir.
20    Q.   Okay.  So I have not asked any questions about that or you
21    haven't heard any questions about that -- about that -- what
22    that means; right?
23    A.   Well, we didn't -- I guess there was a lot of conversation
24    about NovaSys Health members.
25    Q.   Okay.  Well, I thought I was asking about NovaSys Health.

```
 1  Now, I want to ask about members.
 2       Can we agree that Exhibit 1 does not define what a member
 3  is?  There is no definition.
 4  A.   I would agree with that.
 5  Q.   And remember, yesterday, I kept talking about defined
 6  terms?
 7  A.   I do remember that.
 8  Q.   Right?  Maybe it's a little confusing.
 9  A.   No.
10  Q.   But a defined term is when you use a word and you don't
11  want to keep repeating the long thing that goes with it.  You
12  capitalize the first letter, and that's a shorthand way of
13  identifying that thing; right?
14  A.   Okay.
15  Q.   Like, for example, they make fun of me because I still use
16  AOL e-mail, okay, you know, with the -- the dial up (noise).
17  You know that?
18  A.   I am familiar with that, yes.
19  Q.   Yes, sir.  Okay.  So AOL is a defined term for America
20  Online.
21  A.   I think I remember that.
22  Q.   Are you with me?
23  A.   I think I remember that.
24  Q.   Okay.  So "members" in the contract is not defined; right?
25  A.   By your reference to a capitalized "M," I think, is what
```

1    you mean.

2    Q.    No, no.  If we go through -- if the jury goes through the

3    contract, they're not going to find any definition of the word

4    "member."

5    A.    Okay.

6    Q.    All right?

7          Michelle, we can take that down, please.  Thank you.

8          Okay.  Next, NovaSys Health -- oh, by the way, would you

9    do me a favor?  If I ask you a question and if you agree with

10   it, would you tell me, "Yes"; if you disagree with it, tell me,

11   "No" --

12   A.    Yes.

13   Q.    -- as opposed to "Okay," because sometimes "Okay" can

14   be -- can be interpreted like I just -- I understand what

15   you're saying.

16   A.    Yes.

17   Q.    Okay.  Thank you, sir.

18         So we agree "members" is not defined in the contract?

19   A.    Yes.

20   Q.    Okay.  Thank you, sir.

21         Next, NovaSys Health, what that is, among other things, is

22   it's a series of networks for Centene products; right?

23   A.    Which time period are we referring to?

24   Q.    Well, it's also a third party administrator and all of

25   that.  But one of the things that NovaSys Health does is have a

1   series of networks for Centene products; right?

2   A.   A series of networks for the products in this market, yes.

3   Q.   Okay.  Yes.  Fair.

4        Okay.  So NovaSys Health -- and that was true before 2013

5   and after 2013.  After 2014, it had a network, a series of

6   networks; right?

7   A.   Yes, sir.

8   Q.   Okay.  So I'm going to put "NovaSys Health was and is a

9   series of networks for Centene products."

10       Okay.  Now, the other thing -- and I think you answered

11  this earlier, but let me just put it up on the board.  NovaSys

12  Health is not itself an insurance company.

13  A.   That's correct.

14  Q.   Okay.  All right.  Okay.  So now that we've laid out the

15  rules of the road, let's see if we can make some sense of this.

16       Now, see, Michelle is always a step ahead of me.  She

17  knows exactly where I'm going.  Pull out, please, Michelle, the

18  top third, including Section 1.

19       Okay.  So y'all are the ones that wrote this contract;

20  right?

21  A.   Yes, sir.

22  Q.   Okay.  And I'm guessing, as you've sat in this courtroom,

23  Mr. Ryan, as a senior officer for two entities and a senior

24  person for Centene -- I'm guessing one of the thoughts that has

25  come across your mind is, you know, if only we had been a

1    little more specific with this LOA and limited it to certain

2    products and defined who the members were, then we wouldn't

3    have this misunderstanding.

4    A.    I didn't have that specific thought but --

5    Q.    You can see that; right?

6    A.    I tend to gravitate to the timing of this and what was

7    prevalent in the marketplace.  I didn't really think that

8    specifically about that.

9    Q.    Well, I understand, and I'm going to get to that a little

10   later.

11   A.    Okay.

12   Q.    But right now, just sitting here, are you telling the jury

13   that the thought, while you're sitting over there, hearing the

14   testimony -- the thought hasn't crossed your mind, you know,

15   just in retrospect, you know, we're always trying to get better

16   with hind -- with the benefit of hindsight, I wish we would

17   have defined what products we were saying, and I wish we would

18   have defined who the members were.

19   A.    No.  I understand what you're saying.  I think my thought

20   pattern was that -- or I know my thought pattern was that this

21   was the applicable contract for the applicable products.

22   Q.    Of course, nobody disputes that.

23   A.    Yeah.  I think that was really my general thinking.

24   Q.    Yes, sir.  Mr. Ryan, you and I agree on that 100 percent.

25   A.    Okay.

1   Q.   Now, where we have the disagreement is about what it

2   means; right?  Right?

3   A.   Yes.

4   Q.   It's kind of like a ouija board a little bit; right?  Two

5   people may get different interpretations; right?

6   A.   I would agree with that.  And we need to figure out

7   whether or not, by a preponderance of the evidence, by

8   51 percent, okay, our interpretation makes more sense.  We've

9   got to figure that out.  Okay?

10  A.   Okay.

11  Q.   That's what we're doing here; right?

12  A.   Yes.

13  Q.   And so I am going to ask you one more time, as you have

14  sat here, okay, "Yes" or "No":  Has the thought ever entered

15  your mind over the last two days, I wish I would have defined

16  what products; I wish we would have defined the members so that

17  we wouldn't have to do this?  Has that thought crossed your

18  mind even one time during the past two days?

19  A.   That specific thought, no.

20  Q.   Now,  let's -- Michelle, let's put up, please, Exhibit 1

21  next to -- Exhibit 1, Page 1, next to Exhibit 19, Page 2.

22       Okay.  Now, the one on the left is the only contract that

23  we know for sure both parties signed; right?

24  A.   Yes, sir.

25  Q.   And the one on the right is the deemer contract that

1  you've gotten all of these other -- all of these other practice

2  groups to sign; right?

3  A.   Correct.  It was mailed to the other providers, yes.

4  Q.   So, Michelle, would you, please, pull out Section 1 on the

5  left?

6       Okay.  And then -- oh, look at that.  You know, I could

7  have had a V8.  I just saw something for the first time right

8  now.  So we're going to -- we're going to make it a little bit

9  bigger than I thought.

10       So, Michelle, will you please pull out 1.2 down to the end

11  of "member."

12       Okay.  Now, what Michelle has put up on the top is -- is

13  the --

14       Michelle, will you highlight the word "member" on the top,

15  highlight the words "defined terms" in 1.2, and highlight the

16  word "member" below?

17       Okay.  The one on the top, the word "member" is not a

18  defined term; right?

19  A.   Yes, sir.

20  Q.   That means all members because -- right?

21  A.   For that contract, yes.

22  Q.   Yeah.  All members.  So whatever this means, if NovaSys

23  Health is not limited to a particular product, then all members

24  fall under this definition; right?

25  A.   Again, for that product.

1   Q.   For that product.  Well, it's not limited to that product.
2   It doesn't say that; right?  We covered this yesterday; right?
3   A.   Fair enough.
4   Q.   Okay.  And below, remember, I kept talking about defined
5   terms; right?
6   A.   I do.
7   Q.   You defined what "defined terms" means; right?
8   A.   Yes, sir.
9   Q.   And a defined term is "All capitalized terms not
10   specifically defined in this amendment will have the meanings
11   given to such terms in the agreement."
12        Now, "member" is in the deemer contract a defined term;
13   right?
14   A.   Right.
15   Q.   And in the deemer contract, it is limited --
16        Michelle, highlight
17        -- to covered services.
18        Do you see that?
19   A.   I do.
20   Q.   And "covered services" itself is a defined term; right?
21   A.   Yes, sir.
22   Q.   Covered services in the deemer contract -- highlight
23   "covered services" -- no.  Yeah.  Right there.
24        Covered services is the Ambetter product, insurance under
25   the Ambetter product; right?

1    A.    For that agreement, yes.

2    Q.    Okay.  So let's summarize.  So in the deemer contract, a

3    doctor signing this contract would know that "member" means

4    only Ambetter members; right?  You've defined it to mean that;

5    right?

6    A.    I think it says that in the header of the agreement, yes.

7    Q.    And one thing we know about Centene is it has excellent,

8    excellent lawyers that work for the company in its legal

9    department; right?  Among the best in the country; right?

10   A.    I haven't worked with all of them, but I've worked with

11   some, and they tend to be good.

12   Q.    Right.  And because y'all hire the best -- you hire the

13   best people?

14   A.    That would be a goal, to hire best employees no matter

15   where you are.

16   Q.    Sure.  I mean, like the lawyers you have here.  You hired

17   among the best.

18   A.    Fantastic.

19   Q.    Right.  Okay.  So your lawyers helped with both

20   agreements; right?

21   A.    I mean, this is run by legal before it goes out; right,

22   typically?

23   A.    In general, I would say that's the case.

24   Q.    Okay.  So let me make sure I understand what we're talking

25   about here now.  We're not going to focus on this part.  That

```
 1   is already in the can, as they say.  Okay.  I want to focus on
 2   members.
 3        When this contract, the LOA, the one at Exhibit 1, the one
 4   at issue in this case --
 5   A.   Yes, sir.
 6   Q.   -- when it cleared legal and y'all submitted it to SEP,
 7   "members" was not a defined term.  And according to you, it
 8   meant anybody here (indicating); right?
 9   A.   The only thing I would clarify is the process and the
10   statement of how you said it.  Would it be clear?  You're
11   assuming, because I wasn't involved directly in that agreement
12   so --
13   Q.   Yeah.  Right.  And NovaSys Health is not -- NovaSys Health
14   is a series of networks for Centene products; right?
15   A.   NovaSys Health is a series of networks for Arkansas
16   products, yes.
17   Q.   Okay.  So the members of the series of networks for
18   Centene products, if you get treated by one of their -- a
19   doctor that is in-network that has one of those agreements up
20   at the top, that doctor --
21        Highlight 75 percent --
22        -- should be entitled to rely on this contract and expect
23   75 percent of billed charges; right?
24   A.   I wouldn't characterize it that way, no.  We jump from
25   members to reimbursement here, and I am a little confused with
```

1    your reference between the two.

2    Q.   You are confused about this (indicating)?

3    A.   No.  Just your question.

4    Q.   That sentence has 18 words in it.  Does that sentence

5    confuse you?

6    A.   No, sir.

7    Q.   Okay.  So, Mr. Ryan, once again, the members, which is not

8    defined, which is everybody, how do -- is everybody in this

9    series of networks for Centene products -- if they get treated

10   by Dr. Thompson, he gets 75 percent of billed charges?

11   A.   For that time frame, yes.

12   Q.   At that time frame?  Okay.  Well, that's -- okay.  You're

13   throwing a hook at me.

14        Is there a limitation in this contract that cuts it off

15   after a certain time?

16   A.   Not for that network, no.

17   Q.   For that network?

18   A.   The 2011 Letter of Agreement, yes.

19   Q.   Well, is there a limitation, like we have in the deemer

20   contract, that limits it to one network?  Do we have that in

21   our contract, sir?

22   A.   No, sir.

23   Q.   Okay.  So I want to ask you again -- as I'm asking you

24   these questions right now, has the thought entered your mind,

25   you know, he's got a point there; I kind of wish we would have

1  defined it?

2       Has that thought entered your mind as I'm talking, as the

3  words are coming out of my mouth right now?

4  A.   No, sir.

5  Q.   So -- and, operationally, the problem here is that you

6  tried, with a slight of hand, to get us to sign one of these,

7  and pigs and hogs, we didn't.

8       And, voila, drops from the sky, we got this contract at

9  75 percent after the lawsuit was filed; right, sir?  You tried

10  to get us to sign the deemer agreement; right?

11  A.   We sent it to you in 2013.

12  Q.   Yes, sir.  And you wanted us to sign that; right, sir?

13  A.   I wanted all providers to sign it.

14  Q.   And what happened is --

15       Take it down, Michelle.  Let's put 1 back up.

16       What happened, as I understand it, the way y'all do

17  business -- my wife spends a lot of money.  Okay?  She likes to

18  shop.  So she got in some thing where they send her -- she

19  signed up for something -- I don't know -- some kind of makeup

20  thing, and they sent some kind of facial cream to her, and it

21  was like $200 facial cream, which is ridiculous, ridiculous,

22  but it cost $10.

23       But the hook was, okay, it got ya on this mailing list,

24  and they just kept, you know, mailing you this stuff; right?

25       So I just want to ask you something, kind of like the

1   facial cream --

2         If you can pull out, Michelle, the bottom third.  Yeah.

3         What happened here, Mr. Ryan, was it was always your

4   intent that this is like that $10 bottle of facial cream, that

5   I just mentioned -- your intent, when this was signed, is that

6   this would be a temporary agreement; right?  Interim agreement,

7   this would be an interim agreement; right?

8   A.    I couldn't speak to whether or not it was that intent or

9   specifically for this agreement.

10  Q.    Do you remember giving a deposition?

11  A.    I do.

12  Q.    Yeah.

13  A.    Yeah.

14  Q.    And you told me -- actually, you told Ms. Henry --

15  A.    Uh-huh.

16        MR. ZAVITSANOS:  Okay.  Thank you for asking this

17  question.

18  Q.    You told her that the plan was this would be an interim

19  agreement.  Remember that?

20  A.    Generally, letter of agreements are something that is

21  temporary.

22  Q.    Okay.  So let's see how this works.  Okay?  How y'all do

23  business.

24        Highlight Number 6, Michelle.

25        So is this what happened, Mr. Ryan?  I just want to know.

1   Yes or no.  Is what happened:  You gave us the $10 facial
2   cream, we're getting 75 percent, you get us in your network,
3   and then the plan was terminate it at some point down the road
4   and tell us, "Well, now that you're in-network, if you want to
5   stay in-network, you've got to sign this deemer agreement"?
6   A.    No.
7   Q.    You've got to pay $200 now for the facial cream.
8   A.    No.
9   Q.    Is that what the plan was?
10  A.    I understand your question.  No, that was not the plan.
11  Q.    It wasn't the plan.  But it was the plan that these were
12  interim agreements, these LOAs; right?
13  A.    In general, that is their purpose.
14  Q.    Yeah.  And an interim agreement is not any less
15  enforceable than a full agreement; right?
16  A.    I think that's -- I think that's fair.
17  Q.    It's binding; right?
18  A.    Yes, sir, it is.
19  Q.    Okay.  Like -- you know like when you -- you ever buy a
20  house?
21  A.    I have.
22  Q.    Okay.  So when my wife and I bought our house, we had to
23  sign -- you know, you make an offer, and you sign this, like,
24  two-page deal, and then you go to the title company, and then
25  you got this stack of stuff -- and they won't even let you read

1  it.  It's just like sign away.  Okay?

2  A.   Okay.

3  Q.   Well, that two-page deal that you sign, before you go to

4  the title company, that's a binding deal; right?

5  A.   I think that's the offer letter; right?

6  Q.   Yeah.  And if it's accepted, now you have a contract;

7  right?

8  A.   I think that's right.

9  Q.   Right.  And so -- and what happened was, not only did it

10 slip through the cracks here, it kind of slipped through the

11 cracks there.  And then when you realized that it slipped

12 through the cracks, you tried to hide it; right?

13 A.   I don't agree with that characterization but --

14 Q.   Well, will you agree with me that, if you got two cracks

15 in the sidewalk and they slipped in both cracks, one over here,

16 one over there, it's still 100 percent enforceable?

17 A.   I agree.

18 Q.   Whether you knew it or not; right?

19 A.   I think I agree, yes.

20 Q.   Okay.  Now --

21      (A discussion was held off the record.)

22 BY MR. ZAVITSANOS:

23 Q.   Mr. Killingsworth has literally memorized every exhibit.

24 A.   I'm sorry?

25 Q.   Mr. Killingsworth has literally memorized every exhibit.

1    A.    That's pretty impressive.

2    Q.    I'm telling ya I would be lost -- I would be lost without

3    him.

4          Okay.  So let's talk about -- let's talk about the way

5    Ambetter deals with these contracts and its contracting

6    philosophy in Arkansas and other places, but in Arkansas.  So

7    one of the things y'all like to do is -- the plan, the goal is

8    to get everybody on these deemer contracts; right?

9    A.    We want a complete network, yes.

10   Q.    And, in fact, and like most -- when you've got a

11   good-sized company, like TeamHealth or like -- like y'all, like

12   Centene, okay, sometimes it's hard for people in one office,

13   say in St. Louis, to know what other folks in Arkansas are

14   doing or other states; right?

15   A.    That's fair.

16   Q.    And so, occasionally, y'all will have meetings where you

17   get together and you want the message and the plan and the

18   objectives of the company coordinated; right?

19   A.    Okay.

20   Q.    Right.

21   A.    Yes.  All right.

22   Q.    For example, like McDonald's.

23   A.    Uh-huh.

24   Q.    McDonald's is a -- they franchise these so individuals own

25   the McDonald's, but the one thing McDonald's is, like, adamant

```
1    about is that, if you go into a McDonald's in Little Rock, you
2    should expect the same thing, the exact same quality as if you
3    go to Beijing; right?
4    A.    I would assume, yes.
5    Q.    Okay.
6    A.    I haven't been to Beijing but --
7    Q.    Sure.  And so the same thing is true with y'all, with
8    Centene.  You want your policies and your practices to be true
9    in Little Rock, in St. Louis, in Chicago, and other places;
10   right?
11   A.    That would be a goal, yes.
12   Q.    Okay.  And you get together and you try to come up with
13   best practices; right?
14   A.    Yes.
15   Q.    Here's what -- here's the areas of improvement, and here's
16   how we can get to the best practice to make this even better
17   for the company; right?
18   A.    I don't think it makes it better just for the company, but
19   best practice for the product, for the member, the provider,
20   the whole experience, yes, sir.
21   Q.    Sure.  And for the provider.  I'm glad you threw that in.
22         So the best practices are for the providers, too; right?
23   That's the doctors.
24   A.    And customers, yes, sir.
25   Q.    That's because -- I mean, let's be clear, you care about
```

1   the doctors?

2   A.   Certainly.

3   Q.   Right.  I mean, you are looking out for them.  You want

4   what's best for them; right?

5   A.   Sure.

6   Q.   Okay.  So let's put up -- let's put up Exhibit 28, Page 1.

7   And this is --

8        For identification, Your Honor, this is the one that we

9   discussed earlier.

10            THE COURT:  Okay.

11            MR. ZAVITSANOS:  Yes.  Put it up, please.

12       Now, Michelle, will you, please, pull out the -- all the

13   people that received this?  And I want it down to "importance,"

14   please.  Actually, all the way down to --

15   Q.   Okay.  While she's working on it -- let me just -- I am

16   not sure if the jury can see it.  Let me just identify it.  So

17   this is from somebody named Karen Richardson.

18       Who is that, sir?

19   A.   The bottom e-mail says she's the manager of project

20   implementation.

21   Q.   So -- okay.  She's the manager of product implementation?

22   A.   "Project."

23   Q.   Right.  And it looks like there was a meeting that is

24   coming up, and this is lessons learned.

25       Do you see that?

1    A.   Yes, I do.

2    Q.   And attaches a master dec. for our "lessons learned"

3    meeting tomorrow.

4    A.   Yes, sir, I see that.

5    Q.   And one of the people that received -- first of all, there

6    is a lot of names here; right?

7    A.   Correct.

8    Q.   And these are folks -- these are folks all over the

9    country?

10   A.   Just kind of scanning through it.

11   Q.   Sure.

12   A.   It looks to be in various places.

13   Q.   Yeah, and one of them is Ms. Suggs, Kim Suggs?

14   A.   I do see that.

15   Q.   Second line from the top?

16   A.   Yes, sir, I do see that.

17   Q.   And Ms. Suggs is Arkansas?

18   A.   Yes, she is.

19   Q.   Okay.  So she's in your organization; right?

20   A.   She is.

21   Q.   And we see here -- all right.  There we --

22        Boy, she's good.  Can you go all the way down to the

23   bottom for me, please?  All right.  So, Michelle, will you,

24   please, highlight "Kim Suggs"?  It's the second line.

25        Okay.  I don't want you to cross her out because that's

1    who I want to talk about.  Okay.  Thanks, Michelle.

2         Now, Michelle, will you highlight the date, please?

3         So this is February 2014, and let's orient ourselves.

4    That's on the -- kind of the front end of the ACA; right?  The

5    front end of the implementation of the ACA in Arkansas?

6    A.   Nationwide, but yes.

7    Q.   Okay.  Yes.  Because it was launched in January of 2014,

8    and this is February; right?

9    A.   Yes, sir.

10   Q.   And we see the importance is "high"; right?  Right, sir?

11   A.   Oh, yes.

12   Q.   Most e-mails, the overwhelming majority of the e-mails

13   that you get, do not have importance "high."  Would you agree?

14   A.   I never stopped to measure it, but I wouldn't disagree

15   with you.

16   Q.   Yeah.  "High" means like you're going to the front of the

17   list, and it's, maybe, colored differently, or it's --

18   A.   It has an indication.  I don't know if it goes to the

19   front of the list.

20   Q.   Okay.  Fair enough.  So here's Ms. Richardson, the manager

21   of product implementation.  There is a 314 area code.

22        What is -- is that St. Louis?

23   A.   Yes, sir.

24   Q.   So Ms. Suggs is getting it.  And attached is the master

25   dec. for our --

1       Highlight that.

2       -- lessons learned meeting tomorrow.

3       Do you see that?

4   A.   I do.

5   Q.   Okay.  We will be projecting in the conference room -- so

6   this is like one of these virtual meetings, like everybody is

7   Zooming these days; right?

8   A.   I don't know if it's that painful but, yes.

9   Q.   And have you seen that Saturday Night Live skit about the

10  Zoom, the first Zoom meeting?

11  A.   No, sir.  I don't watch Saturday Night Live that much.

12  Q.   Oh, it's hilarious.  It's very funny.

13      Anyway so -- so anyways -- so we will be projecting.

14      So everybody is participating virtually; right?

15  A.   Right.

16  Q.   So, Michelle, go to the next page.

17      And "Ambetter Post-Go Live Review," do you see that?

18  A.   I do.

19  Q.   So this -- this Post-Go Live Review -- "Post-Go Live," the

20  way this is being used, means, like, for example, President

21  Obama was post-George W. Bush; right?

22  A.   After, yes.

23  Q.   Right.  And President George W. Bush was post-President

24  Clinton; right?

25  A.   Yes, after.

```
1   Q.    It just means "after"; right?
2         Okay.  So this is "Ambetter Post," after, "Go Live" -- "go
3   live" means the launch of the product; right?
4   A.    The beginning.
5   Q.    Right.  And here you are a month and a half after you've
6   gone live with the Ambetter product, and now there is going to
7   be a -- there is going to be a virtual meeting across the
8   country with all of these people, including Ms. Suggs, in your
9   organization for the great State of Arkansas, to review what
10  we're doing right so far and what the goals are; right?  Best
11  practices; right?
12  A.    Yes, sir.
13  Q.    Okay.  So let's now go, Michelle, to the next page.  And
14  will you, please -- yeah, pull out the top one, please.  There
15  you go -- the box.  All the way down.  Right there.
16        Okay.  So the purpose of this meeting is to improve our
17  implementation process -- okay.  Now, here's the part I want to
18  ask you about -- "by identifying" --
19        Underline, Michelle.
20        -- "opportunities for improvement and best practices."
21        Do you see that?
22  A.    I do.
23  Q.    Okay.  You're going to identify opportunities to improve;
24  right?
25  A.    I agree.
```

```
1   Q.   Yes, sir.  And so if we go now to page -- if we go to the
2   Frashier, page, 25 --
3        Pull that out.
4        Okay.  So this is a sample page; right?  "Lessons
5   learned."
6        Highlight that, Michelle, up at the top.
7        "How we will repeat."  And do you see the best practices?
8   This is, like, what we need to be doing repetitively; right?
9   A.   Yes.
10  Q.   And one of the things --
11       "Best practices," highlight that.
12       And one of the things you want to be doing repetitively is
13  you want to continue --
14       Follow me.
15       -- "to leverage" --
16       No.  Right there.
17       -- "deemer amendment process when needed"; right?
18  A.   That's what it says.
19  Q.   "Leverage" means you want to get the most out of it.
20  That's a polite way of saying, "Let's make as much as we can
21  through this deemer process"; right, sir?
22  A.   I don't know that I explicitly interpret it that way.
23  Q.   Well, you've heard of companies that are highly leveraged.
24  A.   I have.
25  Q.   That means they've gone out to try and expand as much as
```

1    possible, usually through debt; right?

2    A.    I think that's right, yes.

3    Q.    And here y'all are using that kind of loosely.  You want

4    to continue to leverage deemer amendment process.  That's

5    getting the doctors on this my-way-or-the-highway amendment

6    that y'all are having doctors across the country sign; right?

7    A.    Again, I am not sure that I, not having seen this

8    document, that I completely agree with your characterization of

9    the intent behind these words.

10   Q.    Well, do you, Mr. Ryan, agree that this is a Centene

11   national policy?

12   A.    Really, it's -- I'm thinking about Arkansas in this

13   context.

14   Q.    Okay.  Arkansas.

15   A.    Yeah.

16   Q.    Let's limit it to the great State of Arkansas.

17        Do you agree this is your objective, as the president and

18   CEO of Arkansas Health & Wellness and NovaSys Health?  This is

19   what you're trying to do, and it is the best practice that you

20   want to do repetitively?

21   A.    It's the way to help build a provider network for the

22   health insurance marketplace, yes.

23   Q.    Is that a "Yes?"

24   A.    Yes.

25   Q.    The problem is, though, if you have a contract that fell

1  in the cracks that doesn't allow you to implement this deemer

2  best practice repetitively, the problem with that is you've got

3  to figure out a way to argue that that contract doesn't apply

4  to the Ambetter product.  That's the objective; right?

5  A.   The objective is to create a provider network for the

6  marketplace product.

7  Q.   The objective in this lawsuit is to convince this jury --

8  you want to convince this jury that this contract does not

9  apply to the Ambetter product; right?

10  A.   That's correct.

11  Q.   Because the Ambetter product has been successful for

12  y'all; right?

13  A.   That's not the reason why.

14  Q.   No.  I understand.  But the Ambetter product has been

15  successful; right?

16  A.   It has been.

17  Q.   Yeah.  And the more you pay the doctors, the less y'all

18  make.  I mean, that's just basic math; right?

19  A.   No.

20  Q.   If you paid all doctors 75 percent of billed charges,

21  would you still make the same amount of money?

22  A.   Well, there is two cost components to figuring medical

23  expenses:  the unit cost and the number of times it gets used.

24  Q.   All else being equal -- yes, I took statistics.  I didn't

25  do very well in it.  But all else being equal, paying the

1   doctors less gets you more; correct?  Sir?

2   A.   We want to have a uniform reimbursement, yes.

3   Q.   Of course, you do.  You want to have a uniform

4   reimbursement.

5   A.   Right.

6   Q.   And that's why this guy right here is a major fly in the

7   ointment.  This guy is a problem; right?  Because if word gets

8   out that you've got emergency room doctors getting 75 percent

9   of billed charges, this house of cards starts tumbling and all

10  of these other groups are going to want more; right?

11  A.   It's possible.

12          MR. ZAVITSANOS:  I'll pass the witness, Your Honor.

13          THE COURT:  Cross-examination.

14          MS. PRUITT:  Your Honor, may we approach?

15          THE COURT:  You may.

16      (A bench conference commenced.)

17          THE COURT:  Yes, ma'am.

18          MR. PRUITT:  We are at a place right now where we

19  need to make some strategic decisions, and I ask the Court -- I

20  would like to know, before we do that and make our decisions,

21  what we're going to do about this other issue, to know our

22  strategy.

23          THE COURT:  The question is defendant has to make

24  some strategic decisions right now and wants to know what am I

25  likely to do with the issue regarding the juror and what is our

```
 1    schedule before they make those decisions.
 2        My preference is to recess court tomorrow, after we go the
 3    day, and come back not the next Monday but the next Monday.
 4    And I have not spoken with the other jurors, so I don't know
 5    what their schedules are, but that is my preference.
 6                MS. PRUITT:  Okay.
 7                THE COURT:  And all things being equal, that is what
 8    I plan to do.
 9                MS. PRUITT:  Okay.
10                THE COURT:  Do you need a few minutes before you
11    start on your Cross-examination?
12                MS. PRUITT:  I just want to make sure to consult with
13    Counsel.  Just a few minutes.
14                THE COURT:  Okay.  All right.
15          (The bench conference concluded.)
16                MR. ZAVITSANOS:  Your Honor, can we be excused for a
17    couple minutes?  Oh, I'm sorry.  Are we on break, or are we not
18    on break?
19                THE COURT:  No.  Counsel is just going to consult
20    with Counsel.
21          If you want a few minutes --
22                MR. ZAVITSANOS:  I just need a comfort break.
23                THE COURT:  Let's do this -- let's take ten minutes.
24    Well, let's do this.  Let's take 15, and let's make this our
25    morning break.  We'll come back and go to lunch when we come
```

1    back.  15 minutes, let's stand down for 15 minutes.

2          MR. ZAVITSANOS:  Very good.  Thank you, Judge.

3       (A brief recess was taken.)

4          THE COURT:  All right.  You can be seated.

5       Ms. Pruitt.

6          MS. PRUITT:  Your Honor, we would reserve the

7    questions that we have for Mr. Ryan for when we get to put on

8    our own proof.

9          THE COURT:  Your case in chief?  Okay.

10         MS. PRUITT:  Yes.

11         THE COURT:  Mr. Ryan, you can stand down.

12      Call your next witness.

13         MR. DRENNON:  Your Honor, the plaintiff calls Kim

14   Suggs.

15         THE COURT:  Okay.

16         MR. TALLEY:  Your Honor, may we approach?

17         THE COURT:  You may.

18      (A bench conference commenced.)

19         MR. TALLEY:  Pursuant to the parties' agreement, the

20   parties informally agreed to provide 24 hours' notice before a

21   witness would be called.  Yesterday afternoon, Mr. Drennon

22   verbally requested that they have Ms. Suggs here in the

23   afternoon.

24         MR. DRENNON:  Your Honor, she's under subpoena.

25         THE COURT:  Hold on.  Hold on just a second.

```
 1              MR. TALLEY:  Which, frankly, earlier in the day, they
 2    said they weren't going to call her today.  They changed their
 3    mind in the afternoon.  As a courtesy, I told Mr. Drennon that
 4    we would make her available tomorrow -- or today in the
 5    afternoon.
 6         Then last night, I get an e-mail from Mr. Leyendecker who
 7    says they want to call her first thing in the morning.  I
 8    explained to Mr. Leyendecker that we would make her available
 9    in the afternoon, pursuant to me and Mr. Drennon's agreement.
10              THE COURT:  She's not here.
11              MR. TALLEY:  She's not here.
12              THE COURT:  How long -- where does she live?  Is she
13    in -- is she local?
14              MR. TALLEY:  She is local.
15              THE COURT:  So let's just get her down here.  That
16    will be fine.  I mean, she knew she was going to testify anyway
17    today so she shouldn't --
18              MR. DRENNON:  She's under an obligation to be here.
19              THE COURT:  We'll bring her on in.  And you don't
20    have another witness you can put on?
21              MR. KENNEDY:  Let me and Judy talk for a second about
22    that.
23              THE COURT:  Well, that's all right.
24              MR. KENNEDY:  We may.
25              THE COURT:  Okay.  I mean --
```

```
1              MR. KENNEDY:  We don't want to waste any time.
2              THE COURT:  Okay.  All right.  Well, let's take a
3    couple sounds, and I'll just sit here.
4              MS. HENRY:  Is she close, Your Honor?
5              MS. PRUITT:  She lives out west, Judy.  Where?  I
6    don't know.
7              MS. HENRY:  "Where is she now?" is my question.
8              THE COURT:  Let's get her on the phone, and just tell
9    her to make a beeline on down here.  And we'll take -- and
10   we'll take it up.  And if you have a witness we can put on now,
11   we'll put that witness on now.  If we don't, I'm going to send
12   the jury to lunch, early lunch.  And bring the jury -- well, I
13   mean --
14             MR. KENNEDY:  I'm sorry, Your Honor.  We don't want
15   to do that.  We don't -- I'm sorry.
16             THE COURT:  No.  I don't want them just sitting
17   around.
18             MR. KENNEDY:  Right.  We're not going to have anybody
19   sitting around,
20             THE COURT:  Yeah.
21             Ms. HENRY:  If we knew where she was right now, it
22   might help us decide whether to put on a witness.
23             THE COURT:  Put on a witness.
24             MR. KENNEDY:  Okay.  We'll --
25             THE COURT:  Make a quick call and let us know.
```

```
1              MR. CADY:  Okay.

2              MS. HENRY:  Thank you.

3              THE COURT:  You're welcome.

4              MR. CADY:  We'll find out where she is, Judge.  Thank

5     you, Judge.

6         (The bench conference concluded.)

7              MR. ZAVITSANOS:  Your Honor, can we have one minute?

8              THE COURT:  Yes.

9              MR. ZAVITSANOS:  We're going to see if we can --

10        (A discussion was held off the record.)

11             MR. ZAVITSANOS:  Judge, we're going to put somebody

12    else.

13             THE COURT:  Okay.  Call your next witness.

14             MS. HENRY:  Your Honor, we call Dr. Stan Thompson.

15             THE COURT:  All right.  Dr. Thompson, would you raise

16    your right hand?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  Do you swear to tell the truth, the whole

19    truth, and nothing but the truth, so help you God or under

20    penalty of perjury?

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  All right.  Take a seat.

23             MS. HENRY:  Does Your Honor have any objection if I

24    bring a bottle of water up here?

25             MR. TALLEY:  Your Honor, before we get started with
```

1    this examination, may we approach?

2              THE COURT:  You may.

3         (A bench conference commenced.)

4              MR. TALLEY:  The defense filed a motion in limine to

5    exclude the testimony of Dr. Thompson.  The Court denied that

6    motion without prejudice.  And at this time defense is going to

7    renew the motion to exclude Dr. Thompson's testimony for the

8    same reasons that we raised in our motion in limine.

9              THE COURT:  And remind me what the reasons were.

10             MR. TALLEY:  Your Honor, Dr. Thompson, respectfully,

11   has no knowledge of this contract.  He admitted in his

12   deposition that he doesn't deal with contracting; rather, other

13   SEP executives do that.  He doesn't have firsthand knowledge of

14   reimbursement issues beyond what he learned from the Complaint

15   in this case.

16        And more fundamentally, Your Honor, what the plaintiff is

17   going to do in this Direct Examination is attempt to cast

18   Dr. Thompson as a guy that works in ER every day, as part of a

19   group of physicians, which is inaccurate.

20        But more importantly, Judge, -- and you saw this during

21   the plaintiff's opening statement -- they're going to argue to

22   the jury about the consequences of this breach of contract

23   action, which is improper.  A party cannot argue the

24   consequences of its verdict.

25        And what they're going to do through Direct Examination is

1     they're going to first elicit a bunch of testimony from

2     Dr. Thompson about how COVID has made it difficult, put

3     challenges on ER doctors, how they're on the front lines.

4              THE COURT:  Let me hear from Ms. Henry on this.

5              MS. HENRY:  Judge, thank you for the chance to speak

6     on this because it is very important to us to have

7     Dr. Thompson.  We heard from the very beginning of this trial

8     that Southeast Emergency Physicians has no physicians.  That is

9     absolutely inaccurate.  Dr. Thompson is one of many physicians

10    who works at Southeast Emergency Physicians and who is in the

11    ER every single day, shift in, shift out, morning, noon, night,

12    weekends.  They have portrayed us as something we are not.

13        They have also raised all kinds of issues in this case to

14    which Dr. Thompson can speak.  This is -- we're hearing a

15    relevancy objection right now as opposed to letting the witness

16    testify and determining in the context whether it's relevant.

17             THE COURT:  Here's the thing.  I don't mind because

18    SEP is a plaintiff.  And I don't mind you putting the Doctor on

19    to put a face on the physicians who are bringing the lawsuit.

20    But like I said with the jury before -- when we were in jury

21    selection, the case is not a referendum on Obamacare.  It is

22    not a referendum on the doctors who provided care and whether

23    you want to help and whether they're out there doing soldiers'

24    work.  It's a contract.

25        I hate to say that emotion and -- well, I don't hate to

1    say it.  Emotion and all of those things that would make me

2    sentimentally either want to be against somebody or for

3    somebody, I am trying to keep as much of that out as I can.  I

4    haven't kept out as much as I probably should have.

5          I just don't want this witness to be used as the good ol'

6    doctor down at the hospital doing God's work who's being

7    screwed.  And if you rule against the plaintiff in this case,

8    this is the guy you're hurting.  That's not the issue.

9          And so I would -- I would grant the motion in limine not

10   to keep him out, because I think he has a right to come in here

11   and testify.  But to the extent we're going into "This is who

12   you're hurting," "This has implications beyond this contract,"

13   this jury needs to focus on what terms apply, did the contract

14   apply, and if it did, what are the damages, and that's it.

15             MS. HENRY:  And, Your Honor, they are challenging the

16   very claims in this case and the validity of those claims based

17   on work that is being done by Dr. Thompson and others, and they

18   can speak to the underlying 12,500-plus claims in the case and

19   the validity of those as well as the services that underlie

20   those claims.  They've challenged that.

21             THE COURT:  Ms. Henry, I think the testimony we've

22   heard so far is that the defendants agree that the plaintiffs

23   provided the service.  They paid them for the services.

24   Plaintiff's position is "But you screwed me."  I hate to say it

25   like that, but I'm just going to put it laymen's term.  But you

1  screwed me.  You didn't pay me what you were supposed to pay

2  me.  But the validity of the services provided is not at issue

3  here.

4           MR. KENNEDY:  Do you remember Mr. Cady said that --

5  in opening statement that they're challenging --

6           MS. HENRY:  Uh-huh, right.

7           MR. KENNEDY:  -- that we upcoded?  In other words, we

8  provided X service, and we billed for Y service.  That is why

9  this testimony is so important.  He's challenging that we are

10 billing the right price.

11          THE COURT:  Okay.  So you are saying that the

12 defense, that they billed for services that they weren't --

13 because we haven't heard evidence of it yet.  All we had was

14 opening statement.

15          MR. KENNEDY:  Yeah.

16          THE COURT:  That the defense, that there are services

17 that they charged for that were improperly charged --

18          MR. KENNEDY:  Right.

19          MS. HENRY:  That's right.

20          THE COURT:  -- or should not have been charged.

21          MR. TALLEY:  Well, Judge, respectfully, that opens a

22 whole 'nother can of worms.  And Dr. Thompson is going to get

23 up here and offer opinion testimony about claims and medical

24 services that he did not, himself, provide.

25     If he is going to do that, I think he should have been

1    designated as somebody who was going to be offering opinion
2    testimony and provide a report or a disclosure pursuant to
3    Rule 26, that is required.
4         So to the extent he is going to be offering opinion
5    testimony on the stand, we extremely object to that, because
6    they haven't provided disclosures that are required under Rule
7    26.
8              MS. HENRY:  He is not testifying as an expert, Your
9    Honor.  He has factual background and information that support
10   the claims in the case.  And the Court has told us repeatedly
11   that the claims at issue and the damages in the case are the
12   focus of the case.  And he has information on that.
13        I suggest to the Court, let's get him on.  Let's ask the
14   questions.  If they don't like a particular question, they can
15   object.  We'll stand back.  You decide whether it comes in or
16   not, and we'll move on.  Either he answers the question, or we
17   move to the next topic.
18             THE COURT:  But he's saying he's going to prove
19   damages.  Is he?
20             MS. HENRY:  He is not going to go prove up damages,
21   but he is going to prove the factual background that supports
22   the claims in the case which support the damages.
23             THE COURT:  Let me ask you:  When you say, "factual
24   background," factual background would be more -- would be the
25   stuff we've been hearing so far about the negotiations and all

1  of that.  I think he's going to testify to providing medical

2  services.  I haven't heard.  I don't know what he's going to

3  say, and I haven't read his deposition.

4      But I would imagine that his testimony is going to be,

5  "Look, this is what we do.  And we contracted, or we" -- but I

6  don't know that he can say that.  I am sure he can.  He will

7  say, "This is what we do in the emergency room."

8      I don't know beyond that what he provides that is relevant

9  to the case.  That would be very quick testimony.  But I'll

10 probably sustain the objection to anything that would just be

11 to get some sentiment of the jury.  And so I haven't heard his

12 testimony.  I don't know what he's going to say.  And I think

13 we put him on.  But if he starts going down the path of trying

14 to get the jury to be sentimental to his position, I'm probably

15 going to cut him off.  I'll just let you know that now.

16          MS. HENRY:  Okay.

17          THE COURT:  Okay.  All right.  And anything else we

18 need to take up?

19          MR. TALLEY:  I think that's it, Judge.

20          THE COURT:  And who is going to examine him for the

21 defendant?

22          MR. TALLEY:  I will.

23          THE COURT:  Okay.  All right.

24          MS. PRUITT:  We're letting the youngster do it.

25          THE COURT:  Okay.  I can't see his testimony being

1   very long, though, considering that he's one of the physicians

2   providing services that he can tell "This is the services we

3   provide."

4                  MR. TALLEY:  Beyond that, Judge --

5                  THE COURT:  In all of the facilities here in the

6   state that generated the claims in this case that they're

7   attacking.

8                  MR. TALLEY:  The second Dr. Thompson is trying to

9   prove up damages on their behalf, Your Honor.  We're going to

10  have to be back right up here at the bench.

11                 THE COURT:  Well, I think you just make your

12  objection, and I think, if he's going down that path, I can

13  sustain it without a bunch of conversation here.  Okay.

14                 MR. TALLEY:  Thank you, Judge.

15            (The bench conference concluded.)

16                 THE WITNESS:  Do I come on up?

17                 THE COURT:  Yes, sir.

18                 MS. HENRY:  May it please the Court --

19                 THE COURT:  Yes.

20                 MS. HENRY:  -- and jury?

21                          DIRECT EXAMINATION

22  BY MS. HENRY:

23  Q.   Please state your entire name for the jury, please?

24  A.   Stanley Craig Thompson.

25  Q.   And, Dr. Thompson, what is your relationship to

1   Southeastern Emergency Physicians?

2   A.   I'm an ER physician for SEP.

3   Q.   And do you have another employment relationship with

4   TeamHealth?

5   A.   Yes, ma'am.  I'm the chief clinical officer for the

6   LifePoint division of TeamHealth.

7   Q.   I want the jury to get to know you a little bit more.  So

8   would you give them your professional personal background?

9   A.   Okay.  I was born and raised in Memphis, Tennessee,

10  married, have three kids.  Like I said, I'm the chief clinical

11  officer for the LifePoint division of TeamHealth.  I went to

12  high school, public high school in Memphis, Tennessee,

13  graduated there, went to Jackson State University for my

14  undergrad in Jackson, Mississippi.

15      I then went to medical school at the University of

16  Tennessee College of Medicine in Memphis, Tennessee, came back

17  home.  And then I decided I wanted to do emergency medicine.

18  So I did an emergency medicine residency program at Emory

19  University in Atlanta, Georgia.

20  Q.   Dr. Thompson, you have been sitting in the courtroom for

21  the last three days.  And today is the fourth day of this

22  trial; correct?

23  A.   Yes, ma'am.

24  Q.   And you've heard a lot of testimony, and you just heard

25  testimony from Mr. Ryan, who is the president of at least two

1    of the entities that are defendants the case.

2        Did you hear that testimony?

3    A.   Yes, ma'am.

4    Q.   Can you tell this jury how that testimony made you feel as

5    one of the physicians for Southeastern Emergency Physicians?

6             MR. TALLEY:  Objection, Your Honor.

7             THE COURT:  I'll overrule it.  Let me -- let me hear

8    what he says.  You may.

9             THE WITNESS:  I'm going to tell you a little bit of

10   somewhat of what Mr. Ryan says.  He said he looks out for the

11   members and the providers.  Look at all that has been going on

12   in this trial, this whole week, there is no way he's looking

13   out for my best interests or my partners' or my colleagues'

14   best interests.

15            MS. PRUITT:  Your Honor, may we approach?

16            THE COURT:  You may.

17       (A bench conference commenced.)

18            MR. TALLEY:  Your Honor, we had a lengthy bench

19   conference preceding Dr. Thompson's testimony, which the Court

20   overruled.  The plaintiff was not going to put on Dr. Thompson

21   to put on evidence or testimony about the personal impact of

22   this contract or alleged breach of it.

23       And it took less than two minutes to immediately file that

24   ruling from the bench.  So we object not just for that

25   statement, but we ask that they be stricken for a mistrial

1   again based on the testimony of Dr. Thompson, which violates

2   the Court's ruling from the bench less than ten minutes ago.

3           MS. HENRY:  He didn't --

4           THE COURT:  Hold on, Ms. Henry.

5       Mr. Talley, I don't remember whether Mr. Ryan made the

6   statement that he was looking out for the best interests of the

7   members and --

8           MS. HENRY:  And the providers.

9           THE COURT:  -- and the providers.  I just missed it.

10  The response to that is, no, he's not looking out for my best

11  interests.  I think he can testify to that.

12      Now, the question "How did it make you feel?" the phrasing

13  of the question, you know, "How do you feel about it?" who

14  cares?  But is he looking out for your interests?

15      And the answer to that is "No, I don't think he is."

16  That's a legitimate answer.  I'll let him -- so I'll overrule

17  your objection to that particular answer.

18      And I don't know where he's going from here.  I would tend

19  to believe -- and I don't know how you put on the evidence of

20  this.  The truth is Mr. Ryan's job, as president of this

21  company, is to look out for -- and he's in an arm's length

22  contract.  I don't know if it's his job to look out for the

23  providers other than to keep them on board so that they want to

24  continue to provide services for his members.

25          MR. TALLEY:  And, Judge, I think you can tell from

1    the tenor of the testimony the witness just gave that this is

2    going to be an emotional presentation.

3            THE COURT:  I think it is.

4            MR. TALLEY:  And the Court doesn't want that.

5            THE COURT:  I'll overrule you on the objection to the

6    question just asked.  I'll overrule it, and we'll see what

7    happens from there.

8            MR. TALLEY:  Okay.

9            THE COURT:  Ma'am, Mr. Talley --

10           MS. PRUITT:  Judge, just so you know, I was telling

11   a story --

12           THE COURT:  Hold on.  Let Mr. Talley get here.

13           MS. PRUITT:  When I was in Judge Wilson's court so

14   much -- and, you know, he does not like to be at the bench, and

15   we had to do it with the white noise off to the side.  We would

16   finish our thoughts, and he would turn around and start to walk

17   off.  And when you needed something else on the record, I would

18   go, "Judge Wilson."

19       And the court reporter finally said, "Lyn, do you just

20   want me to stay here?"

21           THE COURT:  "Just stay here."

22           MS. HENRY:  He also moved for a mistrial, and I

23   assume that the objection was overruled or denied.

24           THE COURT:  It was denied for mistrial, yes.

25           MS. HENRY:  I just wanted to make a clear record,

1    Your Honor.  Thank you.

2              THE COURT:  No doubt.  Okay.

3         (The bench conference concluded.)

4              THE COURT:  Doc.

5    BY MS. HENRY:

6    Q.   Dr. Thompson, I wanted to make sure you had completed your

7    answer before we approached the bench.  Did you?

8    A.   I think I did.

9    Q.   You were telling us about your educational background

10   after you went to Jackson State for undergraduate school.  And

11   it's my recall that you studied biology and -- what? -- at

12   Jackson State?

13   A.   I have studied premed biology.  I also had an

14   environmental sciences in there.

15   Q.   And then after you left there, you went to medical school;

16   correct?

17   A.   Yes, ma'am.

18   Q.   So you were an undergraduate for four years?

19   A.   Yes, ma'am.

20   Q.   And then how long was medical school?

21   A.   Four years.

22   Q.   And after your medical school, did you do a residency

23   program?

24   A.   Yes, ma'am.

25   Q.   And how long was the residency program?

1   A.   My emergency medical residency was a three-year program.

2   Q.   Is that a specialty program?

3   A.   Yes, ma'am.

4   Q.   What are some other specialty kinds of programs for

5   residents?

6   A.   I could have chosen to go into general surgery,

7   orthopedics, plastic surgery, dermatology, internal medicine.

8   There is a lot of medical specialties.  But emergency medicine

9   fit me.

10  Q.   So if my math is correct -- and, remember, I'm a lawyer,

11  not a mathematician.

12  A.   Yes, ma'am.

13  Q.   You had 11 years of undergrad, med school, and residency

14  school?

15  A.   That's correct.

16  Q.   Dr. Thompson, while you were in those programs with other

17  students, was it your experience that most of the medical

18  school students, including you, incur a substantial amount of

19  debt while you're in medical school?

20  A.   Oh, yes, ma'am.  You incur debt -- most of us incur debt

21  for our undergrad education as well as our medical school

22  education.

23  Q.   Is it unusual to incur several hundred thousand dollars of

24  indebtedness?

25          MR. TALLEY:  Your Honor, relevance.

```
 1              THE COURT:  I'll sustain -- I'll sustain the
 2   objection as to relevance.
 3   BY MS. HENRY:
 4   Q.   I want the jury to get to know you a little bit better.
 5   Would you talk to them about how you were first employed after
 6   medical school, after your residency program?
 7   A.   So after my residency program and after 11 years, I got a
 8   job, and I started working in the emergency department at
 9   Baptist Memphis in Memphis, Tennessee.
10   Q.   And in what position did you hold or what group did you
11   work in at Baptist Memphis?
12   A.   I can't remember the emergency medicine group.  I think it
13   was Mid South ER Specialists when I first came on.  So when I
14   first joined, I was a line physician for Mid South ER
15   Specialists.  I believe I was.
16   Q.   Did you say "a line physician"?
17   A.   Yes, ma'am, line, L-I-N-E, line physician.
18   Q.   Tell the jury, if you will, please, what is a line
19   physician?
20   A.   Lines, we use that commonly for ER docs.  Line physicians
21   are those guys who show up, clock in, and work the ER.  It's a
22   front line; right?  We're on the front line.
23        So most patients, their first entry into the hospital is
24   through the emergency department.  So we're kind of considered
25   like a frontline providers.
```

1   Q.   When you were at Baptist Memphis, is that when you first

2   became acquainted with SE Physicians, or SEP?

3   A.   Yes, ma'am.  SEP acquired the contract for my old contract

4   group, and I stayed to work with SEP.

5   Q.   In what capacity were you serving when you were employed

6   by SEP in Memphis?

7   A.   So I started out as a line physician with SEP.  And the

8   founder of SEP saw me talking at a meeting and said, "Boy,

9   you've got a leadership ability."

10        And so shortly after that, I became the assistant medical

11  director for the emergency department at Baptist Memphis.

12  Q.   How long have you been the assistant medical director at

13  SEP in Memphis?

14  A.   Four or five years.

15  Q.   Generally, just describe your duties and your supervisory

16  position that you had there with SEP when you first started

17  working with it?

18  A.   So I was still a line physician, so the majority of my

19  responsibilities were still working in the emergency

20  department.  But being assistant medical director, I also

21  assisted the medical director, so I helped with meetings, memos

22  that needed to go out to the doctors.  I would handle any

23  patient grievances that came along.

24        I also would handle the schedule for the docs and the APC.

25  I also would attend committee meetings, and, you know, the

1    cardiology committee, and the surgery committee.  I would

2    attend those meetings to help make sure, you know, we were

3    plugged in and help the emergency department, floor function,

4    so we could help serve the hospital medical staff.

5    Q.    After those years at Baptist in Memphis working with SEP,

6    did you move to another hospital?

7    A.    Yes, ma'am, I did.

8    Q.    To --

9    A.    Sorry, I don't want to overtalk.

10   Q.    Go ahead.

11   A.    So SEP then acquired another contract at a sister facility

12   of Baptist in Southaven, Mississippi, Baptist DeSoto, And I had

13   been the assistant medical director in Memphis, so natural

14   progression became a facility medical director at Baptist

15   DeSoto.

16   Q.    So when you went to Baptist DeSoto, as the medical

17   director there, how many employees did you have under you?

18   A.    As far as the docs?  So we probably -- we started out in a

19   small group.  It was probably eight or ten of us, with maybe

20   four or five APC, the practitioners, the nurse practitioners

21   and P.A.'s.

22        But then the emergency department grew in size, over the

23   years I was there.  It went from, like, a 30,000-volume

24   emergency department to 60.

25        (The court reporter interrupted.)

1       THE WITNESS:  It went from a 30,000-volume emergency

2  department over the years to about a 60-, 70,000-volume

3  emergency department, and so I had to hire more doctors and

4  more APCs.  So at that time, it was probably 25 of us docs and

5  another 12 APCs.

6  Q.   So, Dr. Thompson, you helped grow Southeastern Emergency

7  Physicians in terms of an expansion of the clinical individuals

8  who could serve patients in the ER through its -- through its

9  various facilities?

10  A.   Yes, ma'am, in my role as medical director and then later

11  roles as a regional medical director.

12  Q.   You eventually moved your practice area to the Arkansas

13  area; correct?

14  A.   Yes, ma'am.

15  Q.   Which facilities in Arkansas did you work with SEP?

16  A.   So I became a regional medical director for SEP after I

17  spent ten years as a facility medical director at Baptist

18  DeSoto.  And we -- excuse me.  So that's what gave -- brought

19  me to Arkansas.  And we were -- when I first started, we were

20  overseeing Mercy Hospital in Rogers, Arkansas.  We were

21  overseeing Mercy Hospital in Bella Vista.

22       And then when we started shortly after that, after I

23  started, we started overseeing Baptist NEA in Jonesboro.  And

24  then we started -- that's when we opened the last hospital

25  emergency department was Baptist Crittenden in West Memphis,

1    Arkansas.  So those four as an RMT.

2    Q.   When you were serving in those facilities of Southeastern

3    Emergency Physicians, did you have occasion to continue to help

4    it grow its physician staff at all of those facilities?

5    A.   Yes, ma'am.  I hired -- as regional medical director, one

6    of my responsibilities was to interview and hire and help

7    recruit docs to the individual hospitals.  So while I was

8    there, I probably helped recruit and hired and interviewed more

9    than 15 doctors at those four facilities.

10   Q.   Dr. Thompson, I think that you heard statements in the

11   opening by Mr. Cady on behalf of the Centene insurance

12   companies that Southeastern Emergency Physicians didn't have

13   any employees.

14        Did you hear that?

15   A.   I did hear that.

16   Q.   Is that accurate?

17   A.   No, ma'am, it's not.

18   Q.   Describe to the jury and tell them why that is not

19   accurate.

20   A.   Well, Southeastern Emergency Physicians has clinician

21   employees, such as myself, such as the APCs.  They also have

22   back office employees.  So there's lots of employees at South.

23   Q.   What are APCs?

24   A.   I'm sorry.  APCs are Advanced Practice Clinicians.  So

25   those are the nurse practitioners and the physician assistants

1    that help the docs see the patients in the emergency

2    department.

3    Q.    Dr. Thompson, if I understand correctly, you have a

4    contract with SEP; correct?

5    A.    Yes, ma'am.

6    Q.    And through that contract, you considered yourself to be

7    an employee of Southeastern Emergency Physicians?

8    A.    I do.

9    Q.    Do you know how many employees currently Southeastern

10   Emergency Physicians has at the locations it is serving in

11   Arkansas right now?

12   A.    I don't know the exact number, but it's north of 600.

13   Q.    Let's focus on Arkansas.

14   A.    Okay.

15   Q.    How many at the facilities just in Arkansas?

16   A.    So clinicians --

17   Q.    Yes, sir.

18   A.    -- at those facilities?

19         My last count it was, like, 127 clinicians.

20   Q.    Okay.  And the largest number of clinicians that SE

21   Physicians has in the emergency room, the 600 number you gave,

22   in what areas are those physicians serving?  Is that just

23   limited to Arkansas or beyond Arkansas?

24   A.    No.  SEP is beyond Arkansas.

25   Q.    Dr. Thompson, you heard a couple of other emergency rooms

1   mentioned in the voir dire of this jury, and I want to just

2   push those aside real quickly here.  We heard some comments

3   about emergency rooms at St. Vincent's and UAMS, here in Little

4   Rock.

5       Do you remember that --

6   A.   Yes, ma'am.

7   Q.   -- in the voir dire questions?

8       Do the SE Physicians's physicians staff those particular

9   emergency rooms or emergency departments?

10  A.   No, ma'am, we don't.

11  Q.   You talked about being on the front line as a health care

12  provider.  Was that true for the work that you were doing at

13  Southeastern Emergency Physicians here in Arkansas as well as

14  those in Memphis and Mississippi that you testified about?

15  A.   Yes, ma'am.  I was -- as the regional medical director, I

16  was a line physician at the -- at the four hospitals that I

17  named during that period, Crittenden, NEA, Jonesboro NEA, and

18  Mercy in Rogers, and Mercy in Bella Vista.

19  Q.   Let's talk a little bit about the ER doctors.  You

20  indicated that you had hired several those at the different

21  facilities here in Arkansas, if I understood your testimony?

22  A.   Yes, ma'am.

23  Q.   Were those physicians that worked alongside in the front

24  line in the emergency department?

25  A.   Yes, ma'am.

1  Q.   And were some of those physicians ones that had the same
2  kind of background and training that you had in the
3  emergency -- in your emergency room education?
4  A.   Yes, ma'am.
5  Q.   Are most, if not all, of those ER physicians that have had
6  residencies in specifically ER?
7  A.   Some are.  But some emergency physicians do have
8  residencies in other specialties, typically, family practice or
9  internal medicine.
10 Q.   Does being an emergency room physician require something
11 different than other specialties?
12            MR. TALLEY:  Objection, Your Honor.  Relevance.
13            THE COURT:  I'll overrule it.  I'll let him -- I'll
14 let him answer it.
15            THE WITNESS:  Yes, ma'am.  We're a different breed of
16 doctor.  We are.
17 BY MS. HENRY:
18 Q.   What do you mean by that?
19 A.   So to be in emergency, you've got to sign -- you've got to
20 circle -- bold and circle that says "Yes, I want to work
21 nights.  I want to work weekends.  I want to work holidays.  I
22 want to work 12-hour shifts.  I want to take care of" --
23            MR. TALLEY:  Your Honor, may we approach?
24            THE COURT:  You're objecting to the relevance of the
25 testimony, and I'll sustain the objection.

1          And let me do this, just so the jury understands.  The
2    Doctor works for the organization that's bringing the lawsuit.
3    He has an absolute right to testify and let you know that there
4    are human beings involved in the lawsuit to humanize the case
5    because sometimes a case like this, where you have companies,
6    we tend to stop understanding that you have human beings, like
7    Mr. Ryan and Mr. -- I mean, like Dr. Thompson involved; right?
8          My ruling at the bench was that I'll let him testify and
9    let you know who the plaintiffs are, but I would not let him
10   get into testimony that would elicit any sympathy or your
11   prejudice for or sympathy for.
12         Do you understand what I'm saying?  This is a case about
13   an agreement and what the agreement was and what terms apply.
14   And so ultimately, you need to narrow it down to that point.
15         So the objection was, when the doctor starts telling you
16   about the life he lives, that I have to keep the lawsuit back
17   over here, keep the trial back over here to what we are arguing
18   on.
19         Do you understand?  And so the objection to that line of
20   testimony is sustained.
21   BY MS. HENRY:
22   Q.   Dr. Thompson, you are aware of that there are thousands
23   and thousands of claims in dispute in this case; correct?
24   A.   Yes, ma'am.
25   Q.   For the period of time that those claims were generated

1    from 2014 through current, were you serving in the emergency
2    rooms where those claims were being generated?
3    A.    Yes, ma'am.  I was working in those emergency departments
4    during that time period.
5    Q.    And were those colleagues that you mentioned earlier, that
6    you had engaged and were working alongside on the front line --
7    were those serving during that same period of time that these
8    claims were generated?
9    A.    Yes, ma'am.
10   Q.    Dr. Thompson, you've heard testimony that from the
11   insurance companies that -- well, let me -- let me ask you
12   this:  You've heard something mentioned about network adequacy?
13   A.    Yes, ma'am.
14   Q.    Did you hear that?
15   A.    Yes, ma'am.
16   Q.    Do you know -- are you familiar with what the term
17   "network adequacy" means?
18   A.    Yes, ma'am.
19   Q.    Okay.  Tell the jury what you know about network adequacy.
20   A.    So my understanding with network adequacy, if any
21   insurance provider is going to sell insurance to patients, they
22   have to have a certain number of specialties to be an adequate
23   network.  So they have to have cardiologists, surgeons,
24   internists, family practice, and emergency medicine doctors.
25   Q.    Have you seen the network adequacy documents for NovaSys

1  from 2017?

2  A.    I have seen some, yes, ma'am.

3  Q.    And you've heard the testimony from the insurance

4  companies here that they do not believe that the contract at

5  issue applies, and, therefore, in 2017, Southeastern Emergency

6  Physicians was no longer in-network?

7  A.    I did hear that testimony.

8  Q.    And when you looked at those network adequacy documents

9  that the insurance company provided, were you listed -- you,

10 Dr. Thompson, as a physician in-network?

11 A.    Yes, ma'am, I was.

12 Q.    And did you go through it and look and see whether

13 colleagues that you described earlier were also shown

14 in-network?

15 A.    I saw several of my colleagues that were listed that were

16 in-network.

17 Q.    And those are colleagues who worked for Southeastern

18 Emergency Physicians specifically; correct?

19 A.    Yes, ma'am.

20 Q.    And so based on your description of what network adequacy

21 was, are you telling this jury that, even though the insurance

22 companies now claim you were out-of-network, they were showing

23 you in-network as their physician provider --

24 A.    Yes.

25 Q.    -- available to the insureds?

1   A.   They were showing me as -- me and my colleagues, they were

2   showing us as in-network providers to both the State of

3   Arkansas and to their insureds.

4   Q.   When you say, "the State of Arkansas," why would they be

5   showing you and all of your colleagues who work with

6   Southeastern Emergency Physicians as in-network in their

7   network to the State of Arkansas?

8            MR. TALLEY:  Your Honor, objection.  Speculation.

9            THE COURT:  Overruled.  I'll let him answer that.

10           THE WITNESS:  Makes sense to me.  If I'm going to

11   start an insurance product, I want to show the State of

12   Arkansas that I have a complete network and that I have

13   emergency physicians in my network.

14       Who would buy insurance with no ER doctor?

15   BY MS. HENRY:

16   Q.   And you're aware that Southeastern Emergency Physicians'

17   physicians brought this lawsuit because the insurance companies

18   were not paying Southeastern Emergency Physicians under the

19   NovaSys contract where you were showing in-network?

20   A.   Yes, ma'am.  They listed me in their network but weren't

21   paying me what was -- the amount that was detailed in the

22   contract.

23   Q.   You mentioned that there were two reasons that you were --

24   or two bases for showing you in-network.  One was to show to

25   the State of Arkansas that the insurance companies had a

1    network that was adequate to get their product approved.

2    A.    Correct.

3    Q.    And the other one was -- I think you said that they were

4    showing it to the insureds, which would ultimately be your

5    patient in the ER; correct?

6    A.    Correct.

7    Q.    Tell the jury what you mean by that.

8    A.    So we were covering those four emergency departments and

9    now two more, so that's six.

10   Q.    Okay.  Where are the other two?

11   A.    The other two -- I'm sorry.  The other two that I cover as

12   a chief clinical officer of LifePoint group, the LifePoint

13   facility, LifePoint health system -- those facilities are in

14   Benton, Arkansas and Russellville, Arkansas.  We obtained the

15   Russellville, Arkansas contract in May of this year, and the

16   Benton contract just as recently as August 1st.

17   Q.    Okay.

18   A.    And so to answer your question, let's just take -- let's

19   go back.  Let's take Jonesboro.  For example, Jonesboro is a

20   pretty nice-sized community in Arkansas.  And if I'm going to

21   buy the Ambetter product, I want to make sure that the doc, the

22   ER doc, at Arkansas are in-network because, if I live in Jones

23   or surrounding communities, that's where I'm going to go to get

24   my emergency care.

25         So if I look in their pamphlet and I see Dr. Stan Thompson

1    and I know Dr. Stan Thompson is one of the ER docs in

2    Jonesboro, then I'm relieved.

3        I can look on the Internet, and I can look up Dr. Stan

4    Thompson, and I can see that he is emergency medicine board

5    certified.  He's been practicing for over 20 years.  Not to pat

6    my back, but I'm going to think that guy is probably a pretty

7    good ER doctor.  So, yeah, this product looks pretty good.

8    Q.   So you were being used by the insurance companies as an

9    in-network physician not only to tell the State of Arkansas

10   that you were to accomplish some goal it wanted, you were also

11   being used in the network manual or provider manual for the

12   insureds so that they could look and see your name and purchase

13   insurance through Celtic; correct?

14   A.   Yes, ma'am.

15   Q.   I want to cover something very important here.  When a

16   patient enters the ER, we've heard a lot about the

17   documentation prior to that.  But let's talk about the

18   documentation when the patient gets to the ER.  Okay?

19   A.   Okay.

20   Q.   Contracts are in place.  You're in there serving.  A

21   patient comes in.  If they are not in a state where they can't

22   complete some sort of paperwork or some preliminary assessment

23   or information, do the patients provide the information to the

24   hospital?

25   A.   Yes, ma'am.  They give that information to the hospital,

1 but it's really not in the doctor's workflow.  We're there to
2 take care of patients.  We go in, and we see the patients, and
3 at some point someone from the hospital comes in and gets their
4 insurance information.  That's not my job.  My job is just to
5 take care of the patients when they get there.
6 Q.   Okay.  So that packet of information that comes into the
7 ER, you typically don't see that unless it is some sort of
8 health assessment; is that correct?
9 A.   No, I don't -- I don't really see the insurance
10 information.  That's handled by the people in the hospital, and
11 then that information is sent to people who work for SEP on the
12 billing side.  And that's how that's taken care of.
13 Q.   Okay.  Is it my understanding or -- my understanding is --
14 and tell me if this is wrong -- that no matter what -- whether
15 a patient presents in the ER with or without insurance, you
16 treat?
17 A.   Yes, ma'am.  That's one of the reasons I went into
18 emergency medicine.  I just can take care of people.  I don't
19 have to worry about whether they have insurance or don't have
20 insurance or not.  I can just take care of patients.
21 Q.   And whether or not a patient can afford to pay or not, you
22 still treat?
23 A.   I still treat.  As a matter of fact, it's the law.
24 Q.   Okay.  You're required to do that?
25 A.   Yeah.  There is a law called EMTALA.  That if a patient

1 shows up to an emergency department, irregardless of ability to

2 pay, we still have to medically screen that patient, treat, and

3 stabilize.  And so it doesn't matter whether they have

4 insurance or not.  Emergency medicine is a safety net for the

5 American health care system.  Send us your ill.  It doesn't

6 matter.

7 Q.   Dr. Thompson, so you just meant -- mentioned TeamHealth,

8 and I think you said, when that packet of information comes in

9 from the patient, they fill out all the forms.  I think you

10 said they might present their insurance information?

11 A.   Yes, ma'am.

12 Q.   Okay.  That packet, I think you said, doesn't pass through

13 your hands, but it goes from the hospital to TeamHealth.  Is

14 that what you said?

15 A.   Yes, ma'am.  It goes to the billing department for

16 TeamHealth.

17 Q.   Okay.  And in that process, have you ever seen one of

18 those files that comes from the hospital that goes to

19 TeamHealth?

20    MR. TALLEY:  Objection, Your Honor.  Foundation.  The

21 witness has said this stuff isn't in his workflow.

22    THE COURT:  Okay.  I'll overrule the question with

23 has he ever seen it, and I'll let him answer that question.

24    MS. HENRY:  Yeah.  Okay.

25 Q.   You can answer.

1    A.    So I am not exactly sure what the packet looks likes that

2    they receive on the TeamHealth side.  Have I looked into

3    insurance information for a patient?  Yes.  Because there may

4    be a medicine I want to give that I need to check to see if

5    it's on their formulary to make sure they can afford it or else

6    I may give another medicine.  I may want to send them to a

7    specialist to follow up with, and I may know or can call and

8    say, "This specialist only takes this insurance," then I need

9    to look at that information.

10       But it's -- but it's really just to help the patient get

11   down the line.  It's not for me.  I don't care whether they

12   have insurance or not.  I'm still going to treat them the same.

13   So, yes, I have seen the insurance information, and they use it

14   electronically or print that out and send it to TeamHealth, but

15   I am not sure I have seen it in the exact form that TeamHealth

16   billing and coding department gets.

17   Q.    So it's one of the benefits, then, you had for working

18   with Southeastern Emergency Physicians?  It sounds like you

19   just get to practice medicine and all the administrative work

20   goes through someone else or to TeamHealth to assist you?

21   A.    Yes, ma'am.  That to be doing work for me or being a line

22   physician working for SEP, they take care of all of that other

23   stuff.  I can just focus on taking care of the folks.

24   Q.    For this period of time from 2014 through current, while

25   you've been serving as a front line health care provider, at

```
1   any time did Southeastern Emergency Physicians tell you that
2   they were not going to honor your contract?
3   A.   No, ma'am.
4            MR. TALLEY:  Objection, Your Honor.  Relevance.
5            THE COURT:  That's sustained.
6   BY MS. HENRY:
7   Q.   We've heard that Southeastern Emergency Physicians and/or
8   TeamHealth is just a billing, coding, staffing, collection
9   company.  Did you hear those statements in the testimony and
10  Mr. Cady's statement several times yesterday that Southeastern
11  Emergency Physicians is just a billing, coding, staffing,
12  collection company?
13  A.   Yes, ma'am, I heard it more than several times.  I think I
14  heard it greater than 20 times.
15  Q.   Is Southeastern Emergency Physicians just a billing,
16  coding, collection, and staffing company?
17  A.   No, ma'am.
18  Q.   Tell the jury what Southeastern Emergency Physicians
19  actually is.
20  A.   Southeastern Emergency Physicians to me, through
21  TeamHealth, I call them a "solutions company."
22  Q.   What do you mean by that ma "solutions company?"
23  A.   It's a solutions company.  We have solutions for
24  hospitals' emergency medicine needs and solutions for emergency
25  medicine clinicians' needs.  There is a ton of stuff that
```

1  Southeast Emergency Physicians provides to hospitals and many

2  of its providers and patients that goes way beyond staffing,

3  billing, and coding.

4  Q.   Describe for the jury -- I think I just heard you say that

5  it provides benefits to you and the other physicians.  Tell the

6  jury what that is, what those benefits are.

7  A.   Yes, ma'am.

8           MR. TALLEY:  Objection, Your Honor.  Relevance.

9           MS. HENRY:  Your Honor, the relevancy is that they

10  have drilled -- tried to drill down to this jury that this is

11  just some sort of administrative company, that all it is is

12  bills, codes; bills, codes, collects; bills, codes, collects.

13  And this witness can speak directly to that.

14           THE COURT:  The question was:  Has SEP provided any

15  benefit to him?  I think his testimony so far has been the

16  benefit provide -- well, I think he's testified that the

17  benefit of being an emergency room physician is that he can

18  just focus on practicing medicine, not worried about all the

19  billing.  Is the question you are asking now linked to that?

20           MS. HENRY:  It is.

21           THE COURT:  That it allows him to practice?

22           MS. HENRY:  It is allows him to -- it frees him up to

23  be an emergency room physician.

24           THE COURT:  Okay.

25           MS. HENRY:  And it's totally contrary to what they

1   portrayed applied.

2          THE COURT:  I will overrule it and allow you answer

3   the question.

4   BY MS. HENRY:

5   Q.   Do you remember the question, Dr. Thompson?

6   A.   Repeat it for me, Ms. Henry.

7   Q.   You testified just a few minutes ago that one of the

8   things that you liked about working with Southeast Emergency

9   Physicians is that it frees you up to practice medicine; right?

10  A.   Correct.

11  Q.   How does it do that?  Describe for us what it -- what

12  Southeastern Emergency Physicians does that allows you to be an

13  ER physician.

14  A.   So for a lot of ER physicians, they literally just have to

15  show up and practice medicine.  They do do all of the billing

16  and the coding, but also, there are other -- many other things

17  that Southeast Emergency Physicians provides to get the doctors

18  to help them to do their job better.

19      We do -- there is continuing medical education.  We have a

20  Zenith online platform that our doctors can access to answer

21  any clinical questions while they're working.  Or if they want

22  to go home and study about anything, they can look that up

23  through SEP through TeamHealth.

24      They provide a leadership training for folks like me who

25  want to become leaders in emergency medicine, be the assistant

1  director or medical director.  They provide leadership training

2  for us.  I could go on and on.

3       Let's take what we're living in right now.  Let's take

4  COVID, for example.  So in COVID-19 --

5            MR. TALLEY:  Your Honor, objection.  Relevance.

6            THE COURT:  I'll sustain the objection to the

7  discussion --

8  BY MS. HENRY:

9  Q.  Can you tell me --

10           THE COURT:  -- to the discussion about the COVID-19.

11  BY MS. HENRY:

12  Q.  Does Southeast Emergency Physicians provide you

13  protection?

14  A.  Yes.

15           MR. TALLEY:  Your Honor, objection.  Going to the

16  same point of personal protective equipment in this day and

17  age.

18           THE COURT:  I'll overrule.  He can answer -- he can

19  answer that question specifically.  You can move on.

20  BY MS. HENRY:

21  Q.  Does Southeast Emergency Physicians provide you -- and

22  when you say "you," I am talking about you broadly, you and

23  your colleagues, your other ER providers.  Does it provide you

24  emergency protection person -- personal protective equipment?

25  A.  Yes, ma'am.

```
1   Q.    PPE?

2   A.    When the pandemic started, we knew a PPE may be in short

3   supply by the insurance company.

4           THE COURT:  I'll sustain the objection.  I think -- I

5   think the jury, if you were to ask them, "Do you understand

6   that these are human beings who practice medicine?" I think you

7   have done a good job of getting us to understand that point.  I

8   will let you move on.

9   BY MS. HENRY:

10  Q.    Dr. Thompson, on the administrative side, because you work

11  with Southeast Physicians, do you have to negotiate your

12  contract with the hospital to go into an ER and serve there?

13  A.    My contract personally as an ER physician?

14  Q.    No.  With the hospital, to go into a hospital.

15  A.    Yes.  Now, to -- for SE Physicians to start delivering

16  emergency care in the hospital, we do have to have contract

17  negotiation between SE and the hospital.

18  Q.    Who handles that?  Do you handle that personally, or does

19  somebody at SEP?

20  A.    I'm on that team, but somebody at SEP.  So because of my

21  role now --

22  Q.    Right.

23  A.    -- I do that.  As a line physician previously, I did not

24  do that.

25  Q.    Okay.  I believe that you indicated you had worked with
```

1    SEP for almost a couple of decades?

2    A.   Yes, ma'am.  Right at 20 years.

3    Q.   And so are you familiar with the mission and vision and

4    values of Southeast Emergency Physicians?

5    A.   Yes, ma'am.  It's pretty simple.  We're there to provide

6    quality care for patients.

7    Q.   Is one of the focuses of Southeast Emergency Physicians

8    rural hospital areas?

9    A.   Yes, ma'am.  We have -- we have a lot of rural emergency

10   departments and hospitals, programs in Southeast divisions.  We

11   just don't stick to the -- to the big cities.

12          My job now, as clinical officer for LifePoint, 100 percent

13   of my emergency departments that I oversee are in rural areas.

14             MR. TALLEY:  Your Honor, may we approach?

15             THE COURT:  Okay.

16        (A bench conference commenced.)

17             MR. TALLEY:  I think we all know where this is going.

18   And it is going to be a suggestion to the jury that absent

19   adequate reimbursement rates or contracting, which is in this

20   case, that threatens the viability of the role of the hospital

21   system.  That's where it's going.

22             MS. HENRY:  That was my last question, Your Honor.

23             THE COURT:  Okay.  Okay.  Hold on a second.

24             MR. TALLEY:  It threatens the viability of the role

25   of the hospital system.

1        MS. HENRY:  He has served in these rural hospital

2  areas, and that is part of the background.  They have portrayed

3  us as something that we are not -- billing, coding, staffing.

4  And that is not what it is.  That is not who has brought the

5  suit.  We are entitled for the jury to know who the plaintiff

6  actually is in the case.  That was my last question --

7        THE COURT:  Okay.

8        MS. HENRY:  -- on the staffing of the hospitals.

9        THE COURT:  Okay.  I will overrule the objection to

10  the question.  There is no need to strike it.  You can move on.

11        MR. TALLEY:  Right.  If she's not going any further,

12  I'll withdraw the objection.  But that was my concern.

13        (The bench conference concluded.)

14  BY MS. HENRY:

15  Q.   Dr. Thompson, I have just one last question for you.

16  A.   Okay.

17  Q.   You have been sitting here through the trial all week.

18  Why was it important to you to come here today and testify on

19  behalf of Southeast Emergency Physicians?

20  A.   Southeast Emergency Physicians was founded by doctors.  I

21  know these are two corporations, but this company was founded

22  by doctors.  And so I'm here as one of the senior clinical

23  leaders in SEP to make sure that the doctors' interest and the

24  clinician's interest is represented.  That's why I'm here,

25  Ms. Henry.

```
 1              MS. HENRY:  Pass the witness.
 2              THE COURT:  Cross-examination?
 3              MR. TALLEY:  If you can give me just a second so I
 4   can set up, Judge?
 5              THE COURT:  Yes.
 6              MR. TALLEY:  Ms. Gardner, I might actually use the
 7   ELMO during this --
 8              THE COURTROOM DEPUTY:  Okay.
 9              MR. TALLEY:  -- and switch back.
10                        CROSS-EXAMINATION
11   BY MR. TALLEY:
12   Q.   Good morning, Dr. Thompson.
13   A.   Good morning.
14   Q.   We actually haven't had the opportunity to kind of
15   formally meet each other.  My name is Graham Talley.  I
16   represent the defendants in the case, along with Ms. Pruitt and
17   Mr. Cady.
18        And I know you've been sitting here for a couple of days
19   listening to testimony, and now you're here on the stand.  And
20   that gives me the opportunity to ask you a few questions, too.
21   Okay?
22   A.   Yes, sir.
23   Q.   Like me, you kind of talk fast.  So we're going to do our
24   best for the court reporter.  So if I'm going -- moving too
25   fast or you can't understand me, will you let me know?
```

1   A.   Yes, sir, I will.

2   Q.   Okay.  I believe you told Ms. Henry a minute ago that you

3   work for an entity called LifePoint; is that right?

4   A.   No, sir, I don't work for LifePoint.

5   Q.   That's a division within TeamHealth?

6   A.   LifePoint division is a division within TeamHealth,

7   correct.

8   Q.   Okay.  And TeamHealth is the larger organization under

9   which Southeast Physicians exist; right?  Southeast Physicians

10  is owned by TeamHealth; is that right?

11  A.   I wouldn't say, "Owned by TeamHealth."  There is the

12  relationship between Southeast Emergency Physicians, and

13  TeamHealth is a business relationship, so I couldn't put it

14  into ownership.

15  Q.   And that's a good point.  One of the things you talked

16  quite a bit with Ms. Henry about was kind of how Southeast

17  Physicians is organized right and how it kind of exists with

18  all the doctors.

19       Do you remember that testimony?

20  A.   Yes, sir.  I remember what I just said, yes.

21  Q.   I think the jury has heard quite a bit that Southeast

22  Physicians is a group of ER docs; fair?

23  A.   Fair.

24  Q.   Okay.  And you just told me a second ago you don't know

25  exactly the ownership relationship with Southeast Physicians

1   and then TeamHealth; right?

2   A.   Correct.

3   Q.   Okay.  You went to medical school in Memphis -- or in

4   Memphis?

5   A.   Yes, sir.

6   Q.   Does that use the UT system?

7   A.   Yes, sir.

8   Q.   They've got their medical school over there in Memphis;

9   right?

10   A.   Correct.

11   Q.   Do you still keep up with some of your friends from

12   medical school?

13   A.   Not a lot.

14   Q.   Okay.  But you probably know a lot of doctors

15   professionally; right?

16   A.   Yes, sir.

17   Q.   And a lot of those doctors practice in groups that they

18   own; right?

19   A.   The ones that aren't in emergency medicine, yes.

20   Q.   Well, you've been in Little Rock for a few days at least;

21   right?

22   A.   Yes, sir.

23   Q.   Have you had the opportunity to drive down I-630, the big

24   interstate in the middle of the city?

25   A.   If I have, I didn't know where -- I GPS'd to my hotel, and

1   I've been here solid for a week.

2   Q.   Fair enough.  I'll tell you that, right there on I-630 at

3   Fairpark by War Memorial Stadium, is a big building.  It's

4   called OrthoArkansas.  Okay?

5   A.   Okay.

6   Q.   OrthoArkansas is probably, as you can guess --

7           MS. HENRY:  Objection.

8   BY MR. TALLEY:

9   Q.   -- a group of physicians.

10           THE COURT:  Mr. Talley?

11           MS. HENRY:  Judge, two objections:  One, relevancy;

12   and the other this is going outside the scope of the Direct

13   Examination.

14           THE COURT:  I will overrule you.  I'll wait to hear

15   what the question is.

16           MR. TALLEY:  I'm getting somewhere, Judge.

17           THE COURT:  Let hear the question.

18   BY MR. TALLEY:

19   Q.   I'll represent to you, Dr. Thompson, that OrthoArkansas is

20   a group of orthopedists.

21   A.   Okay.

22   Q.   Does that make sense?

23   A.   You are teaching me.

24   Q.   Okay.  And that group of orthopedists practice with each

25   other as partners.  Okay?  I'll represent that to you.

```
 1   A.    Okay.
 2   Q.    They are employed by the group that they own.  Okay?
 3   A.    Okay.
 4   Q.    Does that make sense?
 5   A.    Makes sense.
 6   Q.    At the end of the year, as partners in that business, they
 7   share in the profits of it.  Okay?
 8   A.    Okay.
 9   Q.    Is that an arrangement you are familiar with as a result
10   of just knowing other doctors?
11   A.    Yes, I am familiar with that arrangement.
12   Q.    That is a pretty common arrangement in the medical world;
13   right?
14   A.    Correct, especially certain specialties.
15   Q.    Sure.
16             MR. ZAVITSANOS:  Can we approach for a second, Your
17   Honor?
18         (A bench conference commenced.)
19             MR. ZAVITSANOS:  So, Your Honor, look, there is no
20   claim in this case for any kind of corporate practice in
21   medicine counterclaim.
22             THE COURT:  Uh-huh.
23             MR. ZAVITSANOS:  There is no claim in this case that
24   the damages or the liability is affected in the structure.  And
25   there is no -- there is no claim in this case that would affect
```

1    how this company is structured.  It's whether the contract was

2    breached or not and now what the damages are.

3        And now what Counsel is attempting to do is to suggest

4    that these doctors are nothing but worker bees, and the profits

5    are getting siphoned up to someone else.

6              MR. TALLEY:  I am making --

7              THE COURT:  Hold on.

8              MR. ZAVITSANOS:  And -- and -- and -- and this is --

9    again, I talked about this kind of national footprint.  This is

10    kind of an attack on TeamHealth 101.  It has not been

11    successful anywhere, and I know that the ruling -- I know Your

12    Honor is going to make your own decision here.

13              THE COURT:  Oh, no, no.

14              MR. ZAVITSANOS:  But here, this case, the goal posts

15    are much more narrower than in all the other cases because Your

16    Honor has dismissed all of those claims.  So we are now here on

17    a contract claim.  And what is Counsel is trying to do -- hey,

18    look, I get it.  He's trying to neutralize the good feelings

19    people have about doctors; right?

20              THE COURT:  Well, no.  Here's what I thought:  You,

21    of course, want to show the jury that you represent human

22    beings although there is a corporate structure.

23              MR. ZAVITSANOS:  Right.

24              THE COURT:  That behind that, SEP are human beings

25    who are affected.

```
 1              MR. ZAVITSANOS:  Right, right.
 2              THE COURT:  And although whether that means this
 3    contract applies or these terms apply really doesn't matter,
 4    but it's what lawyers have to do to show --
 5              MR. ZAVITSANOS:  Yes, sir.
 6              THE COURT:  -- that there's flesh and bones here.
 7              MR. ZAVITSANOS:  Yes.
 8              THE COURT:  That's what I gathered from Ms. Henry's
 9    examination.  Now, this is a man here.  He went to school, and
10    these people worked hard to get here.  This is who the
11    plaintiffs are.
12        What I gathered from Mr. Talley's cross so far -- and I
13    don't know if you're going to go into the profits are siphoned
14    out of the group.
15              MR. TALLEY:  I am not.
16              THE COURT:  What I gathered from him so far is to say
17    there are two types of structures.  You have the OrthoArkansas
18    structure where everybody owns the practice and they --
19              MR. TALLEY:  And they share in the profits.
20              THE COURT:  And then you have the SEP structure where
21    there is an organization that owns a group of doctors -- not
22    owns a group of doctors -- that employs a group of doctors, and
23    they do the work.
24              MR. TALLEY:  I am drawing a distinction.
25              THE COURT:  And I thought he was just going to make
```

```
1    that point and move on.
2              MR. ZAVITSANOS:  Judge, that which Your Honor just
3    said is the thing I am most concerned about.  And I am going to
4    be objecting like a Mexican jumping bean here, okay, because
5    this is a corporate medicine -- corporate practice of medicine
6    counterclaim, which they do not have in this case -- let me
7    finish, please.
8              MS. PRUITT:  I am.
9              MR. ZAVITSANOS:  And I don't mind, up until the point
10   where Your Honor said -- I don't know how Your Honor put it.
11   Yeah, I mean, there's two kinds of structures.
12             THE COURT:  Yeah.
13             MR. ZAVITSANOS:  That's fine.  That's fair game.  But
14   then to talk about who shares in the profits, who owns what.
15             THE COURT:  Well --
16             MR. ZAVITSANOS:  That is absolutely not relevant.
17             THE COURT:  I don't think he was going there --
18             MR. ZAVITSANOS:  Oh, he was --
19             MS. HENRY:  That's where he was --
20             THE COURT:  -- about who shares in the profits.
21             MR. TALLEY:  I'm going to draw the distinction
22   between a group of physicians or partners of one another as
23   opposed to a group of independent contractors that are not.
24   They've cast themselves as a group of ER docs as if they're
25   Arkansas Urology, and they're not.  That's just not true.
```

```
 1              MR. ZAVITSANOS:  We don't have a consumer practice
 2     claim in this case, Judge, or misrepresentation claim.
 3              THE COURT:  Oh, no.  Hold on.  Hold on.
 4              MS. PRUITT:  Your Honor, when you get through
 5     thinking, I would like to make a point, too.
 6              THE COURT:  I am trying to think of what I drew from
 7     the -- because I normally would be the thirteenth juror, but I
 8     guess I'm a seventh juror now.  And there are no -- I'm seeing
 9     the case for the first time, just like the jury is, and I am
10     trying to think of what my impression of this is.
11          My impression of the testimony that Ms. Henry put on was
12     not -- was to put a face on, but she didn't go that next step
13     of arguing or she didn't go the next step of leading the jury
14     to say that, you know, this is who gets the reward if we --
15              MS. HENRY:  I didn't.
16              THE COURT:  She stopped, and she just said, "We're
17     the ones bringing the case.  We're human beings bringing the
18     case."
19          And I will let you put on the counter that, look,
20     different organizations are set differently, and y'all -- y'all
21     do not own your practice.  But to go the next step of arguing
22     that if -- or putting on evidence or crossing him on, if you
23     win, you don't even get the money.
24              MS. PRUITT:  We wouldn't say that.
25              THE COURT:  I know you wouldn't.
```

```
 1              MR. TALLEY:  No, sir.
 2              THE COURT:  But I mean, to give the impression of
 3    that --
 4              MS. HENRY:  Yes.
 5              THE COURT:  -- I will not let you go that far.
 6              MS. PRUITT:  Your Honor, I want to put on the record
 7    there is another factor that I dealt with the Court, what I
 8    heard this morning.  I heard Mr. Zavitsanos about three times,
 9    was "So that 75 percent of billed charges would be paid to
10    Dr. Thompson.  That 75 percent of billed charges would be paid
11    to Dr. Thompson."
12         He specifically wanted the jury to think that extra money
13    is going to be paid to Dr. Thompson and everybody in his
14    position.
15              THE COURT:  Hold on.  Hold on.  Hold on.
16              MS. PRUITT:  And you cannot do that and not let us
17    cross-exam.
18              THE COURT:  I missed that.  And I missed that.  I
19    might need to look at the record --
20              MS. PRUITT:  I wish you would.
21              THE COURT:  -- to see if that statement was made.
22              MS. PRUITT:  I wish you would.
23              THE COURT:  Because if that statement was made --
24              MR. ZAVITSANOS:  No, I never said that.
25              THE COURT:  Hold on.  That's what I'm saying.  I
```

1    would have to look at the record.

2         MR. ZAVITSANOS:  I never said that.

3         THE COURT:  But it may be that I have to look at the

4    record to see if it was made.

5         How long would it take you to --

6         This is in the Cross-examination of Ryan.

7         You said that -- I think you were crossing him pretty hard

8    about, if they don't -- if they don't pay out to the providers,

9    then it increases their profitability.

10        MS. HENRY:  It might.

11        THE COURT:  And you didn't use that term, but that's

12   what you said.  And if you said, "Well, if you're taking food

13   off the table of Dr. Thompson's family," if you said something

14   to that extent, I will let Mr. Talley ask him about -- I'll let

15   him go where he wants to go.

16        If you made a statement that SEP, for every dollar you

17   didn't pay SEP, it increased your profit, --

18        MR. ZAVITSANOS:  That's exactly --

19        THE COURT:  -- then that's a different story.

20        MS. HENRY:  Yes.

21        MR. ZAVITSANOS:  That is exactly what I said.

22        THE COURT:  That would I --

23        MS. PRUITT:  I wish you would read it, Your Honor.

24        THE COURT:  Yeah, I am going to have her look.  One

25   other --

```
1              MS. PRUITT:  The other thing I wanted to say is
2   here's what is going on right now.  Mr. Zavitsanos has gotten
3   up and testified, and he's entitled to do that on cross-exam on
4   some extent, and I think he's gone overboard, as I've pointed
5   out to the Court on several of my mistrial motions.
6        But you can't get up and make all of these inference and
7   then clip us on cross-exam --
8              THE COURT:  I agree to that.
9              MS. PRUITT:  -- about the real relationship.
10             THE COURT:  I agree to that.  But let me --
11             MR. ZAVITSANOS:  We're both doing air quotes now.
12             THE COURT:  But let me see what the transcript says.
13        In the testimony of Ryan in the Cross-examination -- no.
14             MR. ZAVITSANOS:  Yes.
15             THE COURT:  The Cross-examination of Ryan --
16   Mr. Zavitsanos' examination of Ryan, see if he mentioned
17   Thompson and see if he mentioned -- what else?  What else would
18   be a key word?
19             MS. PRUITT:  75 percent and Thompson.
20             THE COURT:  75 percent and Thompson.  And see what it
21   says.
22             MS. PRUITT:  And I think it's more than one.
23        (The court reporter searched the record.)
24             THE COURT:  I think it says Dr. Thompson gets it.
25   And so I think he should be allowed to cross him and say,
```

1    "Well, okay.  You wouldn't get the whole 75 percent.  You were

2    asked about getting 75 percent of your billed charges, would

3    you,

4    Dr. Thompson, get that?

5        "No.  The group would get it."

6            MR. ZAVITSANOS:  So, Your Honor, I did say that, and

7    I volunteered that I said that.  I think further down I used

8    the group repeatedly.  I think I used Dr. Thompson once, and I

9    used SEP multiple times, and I am not excusing that.

10           THE COURT:  I understand.

11           MR. ZAVITSANOS:  But here -- let me be clear about

12   what the concern is.

13           THE COURT:  Uh-huh.

14           MR. ZAVITSANOS:  What Your Honor just asked, that's

15   fine.  It's the ownership structure, which I did not ask about.

16   Okay.  Because that's what they want to do.  They want to

17   basically -- that there is some bean counter somewhere, these,

18   you know, geppettoes, controlling these marionettes and they're

19   the ones getting all the money.

20       That absolutely does not open the door.  If he wants to

21   ask the question, "Dr. Thompson doesn't get the 75 percent; SEP

22   does?" fine.

23           THE COURT:  What is your problem with that line of

24   questioning?  It is directly in response to what he said this

25   morning.

```
 1            MR. TALLEY:  I think there's that, but there's one
 2   more piece of that inquiry, and that is the doctors don't share
 3   in those profits.
 4            MS. HENRY:  That's not true.
 5            MR. ZAVITSANOS:  But I didn't ask anything about
 6   that.
 7            THE COURT:  Yeah.
 8            MS. HENRY:  And I didn't ask either.  He wanted to
 9   admit to his relationship with SEP and not his financial
10   relationship.
11            THE COURT:  From the defendants' perspective, here's
12   what I see.  Not only the way the case has come in so far, but
13   I think it's almost a natural impulse to think these greedy
14   insurance companies; these greedy insurance companies.  They
15   sell you a product, and then they don't want to cover ya.  They
16   don't sign these poor doctors up, and they don't want to pay
17   him.  I mean, just the way it's come in.
18            MR. ZAVITSANOS:  Without objection.
19            THE COURT:  The greedy insurance company.
20            MS. PRUITT:  That is not true.
21            THE COURT:  Their greedy insurance company, and
22   they're at it again.  It's almost -- Chris Rock even does a
23   whole bit on that about the biggest scam artists in the world
24   are insurance companies, and it's funny.
25        The insurance company is now saying, "Okay.  Well, it's
```

1    not just us."  And they're not saying it in that way.  But they
2    want to be able to show that the other side is doing the same
3    thing.  And that this lawsuit is not necessarily a lawsuit
4    between the poor doctors on the front line, but it's a lawsuit
5    between a greedy organization that is hiring these doctors and
6    then they're fighting for their profits, too.

7        I think this is what's good for the goose is good for the
8    gander.

9            MR. ZAVITSANOS:  So here's the problem.  That's fine.
10   That's fine.  But if we're going open that barn door, then we
11   go to the next step, which is --

12           THE COURT:  Tell me.

13           MR. ZAVITSANOS:  Which is emergency rooms --

14           THE COURT:  Look at their profits and look at ours.

15           MR. ZAVITSANOS:  No, no, no, no, no.

16           MR. TALLEY:  They don't want to do that, Judge.

17           MS. PRUITT:  They don't want to do that.

18           MR. ZAVITSANOS:  Which this is policy that they're
19   implementing, there are scores -- and I mean scores of
20   hospitals closing across the country because of these
21   reimbursement rates.  Scores of them.  Okay.  The front lines
22   are being threatened because of what --

23           THE COURT:  But how does that play into the relative
24   positions of the parties fighting each other and the doctors --

25           MR. ZAVITSANOS:  Because, Judge, if we make less

1    money, we pay less to the doctors, which results in closures,

2    which results in a collapse of the health care system.  That's

3    the natural progression of what you're talking about here.

4        I don't have a problem with them asking about whether

5    Dr. Thompson gets the 75 percent.  I never asked about

6    ownership structure.  I never asked about how things are -- how

7    things are shaped.  There are actually claims that can be

8    brought involving the corporate practice of medicine, because

9    corporations are not allowed to own medical practices.  The

10   doctors own the medical practices.

11       And there are -- and this is way above my pay grade.

12   There are very complicated corporate structures and tax

13   structures that are in full compliance with all regulations.

14   And Centene has attempted on several occasions to try and go

15   down that road, and they have not been successful on any of

16   them.

17       Now, what we have here is, instead of being able to

18   respond to it at pretrial and have Your Honor have a full

19   opportunity to look at it, we're doing it on the fly on a claim

20   that is not even in the case on a question that I didn't even

21   open.

22           THE COURT:  But I don't think they're making a claim.

23   I think they are just trying to show that --

24           MR. TALLEY:  You're not working.

25           THE COURT:  -- you are working for this poor group

1    that is just out here doing -- you know, providing care to the

2    common man, when in truth that is not really the case, and I

3    think that is what the Cross-examination is.

4        And as far as going into corporate structure and all of

5    that, I am not going to let you get into all of that.

6            MR. ZAVITSANOS:  That's what I'm concerned with.

7            MS. HENRY:  That's what I objected to.

8            THE COURT:  But as far as you -- as far as you

9    showing --

10           MS. PRUITT:  Your Honor, if you don't let us -- this

11   is Cross-examination.  You have given them, over my

12   objection --

13           THE COURT:  Leeway on everything.

14           MS. PRUITT:  -- wide leeway -- wide leeway.

15           THE COURT:  To put on their case.

16           MS. PRUITT:  To put on their case.  And if there is a

17   credibility issue at any point at all, we're entitled to

18   explore it on Cross-examination, including the structure

19   itself.

20       He sat there and said he didn't know quite if the

21   TeamHealth owned SEP.  And we've got other witnesses coming out

22   who do know.  And the jury needs to understand -- and I think

23   he knows.  He works for TeamHealth.  But the jury needs to

24   understand that they need the credibility.

25           THE COURT:  Is corporate structure the issue or who

```
 1    is the getting the money?
 2              MS. PRUITT:  It's part of --
 3              MS. HENRY:  I didn't ask him about corporate
 4    structure.
 5              MS. PRUITT:  It's part of the -- I am talking about
 6    for the rest of the trial, Judge.
 7              THE COURT:  I understand.  But I am saying --
 8              MS. PRUITT:  Here it is who participates in the
 9    profits.
10              THE COURT:  And I am going to let you get into that.
11              MS. PRUITT:  I know what's going to happen.  And I am
12    just giving the Court a preview, because you can't clip us and
13    allow Counsel for them to get up there and testify to this jury
14    over and over and over again --
15              THE COURT:  Well, let me ask you this.
16              MS. PRUITT:  -- about the emergency doctors.
17              THE COURT:  No, no, no, no.  Let's go in a different
18    direction.  I think the way the testimony has come in -- the
19    way the testimony has come in from the plaintiffs is you have
20    this may -- and you didn't say it like this.  You have this
21    maze of organizations that are intentionally difficult to get
22    through or to work through.  And you didn't say that.  But me,
23    just sitting here listening to it, that is way it appears.
24         Why shouldn't they also be able to show how SEP is set up
25    who its partners are, who its owners, so to speak.  And that is
```

1   not the right phrase.

2           MR. ZAVITSANOS:  Okay.  So let me answer that.  Let

3   me say one thing, and then I'm going to answer the Court's

4   question.  The first thing is the only reason this man is on

5   the stand right now, as opposed to after the next witness, is

6   because their witness, you know, wasn't here.  If he would have

7   gone after, then the next witness would be able to answer all

8   of this, because he's actually TeamHealth financial guy

9   employee.  Okay.  That's the first thing.

10          The second thing, Your Honor, the reason I went into that

11  is because this Court found ambiguity; right?

12          THE COURT:  That was not here.

13          MR. ZAVITSANOS:  Right.  And the issue --

14          THE COURT:  If there is ambiguity, you grant summary

15  judgment.

16          MR. ZAVITSANOS:  And the issue is what does "NovaSys

17  Health member" mean?

18          THE COURT:  Uh-huh.

19          MR. ZAVITSANOS:  They put on evidence, not me -- they

20  put on evidence, that NovaSys Health member is limited to two

21  products, and that "member" means only the members of those two

22  products.

23          The evidence that I put up this morning was to demonstrate

24  not only that they were aware that "member" does not mean, that

25  member was not unlimited but by the conduct and the course

1    dealings, they recognized that member is not limited to one

2    product, and they engaged in a pattern to get people to convert

3    over.  Okay?

4         There was testimony that they elicited about the deemer

5    contract that they brought up, not me -- that they were using

6    the deemer contract for an examination yesterday to

7    establish -- to use that as an interpretive guide for our

8    agreement.

9         And that is the reason why I went into all of that today.

10   Okay?

11        Now, what -- that has nothing to do with our corporate

12   structure, who owns it, how things are allocated.  Okay?  If he

13   wants to ask him where the 75 -- you know, does Dr. Thompson

14   get the 75 percent?  You know, okay, I did say "Dr. Thompson"

15   one time.  They get to do that.

16        But in terms of the corporate structure, Your Honor, how

17   is that in any way relevant to Your Honor's decision that this

18   is ambiguous on that term?

19             THE COURT:  It's not.

20             MR. ZAVITSANOS:  Right.

21             THE COURT:  It's just -- it's countering the

22   testimony that has been put on so far.  And it wouldn't be

23   offered in any way, because it wasn't necessarily relevant to

24   the contract.

25             MR. ZAVITSANOS:  And --

1        THE COURT:  But it would be offered and countered to
2   the testimony that has already been elicited from the other
3   witnesses so far.
4        MR. ZAVITSANOS:  Except, Your Honor, the other thing
5   I have to push back on a little bit is Ms. Henry didn't go into
6   any of that.  So counter to who?
7        THE COURT:  To the first two witnesses that were
8   called.
9        MS. HENRY:  It's outside the scope of the direct that
10  we just did --
11       THE COURT:  But I think
12       MS. HENRY:  -- of Dr. Thompson.
13       THE COURT:  We don't limit the Cross-examination to
14  the scope of the direct.
15       MR. ZAVITSANOS:  No.  I understand.
16       THE COURT:  And I will make a rebuttal to the scope
17  of the cross, typically.
18       Let's do this:  I'll overrule the objection to the
19  question that was asked.  I don't think Mr. Talley is about to
20  go into great discussion about corporate structure.  He just
21  wants to show that Dr. Thompson won't give the 75 percent.
22       I think that's what his foundation was that he was laying
23  for that.  Now, if he wants to get -- if we're going to deal
24  with corporate structure with the next witness, we'll deal with
25  it, but let's get through this witness.

```
1            MR. TALLEY:  Thank you, Judge.

2            MS. PRUITT:  Thank you, Your Honor

3       (The bench conference concluded.)

4  BY MR. TALLEY:

5  Q.   Okay.  We're back, Dr. Thompson,

6  A.   All right.

7  Q.   I appreciate your patience as we worked through some

8  issues at the bench.

9       Before we went up to the Judge, we were talking a little

10 bit about what I would consider to be kind of a traditional

11 physician practice.  And the example I used was OrthoArkansas.

12      Do you remember the testimony or the exchanges we were

13 having about that?

14 A.   Yes.

15 Q.   Okay.  And one of the questions I asked at the end is:  In

16 a group like that, where everybody owns or all the physicians

17 own a piece of the business and are partners with one another,

18 at the end of the year, they share the profits; fair?

19 A.   Fair.

20 Q.   You understand that concept?

21 A.   Yes, sir.

22 Q.   Pretty common.  And TeamHealth -- or SEP isn't organized

23 like that; true?

24 A.   Not like you would describe, no.

25 Q.   Okay.  And one of the things you told Ms. Henry on your
```

1    Direct Examination was that SEP has a number of -- I think the
2    word you used was "employee"; right?
3    A.   Correct.
4    Q.   And you framed the physicians at SEP as employees of SEP;
5    is that right?
6    A.   I did.
7    Q.   Okay.  You agree with me that the doctors that work in the
8    emergency rooms at SEP, staff ERs, are not employees of SEP;
9    they are independent contractors?
10   A.   The majority of them are independent contractors.
11   Q.   Okay.  And when you worked as -- I think you've described,
12   as a line physician --
13   A.   Yes.
14   Q.   -- you were an independent contractor?
15   A.   That's correct.
16   Q.   And you're familiar with the independent contractor
17   agreements that SEP uses for those physicians?
18   A.   Correct, yes.
19   Q.   Okay.  Well, you helped hire some of the physicians;
20   right?
21   A.   Correct.
22   Q.   And once you hired them, you would have them execute one
23   of those agreements; right?
24   A.   Correct.
25   Q.   Okay.  Dr. Thompson, I am going to hand you what I've

1    marked as defense Exhibits 39 and 40.

2         Your Honor, may I approach the witness?

3              THE COURT:  You may.

4              MR. TALLEY:  I am going to put my mask on, too.

5    Q.   Dr. Thompson, I am not going to display these to the jury

6    right now, but are you familiar with those two documents?

7    A.   I have never seen them before right now.

8    Q.   Well, let me ask it another way.  Are you familiar with

9    the independent contractor agreements that SEP enters with its

10   physicians?

11   A.   Yes.  Familiar, yes.

12   Q.   And if you can flip, I think the page -- the second page

13   of Number 39.  Are you there?

14   A.   39.2.

15   Q.   That's it.

16   A.   Correct.

17   Q.   Does that look like one of the independent contractor

18   agreements that SEP enters with its independent contractors

19   that we've been talking about?

20   A.   It does.

21   Q.   Okay.  So you're familiar with that.  Can you flip over to

22   Number 40?  I think I have a paper clip on it.

23   A.   Oh, I'm sorry.  That's the whole separate agreement.

24   Q.   Yes.

25   A.   Gotcha.

1  Q.    Okay.  You have Number 40 in front of you?

2  A.    Yes, I do.

3  Q.    Okay.  Flip to the second page, will you?  Same thing,

4  independent contractor agreement?

5  A.    That's what it appears to be, yes, sir.

6  Q.    And you're familiar with that form?

7  A.    Yes, sir.

8         MR. TALLEY:  Okay.  Your Honor, I would move for the

9  admission of defendant's Exhibit 39 and 40.

10         MS. HENRY:  Your Honor, I have two objections.  One

11  is relevance, and I don't think he laid a foundation for these

12  documents.  This witness said that he had never seen these

13  documents before.  We have no idea whether these look anything

14  like any of these other documents that would be signed with any

15  physician.

16         THE COURT:  Okay.  First question, what is the

17  relevance of these two documents?

18         MR. TALLEY:  I am getting there, Judge.

19         THE COURT:  Well, ask him some questions.  As far as

20  the foundation goes, he said they looked like the typical, but

21  he didn't say they were true and correct copies of an actual

22  agreement.  And I would imagine, if he's never seen these

23  documents, is he the person who signs them with the --

24         MR. TALLEY:  I'm get to something real quick, Judge.

25  I don't think it's a major point, but I think I can continue.

1          THE COURT:  Okay.

2          MR. ZAVITSANOS:  Well, Your Honor, can we know what

3     that is because that might -- that might determine --

4          THE COURT:  Well --

5          MR. ZAVITSANOS:  -- the "just trust me.  I'll get

6     there"?

7          THE COURT:  Well, I am not receiving them now.  He

8     said he'll lay a foundation for it, so I'll see if he can.

9     BY MR. TALLEY:

10    Q.   All right, Dr. Thompson, if you can flip back to 39.

11    Second page, are you there?

12    A.   Yes.

13    Q.   I think you told me a minute ago that you're -- that

14    you're familiar with the form contracts that SEP has its

15    independent contractor physicians enter; true?

16    A.   True.

17    Q.   And this looks like one of those form contracts?

18    A.   It does, just from me -- you handing it to me three

19    minutes ago and me looking at it, it does.

20    Q.   Fair enough.

21    A.   I haven't read it completely.

22    Q.   We didn't meet to prepare for this.

23         So if you can flip to, I believe, Page 7 of this

24    document -- or Page 8 of this document.  Are you there?

25    A.   Yes.

1   Q.   It describes how the independent contract physician is
2   going to be compensated; right?
3   A.   You said Page 7?
4   Q.   Page 8.
5            MS. HENRY:  Your Honor, objection.  Relevancy to the
6   question in this case, which is about a NovaSys contract, not
7   about what the independent contractors or employees of
8   Southeast Emergency Physicians terms of their agreements are,
9   including this witness who is about to be asked testimony, to
10  give testimony about a document he's never seen before, is not
11  a party to it, has not executed the contract, and indicated to
12  the jury that he hasn't even had a chance to read it.
13           THE COURT:  I'll overrule it for the reasons I stated
14  at the bench.  I'm let him continue with his inquiry.
15  BY MR. TALLEY:
16  Q.   One of the hospitals is listed -- actually, two of the
17  hospitals are listed on this agreement; true?
18  A.   True.
19  Q.   And in that portion of this document that I've handed you,
20  it describes how these doctors are compensated by SEP; right?
21  A.   What I'm looking at here shows this physician -- they're
22  basically per hours is what it shows.
23  Q.   The payout?
24  A.   The payout, correct.
25  Q.   And that's true for all the independent contractor doctors

```
1    at SEP; right?
2    A.    I'm sorry.  Could you rephrase that question?
3    Q.    That was a poor question.  I'm with you.
4          So all the independent contract doctors at SEP are paid by
5    the hour; true?
6    A.    Yes and no.
7    Q.    Okay.  Generally speaking, they're paid hourly; is that
8    true?
9    A.    Some are paid hourly.  I can't answer your question "yes"
10   or "no."  Some are paid hourly.  Some have other incentive
11   programs, REU base pay.  There are different ways that the
12   independent contractors can be paid.
13   Q.    Maybe I can see it another way.  You were here this
14   morning for the Cross-examination of Mr. Ryan; right?
15   A.    Correct.
16   Q.    And you do you remember the question where Mr. Zavitsanos
17   asked Mr. Ryan if my clients paid 75 percent of billed charges,
18   that that would get -- that money would go to Dr. Thompson --
19   right? -- and his --
20            MR. ZAVITSANOS:  Your Honor, that is a misstatement.
21   That is a misstatement of -- that is not my question.
22   BY MR. TALLEY:
23   Q.    -- on his contracts.
24            THE COURT:  I'll overrule it.  I will let him answer
25   the question.
```

1           THE WITNESS:  That is not what I understood --

2    BY MR. TALLEY:

3    Q.    Okay.  Well --

4    A.    -- Mr. Zavitsanos to say.

5    Q.    Okay.  Well, because you know that's not true; right?

6    A.    What's that now?

7    Q.    That if my clients paid 75 percent of billed charges under

8    that NovaSys contract, that money is not going to the

9    individual doctors; right?

10   A.    That is incorrect.

11   Q.    Well, you don't own any piece of SEP; right?

12   A.    No, I'm not an owner of SEP.

13   Q.    No, you're not an owner of SEP.  Somebody else owns SEP;

14   true?

15   A.    True.

16   Q.    Another company owns SEP; true?

17   A.    I'm not sure.

18   Q.    Okay.  How long have you worked for SEP?

19   A.    Twenty years as an independent contractor.

20   Q.    You don't know who owns it?

21   A.    I know who founded it, but I am not sure who owns SEP.

22   Q.    Okay.  You remember when we were talking about

23   OrthoArkansas; right?

24   A.    Yes.

25   Q.    You've got five doctors and you made $100,000 in profit

1    that year, each of them owns an equal piece of it.  Everybody

2    makes $20,000; right?

3    A.   I don't know the business set up for OrthoArkansas.  I

4    would have to take what you're telling me for it to be true.

5    If that's their business, yeah, that's the way it would work.

6    Q.   Yeah.  You divide the profits equally based on everybody's

7    ownership; right?

8         MS. HENRY:  I would object again, Your Honor.

9    Relevancy to this particular case and the NovaSys contract that

10   is in dispute.

11        THE COURT:  Okay.

12        MS. HENRY:  And for the same reasons that I objected.

13        THE COURT:  Hold on.  Hold on.

14   You can make another objection, Mr. "Z."

15   Okay.  I'll overrule -- I'll let him inquire.

16   BY MR. TALLEY:

17   Q.   And all I'm getting at, Dr. Thompson, is that is just not

18   the arrangement that SEP has with its doctors, one in which

19   they share the profits?

20   A.   Oh, yes, it is.  In certain SEP contracts, there's things

21   called "profit shares," so there are some contracts in which

22   they share profits with the doctors.

23   Q.   Not your contract.

24   A.   Not -- which -- my contract there?  Every SEP contract

25   that I have, they also shared profits with the doctors.

```
1   Q.   As an owner of the business?
2   A.   No, not as an owner, just as a physician.
3   Q.   Okay.  Let's move on just a little bit.  You remember
4   giving a deposition in this case; right?
5   A.   Yes, sir.
6   Q.   And I think you told us in your deposition that you
7   weren't involved in the execution of the 2011 LOA; right?
8   A.   No, sir.
9   Q.   Okay.  Did you first become familiar with that document
10  through this litigation?
11  A.   Yes, sir.
12  Q.   Okay.  And I think you've also told us in the past that
13  you don't -- you have pretty limited knowledge of insurance
14  reimbursement rates with specific insurance companies or health
15  plans; fair?
16        MS. HENRY:  Your Honor, this is an improper use of
17  the deposition transcript.  He is attempting to use it to
18  impeach something that has never been testified to before.
19        MR. TALLEY:  That last question had nothing to do
20  with the deposition, Judge.
21        MS. HENRY:  He represented what you had said in the
22  past.  That would only be his deposition.
23        THE COURT:  I will sustain the objection to the
24  extent you are asking questions about -- you are impeaching
25  about him having to give you an answer --
```

1           MR. TALLEY:  If I said you testified in the past, I

2    withdraw that.

3           THE COURT:  And continue on.

4    BY MR. TALLEY:

5    Q.   Okay.  You don't have a deep knowledge of insurance

6    reimbursement rates; fair?

7    A.   Deep knowledge, no.

8    Q.   And when you were working with SEP, you didn't deal in any

9    way with groups that were trying to become in-network with

10   insurance companies?

11   A.   No.

12   Q.   Okay.  Other folks at SEP or TeamHealth handled that kind

13   of stuff trying to get in-network with insurance companies?

14   A.   That's correct.

15   Q.   Somebody else on the team?

16   A.   That's correct.

17   Q.   Okay.  I think with Ms. Henry you said you kind of work

18   with hospitals in some of those contracts?

19   A.   That's correct.

20   Q.   Okay.  So when you testified about that earlier, you were

21   talking about SEP getting the contract to work or staff the

22   emergency department down at Saline Memorial, something like

23   that?

24   A.   That is a good typical example.

25   Q.   But you are not talking about negotiating or being

1  involved in conversations about getting in-network with an

2  insurance company or health plan?

3  A.   No, that's not part of my job.

4  Q.   Okay.  Ms. Henry asked you a question on direct about why

5  SEP filed this lawsuit.  Do you remember that?

6  A.   Yes.

7  Q.   And I believe you told Ms. Henry that SEP filed this

8  lawsuit as a result or to see 75 percent of billed charges for

9  the NovaSys contract; is that right?

10  A.   I believe that's what I said.

11         MR. TALLEY:  Okay.  Judge, can we approach?

12         THE COURT:  You may.

13     (A bench conference commenced.)

14         MR. TALLEY:  I think I just laid my foundation of why

15  SEP filed this lawsuit -- was to recover under the NovaSys

16  contract.  That's what the witness just testified to.  It's

17  what Ms. Henry elicited on direct exam.  And now I believe,

18  Judge, I'm entitled to use a copy of the original Complaint and

19  why -- to show why SEP actually filed this lawsuit, in which

20  they alleged that they didn't have a contract at all.

21         THE COURT:  I am going to overrule your request to

22  show them the initial contract.

23         MR. TALLEY:  Can I ask him a question about it?

24         THE COURT:  Well, you are going to ask him about

25  the --

```
1              MR. TALLEY:  I am going to ask him --
2              THE COURT:  -- the first contract, not the operative
3    contract.
4              MR. TALLEY:  Complaint.
5              THE COURT:  The Complaint.  I'm sorry.
6              MR. TALLEY:  Yes, Your Honor.  Because right now --
7              MS. HENRY:  It's not --
8              MR. TALLEY:  -- the jury thinks they filed this
9    lawsuit to recover under the NovaSys contract.  That's exactly
10   what he said on direct exam to -- to a question elicited by
11   Ms. Henry, and I paved the way on cross to fairly rebut that
12   statement.
13             THE COURT:  Mr. Talley, you made your record on that
14   issue, but I am not going to let you do that.
15             MR. TALLEY:  Okay.
16        (The bench conference concluded.)
17   BY MR. TALLEY:
18   Q.   All right, Dr. Thompson.  You have been sitting here now
19   for three and a half days along with this jury.  And I think
20   you told Ms. Henry earlier that -- several times that you
21   believe you were in-network with Ambetter; is that true?
22   A.   I believe I was in NovaSys Health network is what I
23   believed.
24   Q.   Okay.  In this litigation, you understand that the
25   plaintiff's contention, SEP's contention is that it has a
```

1    contract that covers the Ambetter claims?

2    A.    Yes.

3    Q.    From 2014 to the present; true?

4    A.    That's correct.

5    Q.    You understand that?  And are you familiar with TeamHealth

6    employee named Heather Kibbler?

7    A.    No, sir, I am not.

8    Q.    Well, I -- we got the opportunity to take Ms. Kibbler's

9    deposition earlier this month and --

10           MS. HENRY:  Your Honor, may we approach?

11           THE COURT:  You may.

12        (A bench conference commenced.)

13           MS. HENRY:  Your Honor, I think he's trying to

14    impeach this witness with the testimony of another witness in

15    this case, Mrs. Kibbler, if I think I understand correctly

16    where he's going with this.

17           THE COURT:  Is she coming to testify?

18           MR. DRENNON:  And, Your Honor, the issue is

19    Ms. Kibbler was designated under a 30(b)(6) deposition on

20    specific topics.  The topics were addressed at the beginning of

21    her deposition.  The attorney for defendants asked her

22    questions outside of those topics, for which she was not

23    prepared to testify.

24           MS. HENRY:  And I objected.

25           MR. DRENNON:  And they would now like to use her

1 statements that she was not prepared to testify on or

2 designated to testify on.

3      MS. HENRY:  I have 30-something topics that they gave

4 me shortly before the deposition.  We divided those up among

5 two witnesses, Judge.  I specifically laid out, at the start of

6 both of those depositions, to which topics Ms. Kibbler would

7 testify and to which topics Mr. Bristow would testify.

8     Consistently throughout the depositions, they went outside

9 the topics.

10      THE COURT:  Okay.

11      MS. HENRY:  And I would continue to object to that

12 and say this witness has been designated on this topic.  We

13 object to her giving testimony.  We weren't going to ask

14 anyway.  And Mr. Zeigler would go ahead and ask.  And there was

15 nothing I could do to prevent the witness from testifying.

16      MR. DRENNON:  We have a motion pending on this.

17      THE COURT:  You have a motion pending?

18      MS. PRUITT:  You have a motion?

19      MS. HENRY:  She was not testifying as a corporate

20 representative on those topics for which she was not

21 designated.

22      MS. PRUITT:  Your Honor, we designated testimony for

23 her, and the answer is "Yes, she's going to come testify by

24 video."  We can't subpoena her because she lives in another

25 place.  We designated affirmative designation.  They submitted

1    their objections.  The Court has already ruled on and overruled

2    their objections, and she was the thirty-sixth witness,

3    speaking on behalf of company.

4              THE COURT:  Well -- well, you know, Mrs. Pruitt, that

5    if they designate her for one topic and you ask her about

6    another topic, that doesn't bind the company.

7         And I'll be very honest with you.  I looked through

8    those -- the deposition designations that I ruled on, I read

9    them, but I didn't read in the context 30(b)(6) and what she

10   had been designated for.  I was just reading the testimony to

11   see what the witness's testimony would be admissible.  And it

12   might have made a mistake if that was the case.

13        And are you -- is she going to be asked about areas that

14   she was not designated by plaintiffs to answer --

15             MR. TALLEY:  But, Your Honor --

16             THE COURT:  -- the question?

17             MR. TALLEY:  -- under Rule 32, we can use a 30(b)(6)

18   deposition transcript for "any purpose."  That's what the rule

19   says.

20        And if we want to parse words on their position, it's

21   going to be outside the scope.  I'm sure our position is going

22   to be inside the scope, but we abundantly designated this.

23   They put up their objections to that.  And the Court ruled on

24   it.  They never, in their objections to the testimony that we

25   designated, raised an argument related to the scope of that

1    30(b)(6) deposition.

2        And the question I am going to ask about there is not an

3    objection here on the record about the scope.

4            MR. DRENNON:  You don't have to object to a scope

5    during the deposition.  We specifically designated her for

6    topics.  The question is outside the rule because she wasn't

7    designated on that topic.

8            MS. HENRY:  And she also wasn't noticed as an

9    individual deponent either.  She was only asked to come as a

10   corporate representative.  So none of that testimony would be

11   appropriate, Your Honor,

12       And they also did not designate any video for the trial

13   today.  It was only transcript testimony.

14           THE COURT:  Hold on.

15           MS. HENRY:  I just heard him say we're going to bring

16   a video.

17           THE COURT:  I think the issue now is what was she

18   designated -- what testimony was she designated or what

19   questions was she designated to answer or what areas was she

20   designated to give testimony on, Whether she was asked

21   questions outside of those specific areas and then whether she

22   was then asked questions outside and whether that is the

23   testimony that is sought to be used today.

24       And you understand that.  Corporations can't speak, so you

25   have to designate somebody to speak about a certain thing.  So

1   if you have a large corporation, different people have certain

2   amounts of knowledge in certain areas.  You wouldn't go to the

3   engineering department and depose somebody over there and bind

4   the company about something dealing with HR.

5       Do you understand?  Because that person wouldn't have

6   knowledge to bind the company on HR.  So I don't know what her

7   role is at the company.

8       But if plaintiff designated her in a given area --

9           MS. HENRY:  We did.

10          THE COURT:  -- and now her testimony in another area

11  is sought to be used here at trial, she can't bind the company

12  in those areas, if that's the case

13          MS. PRUITT:  And, Your Honor, I wouldn't say this,

14  and I can't make a representation that I don't know to be true

15  to the Court on the record, but I don't know.  But it's

16  important with what she said that I want to look at that to

17  see --

18          MR. TALLEY:  And, Your Honor --

19          MS. PRUITT:  -- because I don't know.  But it is very

20  important, if they don't ruminate the evidence, if it's, you

21  know --

22          THE COURT:  Yeah, if it's admissible.

23          MS. PRUITT:  Right.

24          THE COURT:  Yeah.

25          MS. PRUITT:  And so for them to -- you know, look,

1    I'm certain they're telling me --

2            THE COURT:  And I'm sorry.  I missed that issue.  I

3    missed that.  The objection was that her testimony was outside

4    the scope of the 30(b)(6) -- not notice, but response.  I

5    just -- I just missed it.

6            MR. DRENNON:  We raised.

7            MS. HENRY:  We did.

8            MR. DRENNON:  We raised it.  It's a motion that's

9    filed right now.

10           THE COURT:  Yeah, I just missed it.

11           MR. TALLEY:  And can you tell me what motion that is?

12           MR. DRENNON:  It is one we filed last night.

13           THE COURT:  Oh, okay.  Okay.  That's why.

14           MR. TALLEY:  They filed this motion this morning,

15   Judge, because you've overruled the objections.  And I'll go

16   ahead and show you the testimony, if you want to get started,

17   at Line 18.

18           MS. HENRY:  What page and line?

19           MR. DRENNON:  I need to know what page that is, Your

20   Honor.

21           MR. TALLEY:  29.

22           THE COURT:  Page 25 -- 29.  What line?

23           MR. TALLEY:  I think it starts on 18.

24           THE COURT:  18.

25           MR. KILLINGSWORTH:  29?

1            THE COURT:  Yes.

2            THE COURT:  So that goes to the testimony whether

3    they are in- or out-of-network.

4            MR. TALLEY:  I think the contract --

5            MS. PRUITT:  And whether they have a contract or not.

6            MR. TALLEY:  It is a specific admission from a

7    leader.

8            THE COURT:  But if she was not designated to answer

9    that question, she could come in and say that the whole lawsuit

10   is a lie.  But, I mean, if she's not designated to answer about

11   the litigation, then it doesn't really matter because she

12   doesn't have the knowledge to make that statement and bind the

13   company.

14           MR. TALLEY:  Our position was she was -- I mean, I am

15   sure our position would be -- I haven't seen this motion that

16   they're talking about at this point, Judge, but if we -- why it

17   is being filed on the morning that they're going to give us the

18   first opportunity to actually cross-examine a witness is pretty

19   telling.

20           THE COURT:  Let me ask you a question:  Do you need

21   to deal -- do you need to deal with this issue, with this

22   particular witness?

23           MR. TALLEY:  I think it is critically important that

24   we deal with it with everybody.

25           MS. HENRY:  We've got the designated rep for that

```
1    topic here, and he would have testified but for the fact that
2    Ms. Kibbler -- that Ms. Suggs wasn't here when we were ready to
3    call her.
4              THE COURT:  And, you know, you can recall him in your
5    case in chief if you need him to answer this particular
6    questions.  I know you have him on cross, and you would like to
7    deal with it now, but I need to look at this motion and look at
8    what this person was designated to testify about to see whether
9    this particular question is outside the designated area.
10             MS. HENRY:  And they do have the documents to be able
11   to do that.  They have their list of the 30-something topics
12   that they gave us that they wanted the witnesses to testify
13   about.  And we divided them out, and they could have looked at
14   that, and they could say, "This is the specific topic that we
15   designated, and here is where you said at the start of her
16   deposition she was going to testify on that topic, and this is
17   the topic."
18        We don't have that.  We have taken out of context a
19   question or two.
20             MR. TALLEY:  They can explore that on redirect,
21   Judge.
22             THE COURT:  I don't know.  Well, no.
23             MR. DRENNON:  We can't explain to the jury different
24   rules.
25             THE COURT:  I don't know that this is out of context
```

```
1    the way I read it.  But still, if she is not designated to
2    answer this question, then she can't bind the company because
3    she doesn't know.
4              MR. TALLEY:  And I guess my response to that, Judge,
5    is the Court ordered that we abundantly designate testimony,
6    like, three weeks ago.
7              THE COURT:  You did.  That's exactly right.
8              MR. TALLEY:  We didn't get this objection in response
9    to that testimony, which we affirmatively designated.  At this
10   point, with the current state of the orders in this case, this
11   is coming in as evidence.
12        And now, they file a motion on the morning that we're
13   going to have our first opportunity to cross-examine a witness
14   to keep out what is, quite frankly, the most damning testimony
15   in the case.  I understand why they want to keep it out, Judge,
16   but they could have fought that battle two weeks ago, instead
17   of right here at the bench.
18             THE COURT:  And this is a 30(b)(6) deposition?  It's
19   not a --
20             MR. TALLEY:  It is a 30(b)(6) deposition, and under
21   Rule 32, we can use it for any purpose.
22             MS. HENRY:  Within the scope of the designated
23   topics.
24             THE COURT:  I've got to look and see what she says --
25   going to testify about.  I would say you continue on with your
```

1    Cross-examination, unless you want me to look it over the

2    lunch, and I will give you a decision.  And then --

3              MR. TALLEY:  Judge, I'll go ahead and tell you this

4    is an ultimate question I'll be asking.

5              THE COURT:  Well, of course.  Of course.

6              MS. PRUITT:  It's after 12:30.  I say we take a

7    break.  He's here anyway.

8              THE COURT:  Mr. Thompson, did you file your motion,

9    or did you say it was prepared?

10             MR. THOMPSON:  It was filed.

11             THE COURT:  I mean, were you the one who filed it?

12             MR. THOMPSON:  It was actually filed under Judy.

13             THE COURT:  I've got to give defense a chance to look

14   at the motion and respond to it.

15             MR. TALLEY:  And, Judge, our position on that --

16             THE COURT:  Is that they waived the objection.

17             MR. TALLEY:  -- it's pretty unfair for us to brief

18   this issue up, they not raise it, and then I get a motion

19   immediately before we're about to cross-examine the first

20   witness we can in this trial.  And they raise it then to try

21   and hamstring us from getting out this absolutely critical

22   testimony that we have built the defense case around because it

23   was coming in.

24             THE COURT:  Mr. Talley -- Mr. Talley, I don't

25   disagree with you that it's, like -- I don't disagree with you.

```
1              MR. TALLEY:  Sure.
2              THE COURT:  But look at it from this standpoint.  If
3     I had Ms. --
4              MS. HENRY:  Kibbler.
5              THE COURT:  -- Kibbler on the stand and she was here
6     and she was asked a question outside the scope of her -- what
7     she was designated to testify about and the objection was made
8     here in open court that, "Your Honor, I object.  That's outside
9     the area that she's designated to testify about," I'd sustain
10    the objection.  And so although this is late --
11             MR. TALLEY:  I mean, it's fundamentally unfair to the
12    defense for them to sandbag us on this issue.  And I disagree
13    that -- I think we will be able to fight this issue on the
14    papers.  But I think the procedure, or the way they've gone
15    about it, is pretty questionable, Judge.  It is unfair for them
16    to do it like that.
17             THE COURT:  I understand that.  I would have to
18    believe -- I understand that.  I would have to believe they
19    were looking who the witnesses were going to be today and
20    realized they had not objected based on it being outside the
21    scope, and so they filed -- they prepared the motion.
22             MS. HENRY:  And that would be --
23             THE COURT:  That is not something you hold and you
24    just don't -- I mean, you get that knocked out early.
25    Especially this, you would -- she's saying, "We don't have a
```

1  contract."

2          MR. TALLEY:  We affirmatively designated that

3  testimony.

4          THE COURT:  Yeah.

5          MR. TALLEY:  And we built our defense around it.

6          THE COURT:  Let me have a copy.

7          MR. TALLEY:  You can take my copy, Judge.  I know

8  what it says.

9          THE COURT:  Do you?  And I'm going to look at their

10  motion.

11      Have you looked at the motion at all?

12          MR. TALLEY:  I have not had a chance.

13          THE COURT:  You have been wrapped up with all of

14  this.  I just need you to tell me your position on the motion.

15  And we'll come back and take that up before we bring the jury

16  back.

17          MR. TALLEY:  Okay.

18          THE COURT:  And I will rule on it, and we'll keep

19  moving, one way or the other.

20          MR. TALLEY:  All right.

21          THE COURT:  Prepare to adjust just in case I don't

22  allow you to get into that.  But I don't know what I'm going to

23  do right now.  Yeah.  Okay.

24      (The bench conference concluded.)

25          THE COURT:  All right.  Before we continue with any

1    testimony, I need to take a look at something, a transcript,
2    and then look at the motion to see, and I have to make a ruling
3    on something that -- and decide which direction we go in.  So
4    I'm going to let you have your lunch now.
5        We had a conversation about cutting down our lunch breaks,
6    and I'll cut it down ten minutes, so we'll come back at 1:30.
7    But I am reluctant to cut it down much more than that, because
8    for those of you who leave the building, go through security,
9    go out and get something, I doubt you'll be back in 30 minutes,
10   so I will give you to 1:30 to be back here.  Okay?
11       All right.  Let's recess until 1:30.
12       (Adjourned at 12:45 p.m.)
13
14
15
16                     REPORTER'S CERTIFICATE
17
18
19       I certify that the foregoing is a correct transcript of
20   proceedings in the above-entitled matter.
21
22   /s/ Suzanne M. McKennon, CSR, CRR, RMR
     _____   Date:  August 7, 2020
23   United States Court Reporter
24
25

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter

1          (Proceedings continued at 1:30 p.m.)

2              THE COURT:  All right.  Did you get a chance to take a

3    look at the motion?  Do you want to provide a response?

4              MR. TALLEY:  Yes, Judge.  Do you have a copy of

5    Ms. Kibler's transcript in front of you?

6              THE COURT:  You know what, I took it back to the back.

7              MR. TALLEY:  You got it?

8              THE COURT:  I do have it.

9              MR. TALLEY:  I have a copy, one copy unfortunately,

10   Judge, of the notice of deposition that was served on our

11   clients by the plaintiff for 30(b)(6) deposition.

12        Topic 10 on this Notice of Deposition requested testimony

13   on plaintiff's course of dealing with health insurance

14   organizations -- that would be our clients -- from 2014 to the

15   present relating to billed charges and allowed amounts for

16   services rendered to patients.

17        Ms. Kibler is a vice president at TeamHealth, and her job

18   in part is to oversee billing centers and billing processes

19   within the building.

20        On page 11 of her deposition at line 9, Ms. Henry

21   designated Ms. Kibler to testify about the presentation of

22   billed charges, allowed amounts for in and out of network.

23        Judge, if you flip to page 29, the questions beginning at

24   line 10 and concluding at line 23 relate to that exact issue.

25        "Question:  So earlier we had discussed -- you had talked

1   about how expected amounts are loaded in the system for billing

2   centers, correct?

3        "Yes.

4        "Okay.  You said, if there's a contract with an insurance

5   company, then you load the expected rates, correct?

6        "Yes.

7        "And there's no expected rate loaded for the Ambetter of

8   Arkansas product, correct?

9        The answer to that question was:  "So my understanding is

10  that we are out of network with Ambetter of Arkansas, so we do

11  not have a specific rate loaded into our system."

12       Judge, that is exactly what she was dedicated to testify

13  about on page 11 by Ms. Henry as it relates to Topic No. 10 on

14  that notice of deposition.

15       We can use that deposition for any purpose under Rule 32,

16  and we believe we are entitled to ask Dr. Thompson about it.

17            THE COURT:  What's your response to that?

18            MR. LEYENDECKER:  Mr. Leyendecker, Judge.

19       First thing, the questions related -- they want to use here

20  are specific to Ambetter and the Ambetter claims, and if you

21  look at the cite that counsel just pointed to you on page 29, it

22  begins with, "So earlier we had discussed."

23       Do you see that right there?  29, line 10.

24       If we go back to line 20, which is one of the other pieces

25  that we object to on this basis, page 20, line numbers 5

1    forward, it's clear they are talking about SEP and Ambetter

2    patients.  They are question 9 through 12, Ambetter patients.

3         Once again, if we go to page 29, we're talking about

4    Ambetter of Arkansas.

5              THE COURT:  On page 20, lines what now?

6              MR. LEYENDECKER:  Yes, sir.  First he wants to rely on

7    page 29, beginning on line 10.  That section references earlier

8    testimony.  It also references the Ambetter issue, the Ambetter

9    contract at issue.

10        When we go back to page 20, which is the earlier

11   testimony -- and this is another piece of the testimony we are

12   objecting to -- it's clearest he's talking about Ambetter

13   patients.

14        Look at the question at lines 9 through 12.  Load stuff in

15   the system for the Ambetter patients.

16        So there's no question that what he's doing here and what

17   he's focusing on are this contract as it relates to the Ambetter

18   claims.

19        That is precisely the subject of topics 20, 21, and 22 for

20   which she was not designated, and the piece that we cited in the

21   motion to illustrate her lack of personal knowledge is over on

22   page 20, lines 9 through 15, when she's asked about the Ambetter

23   patients, and she says, "I don't know," and then dat, da, dat,

24   da da.

25        So my problem is I get 10.  By the way, there was a spit on

1    who was going to talk about what parts of 10 between Mr. Bristow

2    and Ms. Tibbits, but the rubber on the road here, Judge, is they

3    want to use this testimony very focused which relates to

4    Ambetter which unquestionably is covered by topics 20, 21, 22

5    not her topics.  Mr. Bristow's topics.  To stand up and make an

6    argument something like, well, see they weren't in the system

7    and so you know you didn't have an agreement.  That's I think

8    the foot dropping on the other half of this, and the bottom line

9    is these are Ambetter-specific claims covered by topics 20, 21,

10   and 22, and it's just not her bailiwick.

11          MR. TALLEY:  If I'm hearing that correctly, Judge,

12   they are challenging the context in which we want to use this.

13   And they had an opportunity and did to counter-designate

14   testimony for Ms. Kibler's deposition.

15      If you go back to page 11, Ms. Henry designated Ms. Kibler

16   to testify about allowed amounts for in and out of network.

17          MR. LEYENDECKER:  Judge -- I apologize.  I interrupted

18   you.

19          MR. TALLEY:  If I may, that's the exact question

20   that's asked here, of what the expected rate loaded for Ambetter

21   of Arkansas, and she responded to that with an answer that was

22   within the scope of this 30(b)(6) deposition.

23      I understand that they want to keep this out, Judge.  But

24   the facts are that Ms. Henry designated her to testify about

25   this issue, and she offered testimony in response to that.  That

 1    is within the scope, and it's very damaging to plaintiff's case.

 2    We are entitled to present that to the jury.

 3              THE COURT:  Hold on.

 4              MR. LEYENDECKER:  Two real quick thoughts, Judge, if

 5    you are ready.

 6              THE COURT:  Yes.  I'm listening.

 7              MR. LEYENDECKER:  I get 10.  It's got, your know, from

 8    sea to shining sea -- sea to shining sea concept to it.  I get

 9    that.  Okay?

10        I can't sit there and tell you how they are going to carve

11    up that sea to shining sea waterfront.

12        I do know, unquestionably, 20, 21, and 22 are Kent's

13    bailiwick and not hers, and I know that the question he wants to

14    use --

15              THE COURT:  Can you tell me what 20, 21, and 22 are?

16              MR. LEYENDECKER:  I beg your pardon?

17              THE COURT:  Give me the areas, 20.

18              MR. LEYENDECKER:  Here's 20.  20 is Plaintiff's

19    Submission of Claims Under the NovaSys LOA.  21, The Factual

20    Basis For Plaintiff's Claims That the NovaSys LOA Governs the

21    Claims At Issue.  22, Plaintiff's Classification of Ambetter As

22    an Out of Network Or In Network Insurance Company From 2014 to

23    Present.

24        And so my point is those three are focused.  We are not sea

25    to shining sea.

1          THE COURT:  I'm reading on page 11, paragraph -- well,

2   line 7.

3          MR. LEYENDECKER:  Yes, sir.

4          THE COURT:  Line 9 where Ms. Henry says on topic 10 on

5   the new list Ms. Kibler will address the presentation of billed

6   charges, allowed amounts for in and out of network.  And it

7   would seem to include broadly the testimony at issue where she

8   says "So my understanding is we are out of network with Ambetter

9   of Arkansas, so we did not have a specific rate loaded in our

10  system."

11      But then when I listened to the topic identified in No. 22.

12         MR. LEYENDECKER:  Yes, sir.  22 is Plaintiff's

13  Classification of Ambetter As Out of Network Or in Network

14  Insurance Company From 2014 to Present.

15         THE COURT:  That would seem to very specifically deal

16  with the testimony, and on page 29 --

17         MR. LEYENDECKER:  That's correct.

18         THE COURT:  -- lines 21 through 23.

19         MR. LEYENDECKER:  Correct.  And so, Judge, if they had

20  a generalized question here, that would be fair game under the

21  sea to shining sea nature of topic 10.  That would be one thing.

22         THE COURT:  What does "presentation of claims" mean?

23         MR. TALLEY:  Your Honor, Ms. Kibler runs and oversees

24  billing processes at TeamHealth.  Those billing processes are

25  handled by computer systems.  So what we are getting at right

1    here with 29 is, if you have a contract with an insurance

2    carrier at line 14, then you load that expected rate or agreed

3    rate into the system.

4        There is no expected or agreed rate in the system for

5    Ambetter of Arkansas which is exactly what Ms. Henry

6    designated -- designated her for on page 11 at line 11.

7            MR. LEYENDECKER:  That's just incorrect, Judge.  And

8    illustrate why -- at least in our minds, okay, if you want to

9    ask her generalities about sea to shining sea, this concept,

10   fine.  But when you want to get specific, that's why Mr. Bristow

11   was 20, 21, and 22.

12       So bear with me for a moment.  If I go back to page 20

13   beginning on line 18, the question is:  "To your knowledge, no

14   rates have ever been loaded for Ambetter of Arkansas; is that

15   correct?

16           "Answer:  I wouldn't be able to speak if one was ever

17   loaded.  She has no personal knowledge, and she wasn't

18   designated to speak to the rifle shot topics on 20, 21, and 22."

19   That's Mr. Bristow.

20           THE COURT:  She was asked on 20, So for that product,

21   Ambetter of Arkansas product, you do know if there was ever --

22   do you know if there was ever an expected amount loaded in the

23   plaintiff's system for Ambetter patients?

24           "Answer:  I don't know if I can answer if there ever

25   was.  I believe this is out of network.  So we don't have a rate

1  loaded."

2          "Question:  So, to your knowledge, is it fair to say

3  that you don't know that?  Strike that.

4          "Answer:  I wouldn't be able to speak if one was ever

5  loaded."

6          MR. LEYENDECKER:  My point is we got our witnesses

7  lined up with particularly.

8      You want to talk about the Ambetter on this issue, 20, 21,

9  22, that's Mr. Bristow.

10     You want to talk in some generalities, sea to shining sea,

11  she can give you some generalities.  But her answer here

12  illustrates she has no personal knowledge, and since she wasn't

13  prepped or designated on those specific topics, she didn't get

14  ready on that.

15     So it would be unfair, irrelevant, and super prejudicial to

16  allow the defendants to cross-examine not her but some other

17  witness with her testimony because she's not a corporate rep as

18  it relates to the focused issues on the Ambetter issues in this

19  case.

20          MR. TALLEY:  The issue, Judge, is there's a reason why

21  she is not here and she's not getting called in plaintiff's

22  case.  And it's because of this exact testimony.

23     We can't serve a subpoena on her and bring her into this

24  courtroom.  But what we can do is designate her testimony, which

25  we did.

1              THE COURT:  Let me ask this:  Does page 20 contradict

2     page 29?

3              MR. TALLEY:  I don't think it does.

4              THE COURT:  Page 29 she's saying, "We didn't have them

5     because we are not in network," and 20, she's saying, "I don't

6     know if I can answer if there ever was.  I believe it's out of

7     network so we don't have the rate loaded."

8          And then she says, "So I wouldn't be able to speak if one

9     was ever loaded."

10         Are they talking about the -- is she talking about the same

11    thing or two different things?

12             MR. LEYENDECKER:  She's talking about whether there

13    was ever an Ambetter rate -- a rate for the Ambetter product

14    loaded in our system.  What she's telling on 20 is I don't know.

15             THE COURT:  I understand that, but I'm saying on 29 is

16    she saying --

17             MR. LEYENDECKER:  Same topic.

18             THE COURT:  We've had a couple times -- and I was

19    asked specific from Mr. Z about this, about completeness, and he

20    views the rule a little differently than I do.

21         The topic of completeness, I don't usually view it as when

22    something is already in evidence that you require the party to

23    show or to focus on items of the document that are not being

24    focused on right now.

25         I generally view completeness in issues like this, either

Thompson - Cross

1   where you have a document that's partially in evidence and the

2   other side says, well, put the other piece in that fully shows

3   what it means, or when you are dealing with a deposition.  And,

4   say, defendant wants to put this deposition before this witness

5   or put on deposition testimony dealing with page 29, I think you

6   make it complete -- the rule of completeness would say that you

7   put on both pages, you let the jury see that on one hand she's

8   saying I don't know and, another hand, she might have given an

9   answer, but her answer is tempered by her previous testimony, "I

10  really don't know."

11       Looking at topic 10 as stated on page 11, it seems to

12  indicate that she can testify about this area.

13       I wouldn't let her testify about this if she had not been

14  designated to testify about it.

15            MR. LEYENDECKER:  In generalities -- I apologize.  I

16  just cut you off.  That was a rude and awful moment by me.

17            THE COURT:  That's okay.

18            MR. LEYENDECKER:  I'll acknowledge 10 is sea to

19  shining sea, but when some lawyers and companies say, let me

20  give you 85 targets as opposed to 11 topics, when we got focused

21  on it, that's 20 through 22.

22       And here's my more fundamental point in terms of what's

23  fair.

24       If they want to have an argument, I get there's a

25  legitimate beef here about whether she was or was not supposed

1    to be given details about Ambetter on this subject.  I get we

2    are having a tussle on that, but if that tussle needs to get

3    resolved in what gets played in the Kibler deposition tape,

4    that's one thing, but there's no basis, no fair basis, in light

5    of her saying, "I don't know," to allow them to cherry-pick an

6    answer and say, look at this, witness, who you don't know who

7    you didn't know.

8              THE COURT:  I think --

9              MR. TALLEY:  That's what redirect is for.

10             THE COURT:  Rule of completeness to put up both and

11   take them through both.  And -- well, and I guess that could be

12   done in two different ways.  I guess you could be allowed to get

13   up and put on the other side.

14        But I would say, Mr. Talley, show this witness since this

15   is not -- what's the lady who gave the deposition?

16             MR. LEYENDECKER:  Ms. Kibler.  Show the first piece

17   where it says, "I don't know."

18             THE COURT:  If this were not -- I think I will require

19   you to -- if you are going to use it with this witness, to show

20   the witness all of it so that it would be complete.  But I don't

21   think I would keep them from showing this witness the deposition

22   testimony on page 29.

23             MR. LEYENDECKER:  Okay.

24             THE COURT:  He just needs to take them through both

25   pages, page 20 where she says "I don't know" and page 29 where

 1   she ultimately says they are not in network.

 2              MR. LEYENDECKER:  You are breaking the tie.  That's

 3   what you are here for.

 4              THE COURT:  I think that's the ruling.

 5              MR. LEYENDECKER:  As long as he's going to show my

 6   witness the testimony that says she doesn't know anything about

 7   Ambetter of Arkansas.

 8              THE COURT:  Because that's her complete response.

 9   When you take the response in total, it's her saying "I don't

10   know" but then she says, here's the deal.  That keeps both

11   arguments alive for both of them.

12              MR. LEYENDECKER:  I'm going to stop drilling.  My wife

13   says, Kevin, stop drilling.  I will stop drilling.

14              THE COURT:  You are not digging a hole in any way.

15              MR. LEYENDECKER:  I think you have heard what I have

16   to say so I'm not going to drill anymore.  That's what I mean by

17   that, Judge.

18              MS. HENRY:  Your Honor, may I clarify one point?

19              THE COURT:  Yes, ma'am.

20              MS. HENRY:  The way I view the difference in topic 10

21   and the topics in the 20s that were not for Mrs. Kibler is that

22   the topic 10 was a general topic.  It was split up between

23   Mrs. Kibler and Mr. Bristow.  And then those 20s topics are the

24   specific topics, and this testimony fit squarely within those

25   topics.

1      So when you have got a general section and a specific

2  section, my argument is the specific section of the rules.

3           MR. THOMPSON:  And, Your Honor, Ms. Henry and I

4  prepared Ms. Kibler -- I'm sorry.  For the record Michael

5  Thompson.  Prepared Ms. Kibler, and I can tell you that we

6  prepared her with the understanding that she was the general and

7  Kent was the specific.

8           MS. HENRY:  And that's the way the testimony came out.

9           MR. LEYENDECKER:  Just one last thought, Judge, on

10  this, and I think this is a new thought.

11      I think the appropriate thing to do is to -- sounds like

12  you've broken the tie, and I get that.  Then he doesn't get -- I

13  think he should show it to the witness and ask familiarity,

14  etcetera, not put this up on the screen for those jurors to see

15  whatever he's got on his mind.  Take it over.  Let me show you

16  20.  You read that, understand what it's saying.  Read 29, and

17  he's going to ask whatever question he's going to ask.

18           THE COURT:  I'll overrule you on that because she's

19  the 30(b)(6) deponent.  She is the party, right?  She is the

20  plaintiff?

21           MR. LEYENDECKER:  If --

22           THE COURT:  Plaintiff's deposition, a party's

23  deposition can be used in any way that counsel wants to use it

24  at trial.

25           MR. LEYENDECKER:  If you are making the fundamental

Thompson - Cross

```
 1    decision that she was, in fact, a 30(b)(6) on the topic in
 2    question.  So you are breaking the tie on whether -- my argument
 3    is about 20 through 22 which is very focused, clear in the
 4    questions, focused on Ambetter and clear 10 is sea to shining
 5    sea, right?
 6              THE COURT:  Yeah.
 7              MR. LEYENDECKER:  If you want to break that tie, I get
 8    it.  But it's clear.
 9              THE COURT:  That will give you a record, too, for
10    appeal.  So, yes, that's what I'm doing.  I'm going to let him
11    show --
12              MR. LEYENDECKER:  Just to be clear.
13              THE COURT:  He's going to show --
14              MR. LEYENDECKER:  He can put it up on the screen, but
15    he's got to start with 20 where she says "I don't know."
16              THE COURT:  Take it through both.
17              MR. LEYENDECKER:  There you go.  I can live with that.
18    I mean, for purposes of your ruling.
19              THE COURT:  That's fine.  And your objection is
20    preserved.  Your objection is that none of it used, that, as I
21    see it, your objection is this witness was not designated to
22    testify about this specific topic, that this is outside the
23    scope of the areas that she was designated for, that she can't
24    bind the company for those reasons, and there are times --
25    precedent is that, even if you don't let the witness testify
```

1    behind the corporation, that can be her testimony.

2         I probably would not just receive it for that purpose.  I

3    have given you a definitive ruling that this is one of the areas

4    she was designated to talk about.  That preserves your issue for

5    appeal.  But what I'm requiring is, because it seems like she

6    gave inconsistent testimony, that I'm requiring defendant -- and

7    sometimes parties don't like -- let me put up what I want to put

8    up.  They want to come up behind me, show them the other part.

9    What I'm requiring Mr. Talley to do is put it all up now

10   because, if she was here testifying, he was going to show it to

11   her, that's one thing.  But she's not here testifying.  He's

12   using it with the doctor, and the doctor wasn't sitting there at

13   her testimony.

14            MR. LEYENDECKER:  That's correct.

15            THE COURT:  So show them both of them, and then the

16   doctor can give whatever testimony he's going to give about it.

17            MR. TALLEY:  I'll do it, Judge.

18            THE COURT:  And so your objections are overruled, and

19   you have a record now.

20            MR. LEYENDECKER:  Thank you, Judge.

21            THE COURT:  And who's -- is this yours, the amended

22   notice?  Whose amended notice is this?

23            MR. TALLEY:  That's mine.

24       (Jury present.)

25            THE COURT:  All right.  You may be seated.

1          Mr. Talley, you may continue.

2                MR. TALLEY:  Your Honor, may I approach the witness?

3                THE COURT:  Yes.

4     BY MR. TALLEY:

5     Q.   All right.  Dr. Thompson, we are back.  You gave a

6     deposition in this case, right?

7     A.   That's correct.

8     Q.   You are familiar with the -- a deposition transcript?

9     A.   Yeah.  I went over it really quickly.

10    Q.   You have read it.  I've just handed you the deposition of a

11    woman named Heather Kibler, and you told me before lunch that

12    you don't know Ms. Kibler?

13    A.   No.  I don't know Ms. Kibler.

14    Q.   Well, I can introduce her for you, and Ms. Kibler works for

15    TeamHealth.  Okay?

16    A.   Okay.

17    Q.   And she works as the vice president of education and

18    integration.  Okay?  Which, as I understand it, she supports

19    billing centers and oversees provider enrollment processes.  All

20    right?

21    A.   Okay.

22    Q.   We had the opportunity to take Ms. Kibler's deposition on

23    July 8 of 2020.  Okay?  And I'm just going to ask you a couple

24    questions about what she said during her deposition.  All right?

25    A.   Okay.

1    Q.    If you can flip to page 11 for me.

2          Are you there, Dr. Thompson?

3    A.    Yes, sir.

4    Q.    You see the line numbers on the left-hand column?

5    A.    Yes, sir.

6    Q.    All right.  At line 19 the question was asked:  "And you

7    understand that you have been designated by the plaintiff in

8    this case, Southeastern Emergency Physicians to testify on its

9    behalf as to the topics listed by Ms. Henry."  Do you see that?

10   A.    Yes.

11   Q.    Did I read that correctly?

12   A.    You did.

13   Q.    And Ms. Kibler said, "Yes."  Did I read that right?

14   A.    You did, sir.

15   Q.    And then the next line is a question that says, "And then

16   you understand that you're speaking on behalf of the plaintiff,

17   correct?"  Did I read that right?

18   A.    Yes, you did.

19   Q.    And when it comes to Ms. Kibler's testimony, she answered

20   that question on the next page at the first line where she said,

21   "Yes, correct."  Do you see that?

22   A.    Yes, I do.

23   Q.    Okay.  I'm going to walk you then to page 20 of this

24   deposition.  Can you go there for me?

25         And Ms. Kibler was asked a couple of questions.  We'll

1   start at line 9.  Okay?

2   A.   Okay.

3   Q.   That question says, "Okay.  So for that product, the

4   Ambetter in Arkansas product, do you know if there was ever an

5   expected amount loaded in plaintiff's system associated with

6   Ambetter patients?"  Do you see that?

7   A.   I do.

8   Q.   Did I read it correctly?

9   A.   Yes, you did.

10  Q.   And Ms. Kibler's response was, "I don't know if I can

11  answer if there ever was.  I believe that it's out of network,

12  so we don't have a rate loaded."  Do you see that?

13  A.   Yes.

14  Q.   And then there was a question that got stricken, and the

15  next line at 18, do you see that?  It says, "To your knowledge,

16  no rates have ever been loaded for Ambetter of Arkansas?"

17          MS. HENRY:  Your Honor, we object based on

18  completeness.  He skipped the questions in between, and those

19  should be read consistent with the Court's ruling earlier.

20          THE COURT:  What were the questions?  Were they above

21  or -- what page was that?

22          MS. HENRY:  The question was:  "So" -- that he

23  skipped -- "So to your knowledge, is it fair to say that you

24  don't know that?"

25          MR. TALLEY:  And it says, "Strike that."  That's why I

1    didn't read it.  But if Ms. Henry wants me to read that, I'm

2    happy to do so.

3    BY MR. TALLEY:

4    Q.    Let's go back to line 16, and that says, "So to your

5    knowledge, is it fair to say that you don't know that?  Strike

6    that."  Do you see that?

7    A.    Um-hum.

8    Q.    That's what Ms. Henry wanted me read.

9    A.    Yes.

10   Q.    Let's go back to line 19.  "To your knowledge, no rates

11   have ever been loaded for Ambetter of Arkansas; is that

12   correct?"  Do you see that?

13   A.    I do see that.

14            MR. TALLEY:  Ms. Henry, do you want me to read the

15   objection?

16            MS. HENRY:  Yes, sir.

17            MR. TALLEY:  Happy to do so.

18   BY MR. TALLEY:

19   Q.    Ms. Henry then put an objection on the record where she

20   says, "Objection, form of the question."  Do you see that?

21   A.    Yes, sir.

22   Q.    Okay.  You remember that from your deposition where the

23   lawyers will object sometimes?

24   A.    Correct.

25   Q.    Okay.  And the answer to that question was, "So I wouldn't

1   be able to speak if one was ever loaded."  Do you see that?

2   A.    Yes, I see that.

3   Q.    Lines 22 and 23.  And then we get back into a discussion at

4   24 and 25 and then onto the next page where Ms. Kibler is asked

5   about her position as the vice president of education and

6   integration.  Do you see that?

7   A.    I do.

8   Q.    Okay.  And she's had that position, at page 21, she said,

9   for four years.  Do you see that?

10  A.    I see that.

11  Q.    All right.  Let's skip ahead then to page 29.  We can

12  probably start, Dr. Thompson, at line 10.

13  A.    I'm sorry.  Which line?

14  Q.    At line 10.

15  A.    10.

16  Q.    And on line 10 the question was asked, "Okay.  So earlier

17  we had discussed -- you had talked about how expected amounts

18  are loaded in the system for billing centers, correct?"  Do you

19  see that?

20  A.    I do see that.

21  Q.    Ms. Kibler responded to that question by saying, "Yes."  Is

22  that right?

23  A.    That's correct.

24  Q.    And then at line 14, she's asked another question.  "Okay.

25  You said, if there's a contract with an insurance company, then

1   you load the expected rate, correct?"  Do you see that question?

2   A.    Yes.  I see that question.

3   Q.    "If there's a contract with an insurance company, then you

4   load the expected rates?"  Did I read that right?

5   A.    Yes.

6   Q.    And Ms. Kibler said, "Yes," right?

7   A.    Correct.

8   Q.    The next question at line 18 says, "And there's no expected

9   rate loaded for the Ambetter of Arkansas product, correct?"  Did

10  I read that correctly?

11  A.    You did read that correctly.

12  Q.    Ms. Henry said, "Objection, form of the question."  Do you

13  see that?

14  A.    I do.

15  Q.    And Ms. Kibler then answered that question that was asked

16  at lines 18 and 19, when she was asked, "And there's no expected

17  rate loaded for the Ambetter of Arkansas product, correct?"

18        And Ms. Kibler's response to that question was "So my

19  understanding is we are out of network with Ambetter of

20  Arkansas, so we do not have a specific rate loaded in our

21  system."  Do you see that?

22  A.    I do.

23        MR. TALLEY:  Thank you, Dr. Thompson.  I have no

24  further questions.

25        THE COURT:  Okay.  Redirect.

```
 1                    REDIRECT EXAMINATION

 2   BY MS. HENRY:

 3   Q.    Dr. Thompson, did you hear testimony in this matter from

 4   our witnesses prior to giving your testimony today that

 5   someone --

 6            MR. TALLEY:  Your Honor, based on the form of this

 7   question, I don't see how it can escape a hearsay objection.

 8            THE COURT:  I'll overrule it.

 9            MR. ZAVITSANOS:  It's in Court.

10            THE COURT:  I'll overrule the objection, and I think

11   she's just laying a foundation for her testimony.

12   BY MS. HENRY:

13   Q.    Did you hear testimony from Centene's two representatives

14   the last three days?

15   A.    Yes.

16   Q.    And did you hear testimony that someone -- that someone

17   being Mr. Meldrum -- had gone into the Centene system and taken

18   Southeastern Emergency Physicians out of network in their

19   system?

20   A.    Yes, I did.

21   Q.    Do you remember the Portico system where they load

22   contracts and take contracts out, that somebody had gone in

23   there and taken Southeastern Emergency Physicians out?  Do you

24   remember that?

25   A.    I do remember hearing that.
```

1    Q.   Do you remember the testimony that had been done sometime
2    in 2017?
3    A.   I'm sorry.  Repeat that question for me.
4    Q.   Do you remember the testimony he gave that that had been
5    done sometime during 2017?
6    A.   Correct.  That's what I heard.
7    Q.   Turn to the front page of this transcript.
8             THE COURT:  She wants to switch over to the Elmo.
9             MR. ZAVITSANOS:  Michelle has got it.
10            MS. HENRY:  Thank you, Ms. Rivers.  If you could just
11   put up the first page.
12   BY MS. HENRY:
13   Q.   While she's doing that, Dr. Thompson, you were not present
14   at Ms. Kibler's deposition, were you?
15   A.   No.
16   Q.   Do you even know when it occurred?
17   A.   No, ma'am.
18   Q.   Let's look at the first page.
19            MS. HENRY:  And, Ms. Rivers, if you will pop out the
20   date for me.  Oh, that's even better.  Thank you.
21   BY MS. HENRY:
22   Q.   We see this is a deposition, a recorded deposition of
23   Heather Kibler taken by Centene and the insurance companies on
24   July 8th of 2020.
25   A.   I see that.

1  Q.    Just last month, correct?

2  A.    Correct.

3  Q.    That is at least three years after Centene pulled

4  Southeastern Emergency Physicians out of network in Portico,

5  right?

6  A.    Yes.  That would be --

7  Q.    So at the time of this deposition, if I understand the

8  insurance company's testimony correctly, there's no way

9  Mrs. Kibler would have said Southeastern Emergency Physicians

10  was in network on July 8th of 2020?

11  A.    That makes complete sense to me.

12          MS. HENRY:  Your Honor, I have no more questions for

13  Dr. Thompson.

14          MR. TALLEY:  I have one question.

15          THE COURT:  Okay.  Is it -- is it an issue that was

16  raised on redirect?

17          MR. TALLEY:  It is.

18          THE COURT:  Okay.

19                    RECROSS-EXAMINATION

20  BY MR. TALLEY:

21  Q.    If you go back to page 29, Dr. Thompson.  Excuse me.

22          MS. HENRY:  We've already had the testimony on page

23  29.  It's been read into the record, and this witness has no

24  knowledge of this testimony.

25          THE COURT:  I understand.  I asked Mr. Talley before

1  he began the recross if this was in direct response for

2  something raised for the first time on redirect, and he told me

3  yes.  I want to hear what the question is.

4  BY MR. TALLEY:

5  Q.   Dr. Thompson, can you read to me the last two words of

6  Ms. Kibler's answer on line 23 of this deposition?

7  A.   "Our system."

8         MR. TALLEY:  Thank you.

9         THE COURT:  Any follow-up, Ms. Henry?

10                     REDIRECT-EXAMINATION

11 BY MS. HENRY:

12 Q.   Dr. Thompson, I'm going to ask you to take just a second

13 and read the entire answer.

14 A.   "The witness:  So my understanding is we are out of network

15 of Ambetter of Arkansas, so we do not have a specific rate

16 loaded in our system."

17 Q.   I'm not a very good English major, but I know present and

18 past tense.  Do you know what present tense is and past tense

19 is?

20 A.   Yes, ma'am.

21 Q.   Okay.  When you read Ms. Kibler's response, do you read it

22 the same way I do, that she's talking about present tense, not

23 past tense?

24 A.   I do.  Present tense is what I'm taking from when I read

25 that sentence.

```
 1              MS. HENRY:  Thank you.  No more questions.
 2              THE COURT:  Anything else, Mr. Talley?
 3              MR. TALLEY:  Nothing further.  I don't want to do an
 4    English lesson.
 5              MR. DRENNON:  Mr. Kennedy and I are going to fight
 6    over who gets the next witness, Your Honor.
 7              THE COURT:  Okay.  Call your next witness.
 8              MR. DRENNON:  Kim Suggs, Your Honor.
 9              THE COURT:  Did we know where he is in the building?
10              MR. DRENNON:  It's a she, Your Honor.
11              MR. TALLEY:  I think he just went to get her.  We
12    don't have access to either of these rooms.
13              THE COURT:  What's her first name?
14              MR. TALLEY:  Kim.
15              THE COURT:  Ms. Pruitt?
16              MS. PRUITT:  Yes, Your Honor.
17              THE COURT:  What's going on with these two locked --
18              MS. PRUITT:  This side.
19              THE COURT:  Keep them from being all balled up
20    together?
21              MS. PRUITT:  Yes.
22              THE COURT:  Ms. Suggs, come on down.
23           KIM SUGGS, PLAINTIFF'S WITNESS, DULY SWORN
24                       DIRECT EXAMINATION
25    BY MR. DRENNON:
```

1  Q.   Good afternoon, Ms. Suggs.  You already -- I was going to

2  tell you can take off your mask if you want to.

3       My name is Baxter Drennon.  I represent Southeastern

4  Emergency Physicians in this lawsuit.  We have never met before,

5  right?

6  A.   Right.

7  Q.   Do you mind speaking up so the jury can hear?

8  A.   Sure.

9  Q.   I had anticipated talking with you a little earlier, and I

10 was going to tell you when we started that there had been a

11 couple witnesses and it's taken a long time.  But we have picked

12 up the pace just a little bit in this case, and I'm hoping to

13 continue to do that with you.  Okay?

14 A.   Okay.

15 Q.   And to do that, I'm going to ask you questions.  If you'll

16 answer my questions, we'll run through these as fast as we can.

17 Okay?

18 A.   Okay.

19 Q.   All right.  You are a Centene employee, right?

20 A.   Yes.

21 Q.   But you actually started working for NovaSys Health back in

22 1997?

23 A.   Correct.

24 Q.   And then in 2010 after Centene bought NovaSys, you became a

25 NovaSys -- excuse me.

1        After Centene bought NovaSys, you became a Centene

2   employee, right?

3   A.    Yes.

4   Q.    At the time that NovaSys was sold to Centene, you were an

5   owner of NovaSys, right?

6   A.    Correct.

7   Q.    One of a few different folks?

8   A.    Right.

9   Q.    And just to briefly talk about NovaSys and what it is,

10  NovaSys, when you owned it before 2014, it's a company that

11  signs up doctors for provider networks, right?

12  A.    Yes.

13  Q.    NovaSys owns provider networks?

14  A.    Correct.

15  Q.    That was its business before 2014 and even earlier than

16  that, right?

17  A.    It was one of the things that they did, yes.

18  Q.    It owns and leases provider networks at that time, right?

19  A.    Yes.  Yes.

20  Q.    The NovaSys networks that existed at the time Centene

21  bought it, you testified Choice network and Preferred network;

22  is that right?

23  A.    Yes.  There were two different networks, yes.

24  Q.    Yes, ma'am.  And NovaSys' clients during that 2013-'14

25  time, their clients provided health care, right?

1    A.    Yes.

2    Q.    Health care to the members, correct?

3    A.    Their clients did, yes.

4    Q.    And NovaSys was not at risk for any of the losses

5    associated with provider payments for those members, right?

6    A.    Correct.

7    Q.    So in my mind -- and please help me.  Have you ever had

8    somebody, probably when you were a kid, give you money to pay

9    for something, maybe a parent giving you money for a movie

10   ticket, something like that?

11   A.    Sure.

12   Q.    You go to the movies.  You take the money your parents gave

13   you.  You give it to the ticket guy?

14   A.    Right.

15   Q.    That's your parent paying for your ticket, sort of you

16   passing the money along, right?

17   A.    Yes.

18   Q.    Similar sort of situation with what was happening with

19   NovaSys back when you owned it, pre2014, there may have been a

20   company that gave NovaSys money to pay claims, but it wasn't

21   NovaSys' money, correct?

22   A.    Correct.

23   Q.    The money just passed through?

24   A.    Right.

25   Q.    After 2014, NovaSys continued leasing provider networks,

1    right?

2    A.   NovaSys continued to its clients, yes, at least the

3    networks.

4    Q.   It continued leasing provider networks, correct?

5    A.   It continued leasing the network to its clients, yes.

6    Q.   Yes, ma'am.  And again NovaSys' clients or client, in that

7    case, companies that provide health care coverage, right?

8    A.   Yes.

9    Q.   Yes.  And much like the pre2014, NovaSys was still not at

10   any risk for any of the payments that were made to providers,

11   right?

12   A.   Correct, for payments made to providers for its clients,

13   yes.

14   Q.   Good.  We got that out of the way.

15        I want to transition briefly to talk about things that you

16   don't know.  Okay?  Is that fair?

17   A.   Sure.

18   Q.   I just want to narrow down what you and I have to talk

19   about today with the jury.  Okay?

20        I'm going to read from a list, and this is based on

21   previous you gave me, but if I misunderstood something, would

22   you let me know?

23   A.   Sure.

24   Q.   You don't contract with providers, right?

25   A.   Correct.

1   Q.   You don't execute contracts with providers?

2   A.   Correct.

3   Q.   You have not done any work on behalf of NovaSys since it

4   was purchased by Centene, right?

5   A.   Correct.

6   Q.   You don't have any responsibilities related to NovaSys?

7   A.   Correct.

8   Q.   You don't know how many contracts NovaSys has had at any

9   one time with providers in its history, right?

10   A.   Correct.

11   Q.   You don't know what happened to NovaSys' contracts that

12   existed before January 1st, 2014?

13   A.   Correct.

14   Q.   Not seen the complaint in this lawsuit?

15   A.   No, I have not.

16   Q.   You never reviewed any claims from SE Physicians?

17   A.   In the context of reviewed, looked at the claims?

18   Q.   Yes, ma'am.

19   A.   I have looked at some claims data.

20   Q.   Okay.  Have you ever looked at the claims that were

21   submitted?

22   A.   No.

23   Q.   You have not personally had any claims issues that were

24   related to SE Physicians directed to you in your course of

25   business, right?

1   A.   No, I have not.

2   Q.   And you don't have any specific knowledge of SE Physicians'

3   claims, correct?

4   A.   Correct.

5   Q.   You don't have any knowledge related to reimbursement rates

6   paid by Centene to SE Physicians, right?

7   A.   By Centene or by NovaSys?

8   Q.   Either one.  You don't have knowledge of that, do you?

9   A.   I have -- I have knowledge of reimbursement processes for

10  claims paid -- for all claims paid for our clients and members.

11  Q.   You don't have specific knowledge related to SE Physicians'

12  claims, correct?

13  A.   Correct.

14  Q.   Okay.  Until last year, so 2019, when your deposition was

15  given in this case, you did not have any knowledge of the

16  contract between NovaSys and SE Physicians?

17  A.   I did not.

18  Q.   Even though you had been an owner of the company, right?

19  A.   Correct.

20  Q.   You only learned about the contract in the course of this

21  lawsuit, correct?

22  A.   Correct.

23  Q.   You've never been involved in negotiations with SE

24  Physicians?

25  A.   I have not.

1   Q.   And you don't know what SE Physicians was being paid on
2   claims before 2014?
3   A.   During the depositions, I became aware of what SE
4   Physicians was supposed to be paid, but before the depositions,
5   I was not aware.
6   Q.   So that's something you educated yourself on related to
7   this lawsuit?
8   A.   At the point of the depositions, I was a part and listened
9   in with all the other individuals in the depositions and learned
10  from that information.
11  Q.   I understand.  So other than this lawsuit, you would not
12  have any information about what SE was paid on claims before
13  2014?
14  A.   Correct.
15  Q.   Same thing, before and after 2014, other than this lawsuit,
16  you don't have any information --
17          COURT REPORTER:  Sir, can you slow down a little bit?
18          MR. DRENNON:  Yes, ma'am.
19          THE WITNESS:  Specifically?
20  BY MR. DRENNON:
21  Q.   Correct.
22  A.   No.
23  Q.   Okay.  And last on this topic, you don't know anything
24  about SE Physicians' claims for damages in this case?
25  A.   I do not.

1    Q.   We are going to do the opposite now, if that's okay.  Let's
2    talk about a few of the things that you are responsible for.
3    Okay?
4    A.   Okay.
5    Q.   Since 2012 your job responsibilities have included
6    oversight for the enrollment functions of the
7    commercial-exchange product?
8    A.   Yes.
9    Q.   The premium billing component of the commercial-exchange
10   product?
11   A.   Yes.
12   Q.   And that includes the system setup for that, right?
13   A.   Yes.
14   Q.   Member-benefit configuration for claims?
15   A.   Oversight for that, yes.
16   Q.   And you have had oversight over the member call center?
17   A.   Yes.
18   Q.   You have had oversight over the provider call center?
19   A.   Yes.
20   Q.   And as of your deposition, you still had oversight over the
21   provider call center, right?
22   A.   Yes.
23   Q.   Still have that?
24   A.   Yes.
25   Q.   You are responsible for communications and marketing?

1    A.    I have oversight of that area as well, yes.

2    Q.    And oversight, you mean supervision?

3    A.    Yes.

4    Q.    And then you have oversight over adjudication of claims,

5    correct?

6    A.    Yes.

7    Q.    All right.  One of those items we just talked about on

8    oversight -- that you had oversight over the call center,

9    correct?

10   A.    Correct.

11   Q.    And specifically the provider call center?

12   A.    Yes.

13   Q.    And in my mind the provider call center is a number that a

14   provider can call in and ask questions?

15   A.    Yes.

16   Q.    The question might be:  Am I in network?

17   A.    Yes.

18   Q.    It might be:  What's my rate?

19   A.    Yes.

20   Q.    Okay.  And the folks who work in the call center for you,

21   you expect them to be helpful when people call, don't you?

22   A.    Yes.

23   Q.    You expect them to provide information?

24   A.    Yes.

25   Q.    You expect them to answer questions?

Suggs - Direct

1   A.   Yes.

2   Q.   You do not expect them to stonewall the providers that

3   call, do you?

4   A.   No.

5   Q.   You don't train the folks in that call center not to answer

6   questions, do you?

7   A.   No.

8   Q.   If somebody refused to answer a question, you'd probably

9   fire them, wouldn't you?

10  A.   They would certainly be counseled about that.

11  Q.   Okay.  Exhibit 46 please.  And I'll tell you this exhibit

12  is something that's been admitted into evidence in this case,

13  and I just want to ask you a few questions about it.  Okay?

14  A.   Okay.

15          MR. DRENNON:  46, Ms. Rivers.

16          MR. ZAVITSANOS:  47.

17          MR. DRENNON:  Excuse me.  47.  Ms. Rivers, if you can

18  pull out the bottom of the e-mail to orient everybody real

19  quick.

20  BY MR. DRENNON:

21  Q.   We see an e-mail here from a lady named Tammie Tibbits to

22  info@celtic/net.com, right?

23  A.   Yes.

24  Q.   That's something similar to a call-in center, the

25  information e-mail address?

1   A.   I am not certain what that e-mail address -- if it was

2   actually to the call center or not.  I don't recognize that.

3   Q.   I apologize.  I'll ask a different question.  Is it

4   something similar to a call center where a provider would e-mail

5   in for information?

6   A.   Yes, it could be similar.  Generic.

7   Q.   We see an e-mail December 9, 2015?

8   A.   Yes.

9   Q.   And Ms. Tibbits, she sends an e-mail to this

10  info@celtic/net.com.  "I'm trying to locate an appropriate

11  contract person in provider relations network development,"

12  right?

13  A.   Yes.

14  Q.   Okay.  All right.  If we can move on up to the next e-mail

15  in the chain.  In fact, you can probably pull up the next

16  couple.

17      Ma'am, I'm sure you noticed December 9 was the original

18  e-mail.  December 23rd, Ms. Tibbits sent another e-mail.  "I

19  haven't received a response."  Do you see that?

20  A.   I do.

21  Q.   This is 14 days later.  Would that be inconsistent with the

22  practices that you expect from your folks in the call center, to

23  not respond to somebody for 14 days?

24  A.   Yes, but this is not from our call center.

25  Q.   I understand.  I'm just asking about your call center.

```
 1    This 14-day delay would be inconsistent with what you would
 2    expect for your call center?
 3    A.    For my call center.
 4    Q.    And Ms. Tibbits' e-mail goes to somebody.  And I'm not sure
 5    if you can pronounce her name.  Do you know Michelle
 6    Wreschinsky?
 7    A.    I do not know her.
 8    Q.    We'll try Wreschinsky.  Okay?
 9          Ms. Wreschinsky on December 23, 2015, she forwards the
10    e-mail approximately an hour later to someone named Nate
11    Watters, right?
12    A.    Yes.
13    Q.    And she says, "This is from the info box," correct?
14    A.    Correct.
15    Q.    And Ms. Wreschinsky, she's asking for help on who to
16    forward this to, right?
17    A.    Yes.
18    Q.    Mr. Watters, he forwards it to somebody named Joel Portman.
19    Do you understand that Mr. Portman is a staff VP of network
20    design for Centene, right?
21    A.    Yes.
22    Q.    He's somebody in the corporate office?
23    A.    Yes.
24    Q.    He's over the entire Ambetter network nationally, right?
25    A.    He is over the -- yes, the network from a corporate
```

1    perspective.

2    Q.    Okay.  So Mr. Watters, he's asking for help from

3    Mr. Portman on responding to Ms. Tibbits' request, right?

4    A.    Yes.

5    Q.    And you would expect -- this is somebody asking for

6    information.  You would expect them to provide an answer or at

7    least be helpful and respond, right?

8    A.    Yes.

9    Q.    That's what you would expect.

10        Let's look at Mr. Portman's response.

11              MR. DRENNON:  Can you pull that out, Ms. Rivers?

12   BY MR. DRENNON:

13   Q.    So Mr. Portman, "Hi, Nate.  Thanks for sending Steve -- he

14   copies a gentleman named Steve Sansel (phonetic)."  This is

15   again on December 23rd.  "Hey, Steve, I owe you a response."  So

16   somebody internal, right?

17   A.    Yes.

18   Q.    Mr. Portman is saying, I owe internal Centene employee

19   responses, but in bold underline, "Don't respond to

20   Ms. Tibbits."  That's what he says, right?

21   A.    Yes.

22   Q.    That's inconsistent with how you train folks in your call

23   center to respond to requests for information, right?

24   A.    In my call center, yes.

25   Q.    Yes, ma'am.  This is a request for information.  You saw

1    it, right?

2    A.   Yes, but not to the call center.

3    Q.   Understand.

4         Mr. Portman is directing folks to stonewall requests for

5    information, isn't he?

6    A.   It says here, "Please do not respond," yes.  At this

7    time --

8    Q.   I'm sorry.  I didn't mean to cut you off.  Did you finish?

9    A.   Yes.

10   Q.   Do you know if he had some sort of sinister reason to do

11   that?

12   A.   I have no idea.

13   Q.   All right.  If this was one of your call center employees,

14   might not be fired, but I think you said you would have a strong

15   talking to with him?

16   A.   In the call center, if they didn't respond and didn't

17   provide additional assistance, yes.

18   Q.   I understand.  Okay.

19        I want to talk about another area that you have oversight

20   for, and that's adjudication of claims, right?

21   A.   I don't specifically oversee the adjudication component.

22   I'm not over the claims team, but I have responsibilities for

23   Arkansas to -- for oversight of our processes, yes.

24   Q.   Okay.  And as I understand it, insurance companies, they

25   generally have a safeguard to ensure that they only make proper

1  payments either to providers or others; is that right?

2  A.   Yes.

3  Q.   Okay.  And a reasonable insurance company takes steps to

4  ensure that the payments it makes, that they are proper, right?

5  A.   Yes.

6  Q.   In other words, before issuing a check, a reasonable

7  insurance company does its homework that makes sure that a

8  treatment is covered, for example; is that fair?

9  A.   It's fair to say that our systems are preconfigured to make

10  proper payment, yes.

11  Q.   And it's not like a patient can just call up and say, I

12  want X procedure, and the insurance company will just cut a

13  check for it, right?

14  A.   Correct.

15  Q.   If there's a request for a procedure like that, an

16  insurance company employee or maybe your system, as you

17  described it, would go through the contract for coverage that

18  the insurance company has with the individual to see if that

19  procedure was covered, right?

20  A.   Yes.  That's all preconfigured into our systems.

21  Q.   And the document, the policy document that would be looked

22  at to determine if there was coverage, that would be called an

23  evidence of coverage; is that right?

24  A.   Yes.

25          MR. DRENNON:  Ms. Rivers, can you pull up Defendant's

 1   Exhibit 30.

 2   BY MR. DRENNON:

 3   Q.   And, ma'am, is this an example of evidence of coverage you

 4   were talking about?

 5   A.   Yes.

 6            MR. DRENNON:  Ms. Rivers, can you go to the last page?

 7   I believe it's 85 of 99.  Okay.  Just the page number at the

 8   bottom.  85.

 9   BY MR. DRENNON:

10   Q.   The evidence of coverage takes the insurance company 85

11   pages to describe the things that it will and will not pay for,

12   correct?

13   A.   Yes, among other things contained in the evidence of

14   coverage.

15   Q.   And on the provider side, there's another document that

16   shows what Centene will pay for and how it will pay.  That's

17   called a Provider and Billing Manual, correct?

18   A.   Yes.

19   Q.   And you are familiar with the Provider and Billing Manual,

20   aren't you?

21   A.   Yes.

22            MR. DRENNON:  Ms. Rivers, if we can look at Exhibit

23   No. 125.

24   BY MR. DRENNON:

25   Q.   And this is something you have seen before, right?

Suggs - Direct

1    A.    Yes.

2    Q.    And this is the -- it's copyrighted 2019.  I'm not sure you

3    can see that at the bottom, Provider and Billing Manual, roughly

4    the same year, right?

5    A.    They are updated the same.

6    Q.    Generally the same with some updates?

7    A.    Yes.

8    Q.    Okay.  All right.  I want to look at this one briefly.

9              MR. DRENNON:  Ms. Rivers, if we can go to page 39.

10   40.  I'm sorry.  Page 40.

11        Ms. Rivers, if you could pull out the chart that's shown

12   here.

13   BY MR. DRENNON:

14   Q.    Ms. Suggs, do you see the chart that's shown?

15   A.    Yes.

16   Q.    And you can see that just under this section, Initial

17   Claims, there's something called par and something called

18   nonpar?

19   A.    Yes.

20   Q.    Okay.  And I think that that's -- we had insurance 101

21   yesterday quite a while.  I think that something par is, in your

22   terms, there's a contract; nonpar, there's not a contract?

23   A.    Correct.

24   Q.    And then there's different days for claims to be submitted

25   depending on if it's par or nonpar.  Do you see that?

1    A.    Yes.

2    Q.    And so by this guideline, Centene intends -- intends for it

3    to fly par or nonpar, correct?

4    A.    Correct.

5          MR. DRENNON:  And, Ms. Rivers, if we can move down to

6    the section Refunds and Overpayments.  Right there.  And if you

7    could highlight the first sentence there.

8    BY MR. DRENNON:

9    Q.    And you see that Ambetter routinely audits all claims for

10   payment errors?  Do you see that?

11   A.    Yes, all claims are subject --

12   Q.    Yes, all claims.  And that's what your company does, right?

13   A.    To be subject to audit, correct.

14   Q.    But the document -- your company's document, it says

15   Ambetter routinely audits all claims, right?

16   A.    That's what it said, yes.

17         MR. DRENNON:  And, Ms. Rivers, if we could go to page

18   55.  And if we could highlight the code editing team and then

19   the -- scroll up.

20   BY MR. DRENNON:

21   Q.    Ms. Suggs, do you see this section?

22   A.    Yes.

23   Q.    The first line, Ambetter uses HIPAA-compliant clinical

24   claims editing software for physician and outpatient facility

25   coding verification, right?

1   A.    Yes.

2   Q.    And we have heard about coding in this case.  99285.  These

3   types of numbers, right?

4   A.    Correct.

5   Q.    And when this says, "Coding verification," that's the

6   coding that it's talking about, the numbers that are billed --

7   used to bill for physician services, right?

8   A.    Correct.

9   Q.    And this is telling us that Ambetter uses software to

10  evaluate the coding that comes in from the physicians and the

11  facilities, right?

12  A.    Correct.

13  Q.    And then it goes on, the second sentence, the software will

14  detect, correct, and document coding errors on provider claim

15  submissions prior to payment, correct?

16  A.    Correct.

17        MR. DRENNON:  Ms. Rivers, will you circle "prior to."

18  BY MR. DRENNON:

19  Q.    We've had English lessons.  We've had insurance 101.  In

20  one of our English lessons earlier, we talked about "prior to."

21  To me that means before.  Is that what it means to you?

22  A.    The code editing software does edit before payment, yes.

23  Q.    And in this document that software will be used to detect,

24  correct, and document coding errors on provider claim

25  submissions before payment will be made?

1    A.    For coding.

2    Q.    For coding.  Again, and coding we are talking about

3    physicians record, it's used to creat a code, that's submitted

4    for payment, right?

5    A.    Yes.  But the code editing software does not edit the

6    provider's records.  It edits just the codes.

7    Q.    Just the codes?

8    A.    Yes.

9    Q.    Sure.  And that goes back to what we were talking about

10   earlier, that insurance companies take steps to make sure that

11   they are only making proper payments, right?

12   A.    To the extent possible, yes.

13   Q.    To the extent possible.

14         And with Ambetter incenting to the extent possible as it

15   relates to coding, that's not a one-step process with this

16   software; is that correct?

17   A.    Correct.

18         MR. DRENNON:  Ms. Rivers, if we can go to the next

19   paragraph.  Just pull out that paragraph.

20   BY MR. DRENNON:

21   Q.    You mentioned that the software is only as good as it can

22   be, right?

23   A.    Correct.

24   Q.    And because of that, Ambetter uses clinical validation by a

25   team of experienced nursing and coding experts to further

 1    identify claims for potential billing errors, right?

 2    A.    Yes.

 3    Q.    And, again, this is something that's done before payment is

 4    made?

 5    A.    Yes.

 6    Q.    This is your company's policy?

 7    A.    I'm not sure about it being a policy, but it is something

 8    that's done before payment.

 9    Q.    This is what you do, right?

10    A.    Yes.

11    Q.    Okay.  And this -- this validation that's done, First Step

12    Software, is that some sort of AI software; do you know?

13    A.    Where did you see "first step"?

14    Q.    Well, we can go back to the earlier paragraph, but -- and

15    we can see it here.  Software is helpful, but we are also using

16    clinical validation because the software is just a useful tool,

17    right?

18    A.    Right.

19    Q.    Okay.  So we've got software, and then we have actual live

20    people, nurses and experts, who further look at the coding

21    that's done before payment is made, right?

22    A.    Correct, if the software triggers an additional review.

23    Q.    It's your software, right?

24    A.    Right.  Well, it's not my software, but --

25    Q.    Your company's?

1    A.    The company's software.

2    Q.    Okay.  Thank you.

3          Now, the third area that we talked about that you have

4    oversight on is communications and marketing, right?

5    A.    Yes.

6    Q.    I want to look at a recent press release that was put out

7    by your company.  Exhibit 129.  And real quick before I get to

8    this, this software coding process we were just discussing,

9    that's something that Centene has been doing for several years,

10   right?

11   A.    Yes.

12   Q.    But even before 2019?

13   A.    Yes.

14   Q.    Okay.  All right.  So now we are looking at a press release

15   again.  You oversee marketing?

16   A.    Not for QualChoice.

17   Q.    Your company, you oversee marketing, right?

18   A.    For certain components of our company, yes.

19   Q.    Okay.  And you are saying you didn't oversee this specific

20   press release?

21   A.    No.

22   Q.    Okay.  That's fine.  Let's look at it real quick.  April 7,

23   2020.  Do you see that?

24   A.    Yes.

25   Q.    And this press release, you are familiar with the event

1   that occurred that's being described here, right?

2   A.   Yes.

3   Q.   Centene purchased QualChoice, another insurance company

4   here in Arkansas?

5   A.   Yes.

6   Q.   Before press releases are sent out, you know, you guys look

7   at them to make sure they are accurate, don't you?

8   A.   Yes.

9   Q.   The folks that work for you at least, right?

10  A.   Yes.

11  Q.   Okay.  And this press release, I'll highlight the sections

12  to the right of the photograph.  Because QualChoice is now under

13  the ownership of the Centene Corporation, QualChoice members

14  will be transitioned to Centene's Arkansas NovaSys Network.

15  That's what it says, right?

16  A.   That's what it says, yes.

17  Q.   Right.  And then we just look a little further down below

18  the photograph.  The change is expected to become effective this

19  summer.  We are in August.  Has that happened?

20  A.   Not that I'm aware.

21  Q.   Fair enough.  Moving a little slow.

22       It says, The NovaSys Health network serves these Centene

23  companies in Arkansas.

24       And what's the first company that's listed, ma'am?

25  A.   Ambetter from Arkansas Health & Wellness.

1    Q.    Ambetter from Arkansas Health & Wellness.  The thing we are

2    talking about in this lawsuit, right?

3    A.    Yes.

4    Q.    And according to Centene, this press release, the NovaSys

5    Health network, first company listed Ambetter from Arkansas

6    Health & Wellness?

7    A.    Yes.

8    Q.    Okay.  All right, ma'am.  I'm going to move on to one last

9    area.

10              MR. DRENNON:  Your Honor, may I approach?

11              THE COURT:  You may.

12   BY MR. DRENNON:

13   Q.    And I'm going to show you what's been marked for

14   identification purposes as Plaintiff's Exhibit No. 28.

15        And, ma'am, this is an e-mail from a lady named Karen

16   Richardson to you and several others, right?

17   A.    Yes.

18   Q.    This is something you are familiar with, correct?

19   A.    Yes.

20              MR. DRENNON:  Okay.  Your Honor, we would offer

21   Plaintiff's Exhibit No. 28.

22              THE COURT:  Any objection to 28?

23              MR. CADY:  Just a second, Your Honor.

24        No objection.

25              THE COURT:  It's received.

1          (Plaintiff's Exhibit 28 was received in evidence.)

2     BY MR. DRENNON:

3     Q.    Ma'am, who is Karen Richardson?

4     A.    She was a project manager, I believe, for the

5     implementation of the Ambetter product for Centene.

6     Q.    Okay.  And on February 17, 2014, she sends you -- and I

7     haven't counted -- and two or three dozen other folks an e-mail?

8     A.    Yes.

9     Q.    And I did some Googling.  Those are mostly vice presidents

10    of the company, right?

11    A.    No, not -- there are some that are -- were vice presidents

12    but definitely not all of them.

13    Q.    There are vice presidents, and then there's also someone

14    named Anan Chupla.  Do you see that Mr. Chupla's name there?

15    A.    Yes.

16    Q.    My understanding, Mr. Chupla was and is the person

17    responsible for the Ambetter network nationally; is that right?

18    A.    He's responsible for the Ambetter product.

19    Q.    Nationally?

20    A.    Nationally, yes.

21    Q.    So Arkansas, Mississippi, all the other states that it's

22    in, correct?

23    A.    He is -- yes.

24    Q.    He is the guy?

25    A.    He is the lead for that product, yes.

1          MR. DRENNON:  Ms. Rivers, we can go to page 2.

2     BY MR. DRENNON:

3     Q.    We see page 2, six weeks in, maybe seven weeks into the

4     launch of the Ambetter product, you get an e-mail with a slide

5     deck entitled Ambetter Post Go-Live Review, right?

6     A.    Yes.

7     Q.    And at least one of the reasons you got this e-mail with

8     this slide deck is because you were lined up to speak at the

9     meeting where this would be discussed, correct?

10    A.    Yes.  I was part of the implementation team for Ambetter.

11    Q.    All those folks that were on the e-mail that we just saw,

12    was that the implementation team?

13    A.    I don't know if it was the full team, but, yes, most of

14    those individuals worked on the implementation.

15    Q.    You were there for Arkansas, right?

16    A.    No, not specifically.  I actually worked from the

17    corporate -- at the corporate level during that time for all

18    Ambetter implementation across all the standing markets.  So not

19    specifically, but Arkansas was one of the plans that implemented

20    Ambetter initially.

21          MR. DRENNON:  Ms. Rivers, scroll down.  All the way

22    down.  That would be great if you can pull out the box there.

23    BY MR. DRENNON:

24    Q.    So the group you were involved in, it was responsible for

25    the implementation of Ambetter product everywhere it went live

1    in 2014.  Y'all are going to have a meeting, and you are going

2    to discuss improving the implementation process by identifying

3    opportunities for improvement and best practices, right?

4    A.    Yes.

5    Q.    And improvement in this case equals reduced risk, cost, and

6    schedule, correct?

7    A.    That's what this says, yes.

8    Q.    So the purpose of this meeting, this slide deck, reduced

9    costs?

10   A.    No.  I mean, the purpose would be to look at our

11   opportunities, where things might not have gone as smoothly on

12   the implementation than we would have liked.  So it's very

13   common after an implementation for the group to meet to look at

14   opportunities to improve the implementations going forward.  So

15   anything we could do better, we would do that to try and improve

16   the process.

17   Q.    Improving the process in this case, according to this slide

18   deck, from your company equals reduced cost?

19   A.    I'm not exactly sure in what context "reduced cost" here

20   would mean.  But it calls for the implementation.  So the

21   expenses -- administrative expenses associated with the

22   implementation.

23   Q.    Reducing cost; is that correct?

24         Let's look at the agenda on page 5 please.

25         Ms. Suggs, you remember being tasked with speaking on a

1  couple different topics at this meeting?

2  A.   I don't specifically recall that far back, but, yes, I was

3  a lead for that particular area; so it would not be uncommon at

4  all for me to speak on that piece.

5  Q.   And we'll look at both of them, but right now we've got

6  pulled up at 10:15 you were scheduled to speak on billing and

7  premium collection, right?

8  A.   Right.

9  Q.   If it was run like anything else, I bet it was probably

10  closer to 10:30, maybe 12:00 or 1:00 by the time you got to

11  speak, right?

12  A.   Could have been, right.

13  Q.   Let's look real quick, just this billing and collections

14  section, page 15.  You see at the top this slide is entitled

15  Improvement Opportunities?

16  A.   Yes.

17  Q.   But this goes -- the purpose of this was improve your

18  implementation of your product nationally, right?

19  A.   Yes.

20  Q.   And you would use these things in Arkansas as well,

21  wouldn't you?

22  A.   Yes.

23  Q.   Okay.  So left side, Lessons Learned.  Middle column,

24  Suggested Improvements.  Excuse me.  Improvement.  And then

25  Action Owner.  In this case, all Kim Suggs?

 1   A.   Yes.

 2   Q.   You got stuck with a lot of things on that?

 3   A.   Yes.

 4   Q.   Okay.  We are oriented here.  Lessons Learned, Suggested

 5   Improvement, Action Owner?

 6   A.   Yes.

 7               MR. DRENNON:  Ms. Rivers, we can go back to page 5.

 8   At 12:50.  If you can pull out that area.

 9   BY MR. DRENNON:

10   Q.   12:50, we've got something with you, Ms. Suggs, and also

11   another Kim, Ms. Bales?

12   A.   Yes.

13   Q.   And that's PET Claims, Benefits, and Configuration, right?

14   A.   Yes.

15   Q.   Ms. Suggs, you are familiar with Peter Pan, right?

16   A.   Yes.

17   Q.   Peter Pan lives in Neverland while he's there and never

18   grows up, right?

19   A.   Right.

20   Q.   That's similar to Ambetter's rate structure, right?

21   A.   I'm not sure I follow.

22   Q.   Okay.  That's great.

23        Mr. Meldrum, he testified that Ambetter defines -- when it

24   enters into a rate schedule, it defines Medicare as the 2015

25   Medicare rates.  You understand that, don't you?

1    A.    Yes.

2    Q.    And even though each year Medicare updates that schedule

3    and may increase those rates, you all stick with the 2015

4    schedule?

5    A.    If that is what's in the contract agreed to, we would stick

6    to the 2015 rates.

7    Q.    Sure.  They are in Neverland; they never go up, right?

8    A.    Unless the contract is renegotiated.  Then they could go

9    up, yes.

10   Q.    Unless the contract is renegotiated.  So you would have to

11   agree to that, wouldn't you?

12   A.    Yes.

13   Q.    All right.  And this definition of Medicare, defining it as

14   the 2015 Medicare, that's something that's caused confusion both

15   within your company and also with providers, hadn't it?

16   A.    I'm not sure.

17   Q.    Okay.  You are not sure?

18   A.    About confusion, no.  Providers are --

19   Q.    Let's look at the page on PET claims, benefits, and cost

20   configuration, page 41.  And maybe this was a problem that you

21   helped solve, if you can pull out that bottom row there.

22         Tell me if I'm reading this right.  "Confusion was

23   experienced by internal staff and external providers by saying

24   that we always follow Medicare.  That's not a true statement.

25   Many processes and fee schedules use Medicare for a base for

1   development.  However, once modified, they are no longer

2   Medicare."  That's what it says, correct?

3   A.   Yes.

4   Q.   And then in the middle, the item Improvement, "Supposed to

5   communicate that we use Medicare as a base, but we do not follow

6   Medicare in all circumstances."  Do you see that?

7   A.   From a policy perspective, yes.  Not necessarily specific

8   to a rate.

9   Q.   And this was something that was assigned to you to clear

10  up, right?

11  A.   I was -- yes.

12       MR. DRENNON:  Okay.  And then, Ms. Rivers, if we can

13  go back one more time to that agenda, page 5.  At 11:00.

14  BY MR. DRENNON:

15  Q.   So sort of in between your two presentations at 11:00,

16  there was a presentation on network contracting and development.

17  Do you see that?

18  A.   Yes.

19       MR. DRENNON:  Ms. Rivers, if we can look at page 25.

20  Third from the bottom of -- perfect.  Great.  Great.  Just that

21  third row, if you would, Ms. Rivers.  Third row.

22  BY MR. DRENNON:

23  Q.   We'll do it this way:  Ma'am, do you see in the middle

24  there, ability to amend existing provider agreements for HIM

25  products.  HIM, health insurance marketplace?

Suggs - Direct

1    A.    Yes.

2    Q.    This is something -- an area for improvement that was so

3    important that y'all discussed it, your development team?

4    A.    Yes.

5    Q.    Okay.  Something that you wanted to do nationally?

6    A.    That I'm unsure of.

7    Q.    Well, you told us earlier that the purpose of this meeting

8    was to ensure improved implementation nationally.

9    A.    Overall products nationally, but there are many things that

10   are at the health plan local level as well.

11   Q.    Okay.  Because you are trying to do things uniformly.  You

12   talk about them nationally, and you bring them local; is that

13   right?

14   A.    Yes.  Like I said, it's local health plan and national

15   agreements.

16   Q.    Local health plan and Ambetter for Arkansas Health &

17   Wellness?

18   A.    Yes.

19   Q.    And then the to-do, so to speak, that comes with that,

20   "Continue to leverage deemer amendment process"?

21   A.    Yes.

22   Q.    Okay.  You are familiar with this process?

23   A.    To some degree, yes.

24   Q.    Mr. Meldrum, he told the jury all about that process; so we

25   don't have to go through it again.

1          But this was something, again, so important that y'all
2    discussed it in an implication meeting?
3    A.    It was discussed at a -- yeah, go-live opportunities, yes.
4    Q.    This is a best practice, Lessons Learned, right?
5    A.    Lessons Learned.
6    Q.    This is something that y'all brought back and implemented
7    in Arkansas, right?
8    A.    From this process or from this meeting?
9    Q.    You all followed this deemer process, right?
10   A.    The deemer process did not come out of this meeting.  It
11   was -- the deemer process had been in existence prior to.
12   Q.    Yes, ma'am.  And this right here is telling folks on the
13   implementation committee that you were on that this is a process
14   that y'all need to continue to leverage, right?
15   A.    From what is written here, it sounds like it, yes.
16   Q.    Okay.
17              MR. DRENNON:  I don't have any other questions.  Thank
18   you.
19              THE COURT:  Cross-examination.
20              MS. PRUITT:  Your Honor, we are going to reserve our
21   questions to when we get to our case.
22              THE COURT:  Okay.  Ms. Suggs, you may stand down.
23        Call your next witness.
24              MR. DRENNON:  Your Honor, can I grab those transcripts
25   off the --

1          THE COURT:  Mr. Kennedy.

2          **KENT BRISTOW, PLAINTIFF'S WITNESS, DULY SWORN**

3          THE COURT:  For the court reporter, spell the last

4   name for us.

5          MR. KENNEDY:  B-r-i-s-t-o-w.

6      May it please the Court.

7          THE COURT:  Yes, sir.

8                          DIRECT EXAMINATION

9   BY MR. KENNEDY:

10  Q.   Would you please introduce yourself to the jury?

11  A.   My name is Kent Bristow, and I work with TeamHealth.

12  Q.   All right.  And, Mr. Bristow, where do you live?

13  A.   I live in Knoxville, Tennessee.

14  Q.   Do you have a family?

15  A.   Yes, I do.  I have a wife, Stacy, and three children, two

16  boys who are in college and one girl who is still in middle

17  school.

18  Q.   Are you a born-and-raised Tennessee fellow?

19  A.   I sure am.

20  Q.   Okay.  Where did you go to college?

21  A.   So I got away for a year and went to Wake Forest University

22  to start college but then came home to University of Tennessee

23  and finished off my school there.

24  Q.   And have you had any other jobs besides working for

25  TeamHealth?

1  A.    Yes.  Out of college I started in Nashville with a public

2  accounting firm, KPMG Marwick, and I was there about three and a

3  half years, and I left and moved back to Knoxville with a

4  regional firm by the name of Pershing & Oakley, was there for

5  about three and a half years, and that's when I was hired into

6  TeamHealth back in 1998.

7  Q.    And what was your entrée position in TeamHealth?

8  A.    I was the vice president for finance.

9  Q.    What's your job title there now, Mr. Bristow?

10 A.    I'm currently the senior vice president for revenue

11 management.

12 Q.    So how long have you been at TeamHealth?

13 A.    Since 1998; so 22 years.

14 Q.    And we have heard -- I did my best I could during opening

15 statement to describe to the jury about what TeamHealth is.  But

16 why don't you tell us.  What's TeamHealth?

17 A.    I would say TeamHealth is a group of physician leaders and

18 other clinicians who are focused on quality patient care and

19 safety and delivering customized staffing solutions to our

20 client hospitals and other facilities and all backed by a kind

21 of robust support services team.

22 Q.    And what is the relationship between TeamHealth and SEP?

23 A.    TeamHealth is the parent company for SEP and really,

24 though, it's kind of helping to arrange for all the support

25 services for Southeastern Emergency Physicians to fulfill its

1   mission.

2   Q.   Is one of those functions to negotiate contracts?

3   A.   Yes, it is.

4   Q.   Are you a person that negotiates the contracts?

5   A.   On occasion I do get involved directly with the

6   negotiations, but for the most part, my team is conducting those

7   activities.

8   Q.   We've already seen your John Hancock on Plaintiff's

9   Exhibit 1.  That's the contract at issue.  And you signed that

10  contract in your capacity as an employee of TeamHealth, correct?

11  A.   Yes, I did.

12  Q.   All right.  Have you signed a few or a bunch of contracts

13  over the years for TeamHealth?

14  A.   A lot of contracts.

15  Q.   Would you say it's in the hundreds or thousands?  Give us a

16  ballpark.

17  A.   Certainly in the hundreds and may have approached over a

18  thousand by this point.

19  Q.   Okay.  Incidentally, the contract at issue in this case

20  that was signed in 2011, do you have a specific recollection of

21  signing that contract?

22  A.   I do not.

23  Q.   Now, is TeamHealth typically trying to get in network with

24  insurance companies?

25  A.   Yes.  It's always our objective to be contracted in network

1  with as much of the plans as we can to benefit our hospital

2  clients.

3  Q.    Why do ER docs want to be in network?

4  A.    Really there is a lot of benefits to all the parties, but

5  for us in particular, you can count on, one, you know what rate

6  you are going to be paid; secondly, you know when you'll be

7  paid; third, you can avoid any kind of disputes.

8  Q.    Theoretically?

9  A.    Yes.  That's true.  So those are the biggest reasons, but

10 also there's benefits for the patients as well as for our

11 hospital clients.

12 Q.    All right.  And is one of the things that the ER docs give

13 up when they enter into these contracts the right to balance

14 bill members and patients?

15 A.    Yes.

16 Q.    Would you say that's a bill concession for ER docs?

17 A.    Yes.  I consider it significant.

18 Q.    We have heard about balance billing.  Let me just tell you

19 ironically a little story that happened to me today that deals

20 with balanced bill to see if we can summarize how this works in

21 practice.

22       So I'm walking over to the courthouse today, and it's my

23 youngest daughter's birthday.  She turned -- she became a

24 teenager today.  She's like a little half pint with glasses.  So

25 it's hard for me to believe that, but I call, and they are in

1    the car, my wife and my daughter, and they are going to the ER,

2    and I'm like, "What happened?"

3        And my wife says, "Well, she got up this morning and went

4    on a bike ride, and she was rounding a corner and crashed into a

5    trash can and thinks she broke her arm."

6        I couldn't feel any worse.  I'm already feeling bad I'm not

7    there for my daughter's birthday, but I'm not there to help deal

8    with that.

9        So they are in the ER.  And so the way it's going to

10   work -- by the way, she didn't have a broken arm.  That's how

11   she's celebrating her birthday.  But we are going to get a bill

12   from the ER physician at some point on that, and because we have

13   insurance that is in network, we are not going to have to pay

14   that bill.

15       Is that basically how balance billing sort of worked itself

16   out between the provider and the member?

17   A.   Yes.

18   Q.   All right.  And what is TeamHealth's corporate philosophy

19   on balance billing?

20   A.   So this is really important.  We take a stand against

21   balance billing.  We really think it's wrong to put a patient in

22   the middle of a dispute between a provider and a health plan.

23   Q.   Y'all put that message out into the public?

24   A.   Yes.  If you ever go on our website, there's actually a

25   link.  I think it's surprise billing, but it's basically a micro

 1  site developed and dedicated to our position on balance billing

 2  and surprise billing where we clearly communicate with a letter

 3  from our CEO that we do not favor and do not practice balance

 4  billing.

 5  Q.   Okay.  What provisions -- based on your experience in

 6  dealing with many, many hundreds of contracts in network

 7  contracts, what provisions do you find are typically found in

 8  network contracts?

 9  A.   There's lots of provisions.  Some would include, you know,

10  definitions.  It could include successors and assignments

11  provisions.  There can be regarding dispute resolution

12  provisions.  There can be compliance provisions as it might

13  relate to a provider manual.  Also, you know, terms of renewal

14  or how the contract might be amended.

15         MR. KENNEDY:  Okay.  Ms. Rivers, could you put

16  Plaintiff's Exhibit 1 please.

17  BY MR. KENNEDY:

18  Q.   And we have all seen and heard all about this the last four

19  days.  This is the contract at issue, right, Mr. Bristow?

20  A.   Yes.

21         MR. KENNEDY:  And real quickly, Michelle, can we see

22  Mr. Bristow's signature?  Page 2.  There it is.

23  BY MR. KENNEDY:

24  Q.   Although I think the agreement's effective date was

25  September 1, 2011, you actually signed it August 12 of 2011

1   right there.  Do you see that?

2   A.    Yes, I do.

3   Q.    And, again, you are signing that for TeamHealth; is that

4   right?

5   A.    Correct.

6   Q.    Okay.  Now, I asked you before I put up this contract what

7   provisions you would normally see in an in-network contract, and

8   I know you have had a chance to review this.  Any of those

9   things that you just listed, do you find those in this contract?

10  A.    Many of them are not covered here.

11  Q.    Does this contract mention the words in network or out of

12  network?

13  A.    No.

14  Q.    Does this contract say it is limited to certain products?

15  A.    No.

16  Q.    What products does SEP have access to vis-a-vis this

17  contract?

18  A.    I believe it was access to all of the Centene products

19  because there's no limitations or exclusions.

20  Q.    And would that be contracts that are existing now?

21  A.    Yes.

22  Q.    And contracts that may come into play later?

23  A.    Yes.

24  Q.    Because there is no limiting language?

25  A.    Correct.

1  Q.    As NovaSys, or whoever pays for NovaSys, paid the 75

2  percent of bill charges pursuant to this agreement?

3  A.    No, they have not.

4  Q.    Since January of 2014, have they done that?

5  A.    They have not.

6  Q.    However, has SEP, on the other hand, faithfully treated the

7  members, the NovaSys members, from January 2014 until this very

8  day?

9  A.    Yes.  Every day.

10 Q.    Has SEP balanced even a single one -- balanced billed even

11 a single one of those members?

12 A.    No, not to my knowledge.

13 Q.    To your knowledge, has anyone from that table or this table

14 or anyone in the universe terminated this contract?

15 A.    I've never seen a written termination notice by either

16 party.

17 Q.    Mr. Bristow, is there any aspect of this contract that SEP

18 has not fulfilled?

19 A.    Not, not to my knowledge.

20 Q.    Now, after you signed this contract or the contract started

21 in September of 2011, how did it go from the jump?

22 A.    Not very well.  As we were submitting claims and watching

23 the payments come in and we were continually -- well, it was

24 really just no payments were coming in.  It was very much a

25 delayed situation to try to get payments to be remitted to us.

1    Q.   And at some point, did y'all learn that NovaSys was going

2    to be offering a new product in the market on the horizon in

3    2014?

4    A.   Yes.  We did receive a letter from them.

5    Q.   Okay.  And what do we refer to that letter as?

6    A.   I have come to know it now as a deemer letter.  That's not

7    a term I was familiar with but...

8    Q.   Okay.  The jury has seen that many times.  Did anyone on

9    our side accept the terms of the deemer letter?

10   A.   No, we did not.  And, in fact, we expressly denied or

11   rejected the terms that were contained in that amendment.

12   Instead, we reiterated our current contract terms in that we

13   would treat members and this product under our current

14   agreement.

15   Q.   Was there anything in our agreement -- you don't have to

16   put it back up.  Is there anything in our agreement that allowed

17   a party to unilaterally terminate the contract?

18   A.   No.

19   Q.   Okay.  It took two to tango to redo this deal?

20   A.   Yes.

21        MR. KENNEDY:  Michelle, let's quickly look at the

22   letter, Plaintiff's 19.

23        MR. ZAVITSANOS:  You said terminated.  I think you met

24   amend.

25        MR. KENNEDY:  I'm sorry.  Fair point.

1    BY MR. KENNEDY:

2    Q.    Was there anything in that Plaintiff's Exhibit 1 that

3    allowed either side to unilaterally amend a contract?

4    A.    No.

5    Q.    Okay.  All right.  What we have here is Plaintiff's 19.

6              MR. KENNEDY:  We'll look at the very last sentence of

7    that letter, Michelle.  I'm sorry.  The paragraph, the very last

8    sentence.  That's fine.

9    BY MR. KENNEDY:

10   Q.    And you see here, Mr. Bristow, it says, should you elect

11   not to participate in this opportunity, your current agreement

12   with NovaSys will not be impacted in any way.

13         And in your mind's eye, having not elected to participate

14   in this opportunity, was it your view that the contract you had

15   in place was not impacted in any way?

16   A.    That's correct.

17   Q.    Incidentally, on this deemer letter, does the word Ambetter

18   appear anywhere in there?

19   A.    No, it is not.  And neither is Centene or Arkansas Health &

20   Wellness or Celtic.

21   Q.    So in reading this deemer letter, there would be no way for

22   SEP to know what that product was going to be called or how it

23   was going to be connected?  They didn't tell you that in there,

24   did they?

25   A.    They did not.

1          MR. KENNEDY:  Okay.  You can take that down, Michelle.

2     BY MR. KENNEDY:

3     Q.   So when did Centene stop paying the 75 percent that it was

4     contractually obligated to pay?

5     A.   Really they never started paying them.  Once we started

6     seeing their Ambetter project patient, from the get-go I think

7     the first issue we saw with the pay group was in April of 2014.

8     Q.   When did you figure that out?

9     A.   Well, as far as connecting the dots to paying the

10    contracted rate, you know it didn't happen until we got into the

11    litigation.  You know, at one point probably in 2015 we

12    discovered they were paying us very low and started questioning

13    it, but until we figured out they weren't paying the contract

14    rate, that was well down the line when we got into litigation

15    and discovery.

16    Q.   You said in the first part of 2015 we started figuring out

17    that they weren't paying the contract rate.  Why did that take

18    so long?  That's a whole year from when this Ambetter came into

19    the market.

20    A.   So for one thing, we didn't start seeing patients until the

21    end of April; so it was probably June before we saw the first

22    payment come on.  It was a very small amount of seeing their

23    patients.  Again, it was just a blind spot we had about where

24    these payments were being posted that no one was seeing this for

25    a period of time.

1    Q.    Who is Michael Slover?

2    A.    Michael Slover was a former employee.  He was senior

3    contract manager on our contracting team.

4    Q.    So based on his title, I assume his roles related to

5    contracts?

6    A.    Yes.  He had a region he oversaw related to managed care

7    and health plans.

8    Q.    All right.  Why did he leave the company in January of

9    2015?

10   A.    He was presented a better opportunity from another company.

11   Q.    And, again, I know you alluded to it in part a moment ago,

12   but why did TeamHealth have such a blind spot to this issue, the

13   connection between NovaSys, on the one hand, and Ambetter, on

14   the other?

15   A.    Because of the way that the -- again, the payments were

16   coming in, Ambetter is a payor we weren't familiar with.  This

17   is new.  And so the people in billing operations are getting,

18   you know, payments in from this Ambetter.  They don't know who

19   it is.  So they set it up, and no one is really seeing it

20   because we don't know what it is for a period of time until the

21   volume accumulates to the point where someone gathered a report

22   and started looking at the payment levels.

23   Q.    And prior to Mr. Slover leaving TeamHealth, was he asking

24   for some clarification on that?

25   A.    I believe he was.  You know, he had been trying to connect

Suggs - Direct

1    the dots on Ambetter acting as the exchange process for NovaSys,

2    but I don't think it really ever got a bowl of affirmation about

3    that.

4    Q.    If SEP was confused about the connection between Ambetter

5    and NovaSys and if we are -- during that time period, 2015 and

6    '16, we are asking Centene for a copy of the contract because we

7    can't connect the dots between Ambetter and NovaSys, would you

8    expect SEP to have a rate loaded in our system for Ambetter?

9    A.    No.  We do not have a rate loaded for Ambetter.

10   Q.    Did Centene ever tell SEP that Ambetter was the new product

11   they were offering through the NovaSys network?

12   A.    Not to my knowledge.

13   Q.    I'm talking about when they started that product, and

14   around 2014.

15   A.    Again, if you look at the letter they sent out, there's no

16   reference to any name whatsoever on there.  So it's really hard

17   to connect the dots.

18   Q.    All right.  So in that time frame coming into 2014 and then

19   2015, did SEP have agreements with any other ACA plans were they

20   were paying a previously agreed contractual rate?

21   A.    Yes.  We had several agreements with several major

22   commercial plans that would have covered all commercial benefit

23   plans, and so when they started -- again, those agreements were

24   entered into prior to the exchange marketplace coming into

25   effect, and so when those started up and those markets that some

1    of those plans started participating in the product, those

2    agreements covered those products, and they were receiving, you

3    know, claims payments at that rate.

4        And in particular, in Arkansas we had a contract existing,

5    you know, back before 2014 with the United Healthcare.

6    Q.    Is United one of the big, big dogs in the industry?

7              MS. PRUITT:  I'm going to object.  May we approach?

8              THE COURT:  You may.

9        (Bench conference reported as follows:)

10             THE COURT:  Yes, ma'am.

11             MS. PRUITT:  Your Honor, the Court is talking about

12   other -- the Court has limited us to talking about other

13   products and other products rights and other products contracts.

14   Up to this point -- and they are getting ready to talk about a

15   United Healthcare product and try to compare the rate that they

16   were willing to pay with the rate we are going to pay.  We tried

17   to do that ourselves with Blue Cross Blue Shield, and the Court

18   said we are not going to get into everybody's rates because this

19   is about this product and this contract, and that's exactly what

20   they were getting ready to do, and I object to it.

21             MR. KENNEDY:  We are not talking about the rates.  We

22   are talking about the fact that there are providers -- other

23   insurance companies in the marketplace that we have contracts

24   with regardless of the rates.  They honored that contract even

25   after the ACA product came in.  So I'm talking about any

1    specific names.  We had to say we had other similar arrangements

2    and people did when they were supposed to do.

3          THE COURT:  I kept the defendant from discussing --

4    I'm trying to remember what it was.  There was something dealing

5    with the ACA and what the expectations were on reimbursement

6    particularities for the ACA.  And I kept them from getting into

7    that.

8          MR. KENNEDY:  This is a completely different context.

9    This isn't a unicorn.  There are other insurance companies that

10   did what they were supposed to do, and I just want to point out

11   that they kind of are a unicorn in that they didn't --

12         THE COURT:  What you are saying is that, because other

13   organizations did not breach or, no, other organizations -- I'm

14   trying to think of the best way to put it.

15       How does what other organizations did inform and how does

16   what other organizations did inform what the defendants have

17   done here?

18         MR. KENNEDY:  Because their narrative in this case is

19   that, if it's a different product, that sort of the -- if the

20   line of demarkation occurred in January of 2014, if you had a

21   contract, it didn't matter anymore.  What we are showing to the

22   jury is that's not true and that's how the industry treated

23   that.

24         THE COURT:  I understand, Mr. Kennedy.  I think their

25   argument is that they entered into an agreement in 2011 that

1    applied to a specific product, that those providers that were

2    providing under that product are no longer in existence.

3        At some years later, they started a whole new line of

4    products, and I think the issue here is whether the plaintiff is

5    correct that the original contract also applies to the new

6    position and their position is it just doesn't.

7            MR. KENNEDY:  And that's right.  And our position is

8    the fact that we are right is borne out by the fact that the big

9    dogs in the industry were doing -- they were honoring their

10   contract.

11           MS. PRUITT:  You can't prove something by somebody

12   else's behavior.  What a third-party failed to do is not

13   relevant.

14           THE COURT:  Simply because -- you'll let --

15           MR. KENNEDY:  Mr. Killingsworth.

16           MR. KILLINGSWORTH:  The issue is they have directly

17   put at issue that a contract cannot possibly include a product

18   that did not exist at the time they entered the contract.

19           THE COURT:  I think that is one of the --

20           MR. KILLINGSWORTH:  Kent's testimony will demonstrate

21   they all typically enter general arrangements with products

22   currently existing apply.  Products that later exist apply, and

23   his testimony as to what other contracts do demonstrate that,

24   that it's common in the industry, and that the ACA, even though

25   it's a new marketplace, they still did it with that, so that was

1   the common industry practice.

2           MS. PRUITT:  But, Your Honor --

3           MR. KILLINGSWORTH:  They are the ones that put that at

4   issue.

5           THE COURT:  So your position is it's common to enter

6   into these broad contracts that apply to all these different

7   products?

8           MR. KILLINGSWORTH:  Correct.  The logic behind that is

9   these are emergency rooms.  They want all products to be

10  covered.  They can't go and contract with every single emergency

11  room, every single insurance company, every time they come out

12  with a new product.

13          THE COURT:  Well, insurance companies can charge

14  different premiums for different products.  So if I have one

15  line of products that charges a very high premium, then more

16  might be covered.  And then over here, I'm charging a much lower

17  premium.  The amount of coverage might be a lot lower.  And so

18  you can't apply the same reimbursement rates to every product we

19  come up with.

20      I'm saying that that doesn't seem as obvious as plaintiff

21  might think it is.

22          MR. KENNEDY:  Here's another point that makes this

23  testimony important.  One of the reasons this got lost on us

24  that we had the blind spot is because the product is called

25  Ambetter.  It's not NovaSys this or NovaSys that.  What I'm

1   going to elicit from him, the reason they weren't confused in

2   the United situation when their ACA product rolled out is

3   because it was called United Compass.  So it was much easier to

4   identify on their end and make sure things haven't fallen in the

5   cracks in the sidewalk.  It's important.  The deemer letter,

6   nothing about Ambetter.  They never told us Ambetter was going

7   to be related to the NovaSys network; so that was very confusing

8   for us.  Explains why we may have dropped the ball, and I want

9   to get from him that that can happen when the product -- the

10  name isn't similar at all like it is with United products.

11        So I'm not getting into specific rates or premiums or

12  anything like that.

13        THE COURT:  I understand.  You are trying to show that

14  what happens with other insurance companies -- the other

15  insurance companies, the fact they were on notice and continued

16  to operate under these similar contracts means that defendants

17  were required to do the same thing.

18        MR. KENNEDY:  Well, that isn't the point I just made.

19  That was the first point.  The second point is, again, the

20  confusion issue, why we are confused by what happened here and

21  not other places because the names are so different there.  Not

22  like for United, for example.  It's easy -- it's United Compass

23  product.  United ding ding ding.  We can --

24        THE COURT:  Tell me how does that -- what is the

25  question that goes directly to that point?

1          MR. KENNEDY:  Why were -- how did you avoid the

2    confusion you had with NovaSys with other providers like other

3    insurance companies like United?

4          MR. TALLEY:  Your Honor, if I may briefly respond to

5    that second point, this confusion issue, the confusion issue was

6    raised in the pleadings in the second amended complaint and was

7    the focus of their AETPA claim which the Court dismissed in its

8    summary judgment process of the order.

9          MR. KENNEDY:  We are not -- I'm not making -- I'm not

10   explaining that we are confused.  I'm explaining we were

11   confused.

12         THE COURT:  One of the points that I picked up on in

13   this case, because it's been constantly, who was the one who

14   prepared the contract, and I think the gentleman who was here

15   the other day said, I prepared it; so one of the points that

16   plaintiffs have been making is that, when you interpret a

17   contract, if there's any ambiguity, you interpret it against the

18   maker of the contract or the writer of the contract.

19         MR. TALLEY:  As the last line of resort.

20         THE COURT:  That will be the argument.  And so now

21   he's saying that he wants to ask a question about confusion.

22   What -- now, if you ask what differentiates this contract or the

23   Ambetter situation with other cases that you have had, well,

24   other insurance companies have had in their -- what is it?  The

25   new product was -- what was the company?

1              MR. KENNEDY:  United Compass.

2              THE COURT:  United Compass.  Their product was a

3    United Compass.

4              MR. KENNEDY:  So the name is familiar to us.

5    Ambetter, who knows what that is, at least in 2015 and '16 when

6    we are trying to connect the dots?

7         I mean, that's why I asked that.

8              THE COURT:  I would let you ask that very narrowly.

9    But to ask the question -- the question shows that everybody

10   else was doing it and understood.  It's a much broader question.

11   I'll not let you ask that question.  I'll sustain the question

12   that was asked but ask a more narrow question.

13             MS. PRUITT:  Two housekeeping matters.  When we are at

14   the bench, somebody just needs to tell the witness to go sit

15   over there.

16        The second one, I'm about to die to go to the restroom.

17             THE COURT:  I know.

18             MS. PRUITT:  I need to be here.

19             THE COURT:  Let's take a quick break and then come

20   back.  And she's been typing for two straight hours, too.

21             MR. LEYENDECKER:  I just told Mr. Cady unless they

22   are -- we are going to finish and rest today.

23             THE COURT:  Okay.

24             MR. LEYENDECKER:  First thing in the morning.  So I

25   think it's going to be today.  We've got a 24-hour witness.  Who

1    are the first three?  He told me he's going to work this out and

2    get back to me.  I wanted to update you on where we think we

3    are.

4             (End of bench conference.)

5             THE COURT:  Ladies and gentlemen, we are going to take

6    our afternoon break now.  I know we brought you out right at --

7    what was it?  2:00, but we came back, I think, at 1:30.  We were

8    taking up motions.  So we have been going about two hours.

9    Let's come back at 3:40.  That's right at 15 minutes.  Okay?

10   All right.  Let's recess until then.

11            (Jury exits.)

12            THE COURT:  You are moving which exhibits into the

13   record?

14            MR. KENNEDY:  Plaintiff's 131, Plaintiff's 133.

15            THE COURT:  131 and 133?

16            MR. KENNEDY:  Yes, sir.

17            THE COURT:  Any objection to Exhibit 131 and 133?

18            MS. PRUITT:  No objection, Your Honor.

19            THE COURT:  Okay.

20        (Plaintiff's Exhibit 131 and 133 were received in

21   evidence.)

22            THE COURT:  Now, I was told that plaintiff expects to

23   rest its case today.

24            MR. KENNEDY:  Yes, sir.

25            THE COURT:  Do we have another witness after this one

Suggs - Direct

1    that you know of?

2            MR. KENNEDY:  No.

3            THE COURT:  This will be your last witness?  Okay.

4    And when will you have your first witness here ready to go?

5    Because we are going to have to take up judgment and take up

6    some of these other things.

7            MS. PRUITT:  Here's my thought, Your Honor:  It's

8    going to take me a while to cross-examine Mr. Bristow, and --

9            THE COURT:  So you don't think you'll have a witness

10   today?

11           MS. PRUITT:  We won't have a witness today.  I don't

12   think I'll finish today with this witness.

13           THE COURT:  Oh, you think we'll be back.  All right.

14           MS. PRUITT:  And my thought is, once they do rest and

15   we do the judgment, all the motions, it will be approximately

16   noon, and our plan is to then have a witness available to put on

17   tomorrow afternoon.

18           THE COURT:  Yes, sir.

19           MR. KENNEDY:  Would it be possible, so we are

20   utilizing most efficiently our time outside of the jury and most

21   efficiently your time, we take up the JNOV?  I think we are

22   prepared.  I have seen exchanges in the jury charge.  Maybe we

23   could start hammering out tonight, too, if the judge is inclined

24   because that's going to take a while.

25           THE COURT:  No.  I'm going to finalize the jury

1    instructions, and I'll let you object to it.  I'm probably not

2    going to go back and forth on the jury instructions.

3               MR. KENNEDY:  I didn't know.

4               THE COURT:  Normally I would, but I think in this

5    case, if I started allowing that, we'd be here until next week.

6               MR. KENNEDY:  Mr. Thompson is very eager to give you

7    the nuts and bolts.

8               THE COURT:  I'll make him make his record on that, and

9    I'm going to make it as simple as possible, and I don't think

10   I'll have that for you this afternoon.

11      How long do you think your case in chief will take?

12              MS. PRUITT:  Probably Tuesday or Wednesday when we

13   come back.

14              THE COURT:  So you think you have a couple days of

15   testimony?

16              MS. PRUITT:  Yes.

17              THE COURT:  Okay.  All right.  Okay.  And so my

18   thought is that I just tell the jury today what the plan is so

19   they can start adjusting to it.

20              MS. PRUITT:  I think it's kind of important to see if

21   anybody is, you know, for that week the Court was considering,

22   whether any of them have an issue there.

23              THE COURT:  Okay.

24              MR. LEYENDECKER:  May I ask a question, Judge, because

25   when I looked at the witness list, it looks like they might have

 1    a couple of live witnesses for today, their expert, and a couple

 2    of tapes.  That sounds like a day's worth of evidence to me.

 3         Is there more than that, or am I missing something?

 4         I'm asking -- not to you but to this other side.

 5              MR. CADY:  We have a few witnesses, an expert, some

 6    tapes.  I do think we'll be a couple days.

 7              MR. LEYENDECKER:  You have got Mr. Ryan and Ms. Suggs

 8    back.  You have got an expert, Mr. O'Brien.  Those are the only

 9    three live that I'm thinking of.  A couple names.

10         Is there more than that that I just listed, if you know?

11              MR. CADY:  Well, we've got a few more on -- yeah, one

12    more on our witness list.

13              MR. LEYENDECKER:  Who is that?

14              MR. CADY:  We don't know if we'll call or not Cynthia

15    McKinney.

16              MS. PRUITT:  Chepeka.

17              MR. LEYENDECKER:  That still sounds like a day to me.

18              THE COURT:  I'm not going to say, plaintiff, you take

19    three days.

20              MR. LEYENDECKER:  I'm observing what I --

21              THE COURT:  You want to bring it to my attention that

22    it may be that it might not take as long as defendant is

23    expecting it to take.

24              MR. LEYENDECKER:  Correct.

25              THE COURT:  But fairnesswise, I couldn't tell them --

1            MR. LEYENDECKER:  I wasn't asking.

2            THE COURT:  I understand.  But fairnesswise I can't

3    tell them they can't put on their case.  And so, you know --

4            MR. LEYENDECKER:  I'm observing, having done this a

5    couple times.

6            THE COURT:  My law clerk said, why don't you declare a

7    mistrial now and start -- let's start working on a new jury, a

8    jury trial that we go straight through with?  He said, since we

9    are coming back in two weeks anyway, why don't we declare right

10   now?  Tomorrow morning we empanel, and we could start on the new

11   trial that would go straight through.

12           MR. KENNEDY:  Did you reprimand him for saying that?

13   That would cost hundreds of hundreds of thousands of extra

14   dollars.

15           THE COURT:  I don't know if it would.  If we started

16   right back over and we hear --

17           MR. KENNEDY:  We have replowing all the ground.

18   That's a lot of money.

19           THE COURT:  That's exactly right.  That's my thought,

20   is that why do the same thing over?

21       He was saying as far as getting it finished more quickly,

22   you might get it finished more quicker that way.

23           MR. ZAVITSANOS:  Judge, I understand what the Court is

24   saying.  I think it's wise to let the jury know what we are

25   going to do.  But if we finish tomorrow, then we finish

1   tomorrow.  Right?  And if not, we go.  And if Ms. Pruitt is a

2   Dean Smith fan and the jury believes that, I don't know if you

3   understand the reference.

4                THE COURT:  I do.  She's not going to put you into

5   four corners.  I don't foresee that.

6                MR. ZAVITSANOS:  No, no.  I understand.  Look, if we

7   finish tomorrow, we finish tomorrow.  If we have to come back,

8   we come back.

9                THE COURT:  I think that's right.

10               MS. PRUITT:  I don't quite know what the point is.

11  Southeastern Emergency Physicians, they are pushing to force us

12  to finish our case, and I'm not going -- as long as the Court

13  doesn't tell me, I'm not going to do that.

14      The other thing I want to raise, Your Honor, is because of

15  certain testimony, we would like for the judgment

16  notwithstanding the verdict and so forth, to argue after they

17  rest.

18               THE COURT:  That's what I plan to do.

19               MS. PRUITT:  Thank you.

20               THE COURT:  Let's bring the jury back, and let's talk

21  to them.

22      (Jury present.)

23               THE COURT:  All right.  You can sit.  All right,

24  ladies and gentlemen.  I want to have a conversation with you in

25  front of all of our friends here.  Let's talk about a few

1    things.  I think the plaintiffs -- this is possibly the

2    plaintiff's last witness.

3         Once the direct examination is complete, then the defendant

4    has an opportunity to -- the defendants have an opportunity to

5    cross-examine.

6         So we might finish today, but the likelihood is with the

7    witness we'll go over into tomorrow.

8         The way a trial normally proceeds is, once the plaintiff

9    has put on his case, then normally there are a lot of arguments

10   to be made to the judge and outside the hearing of the jury.

11   And then once those are done, we start with the defendant's case

12   in chief.  And that's on -- that would be tomorrow sometime,

13   right?

14        I don't think that the defendant's case will last quite as

15   long as plaintiff's because they don't have the burden of proof.

16   And so they won't have as many witnesses.  But I have told the

17   defendant I'm not going to force them to put on the case and

18   have it finish by tomorrow afternoon because I think that would

19   be unfair.

20        I think both sides should have a chance to evaluate their

21   witnesses and decide how to put those witnesses on and how much

22   to spend with them.

23        After the defendant puts on its case, then there are more

24   arguments and motions to the judge.  Then once that's done, then

25   we have what is called a conference -- I don't think that's a

1    special word.  I was going to say a jury instructions conference

2    where we get together to make sure -- I have jury instructions

3    that I'm going to read to you and tell you what the law is, and

4    you determine what the facts are, what happened, and you apply

5    it to the law to come up with a result, right?

6         I prepare those based on requests made from the parties.

7    But then I have to give them to them and give them a chance to

8    object to them, to ask me to include additional instructions,

9    that type of thing.

10        So I don't think that's going to be done really quickly,

11   right?

12        And so to try to get all that done in one day would be very

13   difficult.

14        Okay.  So then typically what we do is recess tomorrow

15   afternoon, and we would come back and finish up next week, and I

16   know all of you were promised five days.  We didn't promise you

17   five days, but we said we thought it would take five days.

18        This is not going to take five days.  It's going to take a

19   little more.  Okay?  As all of you know, because I saw you turn

20   around looking at [Juror].  They laughed.  I called him in the

21   office and asked him about his trip to Florida, to Destin, and

22   we had a conversation.  I won't go into great detail.  Maybe

23   he's talked to you about it.

24        The lawyers and I have -- look, I told you, the lawyers and

25   I have been trying to figure out a way to accommodate you to get

1    you to Destin, and so we have thought about different things.

2    We have thought about buying him a plane ticket and sending him

3    down a day or two later, but [juror] told me I have some plans

4    for this weekend and some things I'm planning to do this week.

5    I'm supposed to do this thing and enjoy the rest of the week,

6    and although we are still trying to figure out a way to -- if

7    there's a way to deal with that, we figured out that there's

8    probably not.  So the question is we want to -- I have never

9    recessed a trial with a jury and brought the jury back over a

10   week later.

11       Here's what I propose to the lawyers:  Instead of declaring

12   a mistrial and starting all back over with a new jury -- because

13   if we have to do all this over again, that would be extremely

14   expensive -- all the lawyers come here and worked hard all

15   week -- what I would like to do is to recess tomorrow.  Instead

16   of starting back up on Monday, starting back up the next Monday

17   and doing two days, maybe that Monday and Tuesday.  And that way

18   you can probably -- we can probably, I would imagine, get the

19   case to you Tuesday morning, do closing starting on Tuesday

20   morning.

21       I think -- and I don't know how long the defendant's case

22   would be.  But I would hope to where you get the case earlier

23   where you wouldn't be here at 5:00 in the evening, where you are

24   here all night trying to figure out what the verdict is and

25   getting mad at me and everything else.

1       Is there anybody else on the jury -- now, of course, that

2   would require you not to do any independent research, which I

3   don't think you could in this case.  It's not some big criminal

4   case.  Where are you going to go find information on this case?

5   Probably nowhere.

6       But is there anybody here who just simply could not come

7   back the next Monday?  You're employer might say you have been

8   gone three weeks, but -- yes, ma'am, [juror].

9            A JURY:  My daughter has two appointments at

10  Children's Hospital on that 17th, if that's the Monday they are

11  talking about.  They are in the afternoon.  They are at 3:30 and

12  4:00.

13           THE COURT:  That afternoon?  The 17th?

14      You are from Dover; so you would have to bring her.

15           A JUROR:  She's old enough to drive.  I just need to

16  be there with her.

17           THE COURT:  I can get you out before.  So if you need

18  to be there at 3:00, we'll recess a little early and start back

19  on Tuesday.  [Juror], you were raising your hand?  Is that a

20  plan we can all do?

21      And we may be done doing all these things tomorrow.  But if

22  we know we can come back and just keep moving, then that

23  relieves the obligation to try to go late until -- although we

24  will still keep working.  We know we are going to keep going.

25      Anybody who just can't do that?

1        Also you can go back to work and do whatever you need to do

2    next week.  Okay?  Unless I hear -- and I'll allow the lawyers

3    to make a record on all of this outside the hearing of the jury.

4    But that's the plan of the Court, as we sit here right now.

5    Okay?

6        All right.  Now, last thing:  You have been going to Judge

7    Volpe's courtroom.  Well, he's indicting people there at 5:00.

8    So I'm not going to send you back over there because he might

9    put some cuffs on you.  He's unsealing indictments today.  And

10   so I can't send you back in there because then, like I said,

11   they might throw some cuffs on you and haul you off.

12       So when we leave today, you'll leave out that door.  That's

13   our typical room exit.  But -- okay.

14               MR. KENNEDY:  May it please the Court?

15               THE COURT:  Yes, sir.

16   BY MR. KENNEDY:

17   Q.   All right, Mr. Bristow.  Before we broke, I was asking you

18   about another contract you had with another carrier.  It was

19   United.  My question is:  Why didn't you have the confusion with

20   United that you had with connecting the dots with Ambetter or

21   NovaSys?

22   A.   Because that product name identified them with United.

23   They offered it under the name United Health Care Compass.

24   Q.   In other words, it's United, it's United.  We know how to

25   deal with that?

Suggs - Direct                                                      252

1   A.    Very clear on that.

2   Q.    Were you here for opening statements?  You were?

3   A.    Yes.

4   Q.    And did you hear Mr. Cady say, after January 1, 2014, SEP

5   stopped sending our claims to NovaSys?

6   A.    Yes.  I remember that.

7   Q.    Is that correct?

8   A.    No.  I don't believe it is.  We actually -- throughout the

9   course, I think we've got -- I had our director of revenue

10  analysis, A.J. Consam (phonetic) run a report on our disputed

11  claims in this case, and he was able to identify over 550 claim

12  examples where we originally submitted the claim to NovaSys but

13  we got rejection letters back from them, saying we need to

14  redirect the payment to Ambetter at a different address.

15  Q.    Did they explain what that -- what one had to do with the

16  other?

17  A.    No.  Other than that just they were not accepting claims at

18  that address anymore, to send them to Ambetter at a different

19  address.

20  Q.    Did that happen in 2014?

21  A.    The first exchanges, yes, we saw is that was 2014.  It

22  continued through 2019.

23  Q.    Who's Tammie Tibbits?

24  A.    Tammie Tibbits is our current director of managed care

25  contracting.

1    Q.    Have you reviewed -- the jury has seen a lot of e-mails

2    between Ms. Tibbits and Centene and NovaSys, making certain

3    inquiries and asking for information.

4         Have you reviewed those e-mails?

5    A.    Yes.  I have reviewed many of her e-mails.

6    Q.    All right.  Did Ms. Tibbits know that the Ambetter product

7    was part of the NovaSys network?

8    A.    In looking back at her e-mails, clearly not.  She was

9    trying to connect the dots and had inquired several times to

10   find out what the reference was to the contract or the letter of

11   agreement they had in their system, but she was never able to

12   get, you know, back or put those -- kind of connect the dots

13   together to figure that out.

14   Q.    In fact, did she eventually try to negotiate a rate of 200

15   odd some percent of Medicare with these folks?

16   A.    Yes.  With Centene, not knowing they were associated with

17   NovaSys, yes, she did.

18   Q.    Now, I note the jury is thinking the same thing that a lot

19   of people are thinking, is:  Why would somebody negotiate 200

20   percent of Medicare if they already had a contract they thought

21   was enforceable?

22        Do you know the answer to that question?

23   A.    Because she just simply didn't know there was a contract

24   already in place.

25   Q.    TeamHealth, SEP, they screwed up a little bit, didn't they?

1    A.    Yes.  We -- you know, shame on us.  We should have done a

2    little more hard work in digging and persevered and not taken no

3    for an answer about what the agreement was they were referring

4    to.

5    Q.    At some point, obviously, the plaintiffs hired lawyers to

6    pursue this, right?

7    A.    Yes.

8    Q.    Do you know when the lawyers hired by TeamHealth and SEP

9    sent a formal demand to the other side?  Do you remember the

10   time frame of that?

11            MS. PRUITT:  Your Honor, object.

12            MR. KENNEDY:  I'm just asking the date.  I'm not

13   asking anything else.

14            MS. PRUITT:  I move to strike that.  It is

15   inadmissible under 408.

16            MR. KENNEDY:  I believe the jury has already heard

17   about it.

18            MS. PRUITT:  Can we approach, Your Honor?

19        (Bench conference reported as follows:)

20            MR. KILLINGSWORTH:  Our demand is in the complaint.

21            MR. KENNEDY:  First I understand there's been paradigm

22   shifts here, but, first, we didn't want them to introduce these

23   e-mails that talked about settlement.  Then we said --

24            THE COURT:  Let them in.

25            MR. KENNEDY:  Now I'm saying when did your lawyer

1   send -- it's just one point on the timeline.  It's not about

2   what we asked for, what the response was.

3        THE COURT:  Let me ask you this:  If you have already

4   received information talking about the negotiations, normally

5   any type of settlement discussions is out.

6        MS. PRUITT:  Your Honor, it was their decision to say,

7   we want those exhibits to come in, because Mr. Z wanted to win

8   something else because he already talked about a retroactive

9   lump-sum payment.  He is asking about lawyers, not business

10  negotiations:  When did the lawyers first send you a demand?

11  That is clearly prohibited under Rule 408.  And even the timing

12  of it is impermissible.

13       MR. KILLINGSWORTH:  It was exhibits -- when we had the

14  discussion of 24 through 27, I believe Your Honor was -- even

15  said that you believe 27 would stay out under 408, and he -- so

16  if -- and they argued vehemently for that exhibit to come in,

17  and now it's in evidence.

18      And because you said it was, it clearly represented

19  legal --

20       THE COURT:  The issue about the demand, what does that

21  do for you?

22       MR. KILLINGSWORTH:  Just know the case.

23       MR. KENNEDY:  Here's my next question.  We made a

24  demand in the first quarter of 2017.  We didn't get the contract

25  that we had been asking for for four years until November of

 1    2018.

 2              THE COURT:  That's already in the record.

 3              MR. KENNEDY:  That's the logical --

 4              THE COURT:  That's in the record.  Overruled.  I'll

 5    let them ask the question.

 6              MS. PRUITT:  Your Honor, over our vehement objection.

 7              THE COURT:  I understand.

 8         (End of bench conference.)

 9              MR. KENNEDY:  May I proceed?

10              THE COURT:  Yes, sir.

11    BY MR. KENNEDY:

12    Q.   The question on the table, Mr. Bristow, is:  When was the

13    demand sent by your lawyers to Centene?

14    A.   I believe it was in the first part of 2017.

15    Q.   And when did your lawyers finally receive a copy of the

16    contract from the other side?

17    A.   I believe I understood it to be in November of 2018.

18    Q.   Okay.  You said you were here for opening statement.  Did

19    you also hear Mr. Cady make reference to this allegation that

20    the folks on our side were upcoding?

21    A.   Yes.

22    Q.   Meaning we were providing a service for, say, 99284, but we

23    were actually trying to collect money for a 99285?  In essence

24    that's what they are alleging?  Is that what you understood?

25    A.   Correct.

1   Q.   All right.  Now we just saw a bunch of information about

2   how robust the audit process is on their side to prevent this

3   sort of thing over the last nine years.  What's the audit

4   process like on our side to prevent this sort of thing?

5   A.   So a couple of points.  One --

6   Q.   Let me actually lay a little foundation there.

7        Do you have folks that report up to you that are in charge

8   of auditing claims in the codes?

9   A.   Yes.

10  Q.   And so ultimately the -- does that mean the buck kind of

11  stops with you on that process?

12  A.   Yes.

13  Q.   All right.  So explain to us what that process is.

14  A.   Sure.  So, you know, billing of claims, we have certified

15  trained coders in our billing centers who are doing the

16  day-to-day billing of codes that are submitted to the health

17  plans, but we have a separate, independent team that does

18  reports.  It's our coding QA team, and it's just dedicated

19  certified trained coders who all they are doing is auditing the

20  coders that are in the building centers, and so they are doing a

21  review, sample of charts on every coder every month to just, you

22  know, validate that they are, you know, coding according to our

23  policies and procedures and the industry standards.

24  Q.   We are going to hear more about the nitty-gritty of

25  upcoding and coding from some other witnesses, but I'll ask you

1   this:  Do we upcode?

2   A.   Absolutely not.  I mean, to us that's an absolute critical

3   core competency about our coding.  That's core to what we do in

4   billing and submitting claims.

5   Q.   And from September 1 of 2011 until about a month ago, had

6   anyone on the other side ever said to anyone on SEP's TeamHealth

7   side suggesting otherwise?

8   A.   No.

9           MR. KENNEDY:  Judge, I'm going to bring the flip chart

10  over here.  May the witness be permitted to step down?

11          THE COURT:  Okay.

12          MR. KENNEDY:  Actually I might do one thing.  Admitted

13  into evidence previously are Plaintiff's Exhibit 131 and 133.

14  May I approach the witness?

15          THE COURT:  You may.

16  BY MR. KENNEDY:

17  Q.   I'm going to show you, Mr. Bristow -- in an effort to save

18  some trees, Plaintiff's Exhibit 131 is literally like a banker

19  boxful of documents.  So I'm going to show you the first page of

20  it.  And could you just tell us what that is?  131.  Put up the

21  first place.

22  A.   This is the first of our disputed claims files.

23  Q.   And those have all been produced to the other side, right?

24  A.   Correct.

25  Q.   And is that for the dates January 1, 2014, through the end

1    of 2019?

2    A.    Yes.

3    Q.    All right.  I'm going to hand you the first page also of

4    Plaintiff's 133.  And the same thing.  This is a gigantic

5    exhibit in reality.  So is that the claims file -- disputed

6    claims file for January 1, 2020, through March 31, 2020?

7    A.    Yes.

8    Q.    All right.  And is it these documents largely -- I'm going

9    to ask you to step down here and scratch out the numbers for the

10   jury.  But are these claims and the numbers that come from those

11   claims largely the data from which you calculate the damages

12   number in this case?

13   A.    Yes.  They are the fundamental basis for the damages.

14   Q.    Okay.  You can step down, Mr. Bristow.  Okay.  Let's start

15   from the top, and we'll go down to the bottom and work our way

16   up.

17        How much damages are plaintiffs claiming in this case?

18   Just write that number down, and then we'll flip it over and

19   start the calculation.

20              THE COURT:  And --

21              THE WITNESS:  9,426,487.

22   BY MR. KENNEDY:

23   Q.    And how many claims are included in that number?

24   A.    The total claim count for patient visits is 12,575.

25   Q.    Okay.  So we'll come back to that page.  Let's flip it

Suggs - Direct

1  over.

2      Mr. Bristow, walk us through how you calculated those

3  damages.

4  A.   The first disputed claims file that you just referenced and

5  the total from 1-1 of '14 to 12-31 of '20, so the total claims

6  was 10,561.

7  Q.   Okay.

8  A.   And then, if you look, the associated bills that were

9  submitted, charges associated with those same claims, it's

10  $14,389,058.

11  Q.   And then we have to take 75 percent of that pursuant to our

12  contract, correct?

13  A.   That's correct.  That's our contracted rate.  75 percent

14  gets you 10,791,794.

15  Q.   And how much have the defendants paid us already?

16  A.   And, again, looking at the allowed amount -- so what they

17  allowed, subtract that, it's a 1,912,530.

18  Q.   Okay.  And so what is the amount of damages through the end

19  of 2019?

20  A.   Subtract those, and it's 8,879,264.

21  Q.   Okay.  Then what did you do?

22  A.   So, again, that just covers --

23  Q.   By the way, point of correction.  That is the number

24  through the end of March of 2020, right?

25  A.   Correct.

1    Q.    Now, from April to present, have all those claims been

2    adjudicated and settled?

3    A.    No.

4    Q.    Okay.  So tell the jury what you had to do for this -- this

5    small component of the damages model.  You had to form kind of

6    some modeling.  Explain to the jury how you forecast, from April

7    1 to the beginning of trial, that segment of damages?

8    A.    So, again, we figure we should take a conservative approach

9    that was logical, and so we decided, okay, the period we are

10   trying to estimate for is April 1st of '20 to 8 -- August --

11   August the 3rd when the trial started.  We said, let's go back

12   and look at the last five years of what's been the actual claim

13   volume for the average of the past five years.

14   Q.    For those particular months?

15   A.    For those particular months for that same period of time,

16   and if you look at that, the average -- can I flip the chart?

17   Q.    Yes.

18   A.    The average we saw over that five-year period was 730

19   claims.  And, again, that's April 1 to August the 3rd.

20   Q.    Okay.  That's an average number of claims for those four

21   months over the last five years?

22   A.    Correct.

23   Q.    All right.  Then what?

24   A.    So then you have got to multiply that by the expected

25   damage per claim.  So you have to go back to this claim period

1  here, and we decide -- took the total damages through March 31st

2  and divided it by the number of claims, 10,561.  So your average

3  damages per claim -- y'all have to check my math, but it does

4  come out to an even $750 per patient.

5  Q.    Okay.  So you take that $750 and what?

6  A.    So you multiply those together, which is a total of

7  $547,223.  So that would be our estimated damages for that

8  period of time.

9  Q.    Okay.  And then what did you do?

10  A.    I'm sorry.  I'm standing in front you.

11        So then you take the damages we came up with through the

12  March 31 period and added it to this number to get our total

13  damages which we showed on that first sheet to begin with,

14  9,426,478.  I meant to stand over here so y'all can see.  I

15  apologize.

16  Q.    Thank you.  Y'all can have a seat.  I'll take that.

17        Mr. Bristow, have you ever bought a house?

18  A.    Yes.

19  Q.    Have you ever taken out a mortgage?

20  A.    Yes.

21  Q.    Let's say, hypothetically, you entered into a mortgage for

22  seven percent.  Would that be a good deal for the bank?

23  A.    Today's market, yes.

24  Q.    Would you pay a lot of interest rate -- a lot of interest

25  over the time of that loan?

1    A.    Yes.

2    Q.    Now, what if the market changed?  Let's say five years into

3    a 30-year mortgage and the rate went down to two percent.  Does

4    the bank have a really good deal at that point?

5    A.    Yes.

6    Q.    Can you get out of it if they don't agree to it?

7    A.    No.

8    Q.    They would have to agree to let you get out of it?

9    A.    Correct.

10   Q.    Because a deal is a deal, right?

11   A.    Yes.

12   Q.    And, by the way, if in year 22 of that agreement, the

13   mortgage company, because they were required or they sold, they

14   temporarily lost your loan agreement, you would still have to

15   make those payments, wouldn't you?

16   A.    Yes.

17            MR. KENNEDY:  I pass the witness.

18            MS. PRUITT:  Your Honor, it will take me a moment to

19   set up.

20            THE COURT:  Take us to the top of the hour.

21            MS. PRUITT:  Okay.

22       Your Honor, may I approach the witness please?

23            THE COURT:  You may.

24                     CROSS-EXAMINATION

25   BY MS. PRUITT:

1   Q.    Good afternoon, Mr. Bristow.

2   A.    Good afternoon.

3   Q.    How are you?

4   A.    Good.

5   Q.    My name is Lyn Pruitt, and I represent the defendants, and

6   I'm going to be asking you some questions this afternoon and,

7   unfortunately for you, probably tomorrow morning.  Okay?

8   A.    Okay.

9   Q.    In this case you gave two depositions in this litigation,

10  didn't you?

11  A.    Yes.

12  Q.    And I put them up there in front of you just in case we

13  need them during the examination.  Okay?

14  A.    Okay.

15  Q.    One of those depositions was taken on March the 28th, 2019,

16  right?

17  A.    Yes.

18  Q.    And the other deposition was taken just recently on July

19  the 9th, 2020, right?

20  A.    Yes.

21  Q.    Okay.  Now, I think I heard you testify, or maybe I didn't,

22  you have been with TeamHealth for about 22 years, right?

23  A.    That's correct.

24  Q.    And during that time, you worked in the same industry for

25  the same company for all those years, right?

 1   A.    Yes.

 2   Q.    And you have had several different positions at TeamHealth

 3   during that period of time, haven't you?

 4   A.    I have.

 5   Q.    Okay.  And I want to talk with you just a moment to make

 6   sure I get that right about what your positions are.

 7              MS. PRUITT:  Did somebody call me?

 8              THE COURT:  No.  I asked Mr. Kennedy to come around so

 9   he can see.

10              MS. PRUITT:  I thought I heard somebody say Lyn.

11   BY MS. PRUITT:

12   Q.    So I'm writing your name up here and the name of the

13   company you worked for and the time that you worked for them; is

14   that correct?  Those years?

15   A.    The organization, yes.

16   Q.    And your first job at TeamHealth was what?

17   A.    I was vice president for finance.

18   Q.    And how long did you do that?

19   A.    I would say approximately five years.

20   Q.    And what was the next title that you had?

21   A.    VP of operations.

22   Q.    And can you tell me, Mr. Bristow, what the VP of

23   operations -- what your job was in that role, please?

24   A.    Yes.  I oversaw some of the specialty service operating

25   divisions.

1   Q.   Can you give the jury or me examples of the specialty
2   services division?
3   A.   They would have included like a nurse call center.  It
4   would have included other -- a spectrum military staffing
5   division as well as our military -- excuse me -- our locum
6   tenens division, and also had some financial operation reporting
7   responsibilities as well.
8   Q.   And while you were vice president of operations, did you
9   have any job responsibilities over contract negotiations?
10  A.   Not related to health plan contracting, no.
11  Q.   So at the time you were vice president of operations and
12  you signed the 2011 letter of agreement, you didn't have any
13  responsibilities with regard to contract negotiations?
14  A.   Well, I apologize.  I will take that back.  I did actually
15  assume I was in that role -- assume some contracting
16  responsibilities, I think, in 2000 -- it would have been in
17  2009, 2008 or 2009 I did take on managed care contracting.
18  Q.   So as vice president of operations for TeamHealth, you did
19  have responsibility for managed care contracting from about 2009
20  on?
21  A.   That's correct.
22  Q.   Okay.  And when did you get promoted or change jobs?
23  A.   So I became senior vice president of operations.  I'm
24  trying to remember the year that was.  That was -- I would say
25  approximately that was in 2010.

1   Q.    So if I put 2009 to 2010 here under vice president of

2   operations, would that be accurate or no?

3   A.    Repeat the question.

4   Q.    Yeah.  I'm trying to get the dates here.  If I put 2009 to

5   2010 for vice president of operations, would that be right, or

6   would it be more accurate to put something else?

7   A.    I would correct it.  And VP of operations 2000 -- so five

8   years after '98, but -- 2003, but I didn't take on the managed

9   care contract responsibilities in that role until 2009.

10  Q.    So did you continue to have the role for managed care

11  contracting from 2009 until you were senior vice president of

12  operations, or did it carry on through?

13  A.    It carried on through.

14  Q.    Okay.  So when did you get promoted to senior vice

15  president of operations?

16  A.    Like I said, I believe it was in 2000 -- I don't remember

17  the exact date.  2011, 2010.  I'm not sure.

18  Q.    And do you recall when you signed -- and just to make sure

19  you and I are tracking on this through the whole testimony, when

20  I am referring to Plaintiff's Exhibit 1, which is also Defense

21  Exhibit 1, the LOA, I'm going to call it the 2011 LOA.  Will

22  you -- will you agree to that description of the LOA that we

23  have been referring to in this case?

24  A.    Sure.

25  Q.    That way all of us will track and you'll know exactly what

1    I'm asking you.

2        So when you signed the 2011 LOA, you were senior vice

3    president of operations; is that correct?

4    A.   Say that again.  I said I wasn't sure of the date that I

5    became senior vice president of operations.

6    Q.   Let's look just to refresh your recollection.

7            MS. PRUITT:  Can you pull up, Graham, Plaintiff's

8    Exhibit 1 or Defense Exhibit 1, either one, the contract, the

9    second page.

10   BY MS. PRUITT:

11   Q.   Let's just look and see.  And if you look at the second

12   line here, Mr. Bristow, this says your title.  Please print.

13   Senior vice president of operations, right?

14   A.   Correct.

15   Q.   And so does that refresh your recollection?

16   A.   Yes.

17   Q.   That at the time the 2011 LOA was signed, you signed it as

18   a senior vice president of operations, right?

19   A.   Correct.

20   Q.   Okay.  And then after -- when did you -- did you get a

21   promotion or trying to get -- your title now, is it a promotion

22   or you moved over, or how does that work?

23   A.   It's a -- as our organization continued to grow, so it's

24   considered to be a promotion, but it became more focused.  It

25   became more full-time revenue related.  I had the responsibility

1    of managed care contracting, but it became a more full-time role

2    in this case along with some additional responsibilities that

3    came along with that.

4    Q.    So your title now is senior vice president of revenue

5    management?

6    A.    Correct.

7    Q.    And how long have you had that?

8    A.    2013.  I'm not exactly sure of the date.

9    Q.    2013 to the present day --

10   A.    Approximately.

11   Q.    -- so you are telling me?

12         Now, I want to go to the period of time where you were vice

13   president of operations, senior vice president of operations,

14   and through the current day.  Okay?

15   A.    Okay.

16   Q.    And I want to talk to you for just a minute about contract

17   negotiations.  You follow me?

18         So back in 2011, you had some people working that you

19   supervised that were responsible for contract negotiations in

20   the managed care space, right?

21   A.    Yes.

22   Q.    And the person that was at the top of that that reported

23   directly to you was a person by the name of J.J. Shrader; is

24   that right?

25   A.    She was one of them, yes.

1    Q.    And J.J. Shrader directly reported to you, correct?

2    A.    Yes.

3    Q.    And she was -- she had a title.  What was her title?  Do

4    you remember?

5    A.    I believe she was vice president of managed care

6    contracting.

7    Q.    Okay.  And she had some people that worked under her,

8    right?

9    A.    Yes.

10   Q.    And one of those people that worked under her was a

11   gentleman by the name of Michael Slover; is that correct?

12   A.    Yes.

13   Q.    And what was Michael Slover's title?

14   A.    I believe he was a senior contract manager.

15   Q.    And how long was Mr. Slover with TeamHealth in his job?

16   A.    I'm not sure what his start date was.  I do know his

17   departure date was in January of 2015.

18   Q.    I heard you say that.  I heard you tell the jury that.

19         He -- this gentleman, Mr. Slover, had an MBA, right?

20   A.    I don't even remember that.  I'm not sure.

21   Q.    And he was a senior contract manager when he left; is that

22   right?

23   A.    That's right.

24   Q.    And was there such a thing as a junior contract manager?

25   A.    No, not that title, no.

1   Q.   So would "senior contract manager" connote that he had had

2   a lot of experience and more experience than others in contract

3   management, right?

4   A.   He would have more than people underneath him, yes.

5   Q.   And who were the people underneath him?

6   A.   I believe there was one support person, Renee -- Stacy Katz

7   actually may have been the person who was supporting him back at

8   the time.

9   Q.   So were there other contract managers that reported to J.J.

10  Shrader who reported to you during the period of time around

11  2011 to 2013?

12  A.   So at least one other that I'm aware of, yes.

13  Q.   And who is that?

14  A.   Sheri Smith.

15  Q.   And I think her name is S-h-e-r-i; is that right?

16  A.   That's right.

17  Q.   And Sheri Smith was -- reported to Michael Slover, correct?

18  A.   No.  They were peers, I believe.

19  Q.   Okay.  Was she also a senior contract manager?

20  A.   I don't recall her title at the time.

21  Q.   Okay.  Now, this would have been -- this lineup or

22  hierarchy for contract negotiation would have been in place in

23  2011 when the letter of agreement was entered into, correct?

24  A.   Yes, I believe so.

25  Q.   Okay.  Now, let's talk about in 2013.  In the year 2013,

1   this same hierarchy would have been in place for contract

2   management and negotiation, right?

3   A.   At least after Michael Slover.   Again, I cannot remember

4   below that, that period of time.

5   Q.   So it's fair -- I can draw a line here and put out beside

6   Michael Slover and J.J. Shrader 2013?

7   A.   Yes.

8   Q.   And you are not sure about Sheri Smith or Stacy Katz,

9   correct?

10  A.   Sheri was with us.   She was Michael's peer.   I don't

11  remember her exact title.

12  Q.   And Michael Slover worked in this job as senior contract

13  manager up until December of 2015, correct?

14  A.   No.   I believe he departed in January of 2015.

15  Q.   Okay.   January of 2015.   Okay.   Now let's talk about the

16  year 2015.   In 2015 -- well, let's talk about '16.   In 2016

17  Tammie Tibbits came into the picture, right?

18  A.   She came into the picture in the fall of 2015.

19  Q.   And Tammie Tibbits had the same job role that Michael

20  Slover had had previously; is that right?

21  A.   That's correct.

22  Q.   Okay.   And who -- so to make it clear, Tammie Tibbits also

23  reported to J.J. Shrader, right?

24  A.   That's right.

25  Q.   And who -- were there peers of Tammie Tibbits that did the

1  same thing that she did during this time?

2  A.    So, again, Sheri Smith still would have been a peer, great

3  peer at that stage.

4  Q.    Anyone else?

5  A.    There were others outside J.J.'s team that were peers, but

6  under J.J.'s peers, those were the only ones.

7  Q.    That's what I'm talking about, is J.J.'s team.

8        So during the fall of 2016, it was Tammie Tibbits and Sheri

9  Smith, right?

10  A.    With Stacy Katz on the team serving in a supportive role

11  for them.

12  Q.    What was J.J. Shrader's title?

13  A.    Again, she was still the vice president for managed care.

14  Q.    So J.J. Shrader was president and vice president of managed

15  care for 2011, right?

16  A.    Yes.

17  Q.    2012?

18  A.    Yes.

19  Q.    2013?

20  A.    Yes.

21  Q.    2014?

22  A.    Yes.

23  Q.    2015?

24  A.    Yes.

25  Q.    And is she still in that role today?

1    A.    Yes.

2    Q.    So from 2011 to the present, J.J. Shrader had the same role

3    and the same title as vice president of managed care?

4    A.    Yes.

5    Q.    Okay.  Now, I want to talk to you a little bit about

6    TeamHealth.  You heard some testimony about TeamHealth, and I

7    would like to ask you some questions about them.

8          Is TeamHealth your employer?

9    A.    No.  Technically my employer is Ameriteam.

10   Q.    Ameriteam?

11   A.    Yes, ma'am.

12   Q.    What is Ameriteam?

13   A.    Ameriteam is an entity with our organizational structure

14   that employs members of our support services team.

15   Q.    And how does Ameriteam relate to TeamHealth?  What's their

16   relationship?

17   A.    So they are effectively sister entities in the same

18   corporate structure together.

19   Q.    They are sister entities?

20   A.    Yes.

21   Q.    And are these sister entities owned by the same parent?

22   A.    Yes.

23   Q.    Who is their parent?

24         MR. KENNEDY:  Objection, Your Honor.

25         May I approach?

1           THE COURT:  Okay.

2       (Bench conference reported as follows:)

3           THE COURT:  Okay.

4           MR. KENNEDY:  The parent is Blackstone.  You've

5   already ordered that we don't need to talk about that.

6           MS. PRUITT:  He testified before that the parent was

7   TeamHealth Finance.

8       When you look at the org chart, it's not Blackstone.  You

9   got to go two rungs up the ladder to Blackstone.  It's the

10  TeamHealth entity that's the parent.

11          MR. KENNEDY:  As long as you are going to tell me you

12  are going to stop before but --

13          MS. PRUITT:  The parent is TeamHealth on the org

14  chart.

15          THE COURT:  Would you lead that question so you get a

16  jump up?

17          MS. PRUITT:  Sure.  Can I pull up a word chart, Your

18  Honor?

19          THE COURT:  Does it have Blackstone?

20          MR. KILLINGSWORTH:  It has Blackstone at the top, the

21  one I've seen.

22          MS. PRUITT:  Can I pull it out?

23          THE COURT:  Isn't TeamHealth your parent company?

24          MS. PRUITT:  You just need a copy of the work chart.

25          MR. KILLINGSWORTH:  Even if they black out the top, it

```
 1   shows -- that's going to make the jury know there's something up
 2   there.
 3            MS. PRUITT:  That's fine.  I'm just use the work chart
 4   myself.  I'm using it for my memory.
 5            MR. KILLINGSWORTH:  Okay.  Sorry.
 6            MS. PRUITT:  I'm old.
 7            THE COURT:  I understand.  So.  Okay.
 8        (End of bench conference.)
 9   BY MS. PRUITT:
10   Q.   So you actually are paid for and paid by Ameriteam
11   Services, L.L.C.; is that correct?
12   A.   That's correct.
13   Q.   And that's the sister company of TeamHealth, L.L.C.; is
14   that correct?
15   A.   That's right.
16   Q.   And those two companies, TeamHealth, L.L.C., and Ameriteam
17   Services, L.L.C., have a parent named Team Finance, L.L.C.; is
18   that correct?
19   A.   Yes.
20   Q.   And that company, Team Finance, L.L.C., has a parent by the
21   name of TeamHealth Holdings, Inc.; is that correct?
22   A.   Yes.
23   Q.   And that company, TeamHealth Holdings, Inc., has a parent
24   by the name of Tennessee Parent, Inc., right?
25   A.   I don't recall that far.
```

1   Q.   Okay.  And that Tennessee Parent, Inc., has a parent by the

2   name of Tennessee Midco., Inc.; is that right?

3   A.   Again, I do not know that.

4   Q.   Okay.  Now, if we were doing these -- if I was drawing

5   these out, which would take me too long to do, I want to just

6   demonstrate that TeamHealth, L.L.C. and Ameritrade [sic], your

7   employer --

8   A.   Ameriteam.

9   Q.   Ameriteam.  I'm sorry.  Thank you.  It's getting late.  I

10  need some coffee.  So these two are sisters, right?

11  A.   Yes.

12  Q.   And I just went over all of the parents up the chain to a

13  certain extent, right?

14  A.   To the extent I knew, yes.

15  Q.   Okay.  To the extent you knew it.  Okay.

16       Now I want to talk a little bit about underneath these two

17  is TeamHealth L.L.C., right?

18       Well, let me just ask you:  Who owns Southeast

19  Physicians -- Southeastern Physicians?

20  A.   Yes, it's TeamHealth, L.L.C.

21  Q.   So TeamHealth, L.L.C., owns what we have been calling in

22  this proceeding as SEP, right?

23  A.   Yes.

24  Q.   And that's -- the official name is Southeastern Emergency

25  Physicians, L.L.C.; is that correct?

1    A.    Yes.

2    Q.    Okay.  Now, do these sisters and parents that I've

3    identified all have offices in Knoxville, Tennessee?

4    A.    We have offices in Knoxville, Tennessee, yes.

5    Q.    And they also have offices in other parts of the country,

6    right?

7    A.    Yes.

8    Q.    Okay.  So in Knoxville, Tennessee -- does SEP have

9    employees that were housed in offices in Knoxville, Tennessee?

10   A.    Yes.

11   Q.    Okay.  How many employees does SEP, Physicians, L.L.C.,

12   have in Knoxville, Tennessee?

13   A.    I don't recall the specific number.

14   Q.    Okay.  Can you give me some kind of a ballpark?

15         Is it less than a hundred?

16   A.    Again, I cannot remember.  I think we produced an exhibit

17   showing that number, but I don't remember the number.

18   Q.    Okay.  Now, TeamHealth, L.L.C., also has employees in

19   Knoxville in their office, right?

20   A.    I'm not sure if it actually has employees under that entity

21   or not.

22   Q.    So the employees for TeamHealth, L.L.C., what entity would

23   they be located under?

24   A.    Repeat the question.

25   Q.    Yeah.  Who acts for TeamHealth, L.L.C.?

1    A.    Who acts?  I don't follow the question.

2    Q.    What individuals act for TeamHealth, L.L.C.?  They are just

3    an L.L.C., right?

4    A.    They're an L.L.C.  I'm not sure what entities are in that

5    entity.

6    Q.    Okay.  Well, just let me ask it this way then:  How many

7    employees -- who employs all the billers, the coders, and all

8    the administrative professionals that do what we have been

9    describing to the jury here for this week?

10   A.    Health Care Financial Services.

11   Q.    Health Care Financial Services.

12         And where does Health Care Financial Services fall in this

13   family tree that I have been describing?

14   A.    Again, I believe they fall under Ameriteam.

15   Q.    I'll be glad to show you a copy.  Would that help?

16         MR. KENNEDY:  Your Honor, I object to the relevance.

17   The structure of SEP and TeamHealth is not an issue of whether

18   there's a contract or not.

19         MS. PRUITT:  May we approach, Your Honor?

20         THE COURT:  You may.

21    (Bench conference reported as follows:)

22         MS. PRUITT:  The relevance, Your Honor, SEP is not a

23   little bitty company with a few physicians.  And it's cross.  I

24   need to be able to establish with him that these companies have

25   hundreds of people.  He's trying to help me, but he's not.

 1            THE COURT:  Yeah.  He's doing his --

 2            MS. PRUITT:  He's doing his best.  So I was going to

 3    hand him this and talk to him about their office in Knoxville

 4    and all that.  I'm not going to --

 5            MR. KENNEDY:  We haven't said SEP is a little

 6    itty-bitty company at all.  That's not our battle cry.

 7            THE COURT:  It has not been expressly said, but the

 8    undertone has been that we have these doctors doing God's work.

 9            MR. KENNEDY:  We didn't actually get to hear about

10    that.

11            THE COURT:  Battling the big insurance companies.

12      I do not want you to go too far and just bludgeon them

13    about being a big, rich company.

14            MS. PRUITT:  They are not --

15            THE COURT:  I don't mind you, I guess, meeting proof

16    for proof and showing we are on equal footing and this is a

17    breach of contract case between two parties that equally

18    negotiated and no sympathy should be involved all.

19            MR. KENNEDY:  If you recall, Your Honor, you probably

20    don't because it wasn't spectacular.  In my opening I actually

21    said TeamHealth is in there to make this equal footing.  I admit

22    that makes us on equal footing.  So we are not running from the

23    size.

24            THE COURT:  I'm sure.

25            MR. KENNEDY:  The objection is relevance.

1        THE COURT:  I think it's just the testimony on

2   the cross-examination of the first two witnesses.  I think it's

3   going to get into some questions that could lead the jury to

4   believe these doctors are just out here doing good work and all

5   they want -- well, and all they want to do is be compensated

6   fairly.

7        I think it's kind of the way it's coming in.

8            MS. PRUITT:  It is.

9        THE COURT:  I don't want to spend a whole lot of time

10  going through corporate structure.  How much more?

11          MS. PRUITT:  About five minutes.  I have got a couple

12  points I want to make.

13         THE COURT:  But there was a bargaining for exchange

14  that was arm's length, no pressure.

15         MR. KILLINGSWORTH:  The thing is they can do that

16  without going into detail of each corporate structure.  I don't

17  think Kent is going to deny it.  It's a big company, and you can

18  show on the contract that part of it is in the beginning.

19         MS. PRUITT:  This man is a much, much better trial

20  lawyer than me, but if it's all the same to them, I would like

21  to try my case.

22         THE COURT:  I'll overrule the objection.  I would let

23  her ask it.

24         MR. KENNEDY:  I'll stipulate to it.  They are big.

25         THE COURT:  And -- you say.  It is what it is.  Try to

1    push through it as quickly as you can, but I'm going to let you

2    make your point.

3              MS. HENRY:  We have an agreement for witnesses --

4              MS. PRUITT:  Provide them 24 hours ahead of time.  We

5    have no agreement.

6              THE COURT:  Ask Mr. Cady to start getting that

7    together.

8              MR. TALLEY:  We talked briefly with Kevin about that

9    on the last break.

10             MS. HENRY:  We heard it on the break.  You just named

11   witnesses that you had left, but you didn't tell us who you are

12   going to call tomorrow.

13             MR. TALLEY:  I said that, just to let you know, we

14   talked about it with Kevin outside in the hallway during the

15   last break, and Steve and I are working on figuring that out.

16   And doing so while we are in the courtroom is difficult, but we

17   are trying, and we'll let you know.

18             MR. KILLINGSWORTH:  It's already 5:00.

19             THE COURT:  Get them to them as quickly as you can.

20   BY MS. PRUITT:

21   Q.   I think I handed you a copy of this, or did I?

22   A.   I think you about did.

23   Q.   Almost did.  So you can refresh your recollection if you

24   need to.

25             And my question is:  Where does SEP fall under these two

 1  sisters, TeamHealth, L.L.C., and Ameriteam Services, L.L.C.?

 2  A.   I'm not following the question.

 3  Q.   Where does Southeastern Emergency Physicians fall?  Who

 4  owns them?

 5  A.   TeamHealth, L.L.C.

 6  Q.   Okay.  Now, when I'm asking this next series of questions,

 7  I'm talking about TeamHealth entities.  Okay?

 8  A.   Okay.

 9  Q.   And how many employees do the TeamHealth entities have in

10  this country?

11  A.   Several thousand.  I don't know the exact place number.

12  Q.   Do you know how many they have in Knoxville, Tennessee?

13  A.   Again, it would be probably over a thousand, but, again, I

14  don't know the exact number.

15  Q.   And TeamHealth, L.L.C., has offices in other places other

16  than Knoxville; is that correct?

17  A.   Correct.

18  Q.   What are some of the other places where they have offices?

19  A.   We have offices in Nashville.  We have offices in Woodbury,

20  New Jersey.  I think we have an office in Pleasant Hill,

21  California.  We have an office in Oklahoma City.  I believe we

22  have some offices in south Florida, in West Palm Beach.  I

23  believe we have some offices in Houston, Texas.

24      We had some offices in Akron, Ohio, in Sunrise, Florida.

25  Those are the ones I can think of right now.

Suggs - Direct                                              284

1   Q.   And does the -- do these offices provide contract

2   negotiations for providers all over the country?

3   A.   Repeat the question.

4   Q.   Yes.  Do these offices provide contract negotiations for

5   providers all over the country?

6   A.   Are you referring to health plan negotiations?

7   Q.   Yes.  Let's qualify it so we'll all be on the same page.

8        Does TeamHealth provide contract negotiations for providers

9   all over the country, health care negotiations?

10  A.   Yes.

11  Q.   Now, for how many states did TeamHealth provide contract

12  negotiations for health care contracts?

13  A.   Again, I don't know the exact number, but I believe we are

14  in about 45 states.

15  Q.   45 states.  Would you agree with me, Mr. Bristow, that

16  TeamHealth is one of the largest providers of health care

17  professional staffing in the United States right now?

18  A.   We would be one of, yes.

19  Q.   Now, when I was asking you earlier about Michael Slover, do

20  you recall that?

21  A.   Yes.

22  Q.   Michael Slover, the senior contract manager, how many

23  states was Michael Slover responsible for in his region?

24  A.   Again, I don't remember the exact number.  But I would have

25  said it was probably three to four.

1    Q.    And do you know how many states Tammie Tibbits was

2    responsible for in her region when she came to work?

3    A.    It would have been about the same number.

4    Q.    Now, you yourself, Mr. Bristow, are not employed by SEP; is

5    that correct?

6    A.    No.

7    Q.    That's not correct?

8    A.    I am not an employee of SEP.

9    Q.    Okay.  I asked a bad question.  Let me ask it better.

10        You are not employed by SEP, correct?

11   A.    That's correct.

12   Q.    Okay.  And you know that SEP is the party that's suing in

13   this case, right?

14   A.    Yes.

15   Q.    Okay.  SEP has very few employees compared to TeamHealth,

16   L.L.C.; isn't that correct?

17   A.    I do not know that to be a fact.

18   Q.    You don't know how many employees SEP has?

19   A.    As I said before, I know they have employees.  I don't

20   remember the exact number.

21   Q.    And you don't know what the -- how it looks in comparison

22   to the employees for TeamHealth, L.L.C.?  Is that what you are

23   telling us?

24   A.    Not to that specific entity, TeamHealth, L.L.C., no.

25   Q.    Would you agree with me TeamHealth has a whole lot more

1    employees than SEP does?

2    A.   It would help if we defined TeamHealth for me as we talk

3    these questions through.

4    Q.   Okay.  I just listed a number of TeamHealth entities when

5    we were going through this chart, right?

6    A.   Yes.

7    Q.   And the TeamHealth entities I listed, would you agree that

8    those entities have a whole lot more employees than Southeastern

9    Emergency Physicians, L.L.C.?

10   A.   Yes.

11   Q.   Now, the jury has heard today about SEP, that they are a

12   group of physicians, correct?

13   A.   Yes.

14   Q.   And you know as vice president -- senior vice president of

15   operations and as senior vice president of revenue management,

16   you know that most of those emergency room doctors for these

17   three hospitals that we are talking about, or six hospitals,

18   weighing talking about -- let me just ask you that first.

19   Strike that.

20        You just went through two pieces of data about the clients

21   that you had used to calculate damages, right?

22   A.   Yes.

23   Q.   Those claims are for certain hospitals in the state, right?

24   A.   Yes.

25   Q.   And one of them is Mercy Bella Vista, right?

1    A.    Yes.

2    Q.    Mercy Rogers?

3    A.    Yes.

4    Q.    Northeast Arkansas Jonesboro Baptist, right?

5    A.    Yes.

6    Q.    Any other entity, any other emergency room in Arkansas that

7    is in those claims that you just talked to the jury about 15

8    minutes ago?

9    A.    Yes.  So I have to go back.  You named NEA Baptist

10   Memorial.  You named Mercy Bella Vista and Mercy Rogers.  Was

11   those three --

12   Q.    I named Mercy Bella Vista.

13   A.    Um-hum.

14   Q.    NEA Jonesboro.

15   A.    Okay.

16   Q.    And Mercy Rogers.

17   A.    There are additional sites that have claims on those

18   spreadsheets that we just went over.

19   Q.    Which ones?  Which entities have claims on those

20   spreadsheets?

21   A.    So the sites that I believe would have claims on the

22   spreadsheets would be -- I think -- Baptist Crittenden and one

23   other site would be -- there's one other site that I'm blanking

24   on at the moment.  Mercy Springdale.  They may have started

25   after that.  I can't remember.

1   Q.   Is there a Mercy Forth Smith?

2   A.   No.  We should have seven sites today, and one literally

3   just started this past Friday; so it would not have claims in

4   the file.

5   Q.   That's what I was trying to get to, that facility that you

6   just contracted with doesn't have claims.  What's the name of

7   it?

8   A.   That is Saline Memorial Hospital, Saline.

9   Q.   Saline.  Most people make that same mistake.  They say

10  Saline County.  It's Saline County.  You know you are not from

11  here.

12       And is there another hospital in that group?

13       The reason I'm doing this, Mr. Bristow, is because it's

14  been talked about -- six or seven hospitals during the course of

15  this, and I want to make sure we did it right and got the facts

16  right.  Okay?

17  A.   So one other site I believe that would not have started

18  services for claims to be in spreadsheets, I believe it's

19  Saint Mary's in Russellville.

20  Q.   So Saint Mary's in Russellville will not have any claims

21  that are subject matters of this lawsuit; is that right?

22  A.   I believe that's right.  Let me take that back.

23       We started providing services, I believe, in May at that

24  site.  So, yes, we are seeing patients under the SEP entity at

25  that site, and we have provided patients presumably care for

1    Ambetter of Arkansas' patients?

2    Q.    Okay.  And my question is just about the damages that you

3    calculated for the jury on those two sheets.

4         Are there any claims for Saint Mary's in Russellville?

5    A.    No, because the way we did the calculation, we only looked

6    at the historical averages of the sites where we were providing

7    services and extrapolated those damages.

8    Q.    And there are no claims on those two sheets that you just

9    showed the jury for Saline Memorial, right?

10   A.    Correct.

11   Q.    Any other hospitals that have been mentioned -- it's been

12   told to the jury that there were six or seven emergency room

13   providers, and I'm just trying to make sure we understand which

14   ones have claims that are the subject matter of this lawsuit.

15        So we've got Mercy Bella Vista, Mercy Rodgers, Northeast

16   Arkansas Jonesboro.

17        Are you telling me that Baptist Crittenden has claims on

18   those two sheets?

19   A.    I believe it was done.

20   Q.    That's four?

21   A.    Two of them, down.  So that's six entities.

22        There's another Mercy site, and I'm trying to remember

23   which city it's in.

24        We said Jonesboro, Bella Vista, and Springdale.  Maybe it's

25   Springdale.

1   Q.   So you believe that Mercy Springdale also has some claims

2   on those two sheets that you were just showing the jury?

3   A.   So, again, I believe there would be five sites, and I

4   believe that would be one of the five, but I would have to

5   confirm that.

6   Q.   Okay.  So just so we are clear, what you know today as you

7   sit here and testify to the jury, is that your belief is that

8   there are five sites within those claims that you just talked

9   about with the jury, five hospitals?

10   A.   I believe that's right.

11   Q.   Okay.  Now, with regard to the doctors that are employed by

12   SEP to service those hospitals, you know as senior vice

13   president of revenue management and as former senior vice

14   president of operations that those doctors are independent

15   contractors, right?

16   A.   Yes.

17   Q.   And by independent contractors, that means that they enter

18   into a contract to be paid by the hour, right?

19   A.   That can be one form of compensation.

20   Q.   And we just looked at today a couple of contracts from

21   those facilities or two of those facilities, and they had hourly

22   rates on them, and that's common in the state of Arkansas,

23   right, for SEP to contract these doctors on an hourly rate,

24   right?

25   A.   I believe so, yes.

1  Q.   Okay.  And so the doctors that are working in these

2  emergency rooms for SEP, when someone comes in, they are

3  required to treat everyone who comes through the emergency room,

4  right?

5  A.   Yes.

6  Q.   And that particular doctor gets paid that hourly rate that

7  they are contracted for regardless of whether the person that

8  comes through the door has insurance at all, right?

9  A.   Repeat that question.

10 Q.   Yeah.  Probably a bad question.

11      The doctor who's receiving an hourly rate for himself or

12 her services, they get that rate regardless of whether the

13 patient they are treating has insurance, correct?

14 A.   I don't know that I can fully agree with that comment.

15 Q.   Well, does SEP not pay their physicians on an hourly basis

16 if they are treating patients that don't have insurance?

17 A.   Repeat that question one more time.

18 Q.   Does SEP pay their doctors an hourly rate regardless of

19 whether the person that comes into the emergency room -- whether

20 they have insurance or not?

21 A.   If the overall economics of the insured population for that

22 site work, then we can pay them, yes.

23 Q.   So if the overall economics doesn't work out, then you

24 don't pay doctors an hourly fee to treat uninsured people in

25 this state?

1    A.    That's not what I said.

2    Q.    Okay.  Then I misunderstood.

3    A.    Yes.  I would say, if the economics don't work out, we

4    wouldn't be in that facility any longer.

5    Q.    Okay.  So let me see if I can restate what I'm

6    understanding you to say.

7          So if in a facility you have a number of uninsured people

8    that have come into the emergency room and the economic

9    calculation doesn't work out, then SEP might make a decision not

10   to staff that facility anymore?  Is that what you just said?

11   A.    It is possible, yes.  If the economics don't substantiate,

12   you know, the ability to recruit and retain qualified physicians

13   at a market rate, that's correct.  We could not afford to stay

14   there.

15   Q.    Okay.  Now, these doctors who are paid hourly rates, they

16   are paid the same hourly rate regardless of the insurance card

17   they come in and show the check-in counter, right?

18   A.    Yes.

19   Q.    So if I walk into the ER and pull out my Blue Cross and

20   Blue Shield card and hand it them, that doctor, if he sees me

21   for three hours, he's going to get paid three hours on that

22   rate, right?

23   A.    Repeat that question.

24             MR. KENNEDY:  Are you done with the flip chart for a

25   while?

1          MS. PRUITT:  Sure.  I was going to say you want me to

2    fold it over.

3          MR. ZAVITSANOS:  We missed him.

4          MS. PRUITT:  You missed my chart?

5          MR. ZAVITSANOS:  No, I missed Collin.

6          MS. PRUITT:  Missed him?

7    BY MS. PRUITT:

8    Q.   Let me see if I can clear it up.

9          If I go in with my Blue Cross Blue Shield card and I have

10   to get my leg stitched up on a weekend because I got a dog bite

11   or something, the doctor who is treating me is going to get paid

12   that hourly rate regardless of what card I have and check in,

13   right, regardless of my coverage?

14   A.   Yes.

15   Q.   So regardless of the reimbursement rate, whether it's 100

16   percent or 75 percent of billed charges or 210 percent of

17   Medicare or whether it's Medicaid or whether it's Medicare, that

18   doctor treating in that ER is going to be paid the same amount

19   of money to treat all of those different patients, right?

20   A.   That doctor may not choose to work there anymore if he

21   can't be compensated appropriately or may not be good quality

22   doctors that they are getting in there if it's -- regardless of

23   what's being paid.

24   Q.   I understand that, Mr. Bristow.  I understand that.  My

25   question was a little different.

1     My question is:  He's going to get the same hourly rate

2   regardless of the reimbursement rate on the insurance coverage,

3   right?

4   A.   Yes.

5          THE COURT:  All right.  I asked Ms. Pruitt to try to

6   wind it up around the top of the hour.  We are going to wind it

7   up today.  I'm not going to keep you late today.  I'm going to

8   let you go home.  We are going to come back and get started at

9   8:30 tomorrow.  I probably will not keep you late tomorrow,

10  since we've already decided we are coming back, and so we'll try

11  to work it out when you are not here late tomorrow.  Okay?

12     All right.  Let's have a good evening and come back

13  tomorrow at 8:30.

14     (Jury exits.)

15          THE COURT:  All right.  I will be back a little bit

16  before 8:30 in the morning.  So if we need to take something up

17  in the morning, I'll be here.

18          MR. TALLEY:  Judge, we have some videos to play of

19  designated deposition testimony.

20          THE COURT:  Okay.

21          MR. TALLEY:  Mr. Leyendecker and I talked just

22  briefly about this, and I think we need some guidance on the

23  Court's preference on how those videos are played, and I can

24  give you a little bit more detail.

25          THE COURT:  Yes.

1          MR. TALLEY:  I have had the video for Heather Kibler

2     cut already based on the Court's ruling on those depositions on

3     those designations.  Excuse me.  That video -- that cut plays in

4     just line -- page/line order of plaintiff or our affirmatives,

5     their counters, their --

6          THE COURT:  Straight through?

7          MR. TALLEY:  Straight through.  And I think

8     Mr. Leyendecker has a different way that he prefers to do that.

9          MR. LEYENDECKER:  Absolutely, Judge.  I have never in

10    my life played a tape where the jury had no idea who's

11    sponsoring what.

12         The rule allows either party to put, for optional

13    completeness only -- if he skips a question and answer in his

14    piece and I plead optional completeness, I can force him to put

15    that in there or vice versa, but he gets to play his ten minutes

16    or hour and half and if I want to play my 15 minutes separate,

17    the rules do not force me to say I have to mix it up so I have

18    no idea what I think is important.

19         THE COURT:  And so do you have somebody who can put

20    yours where you can just --

21         MR. TALLEY:  That's the question.  I don't know the

22    answer to it, if I can get that done overnight.

23         THE COURT:  I would prefer because this is going into

24    tomorrow.  We are not having to talk about it.  You don't have

25    to have it here at 8:00 in the morning.

1          If the preference is to have you cut your piece and play

2     it, let's see if we can get somebody to do it.

3               MR. LEYENDECKER:  I can tell you that just this

4     afternoon is when I started identifying, and mine is going to be

5     tight, right?  I already got mine.  I didn't even have the

6     video.  We got the video, and I've got the person that's

7     committed to getting mine what I'm going to do short on the

8     couple that they're going to play lock, stock, and barrel on my

9     side of the equation.  So I have no doubt they can get theirs

10    done too.

11              MR. TALLEY:  So the Court's preference would be I play

12    my side; he plays his side.

13              THE COURT:  Yeah.

14              MR. TALLEY:  That's fine.  I have never done it that

15    way.

16              THE COURT:  I don't mind either way, but if there's an

17    objection to how you do it.

18              MR. TALLEY:  I have never done it Mr. Leyendecker way,

19    just to let you know.

20              THE COURT:  I have seen it both ways, and you know

21    sometimes we put it in and it plays all the way through.

22              MR. ZAVITSANOS:  You know what this is, right?

23              THE COURT:  It depends on what you mean.

24              MR. ZAVITSANOS:  At North Carolina you know what it

25    means?

1            THE COURT:  Four corners.

2            MR. LEYENDECKER:  It's Princeton that did it, not Dean

3   Smith.

4            THE COURT:  No, he's notorious for midway through the

5   second half he threw up that hand and they threw to the corners,

6   and they just pass the ball around and run out the clock.  You

7   never heard the story that the only person who could hold

8   Michael Jordan down was Dean Smith?

9            MR. LEYENDECKER:  I have heard that story.  That's

10  about all the money.

11           MR. ZAVITSANOS:  You forgot to ask what his favorite

12  color was.

13           MR. LEYENDECKER:  Okay.  Thank you, Judge.

14       (Proceedings recessed at 5:13 p.m.)

15                    REPORTER'S CERTIFICATE

16       I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

17

18                                   Date:  August 7, 2020
    /s/ Kathleen Maloney, RPR, FCRR
19       United States Court Reporter

20

21

22

23

24

25