```
 1            IN THE UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF ARKANSAS

 3                     CENTRAL DIVISION

 4

 5  SOUTHEASTERN EMERGENCY PHYSICIANS, LLC,

 6                    Plaintiff,

 7      V.                              No. 4:17-CV-492-BSM

 8  ARKANSAS HEALTH & WELLNESS HEALTH PLAN,    August 7, 2020
    INC.; CELTIC INSURANCE COMPANY d/b/a       Little Rock, Arkansas
 9  ARKANSAS HEALTH & WELLNESS INSURANCE
    COMPANY; NovaSys HEALTH, INC.; and
10  CENTENE CORPORATION,

11                    Defendants.

12

13               TRANSCRIPT OF TRIAL, DAY 5
             BEFORE THE HONORABLE BRIAN S. MILLER,
14          UNITED STATES DISTRICT JUDGE, and a jury

15

16  APPEARANCES:

17  On Behalf of the Plaintiff:

18      JUDY SIMMONS HENRY
        BAXTER D. DRENNON
19      MICHAEL A. THOMPSON
            Wright, Lindsey & Jennings
20          200 W Capitol Avenue, Suite 2300
            Little Rock, Arkansas 72201-3699
21
        JOHN ZAVITSANOS
22      MICHAEL KILLINGSWORTH
        PATRICK KEVIN LEYENDECKER
23          Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing PC
            1221 McKinney Street, Suite 2500
24          Houston, Texas 77010

25  (APPEARANCES CONTINUED ON NEXT PAGE)
```

```
 1   APPEARANCES (CONTINUED):

 2

 3   On Behalf of the Plaintiff (Continued):

 4        COLLIN D. KENNEDY
               Hanshaw Kennedy Hafen LLP
 5             1415 Legacy Drive, Suite 350
               Frisco, Texas 75034

 6

 7   On Behalf of the Defendants:

 8        LYN PEEPLES PRUITT
          GRAHAM CAUGHMAN TALLEY
 9             Mitchell, Williams, Selig, Gates & Woodyard PLLC
               425 W Capitol Avenue, Suite 1800
10             Little Rock, Arkansas 72201

11        STEVEN M. CADY
               Williams & Connolly LLP
12             725 Twelfth Street, N.W.
               Washington, DC 20005-5901

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
25   transcription.
```

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter

1                        INDEX - (August 7, 2020)

2

3    **WITNESSES FOR PLAINTIFF:**   **Direct**   **Cross**   **Redirect**   **Recross**

4    KENT BRISTOW                               11         114

5

6    **WITNESSES FOR DEFENDANT:**   **Direct**   **Cross**   **Redirect**   **Recross**

7    KIM SUGGS                       150        223

8

9

10

11

12   Motion by Defendants. . . . . . . . . . . . . . . . p. 123

13

14

15

16

17   EXHIBITS RECEIVED:

18   Defendant's Exhibit 6. . . . . . . . . . . . . . . p. 62

19

20

21

22

23

24

25

1          (Proceedings commencing in court at 8:15 a.m.)

2               THE COURT:  All right.  I understand we have

3     something to take up.

4               MS. PRUITT:  I do, Your Honor.  And the reason I'm

5     indulging the Court is because I know there is a motion in

6     limine on one issue, and I don't want to be in violation of the

7     Court's order.

8               THE COURT:  Uh-huh.

9               MS. PRUITT:  I do think the door was open on

10    something yesterday.  I want to make sure the witness is not in

11    here.  Thank you.

12         On balance billing, the question was:  "And what is

13    TeamHealth's corporate philosophy on balance billing?"

14         "So this is really important.  We take a stand against

15    balance billing.  We really think it's wrong to put a patient

16    in the middle of a dispute between a provider and a health

17    plan.

18         "Y'all put that message out into the public?

19         "Yes.  If you ever go on our website, there's actually a

20    link.  I think it's surprise billing, but it's basically a

21    microsite developed and dedicated to our position on balance

22    billing and surprise billing where we clearly communicate with

23    a letter from our CEO that we do not favor and do not practice

24    balance billing."

25         And there is a document where -- sent to Senators Cassidy,

1   Bennett, Carper, Young, and Murkowski and Hassan where they're

2   sending a letter talking about their balance billing practices.

3   And in this letter, it has a table that shows the percentage of

4   balance billing that they do with patients and how much that

5   amount is for the year 2017.

6       And it's directly contradictory to the position they took

7   yesterday, and I want -- I think that opened the door to me

8   asking about this.

9           THE COURT:  Mr. Kennedy, what is the response?

10          MR. KENNEDY:  It's hearsay, one; and, two, it's not

11  technically inconsistent because this is -- this is our

12  message.  There have been instances where, as I understand it,

13  TeamHealth has acquired entities, but that's been their DNA to

14  do that.  And once we've acquired that entity, that is stopped.

15  Of course, there is always the transition period when claims

16  are pending from an entity that we acquire until they're fully

17  matriculated into our family where some of those could still be

18  happening, but that is initiated by the entity that we're

19  acquiring.

20      But this also gets into the lobbying.  And not to mention,

21  I haven't had a full chance to read this full seven-page letter

22  from Congress that TeamHealth's President, CEO -- but

23  Blackstone is mentioned in here a dozen times at least.

24      So if she wants to ask him whether -- you know, I heard

25  you say yesterday, "That's your message that you don't balance

1   bill, and that's what you put out to the public, and you said

2   that you don't balance bill."  And if she wants to go and try

3   to impeach him with a specific instance where she thinks they

4   balance bill and let him try to defend that, then I think that

5   is fair game.

6       But this is hearsay.  It's not inconsistent.  It's got

7   Blackstone in it, in violation of the motion in limine, and

8   it's totally improper.

9         THE COURT:  I think it's proper to ask him, "Weren't

10  you addressed by Congress about balance billing?"  And then he

11  can explain.

12       MR. KENNEDY:  So you trailed off on the last part.

13       THE COURT:  I think it would be appropriate to say,

14  "You are against balance billing, and you took a hard stand

15  again balance billing.  Isn't it true that your company has

16  been addressed by Congress for balance billing?" or something

17  like that.

18     And then he might say, "Yes" or "No."

19     That document will not come into evidence.

20       MS. PRUITT:  I'm not going to try.  I wasn't going to

21  try to get it in, Your Honor.

22       THE COURT:  And I figured that.  But you want to put

23  something in front of him to --

24       MS. PRUITT:  Yes.

25       THE COURT:  -- show there was testimony.  It's for

1  impeachment purposes.

2          MS. PRUITT:  Yes, Your Honor.

3          THE COURT:  Now the details of that document --

4          MS. PRUITT:  No.

5          THE COURT:  -- I don't want politicians' names and

6  whatever mentioned.

7          MS. HENRY:  I am not going to do that.

8          THE COURT:  "Isn't it sure that" -- "Isn't it true

9  that Senator Boozman told you that you were wrong?"

10     I wouldn't want anything like that, but to simply impeach

11 him, and he can say, "Yes" or "No."

12     And then I guess he would, on redirect, say, "Yeah, we buy

13 companies that balance bill and we try to get them in line," or

14 something.  And then you could hit them and say, "No, this was

15 after, so many years afterwards."

16     I don't mind if she impeaches the witness with the

17 document.

18          MR. KENNEDY:  I'm sorry.  Maybe I misunderstood

19 Ms. Pruitt.  I understood her to say she was going to try to

20 offer the document.

21          MS. PRUITT:  No.

22          THE COURT:  And I wouldn't let her go through the

23 details about everybody who was involved in the letter.

24 Because then we start getting into politics and stuff.

25          MS. HENRY:  I understand.  But, Your Honor, on the --

```
1   I do want to get into -- I, obviously, have to talk -- to talk
2   about this is, but I'm not going to do this in a lot of detail.
3               THE COURT:  Okay.
4               MS. PRUITT:  And then I want to talk to him about the
5   amount that they said they did.  And it's in here.
6               THE COURT:  Did you --
7               MS. PRUITT:  I want to hand him a copy because --
8               THE COURT:  Yeah, you can ask him, "In this letter,
9   you were written by a Congressman, and they asked you about
10  balance billing?
11              MS. PRUITT:  Right.
12              THE COURT:  "And here is the amount they said you
13  balance billed."  That is impeachment.  It's no problem.
14              MR. KENNEDY:  Impeaching her with what Congress
15  thinks?  You know, Congress is infallible, Judge.
16              THE COURT:  Well, and here is a good thing.  We don't
17  know what response that will get from -- what response the jury
18  will have to it, but they'll know that --
19              MR. ZAVITSANOS:  Yeah.  And, Judge, just so you have
20  the context -- and I understand the Court's ruling, and I'm not
21  fussing at all about it.
22              THE COURT:  No.
23              MR. ZAVITSANOS:  Just so -- just so you have a more
24  fulsome understanding of what's going on here, there is, like I
25  told you yesterday -- there is this huge national battle going
```

1  on, and there is efforts on both sides to pass certain
2  legislation.
3            THE COURT:  Right.
4            MR. ZAVITSANOS:  So they're using balance billing as
5  kind of a variable about why our legislation should pass.
6            THE COURT:  I get it.
7            MR. ZAVITSANOS:  So, you know --
8            THE COURT:  And can I understand what we have here is
9  a battle of two titans, trying to figure out where we're going
10 from here, what is going to happen?
11           MR. ZAVITSANOS:  Yeah.
12           THE COURT:  I get it.
13           MR. ZAVITSANOS:  Yeah.  Okay.
14           THE COURT:  But what I don't want -- and I want the
15 same thing you all want, and I don't want the same thing that
16 you don't want.  I don't want the jury to start getting sucked
17 into the battle of titans and start trying to --
18           MR. ZAVITSANOS:  Exactly.
19           THE COURT:  -- choose a side of which titan they want
20 to support or that type of thing.
21           MR. ZAVITSANOS:  Exactly.
22           THE COURT:  If we can keep it as close as we can to
23 what the agreement was and let them make a decision on that.
24           MR. ZAVITSANOS.  Right.  No, that's --
25           MS. PRUITT:  That's why I brought it to the Court's

| | |
|---|---|
| 1 | attention. |
| 2 | THE COURT:  That's fine. |
| 3 | MS. PRUITT:  Because there is a motion in limine. |
| 4 | But when you testify to something like that, -- |
| 5 | THE COURT:  You can impeach. |
| 6 | MS. PRUITT:  -- you get impeached. |
| 7 | THE COURT:  You can impeach him. |
| 8 | MS. PRUITT:  They may not think it's good |
| 9 | impeachment, but it is what it is. |
| 10 | THE COURT:  Well, we'll see what he says. |
| 11 | MR. ZAVITSANOS:  Thank you, Judge. |
| 12 | THE COURT:  All Right. |
| 13 | MR. KENNEDY:  Should I bring the witness in?  Are we |
| 14 | done with that? |
| 15 | THE COURT:  Yes, sir, you can bring him in. |
| 16 | Ms. Pruitt, tell me when you're ready. |
| 17 | MS. PRUITT:  I'm ready whenever you are. |
| 18 | THE COURT:  Mr. Kennedy, are you ready?  Mr. Kennedy? |
| 19 | MR. CADY:  Hey, Collin. |
| 20 | MR. DRENNON:  Collin. |
| 21 | THE COURT:  I was asking:  Are you ready?  We're |
| 22 | going to bring the jury in.  Are you ready? |
| 23 | MR. KENNEDY:  Yes. |
| 24 | THE COURT:  All right.  Bring them in. |
| 25 | (whereupon the jury entered the courtroom.) |

```
1              THE COURT:  All right.  You can be seated.

2        Ms. Pruitt, you can continue.

3              MS. PRUITT:  Thank you, Your Honor.

4                    CROSS-EXAMINATION (CONTINUED)

5   BY MS. PRUITT:

6   Q.   Good morning, Mr. Bristow.

7   A.   Good morning.

8   Q.   I want to make sure we've done this -- we've done this for

9   the jury, but I want to make sure that you agree with

10  something.  It's written up on the other board, but I'm not

11  going to go back in the corner and flip it, unless Counsel

12  gives me permission to do that.

13             MR. ZAVITSANOS:  I'm sorry?

14             MS. PRUITT:  Can I flip your chart over there?  Do

15  you mind?

16             MR. ZAVITSANOS:  As long as you don't write on it.

17             MS. PRUITT:  I won't write on it.

18             MR. ZAVITSANOS:  Yeah.

19             MS. PRUITT:  I just want to flip it to one page, that

20  way I don't have to write it out myself.

21        Well, let me just do my own.  I flipped through everything

22  you've written over there.

23             MR. ZAVITSANOS:  I can be your Vanna White.

24             MS. PRUITT:  I am not going to make a comment.

25  Q.   So would you agree with me, Mr. Bristow, or do you agree
```

1   with the Counsel and what the jury has heard, that

2   out-of-network providers and nonparticipating providers are the

3   same thing?

4   A.   I would agree with that.

5   Q.   Okay.  And so when the jury is looking at these exhibits

6   back in the jury room, if they see words like "nonpar" or

7   "par," "nonpar" means nonparticipating; right?

8   A.   Correct.

9   Q.   And then "par," it's not a golf par, or it's not a score,

10  it means participating provider; right?

11  A.   Correct.

12  Q.   Okay.  So the words -- all of these words are used in your

13  industry in these communications that we're going to be talking

14  about with the jury today.  So would you also agree that

15  "out-of-network" and "nonparticipating" mean that there is not

16  a contract.

17  A.   No, I would not necessarily agree with that.

18  Q.   Okay.  We'll talk about that as we go through today.  If

19  Counsel asks one of our witnesses about that, you disagree

20  that, if someone is out-of-network, that there is not a

21  contract?  I mean, a contract for that product and those

22  services?

23  A.   That's correct.

24  Q.   Okay.  So let's make sure we understand.  For that product

25  and for those services, if you're out-of-network, that means no

1    contract; right?

2    A.    Repeat the question.

3    Q.    For a specific product, specific insurer, and for those

4    services, if you're out-of-network, that means there's no

5    contract; right?

6    A.    Again, I don't agree with that.  We have an example of a

7    contract with a health plan that specifically says it's

8    out-of-network.

9    Q.    Okay.  Now, in this situation -- in this situation, you're

10   saying, in this situation, if you're out-of-network, that

11   doesn't mean there is no contract?  Is that what you're telling

12   the jury?

13   A.    I'm telling the jury about a specific contract.

14   Q.    Are you referring to this specific situation, sir?

15   A.    Yes.

16   Q.    Okay.  Typically, in the industry, if you're

17   out-of-network and not participating for a product and

18   services, there is no contract, is there, sir?

19   A.    I would say every situation is different.  Every

20   contractual situation is different.

21   Q.    And there are situations where people are out-of-network

22   and they don't have a contract; right?

23   A.    That can be the case, yes.

24   Q.    And that's the typical situation in your industry?

25   A.    More often than not but, again, not always.

1   Q.   Now, you know -- well, first of all, let me ask you:  You

2   talked yesterday about the -- about TeamHealth's philosophy on

3   balance billing.

4        Do you recall that?

5   A.   I do.

6   Q.   And you're aware that TeamHealth, in fact, has balance

7   billed patients; right?

8   A.   It has in the past.  And, again, there can be situations

9   where we acquire a group and they come into our organization

10  and they've got their own billing system and so they have a

11  prior practice within to balance bill patients.  And then after

12  we acquire them, it may take a period of time for us to get our

13  policies and procedures in place to adjust that to our

14  practices.  So there can be instances in the past where that

15  has happened, yes.

16            MS. PRUITT:  May I approach, Your Honor?

17            THE COURT:  You may.

18  BY MS. PRUITT:

19  Q.   I am going to hand you a document, Mr. Bristow.  This is a

20  document to Senators Cassidy, Bennett, Carper, Young, and

21  Murkowski, and Hassan; right?

22  A.   Yes.

23  Q.   If you'll look at the bottom of that page --

24            MR. KENNEDY:  Objection, Your Honor.  He just said it

25  has happened in the past, so this is improper impeachment.

```
1              THE COURT:  Okay.  Is this document being used to
2    impeach him?
3              MS. PRUITT:  Yes.
4              THE COURT:  Did he agree to --
5              MS. PRUITT:  Yeah, I can read his testimony for you
6    from yesterday -- from yesterday.
7              MR. KENNEDY:  Well, he just answered, in response to
8    that this question, that it has happened in the past and the
9    circumstances surrounding that.  So I don't understand the
10   impeachment here.
11             THE COURT:  I'll overrule the objection, and I will
12   let you ask the question for the limited purpose we discussed
13   for this morning.
14             MS. PRUITT:  Okay.
15             THE COURT:  And I understand the objection.  But her
16   cross is to testimony that was given yesterday.
17             MS. PRUITT:  Correct.
18   Q.   Can you read -- you don't have to read it -- of course,
19   don't read it out loud, Mr. Bristow.  Look at the bottom
20   paragraph there on the first page and the top paragraph on the
21   second page, please.
22   A.   Okay.
23   Q.   In 2017, TeamHealth balance billed.  Is that what this
24   document says?
25   A.   Yes.
```

```
 1  Q.   And on the second page, the top paragraph, if you do the
 2  math calculation there for 2017, the balance billing done by
 3  TeamHealth was approximately $13 million; isn't that correct,
 4  sir?
 5  A.   I am not sure where you're seeing that number.
 6  Q.   Okay.  If you look at the very first paragraph on the
 7  first page, sir, --
 8  A.   Yes.
 9  Q.   -- it talks about 16 million patients per year.
10       Do you see that?
11  A.   Yes.
12  Q.   And so if you take the 16 [sic] patients per year and look
13  to the second paragraph where it says you average --
14            MR. KENNEDY:  I'm sorry, Your Honor.  We need to
15  approach.  Objection.
16            THE COURT:  You can.
17       (whereupon a bench conference commenced.)
18            MR. KENNEDY:  This is -- this is beyond the scope of
19  what you said you would permit, Your Honor.  We were talking
20  about numbers now.  Again, this is not -- this is not -- this
21  is improper impeachment.  He said they've done it before.
22            THE COURT:  The plaintiff's position is that the
23  witness, when asked this time, said, "Yes, we balance billed."
24       And the position of defendants was that, "Look, he got on
25  the witness stand and said they don't agree with balance
```

1    billing.  They're against balance billing."

2         And you wanted to show that to him to impeach off his

3    testimony.  I don't mind you showing it to him to impeach him

4    on his testimony "Did you balance bill?"

5         The position being that he can't clean it with one

6    statement after going into great detail about how they hate it.

7         But how much more of the numbers do we need?  Because at

8    some point, from the plaintiff's perspective, what they're

9    saying is "You just want to show how much money they make," and

10   I think that is the point that he's trying to -- trying to --

11        MS. PRUITT:  Your Honor, if he's on the stand and you

12   look in the jury's eyes and you tell that you don't do it and

13   the letter says -- and then you qualify your answer, which is

14   what he did after he consulted with his client -- his counsel.

15        THE COURT:  Uh-huh.

16        MS. PRUITT:  But, nevertheless, he said TeamHealth

17   didn't do it, and this letter says TeamHealth did it in the

18   year 2017, and I am just trying to get to the amount.

19        MR. KENNEDY:  And he explained why that is.  It's a

20   perfectly plausible explanation.

21        MR. KILLINGSWORTH:  And I believe his testimony was

22   specifically in regard to SEP and the claims in the case.

23   Because the claims in this case, none of them were balance

24   billed.  And I believe the testimony he gave yesterday was in

25   direct relation to that because they were talking about the

1   claims in this case.

2       So she didn't ask about the general practice.  He said

3   that, generally, the practice at TeamHealth is to not balance

4   bill.  But then he said the "never balance bill" was about the

5   SEP claims; that none of the claims in this case are balance

6   billed.

7       And now, she asked him a broader question, and he

8   answered, "Yes, there are times that balance billing occurred."

9   So there's no --

10          MR. KENNEDY:  It's clear.  The record is clear.

11          MR. KILLINGSWORTH:  There is no impeachment.  The

12  record is clear.

13          THE COURT:  I'll overrule the objection, and you can

14  ask him about the number.  And once you get it, let's move on.

15          MS. PRUITT:  Thank you, Your Honor.

16      (The bench conference concluded.)

17  BY MS. PRUITT:

18  Q.   So can we go back to where we were?  did you take a look

19  at the 16 million patients in the first paragraph?

20  A.   Yes.

21  Q.   And then on the top page of the second paragraph, it talks

22  about what you average balance bill a patient.  And if you do

23  the math on that, that would be about 13 million or so?

24      You are much better at math than I am.  We saw that

25  yesterday.

```
 1   A.    I'm not quick with that large a number, so --
 2   Q.    So the average balance billed amount, it says in this
 3   document, is $529; right?
 4   A.    Correct.
 5   Q.    And if there are 16 million patients and the average
 6   balance billing is $529, you can do that the math on that and
 7   figure that out?
 8   A.    We are not balance billing all 16 million members.
 9   Q.    Right, right.
10   A.    Right.
11   Q.    But it tells you that you do it for 30 percent of the
12   patients, so you can figure out what the number is; right?
13   A.    No, that's not -- that's not what it says.  It says only
14   30 percent of the patients that we actually balance billed and
15   remitted a payment.  We didn't balance bill 30 percent of the
16   patients.
17   Q.    So you're unable to calculate how much during -- on this
18   document, how much during 2010 [sic] that TeamHealth balance
19   billed patients?
20   A.    You mean 2017?
21   Q.    Yes, sir.
22   A.    Again, I think you would go to the front box where it says
23   we balance billed 0.16 percent of the total patients.  So the
24   math could be done, but I don't have a calculator.
25   Q.    Okay.  Can you calculate what the amount was for 2017?
```

1   Are you unwilling to do that?

2   A.    I am not sure -- it can be done but --

3   Q.    Okay.  I am not going to waste anymore time on this, sir.

4   A.    I don't have that.

5   Q.    Is it in the neighborhood of $13 million?

6   A.    I don't believe so.

7   Q.    Okay.  Okay.  You know, Mr. Bristow, that Arkansas

8   Health & Wellness provides Affordable Care Act insurance;

9   right?

10  A.    Yes.

11  Q.    And that Affordable Care Act insurance is known as

12  Ambetter; right?

13  A.    As one of the names, yes.

14  Q.    And you know, Mr. Bristow, that Ambetter Arkansas is

15  designed to be affordable; right?

16  A.    I can't speak to its affordability.

17  Q.    You can't speak to what?

18  A.    I can't speak to its affordability.

19  Q.    Okay.  So you don't have knowledge that Ambetter Arkansas

20  is designed to be affordable under Affordable Care Act?

21  A.    I am saying I can't speak to its affordability.

22  Q.    Do you know that that is how it's designed, sir?

23  A.    I believe that is the intention, but I mean, I can't speak

24  to the actual cost of the program.

25  Q.    Do you know that the Ambetter Arkansas --

1          MR. KENNEDY:  Objection.  This is a violation of the
2     motion in limine, order number 2.
3          THE COURT:  Come on up and let me take a look at it.
4     Come forward.
5        (whereupon a bench conference commenced.)
6          THE COURT:  What was the ruling?
7          MR. KENNEDY:  "All evidence, testimony, and argument
8     that shows that the premiums for the Ambetter product in
9     Arkansas are largely paid by state and federal governments
10    through the Medicare private option and normal ACA premiums
11    subsidies granted."
12         THE COURT:  Okay.
13         MR. KENNEDY:  And if they open this door, then we
14    mostly certain should be able to talk about their profits.
15         THE COURT:  I will allow her to ask the question "Is
16    it designed to be affordable?" because she's hasn't -- she
17    hasn't explained -- or she hasn't asked for a question about
18    how it's funded.
19      But where are you going from here?
20         MS. PRUITT:  I was about to go to something else.
21         THE COURT:  Okay.  I'll overrule the objection.  You
22    can ask --
23         MR. KENNEDY:  It's frustrating to have a bunch of
24    bench conferences when you're asking questions.
25         THE COURT:  That's okay.  That's okay.  And you can

1   ask the question, "Do you know if it's designed to be

2   affordable?"

3           MS. PRUITT:  He's --

4           THE COURT:  I think he's already answered.

5           MS. PRUITT:  -- already answered that.  I am not

6   wasting the jury's time.

7       You noticed I wasn't objecting when you were up here

8   yesterday.

9           MR. KENNEDY:  On this witness but not for the other

10  several hours of the week.

11          MS. PRUITT:  Just for the record.

12      (The bench conference concluded.)

13  BY MS. PRUITT:

14  Q.   I think you answered my question, you know, that -- or you

15  understand that Ambetter Arkansas is designed to be affordable;

16  right?  I think you've already answered that.

17  A.   I said the Affordable Care Act possibly was intended to

18  affordable.

19  Q.   Okay.  Now, you know that Ambetter members are covered

20  under a health insurance policy between the Ambetter member and

21  Arkansas Health & Wellness; right?  Or Celtic?

22  A.   Yes.  Right.  So I'm not sure which entity they really

23  have their coverage with.

24  Q.   You know Celtic is a dba for Arkansas Health & Wellness;

25  right?

1  A.   I'll accept your word for that, but I don't -- I don't

2  know that.

3  Q.   Do you know that that's who's been sued in this

4  litigation, Celtic, dba Arkansas Health & Wellness; right?

5  A.   As one of the defendants, yes.

6  Q.   And you're -- you or your company, TeamHealth, sued them

7  under that name; right?

8  A.   I believe that's right, yes.

9  Q.   So my question again is:  Do you know that Ambetter

10  members are covered under a health insurance policy between the

11  member and Arkansas Health & Wellness; right?

12  A.   Again, I am not sure how the coverage works between the

13  names and the entities.

14  Q.   Have you ever looked at the evidence of coverage for the

15  Ambetter policy?

16  A.   I don't -- I think I've seen it, and I'm aware of it.  But

17  I have not studied it, no.

18  Q.   Now, let's talk a little bit about plaintiff's Exhibit 1.

19  The jury's probably memorized it by now.

20      And this is what we've been referring to as the 2011 LOA;

21  correct?

22  A.   Yes.

23  Q.   And if you go to the top of that document -- go to the

24  top, please.  This is a Letter of Agreement between NovaSys

25  Health and TeamHealth; correct?

```
1    A.    Yes.
2    Q.    And TeamHealth is who we've been talking about.  I talked
3    to you about them yesterday; correct?
4    A.    Yes.
5    Q.    Now, go to the next -- the first half of that, please.
6          And this is to be effective September the 1st, 2011; is
7    that correct?
8    A.    Yes.
9    Q.    And let's go to the first clause.
10         Now, it says, "NovaSys will agree to reimburse provider at
11   75 percent of billed charges for services provided to NovaSys
12   Health members."  Is that what that says?
13   A.    Yes.
14   Q.    At this time do you know whether Arkansas Health &
15   Wellness was even in existence?
16   A.    I don't believe it was.
17   Q.    Okay.  So at the time this contract was made, Arkansas
18   Health & Wellness could not agree to reimburse a provider at
19   75 percent of billed charges, could it?
20   A.    No.
21   Q.    Okay.  Now, let's go to the second part of this, for
22   services --
23         No.  I'm sorry, Graham.  The second part of that sentence.
24         "For services provided to NovaSys Health members," do you
25   see that?
```

```
1   A.   I do.
2   Q.   And you know, don't you, Mr. Bristow, that NovaSys -- who
3   NovaSys Health members are?
4   A.   I don't fully know all of their members, no.
5   Q.   Are you aware that NovaSys Health members are the Arkansas
6   state employees, public school personnel?
7   A.   I am not familiar with that.
8   Q.   Okay.  You don't know whether they're a NovaSys Health
9   member or not?
10  A.   I am not sure.  I am not sure who their members are.
11  Q.   Are you aware of the Arkansas HealthNetwork program?
12  They're a NovaSys Health member; right?
13  A.   I am not sure.
14  Q.   You don't know?
15  A.   I don't know the details of all the plans that are part of
16  their network.
17  Q.   And you know -- do you know that the employer groups in
18  the State of Arkansas, some of those are NovaSys Health
19  members.  Did you know that?
20  A.   I was not aware of the specifics of the plans underneath.
21  Q.   Now, you're aware that, when an individual has insurance,
22  they get an insurance card that says -- they give it to the
23  people when they go to the doctor's office?  It says who the
24  insurer is and it gives the information about claim numbers on
25  the back and who to call and how to make a claim; right?
```

1    A.    Yes.

2    Q.    And do you know that these NovaSys Health members were

3    issued a card that said, "NovaSys Health" on the front?

4    A.    I am not sure I have seen their -- all of their member

5    insurance cards.

6    Q.    But they're different, aren't they?

7    A.    I am not aware of that.

8    Q.    Okay.  In the industry, sir, is it common practice for

9    insureds to have a card that reflects which product they're

10   insured under?

11   A.    Yes.

12   Q.    And these NovaSys Health members had one of those cards,

13   didn't they?

14   A.    Which members are you referring to?

15   Q.    The NovaSys Health members.

16   A.    I would suspect that each of the members would have a

17   card, yes.

18   Q.    And you know -- but you have seen the Ambetter member card

19   that someone has when they have Ambetter coverage, haven't you?

20   A.    Yes.

21   Q.    And the Ambetter member card --

22         Let's pull it up, Graham.  I think it's 35, but I am not

23   positive, defense exhibit.  Let's see if we can --

24         This is -- well, first, let me describe to the jury

25   because they'll have this exhibit back there.  Defendants'

1  Exhibit 33.

2       This is the front of the card; is that correct?

3  A.    Yes.

4  Q.    And this bottom is the back of the card; is that correct?

5  A.    Yes.

6  Q.    And on the front of the card --

7       Sorry, Graham.

8       -- up here, it says, "Ambetter" from "Arkansas Health &

9  Wellness"; is that correct?

10 A.    Yes.

11 Q.    Now, you're aware, aren't you, Mr. Bristow, that the

12 NovaSys card says, "NovaSys" in this spot, aren't you?

13 A.    Again, I am not familiar with those cards.  I have just

14 seen this one.

15 Q.    Do you know that there are other products?  Are you

16 familiar with WellCare?

17 A.    It seems like I've heard the name.

18 Q.    So today, as we sit in front of this jury, you have not

19 looked at any of the other cards, for the NovaSys Health

20 members, other than this one that says Ambetter for the

21 Ambetter members; is that right?

22 A.    Yes, I don't believe I've seen those cards.

23 Q.    But you agree with me that everybody has one or should

24 have one, and it should say what policy they're insured under?

25 A.    Yes.

Q. Okay. Now, let's go to the bottom half of this card.

Do you see here where this gives the number to call for medical provider service? It gives an address of where you send claims; right?

A. Yes.

Q. It says, "NovaSys Health" -- I believe that says, "Marketing Network"; correct?

A. I can't see the print.

Q. It's blurry. We'll try to give you a better copy.

He can't see, Graham.

MR. TALLEY: It's not much better.

MS. PRUITT: Don't blow it up.

Q. So for the NovaSys Health members, Mr. Bristow, do you know that the information on the back of the card is different?

A. I do not know.

Q. And it's different because the claims would be sent to a different place; right?

A. Again, I haven't seen those cards. I don't know. I can't speak to that.

Q. Well, sir, you've been working in industry for 22 years. You don't know that the information on the back of the identification card is different depending on what policy is involved and who is insuring this person?

A. It can be, but I don't know if, in this case, it is because I haven't seen the cards.

```
1   Q.    You can take that down, Graham.

2         Now, go back to plaintiff's Exhibit 1, please.

3         The title is between -- this contract is between NovaSys

4   and TeamHealth, and we established that; right?

5   A.    Yes.

6   Q.    And TeamHealth is not actually a party to this lawsuit,

7   are they?

8   A.    No, they're not.

9   Q.    Now, let's go back to pull up 1, please, Graham.

10        That sentence does not say, "Arkansas Health & Wellness

11  will agree to reimburse provider at 75 percent of billed

12  charges," does it?

13  A.    It does not.

14  Q.    That sentence does not say, "Arkansas Health & Wellness

15  will agree to reimburse provider at 75 percent of billed

16  charges for services provided to Ambetter members," does it?

17  A.    It does not.

18  Q.    In fact, Mr. Bristow, Ambetter is not mentioned at all in

19  this Letter of Agreement, is it, sir?

20  A.    That's correct.

21  Q.    And Arkansas Health & Wellness is not mentioned at all in

22  this Letter of Agreement, is it?

23  A.    That's correct.

24  Q.    You know, Mr. Bristow, that the Ambetter Arkansas product

25  was not even in existence in 2011; right?
```

1    A.    That's right.  To the best of my knowledge, that's right.

2    Q.    Okay.  So let's look at 4, please.  This says, "NovaSys

3    agrees to provide payment to provider."

4          Your claim in this case, the provider would be SEP; right?

5    A.    Yes.

6    Q.    For services provided to member; correct?

7    A.    Yes.

8    Q.    It doesn't say, "Arkansas Health & Wellness agrees to

9    provide payment to provider SEP," does it?

10   A.    It does not.

11   Q.    Okay.  When did SEP start providing ER services to

12   Ambetter patients?

13   A.    If I recall right, I think it was at the very end of April

14   2014.

15   Q.    Okay.  And you understand that payments -- that NovaSys

16   agrees to provide payment to the members under this contract;

17   right?

18   A.    Yes.

19   Q.    And you understand that NovaSys has never paid claims for

20   Ambetter members?

21   A.    I don't know if I can say that or not.  I don't know who

22   was actually paying it.

23   Q.    All right.  You know, that the NovaSys Health members were

24   paid 75 percent of billed charges under this contract; right?

25   A.    Repeat the question.

1   Q.   You know that NovaSys Health members were paid 75 percent

2   of billed charges under this contract; right?

3   A.   Not in all cases, no, because that's what we're disputing.

4   Q.   NovaSys Health members -- assume for me, my question, that

5   NovaSys Health members includes these people.  Will you do that

6   for me please, sir?

7   A.   Just those people?

8   Q.   Yes, for now.

9   A.   Okay.

10  Q.   And NovaSys paid those claims at 75 percent of billed

11  charges; right?

12  A.   I believe so.

13  Q.   And Arkansas Health & Wellness has never paid any of these

14  claims because it wasn't even in existence; right?

15  A.   Again, it would not have paid them before they came into

16  existence; correct?

17  Q.   Well, let me just ask the question this way:  This

18  contract provides that NovaSys is going to provide payment to

19  the provider.  That's right, isn't it?

20  A.   Yes.

21  Q.   And it doesn't say, "Arkansas Health & Wellness is going

22  to pay 75 percent of billed charges," does it?

23  A.   It does not.

24  Q.   And Arkansas Health & Wellness is paying for the Ambetter

25  members' claims; right?

```
1   A.   Say that one more time, please.
2   Q.   You know that Arkansas Health & Wellness has paid claims
3   for the Ambetter members?
4   A.   Again, I am not sure who is technically paying the claim.
5   Q.   From a corporate standpoint, Mr. Bristow, TeamHealth would
6   only submit SEP claims to Arkansas Health & Wellness for the
7   Ambetter Arkansas product if SEP was providing care to an
8   Ambetter member; right?
9   A.   Repeat that question one more time.
10  Q.   From a corporate standpoint, TeamHealth would only submit
11  SEP claims to Arkansas Health & Wellness for the Ambetter
12  product if SEP was providing care to an Ambetter member; right?
13  A.   I don't believe that to be the case.  As we talked
14  yesterday, we submitted quite a few claims to NovaSys regarding
15  Ambetter patients.
16  Q.   Okay.  I put your depositions up there, sir.  And if
17  you'll pick the first one for me, please?
18  A.   Okay.
19  Q.   What date was that deposition taken?
20  A.   March 28th, 2019.
21  Q.   Okay.  Would you turn to Page 53 for me?
22       Will you pull that up for me?
23       Are you there?
24  A.   I am.
25  Q.   If you'll look at Lines 22 through 25, and then in the
```

```
 1   next page 54, Line 1 -- I've got the wrong deposition.
 2        Okay.  So here was the question:
 3        "From a corporate standpoint, that SEP would only submit
 4   claims to people who -- when it knew that it was providing
 5   services to a member of a network; correct?
 6        "ANSWER:  Correct."
 7            MR. KENNEDY:  Objection.  That is not inconsistent.
 8   Objection.  Improper impeachment.
 9            THE COURT:  Hold on a second.  Let me look at the
10   question.
11        This is his deposition?
12            MS. PRUITT:  Yes, sir.
13            THE COURT:  I'll overrule it.  She can use the
14   deposition.
15   BY MS. PRUITT:
16   Q.   So you were asked, from a corporate standpoint, SEP would
17   only submit claims to people who -- when it knew that it was
18   providing services to a member of a network; correct?
19        And your answer was correct.
20        Is that right, sir?  Is that your testimony?
21   A.   That's what I said, yes.
22   Q.   Now, I want to pull up, please, Graham, defense Exhibit 8.
23            MR. ZAVITSANOS:  Eight?
24            MS. PRUITT:  Yes, 8.
25   Q.   And just the top line -- well, for the jury to see.
```

1       This is a network access services agreement; is that
2   correct?
3   A.   Yes.
4   Q.   You're familiar with network services agreements in the
5   industry, aren't you, sir?
6   A.   Could you remove that full piece and just let me see the
7   underlying full first paragraph?
8   Q.   Sure.  I could actually hand it to you.
9       You're familiar with network access services agreements,
10  aren't you, sir?
11  A.   I mean agreements can take on a different names.  So, yes,
12  I have seen this kind before.
13  Q.   Have you seen contracts like this before in your business?
14  Right?
15  A.   Yes.
16  Q.   And this contract is --
17      Can we pull up the date, Graham?  Is it May 2014?
18      It is effective as of January 1st, 2014; right?
19  A.   Yes.
20  Q.   And that is the time that the Ambetter product came on the
21  market; correct?
22  A.   I believe that's right.  Yes.
23  Q.   January 1st, 2014; right?
24  A.   Yes.
25  Q.   And this network services agreement is between a health

1    plan and NovaSys; right?

2    A.    Yes.

3    Q.    And the health plan that it refers to -- when the jury is

4    reading it and it says, "Health plan," the health plan in this

5    case is Arkansas Health & Wellness; right?

6    A.    Yes.

7    Q.    Now, let's look at Celtic 3297, Graham.  That's the

8    page -- third page of this.  And let's pull up Section 4.

9        And this says that "All claims for payment for provision

10   of covered services to covered persons will be submitted to the

11   health plan."

12       That's Arkansas Health & Wellness in this case; right,

13   sir?

14   A.    Yes.

15   Q.    "For processing and payment"; right?

16   A.    Yes.

17   Q.    And this paragraph number 4 does not say that these claims

18   are going to be submitted to NovaSys for processing and

19   payment, does it?

20   A.    That's correct.

21   Q.    And, in fact, they weren't -- the Ambetter member claims

22   were not submitted to NovaSys for processing and payment, were

23   they?

24   A.    That is not consistent with what we said -- we talked

25   about.  There was over 550 instances where we did submit it to

1    NovaSys.
2    Q.   And I am going to get to that before I finish questioning
3    you today.
4         On those 552 times where the bills were mistakenly sent to
5    NovaSys, NovaSys rejected those and told them to send them to
6    Arkansas Health & Wellness for payment; right?
7    A.   Yes.
8    Q.   And when they rerouted them and said, "We're the wrong
9    person.  Send it over there to Arkansas Health & Wellness,"
10   those claims got paid, didn't they?
11   A.   They did get paid but not according to the contract.
12   Q.   I know you're trying -- I know what you're trying to tell
13   the jury.  So you don't have to qualify every single answer.
14        I just ask you this question:  That when those 552
15   payments went to NovaSys, at the wrong place -- and they got
16   rejected; right?
17   A.   Yes.
18   Q.   And they got paid by Arkansas Health & Wellness?
19   A.   Again, they got paid.  I don't know if technically it's
20   payment.
21   Q.   But it's not NovaSys, is it?
22   A.   I don't know that.  They didn't redirect the claims to
23   Ambetter.
24   Q.   Sir, you have been working in this company that does this
25   billing and coding and processing, for a living, and you've

1    been involved in this litigation, and you don't know that those

2    claims were rejected from NovaSys and sent to Arkansas Health &

3    Wellness for payment?

4    A.    Yes, they were rejected.  But, again, I can't

5    differentiate the companies.  We see them as being all one

6    company.  So who technically is paying that behind the scenes,

7    I'm not sure.

8    Q.    You don't know who pays the Ambetter members' claims?

9              MR. KENNEDY:  Objection.  Asked and answered.

10             THE COURT:  I'll overrule it.  She can ask.

11             THE WITNESS:  Again, I am not sure who is funding

12   those claims.

13   BY MS. PRUITT:

14   Q.    Let's turn to Celtic 3299, please, Graham.  That's Page 5

15   of this agreement.  Can you pull that up?  No.  The paragraph

16   that has the "C" in it?  This is Page 8 of defense exhibit --

17   no.  It's Page 5 of defense Exhibit 8.

18         And this provision says, "NovaSys is not and will not be

19   directly or indirectly responsible for the payment from its own

20   funds of any claims or billings for the provision of health

21   care services, items, or accommodations to the covered

22   persons."

23         Did I read that correctly?

24   A.    Yes.

25   Q.    And this network services agreement says that NovaSys is

1   not and will not be responsible for payment from its own funds

2   of any claims or billings for the provision of health services,

3   doesn't it?

4   A.   That's what it says, yes.

5   Q.   And it says, "The health plan acknowledges and agrees that

6   NovaSys is not an insurer, guarantor, or underwriter of the

7   obligations of health plan to provide or arrange for health

8   care services, items, or accommodations to covered persons,"

9   does it?

10  A.   That's what it says, yes.

11  Q.   And, in fact, that's the practice that occurred with

12  regard to the Ambetter product; correct?

13  A.   Again, I just can't speak because I don't know who is

14  actually funding the claim.

15  Q.   I didn't ask you who is funding.

16      I asked you, if this practice that NovaSys was not going

17  to be responsible for the payment of any funds, is what

18  happened?

19  A.   Again, I am not familiar with this agreement, and so I

20  can't speak to that.

21  Q.   So I want to make sure you're telling the jury that you

22  don't know how it worked in paying these claims.

23          MR. KENNEDY:   Objection.   Asked and answered.

24          THE COURT:   I'll overrule it.   She can ask.

25          THE WITNESS:   Again, behind the scenes, what is going

1   on with Centene, about who is funding and sending premiums

2   around and funding claims, I can't speak to the innerworkings

3   of Centene.

4   BY MS. PRUITT:

5   Q.   I didn't ask you about Centene, sir.  I asked you about

6   NovaSys.  And you don't know if they paid any of the Ambetter

7   claims?

8   A.   Again, I cannot speak to who was paying the claim.

9   Q.   And I asked you -- I didn't ask you about Centene again.

10  I asked you about Arkansas Health & Wellness.

11       Do you know that Arkansas Health & Wellness paid the

12  Ambetter members claims?

13            MR. KENNEDY:  Same objection.

14            THE WITNESS:  Same answer.

15            THE COURT:  It's overruled.

16            THE WITNESS:  I am not sure how to answer any

17  differently.

18  BY MS. PRUITT:

19  Q.   I am not trying to get you to answer any differently.

20  What I asked you was:  Are you telling the jury that you don't

21  know?

22  A.   That's correct.

23  Q.   Okay.  Now, I know that there is a dispute in this lawsuit

24  clearly over how much was paid.  But you agree with me,

25  Mr. Bristow, that all 12,500 claims, that you talked to the

1    jury about yesterday, were paid by Arkansas Health & Wellness?

2    A.    I thought it was the same question.  All the claims did

3    receive a payment on them, yes.

4    Q.    All of the -- all of the ones you were talking with the

5    jury about.  That is all I'm asking.

6    A.    Yes.

7    Q.    So let's go back, after reviewing this contract.

8          Let's go back, Graham, to the Letter of Agreement, 4, And

9    pull up Clause 4, please.

10         This contract says, "NovaSys agrees to" make -- "provide

11   payment to providers to give covered services," doesn't it?

12   A.    Yes.

13   Q.    And the contract we just read that's about the Ambetter

14   product and accesses to a network for that product specifically

15   says that NovaSys is not the insurer and is not agreeing and

16   will not be making payments; correct?

17   A.    That's what it said, yes.

18   Q.    Now, when the -- when claims are paid, that money goes to

19   TeamHealth; right?

20   A.    Really it gets paid to SEP because SEP is a part of

21   TeamHealth.

22   Q.    Okay.  It's paid to by SEP, and SEP sends it to

23   TeamHealth?

24   A.    I believe that's correct, yes.

25   Q.    Now, we talked about SEP yesterday being an LLC.  My law

1   firm is an LLC, and that means there are members.  Sometimes it
2   can be an individual, and sometimes it can be a corporation or
3   some other type of LLC; right?
4   A.   Again, I am not that astute on inner structures.  It's not
5   my expertise here.
6   Q.   Well, can you tell the ladies and gentlemen of the jury
7   who are the members of SEP's LLC?
8   A.   I believe TeamHealth LLC.
9   Q.   Okay.  Because TeamHealth fully owns SEP?
10  A.   Yes.
11  Q.   Okay.  So my question then is:  When the money goes to
12  SEP, its Limited Liability Company, that money goes to the
13  owner, TeamHealth; right?
14  A.   Yes.
15  Q.   Thank you.
16       Mr. Bristow, when was the first time that SEP and
17  TeamHealth became aware that NovaSys built a network being
18  accessed by Ambetter?
19  A.   I believe -- again, I don't know that it was ever
20  officially affirmed but -- where we first thought we had
21  connected the dots, it's probably back in November of 2013 when
22  Mr. Slover, I think, was trying to inquire of Mr. Meldrum if
23  that was going to be the case or not.
24  Q.   So do you remember -- well, let's just look at your
25  deposition.  Let's look at the second deposition, if you will,

1   Page 174.

2        Can you pull that up, Graham?

3            MR. KENNEDY:  We don't want to put it up until she

4   lays the foundation that there is a prior inconsistent

5   statement, Judge.  Objection.

6            MS. PRUITT:  I already laid it.

7            THE COURT:  I don't know that you've asked a question

8   yet.

9        What was the question?

10  BY MS. PRUITT:

11  Q.   The question was:  When was the first time SEP and

12  TeamHealth became aware that NovaSys built a network being

13  accessed by Ambetter?

14           THE COURT:  And he said, "2013."  He said, "2013."

15           MS. PRUITT:  Correct.  And this is a different

16  answer.

17           THE COURT:  Okay.

18  BY MS. PRUITT:

19  Q.   Can you look at the bottom of Page 174 -- excuse me, 174,

20  Lines 1 through 7.

21       "ANSWER:  I think during the course of litigation and

22  discovery at depositions, and, in fact, I think there is still

23  information out there, but to make" --

24       I want the jury to see it.  So go back.  There is the

25  question.

1    "When's the first time that plaintiff became aware that
2    NovaSys built a network, built a network being accessed by the
3    Ambetter from Arkansas product?"
4        In your deposition, July the 9th, 2020, which is just a
5    month ago, you said under oath, "I think during the course of
6    litigation and discovery in depositions"; is that correct?
7            MR. KENNEDY:  Objection, Your Honor.  That is an
8    improper impeachment because the answer to the first question
9    was it really never has been -- I am not sure it's ever been
10   confirmed.
11           THE COURT:  Overruled.
12   BY MS. PRUITT:
13   Q.   Is that what you said, sir?
14   A.   Can you repeat the question?
15   Q.   Let's just go back to the transcript.  Page 173, the
16   question is:
17       "When is the first time that plaintiff became aware that
18   NovaSys built a network, built a network being accessed by the
19   Ambetter Arkansas product?"
20       And you said, "I think during the course of litigation in
21   discovery and depositions."
22       Did I read that correctly?
23           MR. KENNEDY:  Judge, she didn't read the answer
24   correctly.
25       Can we have the whole answer read?

 1   BY MS. PRUITT:

 2   Q.   I'll read the whole answer.

 3        "In fact, I think there's still information that is being

 4   garnered today.  It's really even outstanding today, discovery

 5   requests that defendants have not provided that would allow us

 6   to put the full picture together."

 7             MR. KENNEDY:  Thank you.

 8   BY MS. PRUITT:

 9   Q.   Was that the answer?

10   A.   That was the answer, yes.

11   Q.   And so what you just -- what you told the jury yesterday

12   and what you're telling me today is that's not correct?  Is

13   that what you're saying?

14   A.   Yeah, I believe I said, when Mr. Slover was inquiring,

15   that he thought that was the case, but we never got a personal

16   filed application back at that point in time.

17   Q.   So all I'm trying to find out is when TeamHealth first

18   became aware -- that SEP and TeamHealth became aware that

19   NovaSys built a network being accessed by Ambetter?  Do you

20   know the answer to that question?

21   A.   Well, we know, obviously, in 2000 -- in late 2015, when

22   Mrs. Tibbits is inquiring about it, because she's interacting

23   with the Centene people about that.  But again, before that,

24   Mr. Slover had inquired but had not gotten an affirmation on

25   that.

1    Q.    Okay.  Let's take a look at defense Exhibit 3, please.

2         This is a letter dated June the 14th, 2013; correct?

3    A.    Yes.

4    Q.    And this letter was sent to Southeast Emergency

5    Physicians; correct?

6    A.    Correct.

7    Q.    And let's look at the first sentence of this letter,

8    please, Graham.

9         "We are pleased to announce that NovaSys Health is

10   contracting with providers to serve as the network for

11   qualified health plan, certified by the Arkansas federally

12   facilitated partnership exchange."

13        Did you read that correctly?

14   A.    Yes.

15   Q.    So Southeast Emergency Physicians was being informed on

16   June the 14th, 2013 that NovaSys Health was creating a network

17   for a qualified health plan; correct?

18   A.    Correct.

19   Q.    And that letter was received by Southeast Emergency

20   Physicians?  That's what you said yesterday.

21   A.    Yes.  It did get received, yes.

22   Q.    So reading the first sentence of that letter, it's clear

23   that, as of June 14th, 2013, TeamHealth knew that NovaSys was

24   contracting with providers to service with the network for a

25   new qualified health plan; right?

```
1    A.   Yes.
2    Q.   Now, let's take a look at the second page of that
3    document.
4         And do you see highlighted in the middle there "commercial
5    exchange product?"
6    A.   I do.
7    Q.   And so Southeast Physicians knew in 2013 that there was
8    going to be a commercial exchange product; right?
9    A.   Yes.
10   Q.   And I think I recall you saying yesterday -- please
11   correct me if I'm wrong -- that one of the reasons that you
12   couldn't connect the dots was because it was confusing and you
13   didn't understand it was Ambetter.
14        Did you say that?
15   A.   We did, because there is no mention of Ambetter in these
16   documents.
17   Q.   Okay.  That's what I want to talk to you about.  You knew
18   there was a commercial exchange product being created during
19   this period of time; right?
20   A.   Yes.
21   Q.   And you knew that wasn't just for Arkansas; that that was
22   being done in a lot of other states as well?
23   A.   Yes.
24   Q.   Okay.  And this was an announcement to Southeast
25   Physicians that that was happening; right?
```

```
1   A.   Yes.
2   Q.   And it also told you that that new product that was being
3   created -- it told you what the rates were going to be paid for
4   under that product; right?
5   A.   Yes.
6   Q.   Okay.  Let's look at that, Exhibit 3, Page 8.
7        It says 100 percent of the payor Medicare is going to be
8   what's paid for claims; right?
9   A.   Yes.
10  Q.   Let's go to Page 10 of this same Exhibit 3 and under the
11  second paragraph, Graham, the last sentence.
12       It tells you, SEP and TeamHealth, that the exchange
13  product will be offered by Celtic Insurance and administered on
14  behalf of Celtic Insurance by NovaSys Health; correct?
15  A.   Yes.
16  Q.   And then it says, if you go down to the -- these are
17  frequently asked questions; right?
18  A.   Yes.
19  Q.   So when this announcement was made to SEP, it came with
20  information about what was going to be paid under this new
21  product; right?
22  A.   Yes.
23  Q.   And it also came with information about frequently asked
24  questions and tried to answer some questions; correct?
25  A.   Yes.
```

1  Q.   And "How does it affect our existing contract?" was one of

2  the questions; right?

3  A.   Correct.

4  Q.   And it says, "Your decision whether to participate in our

5  new exchange product will not affect your existing contract or

6  your existing rates, as they relate to other products."

7       Did I read that correctly?

8  A.   You did.

9  Q.   And "other products" would be products other than

10  Ambetter; correct?

11  A.   Again, there's not a reference to Ambetter here.

12  Q.   Okay.  "Other products" would mean products other than

13  this commercial exchange product?

14  A.   Yes.

15  Q.   Okay.  And the next frequently asked question is "How does

16  this affect Arkansas HealthNetworks?"  And the jury has heard

17  that Arkansas HealthNetworks was one of the NovaSys members;

18  right?

19  A.   Again, I have not heard that myself.  So, again, I'll take

20  that as an assumption.  I would agree with it.  I mean, I don't

21  know that independently.

22  Q.   Okay.  In the frequently asked questions "How does this

23  affect Arkansas HealthNetworks?" SEP is told "Arkansas

24  HealthNetworks is expected to sunset on December 31, 2013;"

25  correct?

1   A.   Yes.

2   Q.   "How will this affect my reimbursement?"

3        On the next page, please, Graham, 11 of the exhibit.

4        "Participating in this product will mean that your

5   business will receive the newly agreed-upon rates for only

6   members enrolled in the exchange product"; right?

7   A.   Yes.

8   Q.   And the exchange product refers to the commercially

9   exchanged product; right?

10  A.   Yes.

11  Q.   And "No other changes to your current reimbursement

12  processes will need to be made"; correct?

13  A.   Correct.

14  Q.   Now, are you telling the ladies and gentlemen of the jury

15  that, because this document that we just read from doesn't say

16  "Ambetter," that you didn't understand that a product was being

17  created and was eventually named Ambetter and that these

18  questions and answers applied to that product?

19  A.   I don't follow the question.  Can you repeat that, please?

20  Q.   Sure.  Probably a bad question.

21       You understand that this document, the letter and the

22  attachments to it, apply to the Ambetter product?

23  A.   As I sit here today, I know that now, yes.

24  Q.   And there is no question about that, is there, sir?

25  A.   Repeat that question.

1   Q.   There is no question that this document applies to the

2   Ambetter product; right?

3   A.   Again, but it's not in force, because it was rejected.

4   But that was their intent, yes.

5   Q.   And the frequently asked questions then --

6        Let's go back, Graham, to "How does it affect our existing

7   contract?" on Page 10.

8        First sentence, "Your decision whether to participate in

9   our new exchange product will not affect your existing contract

10  or existing rates as they relate to other products."

11       That means products other than Ambetter; correct?

12  A.   Other than the exchange products, yes.

13  Q.   And we know that is Ambetter; right?

14  A.   Today, yes, we know that.

15  Q.   Okay.  And go again to Page 11 at the bottom to this

16  frequently asked question:

17       "How will this affect my reimbursement?"

18       "Participating in this product will mean that your

19  business will receive the newly agreed-upon rates for only

20  members enrolled in the exchange product."

21       That would be for only members enrolled in the Ambetter

22  product; is that right, sir?

23  A.   As we sit here and know today, that was their intent, yes.

24  Q.   And this came to SEP in June of 2013; right, sir?

25  A.   Correct.

1   Q.   Now, let's go to Exhibit 4, defense Exhibit 4.  Can you

2   pull up the whole thing make it a little bigger in case --

3   because even on the screen, you can't really see it very well.

4   There you go.

5        So this was an e-mail from -- between Michael Shrader and

6   JJ -- I mean JJ Shrader and Michael Slover; right?

7   A.   Right.

8   Q.   And this e-mail was July 24, 2013; right?

9   A.   Yes.

10  Q.   So it was about a month after this letter that we just

11  looked at came to SEP; correct?

12  A.   Yes.

13  Q.   And Jennifer sent this e-mail to Michael Slover and CC'd

14  Stacey Capps; right?

15  A.   Yes.

16  Q.   And Stacey Capps and Michael Slover and JJ are all people

17  working in contract negotiations at TeamHealth; right?

18  A.   Yes.

19  Q.   And if you'll look at the bottom, Jennifer Shrader is the

20  director of managed care for TeamHealth; right?

21  A.   Yes.

22  Q.   Okay.  And Jennifer says, "Sorry the meeting cut off

23  during your comments on NovaSys.  The last I heard was that the

24  exchange product is a different product"; right?

25  A.   Yes.

1   Q.   And so JJ Shrader understood, from the June 2014 letter,
2   that this exchange product is a different product; right?
3   A.   Again, I don't know what their -- it doesn't specifically
4   say if they were referring to the letter or not that was sent.
5   Q.   Well, within a month, some source -- from source JJ
6   Shrader knew that the exchange product was a different product;
7   right?
8   A.   Yes.
9   Q.   Okay.  And then Michael e-mails back and tells her, "The
10  cover letter I received appears to state that any and all
11  exchange products offered by NovaSys will be adjudicated under
12  the commercial exchange product addendum."
13      And the commercial exchange product addendum is Exhibit 3
14  that we were just looking at; correct?
15  A.   Yes, I believe so.
16  Q.   "This would be mean 100 percent Medicare reimbursement."
17      Did I read that correctly?
18  A.   Yes.
19  Q.   And she talks about which -- Michael talks about which
20  plans.  "The mood of the notice indicates the claims will be
21  differentiated from current claims, other payors or current
22  employer groups."
23      Is that what Michael told her?
24  A.   Yes.
25  Q.   He said, "Probably using some sort of group indicator;

1    right?

2    A.    Yes.

3    Q.    So on July 24th, 2013, Michael Slover, his boss

4    JJ Shrader, the director of managed care, were discussing the

5    commercial exchange product; right?

6    A.    Yes.

7    Q.    And that is the product that was the subject matter of

8    June 14th, 2013 letter; right?

9    A.    Yes.

10   Q.    Okay.  Now, let's go to Exhibit 5, defense Exhibit 5.

11         And this is an e-mail from Michael Slover at TeamHealth to

12   Bryan Meldrum, who was testifying earlier this week; right?

13   A.    Yes.

14   Q.    And they're discussing the exchange product.

15         Do you see the subject?

16   A.    Michael's attempting to exchange, yes.

17   Q.    And the date of the e-mail is November 27th, 2013?

18   A.    Yes.

19   Q.    So trying to get a time line here for the jury, June was

20   the letter notifying us of the exchange product; right?

21   A.    Yes.

22   Q.    The e-mail between JJ, Michael was July 2013; right?

23   A.    Yes.

24   Q.    This is now November 2013, and Michael is contacting Bryan

25   Meldrum, and he says, "Good morning.  Long time no speak."

1          I want to focus on the third paragraph there.  "It appears
2    that NovaSys is going to be the network for Ambetter.  And that
3    being the case, I need to opt out of this product.  Note, we
4    would be willing to accept the percent of billed charges,
5    75 percent of the provider's billed charge, under our current
6    agreement.  Please review and let me know if that is
7    acceptable.  If not, please let me know if this e-mail can be
8    used as opt-out notice or how you would like me to submit
9    notice."
10         Did I read that correctly?
11   A.   Yes.
12   Q.   And Michael Slover is the senior contract manager; right?
13   A.   Yes.
14   Q.   Just -- I want to go back to this, Graham, but just so the
15   jury can you see, if you'll go down to the bottom.
16         Michael Slover, MBA; right?
17   A.   Yes.
18   Q.   I asked you yesterday if Michael Slover has an MBA.  Does
19   that refresh your recollection?
20   A.   It does.  I did not recall that.
21   Q.   So Michael Slover, MBA, is the senior contract manager at
22   TeamHealth; right?
23   A.   Yes.
24   Q.   And let's go back to the third paragraph, Graham.
25         And this letter acknowledges that Michael knows that

1  NovaSys is going to be the network for Ambetter; correct?

2  A.   Yes.

3  Q.   And that being the case, he says he wants to opt out of

4  the product; right?

5  A.   Correct.

6  Q.   Okay.  Now, you told the jury yesterday that there was

7  confusion about what the exchange product was.  So we know from

8  this e-mail that Michael Slover, the senior contract manager,

9  as of November 27th, 2013, was not confused because he mentions

10  Ambetter right here, doesn't he?

11  A.   Well, he says, "appears."  I don't know if he is

12  100 percent convinced, but he thinks that is the case, yes.

13  Q.   So let me just read the sentence.  "It appears that

14  NovaSys is going to be the network for Ambetter"; is that

15  right?

16  A.   That's what he says, yes.

17  Q.   Okay.  And so TeamHealth knows, as of November 27th, 2013,

18  that the exchange product is Ambetter; correct?

19  A.   Michael believes that's going to be the case, yes.

20  Q.   Well, Michael is the a senior contract manager; correct?

21  A.   Yes.

22  Q.   And he reports to JJ Shrader; right?

23  A.   Yes.

24  Q.   And she reports to you?

25  A.   Yes.

1  Q.   And Michael says in this e-mail that he -- "that being the

2  case, I need to opt out"?

3       Is that what he said?

4  A.   Yes.

5  Q.   Okay.  Now, if there is not a contract that applies and

6  you opt out -- you can assume that for me.  There's not a

7  contract that applies, you opt out, then you agree with me that

8  there is a rate that gets paid according to that addendum that

9  we just looked at?

10  A.   Can you repeat that question, please?

11  Q.   Sure.  If there is not a contract and you opt out, there

12  is a rate that's paid for services according to the default

13  rate that you get if you're not in-network; right?

14  A.   You're losing me on the first part of the question when

15  you say, "There is not a contract."

16  Q.   Right.  Let's just assume there is a brand new product.

17  You opt out of it.

18  A.   But if there is not a contract, there is nothing to opt

19  out of.

20  Q.   Okay.  My question to you, Mr. Bristow, is:  If you can

21  assume that there is not a contract that applies, then your

22  testimony to the jury is there is nothing to opt out of, if you

23  receive this letter?

24  A.   I don't think that's what I'm saying.  I believe the

25  contract does apply to all the products that would be included

1  in the exchange product.

2  Q.   And your testimony to the jury is that this was -- this

3  was an opt out?

4  A.   This was a rejection of what they were trying to do with

5  their deemer letter amendment, which they can't do under the

6  contract.

7  Q.   Let's turn to Exhibit 10, please, Graham.  And let's take

8  a look at the date of this.  Can you actually up the first part

9  so you can see the date there?

10       So I apologize to the jury.  I am backing up a month or

11  two.

12       What we just looked at was November.  But this is

13  backwards.  It's June the 19th, 2014; right?

14  A.   Yes.

15  Q.   And that was five days after the date of that addendum and

16  letter that we just looked at that was defendants' Exhibit 3;

17  right?

18  A.   I'm sorry.  I am not sure I'm tracking that.

19  Q.   Okay.  Let's just -- I want to make sure.  If you're not

20  tracking, that means the jury's not tracking so -- or maybe

21  they are; maybe they're smarter.

22  A.   Maybe.

23  Q.   It's hard to track some of these days.

24       Let's look back at Exhibit 3.  On the left, Graham.  And

25  highlight on the date.

1      So this letter is June 14th, 2013.  Does that refresh your
2  recollection to the date?
3  A.   Yes.
4  Q.   And it had -- it had the provider agreement amendment
5  attached to it; right?
6  A.   Correct.
7  Q.   And it's the same document that had the frequently asked
8  questions attached to it; right?
9  A.   Correct.
10 Q.   Okay.  So then let's go back to Exhibit 10, please.
11     And pull up the date.
12     So this is June 19th, 2014.  This is a year -- is it a
13 year later?  Let me make sure we're accurate here.  It's a year
14 later.  So I was wrong.
15     A year letter, June of the next year; right?
16 A.   Right.
17 Q.   And that's an e-mail -- well, let's go to the -- from
18 Jennifer Shrader; right?
19 A.   Yes.
20 Q.   To Michael Slover; right?
21 A.   Yes.
22 Q.   So a year later.  And in June -- as of June 19th, 2014,
23 Ambetter had already been launched, and people were already
24 Ambetter members and people were receiving care and treatment;
25 right?

1  A.    I believe that's right.

2  Q.    Okay.  So Jennifer says at the bottom -- actually, she

3  says on June 16th.

4        Graham, pull up the bottom half.  There you go.

5        She asked Michael -- and the subject of this e-mail is

6  "Ambetter Arkansas;" right?

7  A.    Yes.

8  Q.    So they're talking about the Ambetter product in this

9  e-mail; correct?

10  A.    Yes.

11  Q.    And she says, "Should we load 100 percent of Medicare to

12  Ambetter Arkansas?"; correct?

13  A.    Yes.

14  Q.    And that's her title, vice president of managed care;

15  correct?

16  A.    Yes.

17  Q.    So what she's asking Michael Slover is "We've got to --

18  we're going to load this into the system.  Should we load

19  100 percent of Medicare?"

20        And you recall the clause in that letter a year ago that

21  said this is what the payment is going to be, 100 percent of

22  Medicare; right?

23  A.    Yes.

24  Q.    She's asking Michael, "Should we load 100 percent of

25  Medicare to Ambetter?"; right?

A.   Yes.

Q.   And so I want to ask -- clear up something for the jury. When these contracts and everything are negotiated -- and you said you signed hundreds and hundreds of these, yesterday; right?

A.   Yes.

Q.   When these contracts are negotiated, they're entered into the TeamHealth system; right?

A.   Yes.

Q.   And the language that TeamHealth uses is "We loaded it to into the system."

So that's what she's talking about; right?

A.   Yes.

Q.   And she's asking Michael Slover, "We need to load this into the system at 100 percent of Medicare," as it says in the addendum; right?

A.   That's not what this says.

Q.   Okay.  Let's just read it:  "Should we load 100 percent of Medicare to Ambetter Arkansas?"

Did I read that correctly?

A.   Yes.

Q.   And Michael says back, answers back on June --

Let's go to the top now.

-- on June 19th, 2014, "Subject:  Ambetter Arkansas, from what I understand of our decision and strategy regarding the

1    loading of marketplace products, that would be my

2    recommendation."

3        Is that what that says?

4    A.   Yes.

5    Q.   Michael Slover's recommendation is according to

6    TeamHealth's "decision and strategy."

7        Is that what it says?

8    A.   It does.

9    Q.   According to TeamHealth's "decision and strategy regarding

10   the loading of marketplace products, that would be my

11   recommendation."

12       As of a year later, after receiving this letter, that's

13   what it says; right?

14   A.   That's what it says.

15   Q.   Okay.  Now, let's go to defense Exhibit 6, please.

16           MR. TALLEY:  Hey, Lyn.

17       (A discussion was held off the record.)

18           MS. PRUITT:  Your Honor, may I consult for a moment?

19           THE COURT:  It hasn't been received.

20           MS. PRUITT:  Can I just have it, a copy of it,

21   Graham, please?  Thank you.

22       Your Honor, does it show defense Exhibit 6 has been

23   entered?

24           THE COURT:  No, it hasn't been received.

25           MR. KENNEDY:  No objection.

1          THE COURT:  Okay.  Number 6 received.

2          (Defendants' Exhibit 6 was received into evidence.)

3          MS. PRUITT:  Thank you, Your Honor.

4       Okay.  We can pull up Exhibit 6.  Now, let's pull up the

5   top half of that page, please, Graham, on defense Exhibit 6.

6   Q.   So this is dated April the 3rd -- excuse me, that's when

7   they copied the e-mail.  Sorry.

8       Go down.

9       November 27th, 2013; right?

10  A.   Yes.

11  Q.   An e-mail from Michael Slover to Jennifer Shrader; right?

12  A.   Yes.

13  Q.   And Jennifer is the same as JJ; right?

14  A.   Correct.

15  Q.   And Michael says, "NovaSys sent out a notice back in

16  June"; right?

17  A.   Right.

18  Q.   Since he didn't receive it until 30 days after the

19  response, he called Bryan at NovaSys but hasn't been able to

20  speak with him.  He says, "It appears that NovaSys has a

21  network partnership with Ambetter, which is the exchange

22  offered in Benton County where Mercy of Northwest Arkansas is

23  located"; is that right?

24  A.   Yes.

25  Q.   It says, "I'll touch base with Bryan and get out a term

1   letter."

2        Did I read that correctly?

3   A.   Yes.

4   Q.   Does "term letter" mean something in your industry?

5   A.   It does.

6   Q.   What does it mean?

7   A.   It would be short for "termination letter."

8   Q.   Okay.  So he's telling -- Michael is telling Jennifer that

9   he'll touch base with Bryan and get out a termination letter;

10  correct?

11  A.   Correct.

12  Q.   Okay.  I don't know where I just put it.

13       So we've been discussing a time line from the time they

14  got the letter in June of 2013 up to the end of November 2013;

15  right?

16  A.   Yes.

17  Q.   And so from December of 2013 until February of 2016,

18  claims were being submitted for Ambetter members and Arkansas

19  Health & Wellness was paying those claims; right?

20  A.   Can you please tell me your time line in that question?

21  Q.   Yes, I will.  My question is:  As of June 2014 -- 2013,

22  when the letter was sent --

23  A.   Which year?  You said 2013 and 2014, I think.

24  Q.   2013.

25  A.   Okay.

1   Q.   From June 2013, when the letter was sent, up through

2   November 27th, 2013, do you got me?

3   A.   Right.

4   Q.   That's the period of time we just discussed with the jury;

5   right?

6   A.   Right.

7   Q.   And so my question is:  From December of 2013, right after

8   this November 27th e-mail, until February of 2016, claims were

9   being submitted and paid by Arkansas Health & Wellness; right?

10  A.   Again, I don't think we saw and billed for their first

11  member until April -- end of April 2014.

12  Q.   That wasn't my question, sir.  My question was:  You were

13  billing for claims of Ambetter members when they were submitted

14  during that period of time, whenever you first had a claim,

15  from that period of time until February of 2016; right?

16  A.   That we were submitting bills to Ambetter?

17  Q.   And being paid on them.

18  A.   Yes.  Some claims, yes.

19  Q.   Okay.  And you were being paid at the rates that are

20  discussed in the agreements in the addendum to the June 2014

21  letter?  You were being paid?

22  A.   I don't know that they were paying those rates.

23  Q.   Okay.  We'll ask -- we'll ask somebody that does.

24       But the point is claims were being paid.  From the first

25  time you received one in 2014 until 2016, payment was being

1   made on those Ambetter member claims; right?

2   A.   Correct.

3   Q.   Okay.  And during this period of time from 2013 to the end

4   of 2015, when Mr. Slover left, Mr. Slover was there as a senior

5   contract manager; right?

6   A.   He was there.  But I think he left in January of '15.

7   Q.   January of '15.  He was there during this period of time

8   from 2013 to January of 2015 when he left; right?

9   A.   Yes.

10  Q.   And he was the senior contract manager; right?

11  A.   Yes.

12  Q.   And Jennifer Shrader was there for the entire period of

13  time, as his boss and head of contract negotiations, from the

14  first time you received an Ambetter claim until February of

15  2016; right?

16  A.   Yes.

17  Q.   And she was being paid by TeamHealth --

18  A.   Yes.

19  Q.   -- to do that job?

20  A.   Yes.

21  Q.   And she actually was with the company this entire time?

22  A.   Yes.

23  Q.   Okay.  Now, she and Michael Slover had a conversation

24  about loading this into the system; right?

25  A.   They had an exchange, yes.

```
1   Q.   How did it get loaded?
2   A.   It didn't get loaded.
3   Q.   Okay.  So it was out-of-network?
4   A.   It just wasn't loaded in the system.
5   Q.   And not loaded in the system, in your industry language,
6   means out-of-network; right?
7   A.   It means lack of a contract for Ambetter.  At the time
8   they just didn't know, again, that it was related to NovaSys,
9   because we have a NovaSys contract loaded in the system.
10  Q.   It means -- that's the question I asked you earlier.  If
11  it's out-of-network and not loaded in the system, it means
12  there is no contract in your system?
13  A.   That's correct.  But again, we were asking for the
14  contract.
15  Q.   I understand that your position is that somehow you didn't
16  have the other contract.  We'll get to that.  But something --
17  nothing was loaded in the system, so you were getting -- but
18  you were getting paid on those claims; right?
19  A.   Yes.
20  Q.   And that means it's out-of-network; right?
21  A.   I just don't know if I would technically say it's
22  out-of-network.  It's just not loaded in the system.
23  Q.   But you were getting paid -- let's say a whole different
24  company, a different product, and everything in your system.
25       If it's not loaded in your system, it's out-of-network;
```

1  correct?

2  A.   Again, there can be some agreements that we have that

3  don't get loaded up because they're difficult to monitor and

4  put in there.

5  Q.   Okay.  So here's what I want to know, sir:  That 2011

6  Letter of Agreement, it was loaded in the system, wasn't it?

7  A.   Yes.

8  Q.   And it was loaded in the system in-network, wasn't it?

9  A.   It was loaded as contracted, yes.

10  Q.   In-network; correct?

11  A.   As contracted, yes.

12  Q.   Yes.  And these NovaSys Health members got paid using that

13  electronic system based on that contract, didn't they?

14  A.   I believe they were, yes.

15  Q.   So to be clear, the 2011 Letter of Agreement was in your

16  system?

17  A.   Yes.  We had loaded up NovaSys contracted rates in our

18  system.

19  Q.   And it was in your system in 2011 for NovaSys Health

20  members; right?

21  A.   Yes.

22  Q.   Now, you told the jury yesterday that you were familiar

23  with documents that had been exchanged and discovery that had

24  gone back and forth in the course of this lawsuit.

25       Do you remember referring to that?

1    A.   Yes.

2    Q.   And you said something to the effect of "We gave the

3    Letter of Agreement to you in that process"; right?

4    A.   Yes.

5    Q.   Okay.  And that's your belief?

6    A.   Yes.

7    Q.   Okay.  Let's pull up the contract, plaintiff's Exhibit

8    No. 1.

9        In this discovery stuff, you know that the parties that

10   produce documents have something called a Bates number on them,

11   don't you, sir?  Because they asked you about that at your

12   deposition; right?

13   A.   I believe so, yes.

14   Q.   And that -- so if it's my client, Celtic, it has a Bates

15   number "Celtic 1," "Arkansas Health & Wellness 5," or whatever;

16   right?

17   A.   Yes.

18   Q.   And in this situation --

19       Let's pull the Bates number, Graham, at the bottom of the

20   contract.

21       This document says, "Southeastern 3804."  So when the

22   documents were exchanged, you, TeamHealth and Southeastern, are

23   the ones that gave us this document.

24       Do you see that, sir?

25   A.   I see that, but I don't -- yeah, I am not sure who

1  provided it to you.  I understood they provided it to us.
2  Q.   So your client gave the document to us and put a Bates
3  number on it; right?  That's what this Bates number says.
4  A.   Again, I don't know who provided it to who.  And I see
5  this, how it's labeled here.
6  Q.   And that would make sense since this contract was loaded
7  in your system and was in your system back in 2011; right?
8       I mean, Mr. Bristow, you can just go in and search for
9  something in your system and pull it up; correct?  Somebody
10 did.
11 A.   Correct.
12 Q.   Okay.  Take that down, Graham.
13      I hear Counsel behind me whispering, saying that "We just
14 renumbered it and sent it back to you."  I heard them say that
15 back there.  I am sure the jurors -- some of the jurors may
16 have heard it, too.
17           MR. ZAVITSANOS:  I am going object to this sidebar,
18 Your Honor.  I was talking with my co-Counsel here.
19           THE COURT:  I'll overrule it because I can hear it.
20 You can continue.
21 BY MS. PRUITT:
22 Q.   So I want to ask you about that.  Let's just assume that
23 might be true that we crossed out -- crossed out a number or
24 whited out a number, because the one we produced --
25      Graham, can you get the one we produced?

1          MR. ZAVITSANOS:  Your Honor, can we approach for a

2     second?

3          THE COURT:  You can.

4       (Whereupon a bench conference commenced.)

5          MR. ZAVITSANOS:  Your Honor, we produced this in June

6     of --

7          MR. KILLINGSWORTH:  Of 2020.

8          MR. ZAVITSANOS:  -- 2020, Your Honor.  This is highly

9     misleading.  It's 403, suggesting that we produced this first.

10    That is where Counsel is going right now to suggest that we

11    produced it first because we have a lower Bates number.  We did

12    not get this until they produced it, and then we produced in

13    2020.

14         THE COURT:  Who produced this to whom?  Did y'all

15    produce it to them?

16         MS. PRUITT:  We both produced the same document.

17         MR. ZAVITSANOS:  They produced it first --

18         MS. PRUITT:  But the point --

19         MR. ZAVITSANOS:  -- in November of '18.  We produced

20    in 2020.  This is very misleading.

21         THE COURT:  And the issue is their notice?

22         MR. ZAVITSANOS:  Yes, exactly.

23         MS. PRUITT:  Your Honor, just for the record --

24         MR. ZAVITSANOS:  November.

25         MS. PRUITT:  -- the objection is something I haven't

1   done yet, for the record, that I'm about to say -- they heard

2   Counsel say that.  They were basically testifying to the jury,

3   telling them that we produced it back, and I'm just clearing it

4   up to tell them that.

5            THE COURT:  I will say this:  This has happened

6   enough -- several times.  I can hear you talking, and I know

7   that you might not mean to do it.

8            MR. ZAVITSANOS:  I don't mean to, Your Honor.

9            THE COURT:  But I can hear it up here.  And I know,

10  if I can hear it here and you're facing that way, that the jury

11  can hear your conversation.  I don't --

12           MR. ZAVITSANOS:  I mean, the problem, Your Honor, is

13  there is a matter -- it's an unassailable fact.  They produced

14  it November of '18; we produced it in 2020.

15           THE COURT:  I understand that.

16           MR. ZAVITSANOS:  So this entire line of questioning

17  is really --

18           THE COURT:  Right.

19           MR. ZAVITSANOS:  -- a 403 because -- first of all,

20  it's demonstrably -- it's demonstrably -- the implication is

21  demonstrably untrue.

22           MR. KENNEDY:  The witness -- it's not something we

23  can clear up with him because he doesn't know.

24           MR. ZAVITSANOS:  Because he doesn't know.

25           THE COURT:  Yeah, because he doesn't know.

```
1              MS. PRUITT:  But they --

2              MR. ZAVITSANOS:  And that's the problem.

3              MS. PRUITT:  Well, they told -- they testified to the

4    jury, and there is another document that has our Bates number

5    on it, Your Honor.

6              THE COURT:  Yeah.

7              MS. PRUITT:  I am not going -- I won't go there.

8              THE COURT:  When you produced it to them, was it

9    Bates stamped?

10             MS. PRUITT:  Yes, it was.

11             MR. ZAVITSANOS:  Your Honor, here's the problem.

12             MS. PRUITT:  Celtic.

13             MR. ZAVITSANOS:  It assumes we both produced the same

14   number of documents; right?  And so when we sent them the

15   Request for Production, of course, their numbers are going be

16   bigger.  Okay?  We don't both start at -- we don't both produce

17   at the same rate.

18       I mean, it is an unassailable fact we got this in November

19   of '18; we didn't produce ours until 2020.  Okay.  Now, the

20   problem is this gentleman --

21             THE COURT:  He doesn't know.

22             MR. ZAVITSANOS:  I mean, the implication to the jury

23   is that somehow we had this in our system and we printed it

24   off.  Okay?  And that is just false.

25             THE COURT:  And I think that has been my
```

1   understanding.

2          MS. PRUITT:  Your Honor, they have said we hid stuff.

3          MR. ZAVITSANOS:  They did.

4          MS. PRUITT:  And there is a document that says,

5   "Celtic" on it that we gave to them.  This document doesn't

6   have "Celtic" on it; it has "Southeastern" on it.  And they

7   told the jury, "We just reproduced what they gave us."

8       I am entitled to show that they would have had to white

9   our -- white out our Bates and Bates it themselves.

10         MR. KENNEDY:  That's what we do.

11         MR. ZAVITSANOS:  Which is what we did, Your Honor.

12         MS. PRUITT:  Your Honor --

13         MR. ZAVITSANOS:  The problem -- I mean, can I put

14   Mr. Drennon up on the stand to produce?

15         THE COURT:  To produce him?

16         MR. ZAVITSANOS:  Yeah, I would like to produce him.

17         MS. PRUITT:  Because they spoke it to the jury --

18         THE COURT:  Where were you going with the line of

19   questioning on this?

20         MS. PRUITT:  I was going to say I heard Counsel back

21   here saying that.  Let's just assume that happened.  And now

22   I'm going to talk about their system.

23         THE COURT:  Let me do this.  Let me give the jury an

24   admonition to --

25         MR. ZAVITSANOS:  Yeah, this is --

1       THE COURT:  -- disregard any statements made by
2   Counsel from Counsel's table.  And let's move beyond this line
3   of inquiry, and I'll tell the jury that, "Look,"
4       MR. ZAVITSANOS:  Your Honor --
5       THE COURT:  -- "disregard any statements or comments
6   made by Counsel the Counsel table, and we'll be fine."
7       MR. ZAVITSANOS:  Your Honor, I have a real problem
8   with that.  First of all, I won't do it again.  But second of
9   all, that suggests that the Court --
10      THE COURT:  No.
11      MR. ZAVITSANOS:  -- is endorsing Counsel's view that
12  we produced this first.
13      THE COURT:  No, it's not endorsing any view.  It's
14  just -- it's trying to move us away from having to go back and
15  forth to prove to the jury one thing or the other.  If she
16  wasn't going in that direction and there was a statement at
17  Counsel's table, that leads her to believe she has to now rebut
18  what was said at Counsel's table.
19      MR. ZAVITSANOS:  She what?
20      THE COURT:  If the jury disregards what the statement
21  is, then we don't have to deal with that.
22      MR. ZAVITSANOS:  Except she was going in that
23  direction, and that's the implication -- is that it came out of
24  our files, and we knew about it, and everything we've been
25  saying to the jury has been false.  When in reality, we did not

1   get this until --

2          THE COURT:  Until they produced it to you.

3          MR. ZAVITSANOS:  -- until November of '18.  That's

4   the fundamental problem.

5      So now I'm going to ask leave to put Mr. Drennon up on the

6   stand, so that he can testify about when we got it.  Okay?

7   Because -- and she's opened the door on this, not us.  Okay.

8   With this false implication that has been left to the jury, I

9   mean, that is crystal clear -- it is crystal clear that -- and

10  they're all taking notes on this.

11         THE COURT:  I would imagine, if I were to ask the

12  jury did they hear the statements of Counsel, they probably

13  heard something, but they wouldn't be able to tell me what they

14  heard and --

15         MS. PRUITT:  Well, I can tell you this:  I am sitting

16  there asking my question, and when somebody -- I hear it.

17         THE COURT:  Yes.  I mean, I could hear you.

18         MS. PRUITT:  And the thing about it is, Judge, you're

19  talking about -- that's improper.  That is improper.  I've been

20  at the bench four times in this trial about Counsel's behavior

21  with googly eyes and saying things to the jury.  It's not

22  professional, and that -- it needs to be stopped, Judge, and I

23  am asking you to do something more and stop it --

24         THE COURT:  Yeah.

25         MR. ZAVITSANOS:  Well, no.

1          MS. PRUITT:  -- because it's distracting.  They

2   get -- they've been coughing and hacking and getting up during

3   my cross-examination.  It's all just a game.  That's not what

4   this is about.  This is a trial where we want to get the facts

5   out to the jury to let them make a decision.

6          THE COURT:  I agree with you.

7          MR. ZAVITSANOS:  Your Honor --

8          THE COURT:  Mr. Z., I agree with her, with that

9   characterization.  I said I agree with the characterization.

10  There's been a lot more activity at this table.  Now, you have

11  more lawyers.  But I will tell you I wish you had a camera on

12  you.  Your movements are sometimes very demonstrative.

13  Sometimes you're pointing and telling people to do stuff, and

14  it's distracting.  It's distracting.

15      I'm not getting on you, because you're a great lawyer.  I

16  am going to sit and tell you you've put on a great case, and

17  the work you're doing is great.

18      But the work Ms. Pruitt is doing is great, too.  And she's

19  trying to do her work.  And not only is she dealing with a

20  witness, she's dealing with Counsel's table, and so she is

21  doing this.  So she is asking to admonish you.  I am not going

22  to do that, but I am going to ask you to tone it down, keep it

23  down, so she can do her work.

24          MR. ZAVITSANOS:  I understand Your Honor, but the

25  problem we have right now, histrionics aside, what -- we have a

1  clear implication, that the position we have taken in this
2  case, that this was not produced until November of '18 was
3  false.  When, in fact, Ms. Pruitt had no good faith basis to
4  ask these questions.  None.  Zero, because she knows for a fact
5  that this was not produced until November of '18, and we didn't
6  produce ours until November of 2020.

7      And, Your Honor, how am I going to unring that bell?  I
8  don't want to move for a mistrial.

9          THE COURT:  I don't --

10          MR. ZAVITSANOS:  But this is like a -- this is a
11  central theme of our case, which is they concealed this from us
12  until November of '18.  And now Ms. Pruitt has basically
13  convinced this jury, okay, that we lied to them.  And this
14  is -- and so -- and what -- and how does she react to this?  By
15  pointing to my histrionics or whatever.

16      Okay.  The reason I reacted the way I did, Your Honor, --
17  and I apologize -- is because it's false, and she had no good
18  faith basis to ask that.  When she knows this was produced in
19  '18 --

20          THE COURT:  And you received it from Celtic?

21          MR. ZAVITSANOS:  -- by them.  Yes.

22      And so I would like -- we would like -- I mean, frankly, I
23  would like to suspend the examination and put Mr. Drennon up on
24  the stand for two questions as to when this was produced, and
25  then we can resume.

```
 1              THE COURT:  I'll overrule you on that.  You made your
 2   record of it, though.
 3          Now, I say let's move in a different direction.  I can ask
 4   the jury about what they heard, but I would imagine --
 5              MS. PRUITT:  Your Honor, I would like to be
 6   permitted --
 7              THE COURT:  -- they're not as attuned to what the
 8   lawyers are saying as I probably am.
 9              MS. PRUITT:  I would like to be able to go to that,
10   which is where I was going before all this -- to go back to the
11   fact -- he's already testified that the documents are loaded in
12   their system.  I would like to end this with the fact that it
13   was loaded into their system, because he said it is -- it was
14   loaded in the system.  He's already testified the document was
15   loaded in the system.  And so --
16              THE COURT:  And your position is that you didn't get
17   the document until discovery.
18          And are you saying his testimony was that it was loaded in
19   his system?
20              MS. PRUITT:  Yes, the contract.  I mean, that's
21   clear.
22              MR. ZAVITSANOS:  We have two issues, Your Honor.
23              THE COURT:  Was that his testimony --
24              MR. ZAVITSANOS:  Yes, yes.
25              THE COURT:  -- that the document was loaded in his
```

1   system.

2          MR. ZAVITSANOS:  And let me slice this a little

3   finer.  Okay?  We have never taken the position that this

4   document was not --

5          THE COURT:  Right.

6          MR. ZAVITSANOS:  -- in our possession.  In fact, we

7   have fallen on the sword and said, "We screwed up.  It slipped

8   through the cracks.  We never connected the dots."  And the

9   gentleman has been consistent with that.

10          THE COURT:  Yeah.

11          MR. ZAVITSANOS:  The problem -- the problem is

12   this -- I mean, this is the pinnacle of our case, which is that

13   we did not get this from them until November of '18.  And right

14   now, it is crystal clear to this jury that we lied to them

15   when, in fact, the opposite is true, that they -- they just

16   suggested to the jury that we produced it to them with the

17   Bates number.  She put it up.

18          THE COURT:  You objected to it before she asked the

19   question and got to the answer; right?

20          MR. ZAVITSANOS:  No, no, no.  I didn't.  We did not.

21   And so, Your Honor, you can take judicial notice because that's

22   an unassailable fact.  That is not a -- that is not a contested

23   issue.  You can take judicial notice as to when it was -- when

24   it was produced.

25      And we would ask that the Court instruct the jury as to

1    when this was produced by them and when it was produced by us.

2    That's not a controversial -- that is not a controversial

3    issue.  We would request that you do that.

4          And, Your Honor, I give you my word I will be a statue

5    from here on out.  Okay?  That is a totally different deal.

6                THE COURT:  And, of course, you don't want to me to

7    give that --

8                MS. PRUITT:  It's not a subject matter for judicial

9    notice.  That is not correct.

10               THE COURT:  That would be a stipulation.

11               MS. PRUITT:  They put up in opening statement that we

12   hid it, and it was in their system.  I mean, that was the whole

13   point, Your Honor.

14               THE COURT:  I understand that.

15               MS. PRUITT:  They said we hid it.

16               THE COURT:  And you can ask that question.  You can

17   ask that question.

18               MS. PRUITT:  That's where I was going.

19               THE COURT:  You can ask that question.  So I'll

20   overrule the objection.  You can ask the question.  I will not

21   tell the jury when these documents were exchanged in discovery.

22         But I can ask them whether they remember what the question

23   was and what the answer was or what your statement was about,

24   Counsel's statement.  But I bet you they wouldn't remember if

25   we asked.

```
1              MS. PRUITT:  I bet you're right.

2              MR. ZAVITSANOS:  Your Honor, I -- my only concern

3    with that is it puts the thumb on the scale to an already

4    misleading assertion that Counsel has made when she put the --

5    when she put the Bates number up.  And it suggests that somehow

6    I got upset because she caught me.  That's the -- that's a

7    problem.  Now, with regards to, you know, what the Court

8    observed --

9              THE COURT:  We're beyond that.

10             MR. ZAVITSANOS:  -- that's a separate issue.

11        I mean, my concern right now, Judge, and is -- and you saw

12   what we did, during the course of the trial, is that we

13   negligently -- negligently did not connect the dots.  But

14   negligence is not a defense for breach of contract.

15        And now, we've got -- I mean, this is absolutely

16   devastating.  The implication that Counsel just suggested to

17   this jury, and it's false that somehow we had it in our system,

18   we produced it early because it's got a low Bates number, and

19   we -- basically, this whole trial has been a charade.

20        And this is -- you know, this is -- this is a real problem

21   here.  This is a real problem, because, in fact, unassailably

22   they produced it to us in November of '18; we produced it in

23   2020.

24             MS. PRUITT:  Your Honor --

25             MR. ZAVITSANOS:  So how do I get that evidence out,
```

1    Your Honor?  I mean --

2              MS. PRUITT:  It was -- it was responsive to the

3    discovery request.  If they had it, they had to produce it.

4    They found it.  That's the whole point.  They're saying we hid

5    stuff from them.  And in their system, they found it.  They

6    produced it.

7              MR. ZAVITSANOS:  In 2020.

8              THE COURT:  I'll deny the request to tell the jury

9    when discovery was exchanged.

10        I'll sustain the objection to going into when the

11   discovery was exchanged and when they produced it to you and

12   the lower Bates numbers and all of that.  Let's continue.

13        Your record is made on your request that I take the action

14   that you've requested.  So the record is clear, I'll overrule

15   the request or deny the request.

16             MR. ZAVITSANOS:  Understood.

17             THE COURT:  At least you have a record.  Okay?

18             MS. PRUITT:  Thank you, Judge.

19             MR. TALLEY:  Thank you, Judge.

20             THE COURT:  And let's go for about 15 more minutes,

21   and I've got to run down the hall.

22        (The bench conference concluded.)

23        (A discussion was held off the record.)

24   BY MS. PRUITT:

25   Q.   Okay.  My question was:  This Letter of Agreement, that's

1  up on the screen, was loaded into TeamHealth's system; correct?

2  A.   Correct.

3  Q.   And it was loaded in there as of probably the effective

4  date of the agreement; right?

5  A.   Correct.

6  Q.   And that would have been September of 2011; right?

7  A.   Correct.

8  Q.   Now, if you will, Graham, pull up defense Exhibit 13,

9  please.  And let's go -- this e-mail is long, so let's start at

10 the back, which is where the chain begins.  Pages 3 and 4 of

11 this exhibit, Graham.  So let's go to page 3 first, and we'll

12 get oriented.  And pull out the bottom half.

13       This is an e-mail from Tammie Tibbits; right?

14 A.   Yes.

15 Q.   Now, Tammie Tibbits took Michael Slover's place; correct?

16 A.   Correct.

17 Q.   And so Tammie Tibbits is also a senior contract manager;

18 correct?

19 A.   I believe so, yes.

20 Q.   And Tammie Tibbits is writing a name by the name of

21 Adam -- and I don't speak French; I just speak Arkansan.  And

22 so I can't tell how you say the last name.  Fuge or --

23 A.   I am not sure either.

24 Q.   And the subject of the e-mail is "Contracting"; right?

25 A.   Yes.

1   Q.    And it says, "for Ambetter Arkansas" -- or refers to
2   Ambetter Arkansas?
3   A.    Yes.
4   Q.    And so you understand that Tammie is talking to this
5   gentleman about contracting for Ambetter; correct?
6   A.    Correct?
7   Q.    And this is February 15th, 2016?
8   A.    Yes.
9   Q.    And so for all of the e-mails that you reviewed between
10  June of 2013 -- strike that.
11       The last e-mail we saw was November between Michael -- was
12  November 27, 2014; right?
13  A.    I believe that's right.
14  Q.    Okay.  So the jury can look at it.  It may be in 2013.
15       But there are no other e-mails, that you're aware of,
16  about this subject matter.  This February 15th, 2016, is the
17  next time that there was discussion of contracting for Ambetter
18  Arkansas; right?
19  A.    I believe that's right.
20  Q.    Okay.  And so Tammie is asking this gentleman, "Do you
21  handle the contracting for Ambetter of Arkansas?"; right?
22  A.    Yes.
23  Q.    Now, let's go to Page 2, Graham, and pull up the top.
24       And I'm not going to waste the jury's time.  Apparently,
25  this gentleman forwarded this e-mail to Chepeka McKinney, and

1    Chepeka McKinney gets back to Tammie Tibbits Wednesday,

2    February the 17th, two days later, 2016; right?

3    A.    Yes.

4    Q.    And the subject matter, again, is "Contracting for

5    Ambetter"; right?

6    A.    Yes.

7    Q.    And she says, "I received your e-mail from Adam."

8          That's what I just said; right?

9    A.    Yes.

10   Q.    And she said, "We do contract directly, and we'll contract

11   the TIN entity level."

12         That means tax ID number, doesn't it?

13   A.    Correct.

14   Q.    And she said, "I will go ahead and let you know that our

15   payment methodology is based off of Medicare"; right?

16   A.    Yes.

17   Q.    And you understood for Ambetter that their payment

18   methodology was based off of Medicare; right?

19   A.    Well, that's what it states here, yes.

20   Q.    Okay.  And it says, "We reimburse at 185 percent of

21   Medicare."

22         "MC" stands for Medicare; right?

23   A.    Yes.

24   Q.    And she said, "I would be happy to draft a contract for

25   your review"; right?

```
1    A.   Yes.
2    Q.   So the contract, as you call it, described it, for the
3    jury -- you said it was an offer or counteroffer of some kind.
4    But that June 2013 document, which is defense Exhibit 3 that we
5    looked at a few minutes ago; right?  Do you remember that?
6    A.   Yes.
7    Q.   That rate in that document was 100 percent of Medicare;
8    right?
9    A.   Yes.
10   Q.   This discussion between Chepeka and Tammie is that they're
11   showing interest in contracting for Ambetter, and Chepeka is
12   saying -- telling Tammie what the payment methodology would be
13   or what they're willing to agree to for in-network; right?
14   A.   Again, I don't see where it's in-network, but they're
15   talking about -- she's talking about what they pay when you get
16   contracted, yes.
17   Q.   But if you enter into a contract, you are going to be
18   in-network; right, sir?
19   A.   Again, that is not -- no -- the case.  Every, you know,
20   situation is different from client to client we have.  They're
21   not all the same.
22   Q.   Okay.  Let me change my question.  Chepeka is telling
23   Tammie, your employee, the senior manager of contract
24   negotiations -- right?
25   A.   Yes.
```

1    Q.    That she's letting her know what the payment methodology

2    is based off of Medicare; right?

3    A.    Yes.

4    Q.    And 185 percent of Medicare -- obviously, it's greater

5    than 100 percent in that original letter; correct?

6    A.    Yes.

7    Q.    Okay.  And she says, "We're using the 2015 Medicare

8    schedule"; right?

9    A.    Yes.

10   Q.    And then she says, "I would be happy to draft a contract

11   for you to review."

12         Did I read that correctly?

13   A.    Yes.

14   Q.    Okay.  Now, let's look at Page 1 of defense Exhibit 13.

15   Tammie responds back to Chepeka; is that right?

16   A.    Yes.

17   Q.    And that's on February the 19th, 2016; correct?

18   A.    Yes.

19   Q.    And they're continuing this discussion about contracting

20   for Ambetter; correct?

21   A.    Correct.

22   Q.    Okay.  In the previous e-mail, Graham, just so -- if we

23   could for the jury, sorry, go back to Page 2 of Exhibit 13.

24         She says, "If interested, please provide the following."

25   So Chepeka is telling Tammie, "If you're interested in this,

1   please provide me with the following information:  your name,

2   your tax ID number, your group NPI, your address, your billing,

3   and all of that"; right?

4   A.   Yes.

5   Q.   So now go to Page 1 --

6        So Tammie e-mails back, and she gives Chepeka all of that

7   information; right?

8   A.   Yes.

9   Q.   And that -- she gives it back to her, suggesting that

10  they're interested in talking because that's what she was

11  invited to do, so she did it; right?

12  A.   Yes.

13  Q.   Okay.  Now, the next paragraph, Graham.

14       She says, "Your contract rates at 185 of 2015 Medicare are

15  significantly below what we are contracted for other exchange

16  products."  And she goes on to say -- the jury can read that

17  about the ER physician.

18       But she says at the end that "Our goal is to participate";

19  correct?

20  A.   Yes.

21  Q.   And we established earlier, Mr. Bristow, that

22  "participating" means -- "participating" means the same as

23  in-network; right?

24  A.   We didn't say that.

25  Q.   Okay.

1   A.   We were talking about out-of-network and nonparticipating.

2   Q.   Okay.  Did the opposite apply to this?  We said,

3   "Nonparticipating and out-of-network are the same things."

4        Are participating and in-network the same thing?

5   A.   You can be participating.  I can think about that.  I

6   don't know that they're necessarily synonymous.

7   Q.   So let me just ask it this way:  Tammie says, "Our goal is

8   to participate," to participate in an agreement regarding the

9   contracting for Ambetter; right?

10  A.   Correct.

11            THE COURT:  Is this a good time?

12            MS. PRUITT:  Yes.

13            THE COURT:  All right.  Ladies and gentlemen of the

14  jury, we're going to take a few minutes, and I have a hearing

15  down the hallway, so I'm going to run down the hallway and take

16  that up.  It might take me 20 minutes, maybe a little longer,

17  but I think maybe around 20 minutes.  So you'll just stand down

18  until I'm back, and we'll call you back in.  But look for me to

19  call you back in around 10:45.  All right.  Let's stand down.

20        (The Court handled an unrelated case.)

21        (Whereupon on trial resumed.)

22            THE COURT:  All right.  You can be seated.  And

23  ladies and gentlemen of the jury, please forgive me.  I had a

24  hearing in a case -- I was telling the lawyers about this right

25  before you came out.  I had a criminal trial -- a criminal case

1    that is going to trial in February.  And I had 55 defendants in

2    it, and we've narrowed it down to 30 defendants, because we've

3    had some people come and plead guilty.

4         And that was one that I had to go down and take a guilty a

5    plea in that case.  And I had a lady who came in and pled

6    guilty to a conspiracy to move methamphetamine.  And her

7    mandatory minimum was ten years.  And so she's going to get ten

8    years to life.  And so that's what I've been dealing with on

9    some of our breaks.

10        And so I'm sorry to leave you out there so long, but if I

11   don't narrow the case down instead of being eight weeks, it

12   might be ten weeks or longer.  So we're going to have, as it

13   stands, 30 lawyers and clients in the courtroom trying that

14   case unless we can get it narrowed down.

15        So thank you for your patience.  I appreciate it.

16        All right.  Ms. Pruitt, you may continue.

17             MS. PRUITT:  Thank, Your Honor.

18   Q.   Can we pull up 14?  And let's start at page -- start at

19   Page 4, please, Graham.  The jury has seen the rest of that.

20   Down at the bottom, please.

21        Are you there, Mr. Bristow?

22   A.   Yes.

23   Q.   Okay.  So there we move forward now.  We're now on

24   February 18th, 2016; right?

25   A.   Yep.

1    Q.    And Tammie Tibbits is sending Sheri Smith an e-mail, still

2    talking about contracting for Ambetter; right?

3    A.    Correct.

4    Q.    And she said she finally got someone from Ambetter to

5    respond to her.  She asked the question of Sheri Smith -- now,

6    Tammie is asking Sheri Smith a question, because Sheri Smith --

7    I wrote down -- was one of the individuals that worked with

8    Michael Slover and Stacey Capps; right?

9    A.    Yes, that would have been peers.

10   Q.    Excuse me?

11   A.    Michael and Sheri would have been peers.

12   Q.    Peers.  Okay.

13   A.    Yeah, peers to Sheri.

14   Q.    Okay.  And that -- so Sheri was still there, Michael's

15   peer -- Sheri was still there when this was going on in 2016;

16   correct?

17   A.    Correct.

18   Q.    And Tammie was asking her, "When they immediately throw

19   out rates to you, do you counter rate before obtaining the

20   contract?"; is that correct?

21   A.    Yes.

22   Q.    Now, let's move to the top half of that, please, Graham.

23        And Sheri Smith responds back.

24        And let's look at the second paragraph there.

25        "Since this is an ACA plan" -- "ACA" is Affordable Care

1    Act; right?

2    A.    Yes.

3    Q.    -- "this is kind of new to me as well.  Last year, we

4    focused on getting our current payors to pay at a rate that was

5    already contracted for another product.  There weren't that

6    many ACA payors yet, and we didn't really seek them out like we

7    are now.

8         "Honestly, 185 percent of Medicare isn't terribly bad,

9    considering they can pay lesser of three in the absence of a

10   contract, and that always ends up being 100 percent of

11   Medicare."

12        Did I read that correctly?

13   A.    Yes.

14   Q.    So Sheri Smith is telling Tammie Tibbits that, honestly,

15   185 percent of Medicare, which is what the jury just heard

16   Chepeka was talking to Tammie about; right?

17   A.    Yes.

18   Q.    And 185 percent of medication isn't terribly bad,

19   considering the option is to pay the lesser of three in the

20   absence of a contract because that usually ends up being

21   100 percent of Medicare; right?

22   A.    That's what it says, yes.

23   Q.    Okay.  Now, let's go to Page 3 of that same document,

24   Exhibit 14.  So Tammie, at the bottom, same e-mail string;

25   right, sir?

1    A.    I believe so.

2    Q.    Yeah.  She says, "It's a health insurance marketplace

3    insurance ACA plan, so fairly new."  Is that what it says?

4    A.    Yes.

5    Q.    And let's go to the top.  Sheri Smith writes back to her.

6    And let's focus on that second paragraph:  "I'd also curious if

7    we had a median or average rate that we want to achieve with

8    ACA plans and structure.  Obviously, we would like to get

9    percent of charges, but I'll bet the Affordable Care Act plans

10   are not going to do percentage of charge.  And why would they?

11   In the absence of a contract, they pay Medicare rates and are

12   done with it."

13         Is that what Sheri is telling Tammie?

14   A.    Yes, that's what she says.

15   Q.    And it looks like Tammie is reaching out to Sheri, asking

16   for her advice on the negotiation of this contract; right?

17   A.    Yes.

18   Q.    Okay.  And Sheri tells her that they would like to get a

19   percentage of charge, but that the Affordable Care Act plans

20   are not going to usually do that.  And why would they?  Because

21   in the absence of a contract, they pay Medicare rates and are

22   done with it; correct?

23   A.    Yes.

24   Q.    Now, let's go to the next page and the top.  Graham, in

25   the same e-mail string.  Pull up the top.  And Tammie Tibbits

1   to Sheri Smith.

2       She said, "Will do.  I submitted a financial request.  The

3   other Affordable Care Act plans" and she -- "plans in the

4   Arkansas market that we are par" -- which means participating;

5   right?

6   A.   Yes.

7   Q.   "Include Blue Cross Blue Shield, low rates; UHC,

8   75 percent of billed charges; QualChoice, new negotiated letter

9   of intent with rates that approximate 347 percent of Medicare.

10  So it's all across the board in Arkansas.  I may go ahead and

11  express our position on rates and feel them out to see if rates

12  are negotiable.  I agree 185 percent is better than

13  100 percent.  The volume is growing in that market.  Blue Cross

14  Blue Shield Arkansas has, by far, the largest volume, with low

15  rates.  I'll keep you posted," is that what Tammie says back to

16  Sheri?

17  A.   Yes.

18  Q.   And then let's go back to the first page.  And Sheri

19  says -- Tammie's still discussing contracting for Ambetter;

20  right?

21  A.   Yes.

22  Q.   She says, "I do have one question, of course.  We are

23  seeing many of our competitors take an aggressive

24  nonparticipating approach with many managed care plans.  But if

25  the ER providers take a nonparticipating stance on Affordable

1   Care Act products, wouldn't that essentially hurt them because

2   the Affordable Care Act then has the option of paying them

3   Medicare rates and we can't balance bill?"  Did I read that

4   correctly?

5   A.   Yes.

6   Q.   And then she says, "I'm still learning a lot with these

7   ACA plans"; right?

8   A.   Yes.

9   Q.   Now, let's go to the top, where Sheri responds back.  And

10  Sheri tells her, "I thought at this point, technically, we

11  could balance bill, although hospitals don't want us to.  I

12  don't think we're prohibited by law from balance billing."

13       Did I read that correctly?

14  A.   Yes.

15  Q.   So Sheri and Tammie are having a discussion about the fact

16  that the hospitals prefer that SEP and other providers like

17  them not balance bill the patients; right?

18  A.   Yes.

19  Q.   And that comes from the hospitals that you contract with

20  to run their emergency room; right?

21  A.   Yes.

22  Q.   Okay.  Now, let's go to Exhibit 15, Page 3, please,

23  Graham; 3.

24       Graham is not as professional at Ms. Rivers is.

25       Did you find it?  Thank you.

1         I'm kidding you, Graham.

2         Can you pull that out in the middle, please?

3         Okay.  So we're still March the 1st, 2016, talking about

4    contracting for Ambetter; right?

5    A.    Yes.

6    Q.    And this is from Tammie Tibbits to Chepeka McKinney;

7    correct?

8    A.    Correct.

9    Q.    And, first of all, in the first paragraph it's talking

10   about another state; right?

11   A.    Yes.

12   Q.    And then she says, at the end of this e-mail, Tammie

13   says -- Tammie is with TeamHealth; right?

14   A.    Correct.

15   Q.    Says to Chepeka, "I look forward to working with you to

16   get a contract in place"; correct?

17   A.    Correct.

18   Q.    And then let's go to 2.  The bottom part, Graham.  Bottom

19   half, please.

20         And Tammie responds to Chepeka, because they're talking

21   about the Letter of Agreement.  The jury has heard some of

22   those e-mails.  They're talking about the Letter of Agreement.

23   And Tammie tells Chepeka in this e-mail, "I had called Ambetter

24   of Arkansas provider services in January 2016 and was advised

25   our tax ID number for Southeastern Emergency Services was

1  nonpar"; correct?

2  A.   Correct.

3  Q.   And "nonpar" means nonparticipating; right?

4  A.   Correct.

5  Q.   And that would be nonparticipating for Ambetter of

6  Arkansas?  Is what they're talking about; right?

7  A.   Correct.

8  Q.   Now, let's look at -- you've read -- you've reviewed all

9  of these e-mails.  You said that yesterday; right?

10  A.   Most of them, I think I have, yes.

11  Q.   And so there was a discussion back and forth about the

12  Letter of Agreement back in 2011; right?

13  A.   Correct.

14  Q.   And y'all asked for a copy of it; right?  Not y'all, but

15  let me be precise there.

16      Tammie asked for a copy of it; right?

17  A.   Yes, she has.

18  Q.   And there was a discussion between she and Chepeka about

19  whether that LOA applied or didn't apply, whether it was

20  in-network or out-of-network; right?

21  A.   Again, she was inquiring about what you are referring to.

22  It wouldn't be in a response.  I am not sure that is all the

23  back and forth that you characterized it.

24  Q.   Okay.  But there was some back and forth on that; right?

25  A.   Correct.  Trying to ascertain -- there was a reference

1    that there was a contract in place and the Letter of Agreement
2    in place.  Would you share that with us?  What is that?
3    Q.    And Chepeka and Tammie are discussing that issue; right?
4    A.    Yes.
5    Q.    And talking about it?
6    A.    Yes.
7    Q.    Okay.  Let's look at 18, please.  Second page, please.  In
8    the middle, if we can pull that up.  Thank you, Graham.
9          And on August the 23rd, 2016, Tammie says to Chepeka, "Can
10   we set up a conference call to discuss?  We need to understand
11   how you are showing our tax ID number par in your system.
12   Thank you"; right?
13   A.    Yes.
14   Q.    And let's look at Page 1 of that exhibit.  So they're --
15   at the bottom of this, they're going and forth on a schedule.
16         Pull up the bottom half so the jury can see it.
17         They're just talking about dates.  Can you do one of these
18   dates?  And Tammie gives her three dates; right?
19   A.    Yes.
20   Q.    And then let's go to the top half of it, Graham.
21   A.    Tammie back to Chepeka.  She says, "Yes, that's fine.
22   Let's do a conference call.  Does one of these dates and times
23   work?"; is that correct, sir?
24   A.    Yes.
25   Q.    So Tammie and Chepeka are going to have a conference call

1    to discuss the contracting for Ambetter Arkansas; right?

2    A.   Yes.

3    Q.   Okay.  Let's go to 19.  Top, please, yes.  So that was in

4    August; right?

5    A.   Yes.

6    Q.   Now, they were trying to schedule a conference call in

7    September.  That's what the e-mail we looked at just showed a

8    while ago; right?

9    A.   Right.

10   Q.   And now this e-mail from Chepeka to Tammie -- they must

11   have had a conference call on one of those dates or some other

12   date in September or early October; correct?

13   A.   That's what this implies, yes.

14   Q.   Okay.  So Chepeka then e-mails Tammie on October the 11th,

15   2016 and says -- excuse me, Tammie is sending this e-mail to

16   Chepeka; right?

17   A.   Correct.

18   Q.   Sorry.  I had it backwards.  And so Tammie from TeamHealth

19   says, "In follow-up to our recent conference call, would you be

20   able to agree to a rate of 210 percent of Arkansas Medicare for

21   ER services"; correct?

22   A.   Correct.

23   Q.   So after the conference call between Tammie Tibbits and

24   Chepeka, Tammie writes back and says, "I'm following up.  Will

25   you agree to a rate of 210 percent of Medicare"; right?

1   A.   Correct.

2   Q.   Let's go to 20, please.  And let's pull the bottom half up

3   from Chepeka to Tammie.

4        Chepeka says, "At this time we are unable to offer

5   210 percent of the Arkansas Medicare fee schedule.  I can offer

6   you a rate of 200 of the Arkansas Medicare fee schedule.  If

7   you are willing to accept this offer, please advise."

8        Did I read that correctly?

9   A.   Yes.

10  Q.   And then Jennifer Shrader gets involved.  Let's look at

11  the top half, because Tammie sent something to Jennifer Shrader

12  and says, "Well, they've agreed to 200 percent of the Arkansas

13  Medicare fee schedule.  I haven't yet broached the subject to a

14  retro-effective date"; is that correct?

15  A.   Correct.

16  Q.   And then she says, "What steps do we need to get approval

17  from Kent" --

18       That's you; right?

19  A.   Yes.

20  Q.   -- "to proceed with the go forward agreement.  I will need

21  to review the contract language as well.  Don't have standard

22  Ambetter Arkansas agreement" in hand -- "hand to date."

23       So, basically, what has happened is Chepeka -- Chepeka and

24  Tammie have gone back and forth talking about potential rates

25  for contracting for Ambetter of Arkansas, haven't they?

```
 1   A.    Yes.

 2   Q.    And they've talked about 200 percent, and they've talked

 3   about 210 percent?

 4   A.    Correct.

 5   Q.    And right now, we said, "200."  She's talking to her boss

 6   about that.

 7         Is that what you see in this e-mail?  Tammie is talking to

 8   Jennifer about that?

 9   A.    Yes.

10   Q.    Now, let's look at 21, defense Exhibit 21.

11         Tammie says at the bottom, "Since we've been receiving

12   such a low OON UCR payment" -- do you see that?

13   A.    Yes.

14   Q.    And "OON" means out-of-network; correct?

15   A.    Yes.

16   Q.    She says, "Since we've been receiving the out-of-network

17   payment, can we discuss a retro-effective date or claim

18   settlement for older dates of service?"

19         Do you see that?

20   A.    Yes.

21   Q.    Did "DOS" means dates of service?

22   A.    Correct.

23   Q.    And then Tammie -- Chepeka e-mails back to Tammie and

24   says, "At this time the offer stands at 200 percent of the

25   Arkansas Medicare fee schedule.  I am not able to honor your
```

1    request of claims settlement or retro-effective date.  If you

2    are willing to accept the current offer, I will be happy to

3    create a contract proposal to send to you for your signature."

4         Did I read that correctly?

5    A.   Yes.

6    Q.   Let's go to 24, please.

7         Let's go back just a minute.  I want to point out

8    something on the date, Graham.  If you'll just go back to

9    defendants' Exhibit 21 for me, please.

10        So on our time line, this -- where they're discussing the

11   200 percent is October of 2016; correct?

12   A.   Correct.

13   Q.   And then let's go to Exhibit 24 and pull up the top half.

14        And now, we're in May, May 16th, 2017; correct?

15   A.   Correct.

16   Q.   And Chepeka is e-mailing -- Bryan Meldrum is e-mailing --

17   excuse me.  Chepeka is e-mailing Bryan Meldrum; right?

18   A.   Yes.

19   Q.   And the subject is "TeamHealth contracting for Ambetter

20   Arkansas"; right?

21   A.   Yes.

22   Q.   Okay.  Let's go to the second paragraph.  Chepeka tells

23   Bryan Meldrum, who the jury's heard from, "We previously had an

24   LOA for NovaSys Health with TeamHealth at 75 percent of billed

25   charges.  However, this Letter of Agreement did not cover

1    Ambetter of Arkansas.  It only covered NovaSys.  I have

2    attached the copy of their signed LOA."

3        Is that what that says?

4    A.   Yes.

5    Q.   Okay.  So that is as of May.

6        Let's look at defendants' Exhibit 25.  Now, we're in June,

7    June the 23rd, 2017.  Bryan is e-mailing Tammie.

8        And let's pull up the second paragraph.

9        Tammie Tibbits with TeamHealth says, "I've now been

10   directed to resume contracting at the state level.  In order to

11   move forward with an agreement" -- and then he goes on about

12   the lump-sum payment.

13       And it says at the last sentence, "If we can't agree to

14   implementing a contract, in conjunction with a retro settlement

15   agreement, then I'll have to turn the negotiations back over to

16   the legal team"; right?

17   A.   Yes.

18   Q.   And that's June the 23rd, 2017; correct?

19   A.   Yes.

20   Q.   Now, let's look at defendants' Exhibit 26.  This is an

21   e-mail from Bryan Meldrum to Tammie Tibbits at TeamHealth;

22   right?

23       Let's look at the bottom half.

24       This is June 2017; right?

25   A.   Yes.

1  Q.   And Tammie Bryan says, "Thank you for the note regarding
2  our offer to contract.  I am declining your offer to retro any
3  arrangement.  I made the same rate offer previously, and you
4  declined to accept it at that time.  I do not feel compelled to
5  now make the same offer retro-effective.  I am again making the
6  offer for 200 percent of Medicare, our AWP rate in Arkansas for
7  emergency physicians' services, to you for any emergency
8  physician providers that are represented by TeamHealth."
9       Did I read that correctly?
10 A.   Yes.
11 Q.   So Mr. Meldrum is telling Tammie Tibbits -- let's look at
12 that second sentence.  "I am declining your offer to retro any
13 agreement."  That just means to go back in time.
14      And y'all wanted to go back in time to the claims as of
15 the first of 2015; right?
16 A.   That's correct.
17 Q.   And he says he's declining to retro because "I made the
18 same rate offer previously, and you declined to accept it at
19 the time"; correct?
20 A.   Correct.
21 Q.   So this e-mail from Bryan says that he's already made that
22 offer previously of 200 percent, and TeamHealth declined it;
23 correct?
24 A.   Correct.
25 Q.   And so after that, again, Tammie --

1          At the top half, please, Graham.

2          Tammie then gets Jennifer -- reports back to Jennifer and

3    says, "We're not getting anywhere with retro settlement

4    requests.  Go forward only."

5          Is that what that says?

6    A.    Correct.

7    Q.    And then let's turn to defendants' Exhibit 27.

8          Let's blow up -- pull out the top half, please.

9          So now, we're at June 2017; right?

10   A.    Yes.

11   Q.    And this is an e-mail from Tammie to Bryan, and it says,

12   "I've been advised legal will proceed with filing litigation

13   seeking higher reimbursement in conjunction with the settlement

14   agreement"; correct?

15   A.    Correct.

16   Q.    So all of these e-mails we -- the jury just saw from

17   approximately 2000 -- early 2016 talk about in the subject --

18   in the subject line that those e-mails are referencing

19   contracting for the Ambetter Arkansas product; correct?

20   A.    Correct.

21   Q.    Every one of them says, "Subject matter:  Contracting for

22   Ambetter of Arkansas"; correct?

23   A.    Correct.

24   Q.    All across that period of time; right?

25   A.    Yes.  Now, you are the vice president of revenue

1    management, currently; correct?

2    A.    Senior vice president.

3    Q.    Senior vice president, I apologize.  I know that means

4    something in the structure.  I apologize.

5          You're senior vice president for finance management --

6    revenue management?

7    A.    Revenue management, yes.

8    Q.    Okay.  And as part of that job, one of the things that

9    TeamHealth does is it looks at budgets for all of the companies

10   and their products and how they're being reimbursed; right?

11   A.    Yes.

12   Q.    And they look at that, obviously, to see how much money is

13   being made on certain products and what the rates are because

14   they have to do that, just like any huge business does, to

15   figure out how much net profit they're making; right?

16   A.    Repeat the question.

17   Q.    You look at those kinds of things, don't you, as senior

18   vice president of revenue management, to figure out how much

19   profit you're making.  You budget, and then you look at your

20   budget to see if you made it or gone over or came under; right?

21   A.    Yes.  In our role, we're not looking at profits.  We're

22   just looking at revenue and the collections and the volume in

23   order to plan activities.

24   Q.    Okay.  So but revenue results in profits for TeamHealth;

25   right?

1   A.   That's the goal, yes.

2   Q.   So if you're looking at the revenue, then, ultimately,

3   you're looking at profits; right?

4   A.   Again, in our group, we are not looking at profits, no.

5   Q.   Okay.  But your group looks at the revenue; correct?

6   A.   Sure.

7   Q.   And you do that for each hospital?

8   A.   Yes.

9   Q.   So it's not just for the State of Arkansas.  Within

10  Arkansas, you do that for each individual hospital; correct?

11  A.   That's correct.

12  Q.   In order to do that, do you budgets every year; is that

13  right?

14  A.   Yes.

15  Q.   Okay.  Now, let's pull up defendants' Exhibit 29, please.

16  And let's pull up the bottom half, please.  That e-mail is from

17  you to Kristi Baloo and Jennifer Shrader; right?

18  A.   Correct.

19  Q.   And it's dated November 8th, 2017; correct?

20  A.   That's right.

21  Q.   And Kristi says, "For JJ's budget assumption," and she's

22  talking about JJ Shrader; right?

23  A.   Yes.

24  Q.   And she says, "What percentage of Medicare did we assume

25  for the new rate for Ambetter Arkansas and Ambetter

1  Mississippi?"; correct?

2  A.   Yes.

3  Q.   Let's look at the top half of this.  And you respond back,

4  "Thanks.  That is what I thought but wanted to confirm"; is

5  that correct?

6  A.   That's correct.

7  Q.   So in November of 2017, they were asking, for budgeting

8  purposes, what percent of Medicare to put in for Ambetter of

9  Arkansas; correct?

10  A.   Yes.  This is an assumption, yes.

11  Q.   And they put in 200 percent?

12  A.   Yes.

13  Q.   Or you told them to.

14  A.   I didn't tell them to.  I just asked what it was, yes.

15  Q.   Okay.  And that's what you were told?

16  A.   Yes.

17  Q.   You can put that down, Graham.

18       SEP is not a participating provider with Arkansas Health;

19  correct?

20  A.   I disagree with that.

21  Q.   Okay.  Do you remember when I -- let's look at your

22  deposition at March 28th, 2019, please, sir.

23       Can we pull up Page 35, please, Graham?

24       And I would like for you to look at, when he pulls it up,

25  Lines 18 through 21, please, sir.

1          When you gave your deposition in March, it's the same
2     thing as the court.  You come in there and take an oath.  The
3     court reporter gives an oath, and you swear to tell the truth,
4     like that; right?
5     A.   Correct.
6     Q.   So let's look at the question that was asked at Line 18:
7          "Is SEP -- is not -- does not have -- is not a
8     participating provider with Arkansas Health; correct?"
9          And your answer was "Correct."
10         Did I read that correctly?
11    A.   Yes.  But, again, that was back in March 2019, and we now
12    have new information since then, so I have a different view
13    about that.
14    Q.   Okay.
15         You can take that down.
16         So let's talk about -- Mr. Bristow, you had the Ambetter
17    product loaded in your system out-of-network, don't you?
18    A.   We don't have anything loaded in the system.
19    Q.   You gave a deposition, once again, on July the 9th, 2020,
20    didn't you?
21    A.   Yes.
22    Q.   Okay.  Can we pull that up, Graham, Page 189 of the
23    July 20 -- 9th, 2020, deposition, Lines 15 through 21?
24         The question there is:  "Well, how do you identify the
25    Ambetter from Arkansas product in your system?"

```
1        "Well, we have that product loaded as out-of-network, as I
2   said."
3        Did I read that correctly?
4   A.   Yes.
5   Q.   And the next question was:  "And has that product always
6   been loaded as out-of-network?"
7        And you said, "To my knowledge, yes."
8        Did I read that correctly?
9   A.   Yes.
10  Q.   Thank you.
11       And that deposition was a month ago, wasn't it, sir?
12  A.   Yes.
13  Q.   Okay.  Take that down.
14       Do you know who Heather Kibbler is?
15  A.   Yes.
16  Q.   And Heather Kibbler -- well, let me just ask you this:
17  You were -- you were there for her deposition; right?
18  A.   Yes.
19  Q.   You were there for her deposition; you've been there for
20  Tammie Tibbits's deposition; for some other depositions in this
21  case, you were present; right?
22  A.   Yes.  At some of them, I was.
23  Q.   Yeah.  And you aren't the one being deposed.  You were
24  just there listening to the people from TeamHealth that were
25  being deposed; right?
```

1    A.    Yes.

2    Q.    And so you were there for Heather Kibbler's deposition;

3    correct?

4    A.    Yes.

5    Q.    And she was designated by SEP to testify on behalf of the

6    company, wasn't she?

7    A.    As one of them, yes.

8    Q.    As one of them.  You were one, too, as well; right?

9    A.    Correct.

10   Q.    And have you had a chance to read her deposition?  Did

11   someone show it to you in preparation for your testimony today?

12   A.    I have not, no.

13   Q.    Okay.  But you were present?

14   A.    Yes.

15   Q.    Okay.  So let's take a look at Page 29 of her deposition,

16   please, Lines 14 through 23.  You said, "If there is a contract

17   with an insurance company, then you load the expected rates;

18   correct?

19        "Yes.

20        "And there is no expected rate loaded for the Ambetter of

21   Arkansas product; correct?"

22        There was an objection.

23        Then it says:  "So my understanding is we are

24   out-of-network with Ambetter of Arkansas.  So we do not have a

25   specific rate loaded in our system."

1      Is that what she said?

2            MR. KENNEDY:  Your Honor, objection.  If you'll

3    recall, she was supposed to read page 20 first in regards to

4    this witness.

5            THE COURT:  That's correct.  Read 20 first.

6            MS. PRUITT:  I'll read 20.  I was going to read it in

7    a second but --

8            THE COURT:  That's fine.

9    BY MS. PRUITT:

10   Q.   Let's look at 20.  Pull that up.

11       Ms. Kibbler says, Line 9, "So for that product, the

12   Ambetter in Arkansas product, do you know if there was ever an

13   expected amount loaded in plaintiff's system associated with

14   Ambetter patients?

15       "I don't know if I can answer if there ever was.  I

16   believe that it is out-of-network.  So we don't have a rate

17   loaded.

18       "So, to your knowledge, is it fair to say that you don't

19   know?  To your knowledge, no rates have ever been loaded for

20   Ambetter of Arkansas; is that correct?"

21       She said, "So I wouldn't be able to speak if one was ever

22   loaded."

23       Then let's go back to Page 29, Lines 14 through 23.

24       And she's asked, "You said, if there is a contract with an

25   insurance company, then you load the expected rates; correct?

1      "Yes.

2      "And there is no expected rate loaded for the Ambetter of

3  Arkansas product; correct?"

4      She says, "So it's my understanding as we are

5  out-of-network with Ambetter of Arkansas.  So we do not have a

6  specific rate loaded in our system."

7      Did I read that correctly?

8  A.   Yes.

9  Q.   And this deposition, Graham, can you pull up the first

10  page of it?  If you can't, I'll put it on the ELMO.

11      And that testimony by Ms. Kibbler was given about a month

12  ago on July the 8th, 2020; right?

13  A.   Yes.

14  Q.   Thank you, sir.

15      That's all I have.

16          THE COURT:  Mr. Kennedy?

17          MR. KENNEDY:  Yes, Your Honor.

18          THE COURT:  And I'll leave this up to you.  Do you

19  want to take up your redirect now, or would you rather take a

20  break and come back after?

21          MR. KENNEDY:  Well, if we're going to break in ten

22  minutes, I would rather wait.

23          THE COURT:  How much time do you think you have?  I'm

24  not going to hold you to any time.  It's just for planning

25  purposes.

```
 1          MR. KENNEDY:  A good half hour.
 2          THE COURT:  Why don't we take a break?
 3      Are you ready to take a break now and come back and listen
 4  to redirect after, or would you rather take a break here?  You
 5  don't care as well.  Let's push through.
 6          MR. KENNEDY:  Okay.
 7          THE COURT:  Unless you want -- like I said, I'll
 8  leave it to you.  Unless you want to take a break first, that's
 9  fine.
10      Mr. Kennedy?
11          MR. KENNEDY:  May it please the Court?
12          THE COURT:  Yes, sir.
13                      REDIRECT EXAMINATION
14  BY MR. KENNEDY:
15  Q.   Mr. Bristow, the contract at issue in this case,
16  Exhibit 1, plaintiff's and defendants', when did you become
17  personally aware of that contract?
18  A.   Well, I'll say I signed it back in 2011, but after that, I
19  don't think I became aware of it until -- really, it's been
20  just before we were filing the Second Amended Complaint.
21  Q.   Okay.  Was that November of 2018?
22  A.   I believe that's my understanding, that the contract was
23  produced.
24  Q.   Well, that's what I was going to ask you.  How did you
25  become aware of it?
```

1   A.   Our attorneys made it -- made me aware of it.  Again, it

2   wasn't until they had received it.  I don't remember an exact

3   date that I was made aware of it.

4   Q.   And after they sent it to us in discovery in this lawsuit,

5   do you know, one way or the other, when we sent it back to them

6   in discovery?

7   A.   I am not aware of any dates about that, no.

8   Q.   You've read the Tibbits's emails.  You were just showed a

9   lot of them again.

10       Again, do you believe that, based on Ms. Tibbits's

11  e-mails, that she had that contract at her fingertips?

12  A.   No.  And it's clear throughout the entire inner -- the

13  exchange of interactions with them that she was pretty clueless

14  and was never informed about that after inquiring multiple

15  times.

16  Q.   And was she pleading with Centene and NovaSys folks to

17  give her that information in those e-mails?

18  A.   Certainly.  Yes, and I believe she certainly was.

19  Q.   And let's put up, Michelle, plaintiff's 47, once again,

20  just to run this into the ground.  The very top e-mail.

21       And after all of that pleading, on plaintiff's 47 -- and

22  we saw, in the opening statement and other times -- we went up

23  the food chain all the way on this e-mail -- the punch line at

24  the end is the powers that be at Centene are telling other

25  people and at Centene and/or NovaSys, "Please do not have

1   anyone respond to them at this time.  Don't call them back,

2   don't e-mail, and don't give them the contract"; right?

3   A.    That's correct.

4   Q.    Now,  interestingly enough, Ms. Pruitt just showed you

5   defendants' Exhibit 24.  And let's check something.  That

6   e-mail I just showed you where they said, "Go pound sound" was

7   December 23rd, 2015.  That was the merry Christmas e-mail.

8         So let's see what Ms. McKinney says to Mr. Meldrum.

9   Again, this is an internal communications with Centene.

10        Highlight the second paragraph, please, Michelle.

11        Now here, even though they told us to go pound sand and

12   they wouldn't give us the contract, May 2017, Ms. McKinney is

13   saying to Meldrum, the vice president of all of these family of

14   companies, "We had an LOA for NovaSys with TeamHealth at

15   75 percent of billed charges.  However, this LOA did not cover

16   Ambetter of Texas; only NovaSys.  Here, Mr. Meldrum, I have

17   attached a copy of the signed Letter of Agreement."

18        Do you see that?

19   A.    I do.

20   Q.    Have we seen any other e-mails after this where that was

21   forwarded to us?

22   A.    No, not that I'm aware of.

23   Q.    You can take that down, please.

24        Now, Ms. Pruitt spent a great deal of time on

25   cross-examination asking you about defense Exhibit 2.

1          Just pull that up real quick, please, Michelle.  I want to
2    see the first paragraph of it again.
3               THE IT TECH MICHELLE:  Defense Exhibit 2?
4               MR. KENNEDY:  Defense Exhibit 2.
5          Not "2."  What is the network services provided again?
6               MR. ZAVITSANOS:  That's our "2."
7               MR. KENNEDY:  Our "2."  I'm sorry.  Plaintiff's 2.
8          Just the first paragraph.  This is what he was asked
9    about, asked a lot of questions about.
10   Q.   And, again, who is this agreement between, that she was
11   asking you all of these questions about, Mr. Bristow?
12   A.   Between Celtic, dba Arkansas Health, and NovaSys Health,
13   Inc.
14   Q.   And she made the point, under this agreement, that NovaSys
15   isn't responsible for making payments.
16        Do you remember that line of questions?
17   A.   I do.
18   Q.   Once again, is SEP or TeamHealth a party to this
19   agreement?
20   A.   No, we're not.
21   Q.   Do we --
22   A.   We never have been made aware of this agreement before we
23   get into --
24   Q.   Is SEP or TeamHealth -- do they concern themselves with
25   this agreement?

1  A.   No.

2  Q.   You can take that down, please.  And, again, it all comes

3  down to this connecting the dots issue.

4       The deemer letter, I am not going to put it back up again,

5  because I am sure the jury can memorize that letter, too.

6       But did they bother telling -- they're just about to roll

7  out this product.  Surely, they had come up with a name.  Did

8  they bother telling us anything in that deemer letter about

9  this thing called "Ambetter" or "Arkansas Health & Wellness."

10      Was that in the deemer letter?

11 A.   No, it was not.

12 Q.   They could have told us that, couldn't they?

13 A.   Yes.

14 Q.   But our contract, which is the only contract this jury is

15 going to be asked to evaluate in this case, we know we have

16 access to all of their members; correct?  Lowercase members, do

17 you remember that discussion?  Actually, you wouldn't have

18 remembered it because you weren't in the courtroom.

19 A.   I wouldn't remember that, yeah.

20 Q.   But we talked about defined terms.  Capital "Member" and

21 lowercase "members."

22      And in our agreement, members isn't defined; right?

23 A.   That's correct.

24 Q.   We get access to all of their members including Ambetter?

25 A.   That's what we believe, absolutely.

1  Q.   Now,  let's do look at one of the exhibits that Ms. Pruitt

2  pointed out to you, defense Exhibit 4, just to clear something

3  up.

4        The second -- the bottom e-mail there, Ms. Rivers.

5        Because I believe Ms. Pruitt was drawing to your attention

6  the second sentence before the comma.  It says, "The last I

7  heard was that the exchange product is a different product,"

8  comma -- that's what she had highlighted.

9        But then what does it say here?  What's the rest of the

10  sentence say?

11  A.   "Same tax ID that is contracted."

12  Q.   Does that mean TeamHealth viewed this as the same company?

13  A.   Yes.

14  Q.   Covered by their existing contract?

15  A.   Yes.

16  Q.   Defense Exhibit 5, we saw this a while -- a few minutes

17  ago.  An e-mail on November 27th, 2013 from Mr. Slover to

18  Mr. Meldrum.  So this is sort of a unique e-mail that we've

19  seen, because it's Mr. Slover talking directly to, up the

20  chain, Mr. Meldrum, and we aren't -- nobody else from our side

21  is on this e-mail, is it?

22  A.   No.

23  Q.   And contrasting the e-mail that we have read from

24  Ms. Tibbits to all of these folks at NovaSys and Centene and in

25  looking at what this says for Mr. Slover to Mr. Meldrum, did

1   Ms. Tibbits have the knowledge Mr. Slover had?

2   A.   Unfortunately, not.  Again, that was kind of the

3   shame-on-us part.  Obviously, we didn't transfer that knowledge

4   effectively from Michael to Tammie when she came in.

5   Q.   Yeah, we talked a little bit in opening statement.  Maybe

6   I need to just -- let's drill down on that very fine point.

7        Mr. Slover was gone, January 1st, 2015, and -- right?

8   A.   Right.

9   Q.   And Ms. Tibbits came on about when?

10  A.   September, I believe, of 2015.

11  Q.   And is that typical that it would take eight months to

12  fill that position?  Do you have any idea what the problem was

13  there?

14  A.   It is a little longer than usual, but I don't recall the

15  specific circumstances on why it took so long.

16  Q.   And did Mr. Slover leave a to-do list for his replacement,

17  to your knowledge?

18  A.   No, not that I'm aware of.

19  Q.   Let's look at defense Exhibit 6.  You were showed this a

20  moment ago.

21       Michelle, from the November 27th e-mail up there, view at

22  the top.

23       And this is where Mr. Slover is e-mailing Ms. Shrader in

24  November of 2013, and he's talking about talking about

25  responding to the deemer letter.  And in the very last

1  sentence, Mr. Schroeder says, "I'll touch base with Bryan to

2  get out of term letter."

3       Do you see that?

4  A.   Yes.

5  Q.   And what he is really talking about is rejection of this

6  deemer letter; right?

7  A.   Correct.  It was exactly -- not all in the same time

8  period, but that's how we responded to him.

9  Q.   We want to make sure we're not deemed into this amendment

10 that they are trying to unilaterally impose?

11 A.   Correct.

12 Q.   There was -- at the very end of Ms. Pruitt's examination

13 of you, she showed you the e-mail, and it was -- actually, it

14 was Ms. Kibbler's testimony about whether the thing -- the

15 contract was loaded in- or out-of-network, the rate.

16      Do you recall that?

17 A.   I do.

18 Q.   Well, Centene was certainly not paying us as in-network at

19 the time; right?

20 A.   Correct.

21 Q.   And that would be a reason why, if the rate was loaded,

22 down the road it was loaded as out-of-network; right?

23 A.   Just to clarify this:  We didn't have anything loaded, so

24 there is no terms to load, and so -- and that's why there is

25 nothing really in the system about it.  But, right, she

1  wouldn't have been inquiring, you know, over a course of time

2  for a contract if she thought we had a contract in place.  So

3  that's where we just, again, could not -- could not connect the

4  dots until we got into this process.

5  Q.   So at the end of the day, Mr. Bristow, has our contract --

6  this jury is going to be asked to evaluate -- has that contract

7  been terminated?

8  A.   No, not to my knowledge.

9  Q.   Has it been amended?

10  A.   No.

11  Q.   And is there any limiting language in that contract that

12  suggests that we don't have access to Ambetter?

13  A.   No.

14            MR. KENNEDY:  I pass the witness.

15            THE COURT:  Anything final?

16            MS. PRUITT:  I have no further questions, Your Honor.

17            THE COURT:  Can he be released from his subpoena?

18            MR. KENNEDY:  I was going to ask that.

19            MS. PRUITT:  As far as we're concerned, yes.

20            THE COURT:  You're free to go

21            THE WITNESS:  Thank you, sir.

22            THE COURT:  Will the lawyers approach the bench real

23  quick?

24        (whereupon a bench conference commenced.)

25            MS. PRUITT:  I like your seersucker.

1          MS. HENRY:  I know.  Me, too.

2          THE COURT:  I have a --

3          MR. ZAVITSANOS:  Your Honor, I'm sorry we forgot our

4   masks.

5          THE COURT:  Nah, that's okay.

6      Make sure Suzanne has a little room.

7      I know you had mentioned this might be your last witness.

8   Do you want to rest now, or do you want to wait until after the

9   break?  I was thinking, if you rested now, then we could let

10  the jurors stay out a little while, while we take up motions.

11  However, if you want to take a little time and assess and be

12  sure --

13         MR. ZAVITSANOS:  No.  We'll rest.

14         THE COURT:  Okay.  All right.  How much time do you

15  think it will take us for our motion?

16         MR. TALLEY:  Your Honor, that's -- it's going to take

17  a little bit of time.  I think, conservatively, 30 to

18  45 minutes, depending on --

19         THE COURT:  How much detail you want to give me?

20         MR. TALLEY:  Well, depending on how the Court thinks

21  about things I am going to raise, I think, in this argument --

22         THE COURT:  I don't want to tip my hand, but I think

23  I have heard enough that would lead me to believe that we

24  probably will be back next week, or we probably will be back,

25  but I would never cut anybody off from making a record that you

1    need to make.

2              MR. TALLEY:  And I think I do need to make a record.

3              THE COURT:  As Mr. Thompson just said a little while

4    ago, I had a case that I didn't grant judgment, as a matter of

5    law, in his case.  And it went to the jury, and he won.

6         And then the Eighth Circuit came behind me and said I was

7    wrong.

8         And so I get it -- I get it wrong.  And so I'm going to

9    let you make your record.

10             MR. KENNEDY:  I mean, were you being vindictive of

11   Mr. Thompson when you did that?

12             THE COURT:  Of course not.

13             MR. KENNEDY:  Your mask isn't on --

14             THE COURT:  (Noise.)

15             MR. KENNEDY:  -- so I can see the laughing.

16             THE COURT:  Well, let me pull it on, and look.

17        No, no, no, no, no.  Yeah.  So --

18             MS. PRUITT:  Yeah, I think they're going to lunch.

19             THE COURT:  Okay.

20             MS. PRUITT:  I would hate for them --

21             THE COURT:  Because they would just be sitting there.

22        Okay.  I can give them a little more time.  And you have a

23   witness ready this afternoon, just in case --

24             MS. PRUITT:  Yes.

25             THE COURT:  -- things don't go your way?

1          MS. PRUITT:  Yes.

2          THE COURT:  Okay.  Good.

3          MS. PRUITT:  Of course.

4          THE COURT:  Okay.  Hey, I am going to let them --

5          MR. TALLEY:  Judge, do you want to take that up now,

6     or do it -- have us go to lunch and come back?

7          THE COURT:  I think we come back from lunch, and we

8     take it up.

9          MS. PRUITT:  Yeah.  Eat now.

10          THE COURT:  Give us a break now, and then we come

11     back.

12          MS. PRUITT:  Eat, please.

13          THE COURT:  And then we can --

14          MR. DRENNON:  Your plan is Ms. Suggs and the other

15     witnesses?

16          MS. PRUITT:  I don't have any idea what our plan is.

17          THE COURT:  Okay.  Let's take our break now, and then

18     we'll come back.

19       (The bench conference concluded.)

20          THE COURT.  All right.  Mr. Kennedy, call your next

21     witness.

22          MR. KENNEDY:  The plaintiff rests, Your Honor.

23          THE COURT:  Okay.  All right.  Ladies and gentlemen,

24     you have heard the plaintiff's case.  Normally, what happens,

25     when the plaintiff rests, we have discussions that take up

1    about where we go from here and how the case will proceed from

2    here, and that might take from -- that's what I was talking to

3    the lawyers about here at the bench.

4         Our arguments and discussions could take as long as 30 to

5    45 minutes.  And so what I'm thinking is we could have a lunch

6    break now.  I'll give you a longer lunch break so that you're

7    not just sitting back there waiting on us to get done.

8         And we'll take a lunch, and then we'll come back and start

9    doing what we do, and we'll bring you back.  It is right at ten

10   minutes after 12:00.  And how about we come back at 1:30, 1:45?

11        Is that enough?

12        We don't need to come back at 2:00, do we?  I just want to

13   make sure.  And I don't want -- I would rather give them a

14   longer break and have them not waiting around in the building

15   than to give them a shorter break and have them sitting back

16   there, and it doesn't matter.  And there are no wrong answers

17   to this.  What do we think?

18            MR. TALLEY:  I think 1:45 would be appropriate, Your

19   Honor.

20            THE COURT:  Do you have any objection to that?

21            MR. ZAVITSANOS:  No, Judge.  I was going to say 1:30

22   because I -- but 1:45 is fine.

23            THE COURT:  Okay.  Let's do that.  You stand down

24   until 1:45.  You can talk to Mr. Craig over there about when

25   you have to be back in the building.  He'll give you some --

1  you know, he's a horse rider.  So if you run too far, he'll get
2  on his horse and come and pick you up.
3       Okay.  Let's recess.  One last thing, you heard the
4  plaintiff's case.  Defendant still has a case to put on.  Don't
5  start making decisions about what your verdict will be right
6  now, and although you have heard -- until you have had a chance
7  to hear the defendants' case, until you have had a chance to
8  hear closing arguments, and a chance to read the jury
9  instructions, and go back and talk to each other.  So keep an
10 open mind until you've heard the entire case.  Okay?  All
11 right.  You can stand down.
12      So we'll meet back here at 1:00 o'clock.  Let's recess
13 until 1:00 o'clock.
14      (A brief recess was taken.)
15           MR. TALLEY:  Good afternoon, Your Honor.  May it
16 please the Court?
17           THE COURT:  Good afternoon.
18           MR. TALLEY:  Graham Talley on behalf the defendants.
19 At this time, the close of the plaintiff's case, the defendants
20 respectfully move for judgment as a matter of law.  I will go
21 ahead and tell the Court that my office is filing a formal
22 brief on this issue, largely for the purposes to make sure our
23 record is clean, in addition to the transcript.
24      After four and a half days of testimony, Your Honor, we
25 respectfully believe the plaintiff spent a lot of time trying

1   to muddy the waters and make this case more confusing than it

2   is.

3       The facts are, as I believe them to be, pretty

4   straightforward and blurring the lines between distinct and

5   separate business entities, is what the plaintiff has been

6   trying to do, because it's the only way that a jury could

7   potentially enter a verdict in favor of the plaintiff.

8       So I'm not going to rehash all of it for you.  I am not

9   going rehash arguments that were made at the summary judgment

10  statement.  I think I just dropped a note in my brief.  I am

11  not going to spend time arguing with you about the meaning of

12  NovaSys Health members.  Okay?  The Court has dealt with that

13  issue, and the Court is well informed on that issue, and I am

14  not going to do that.

15      But I do respectfully submit, Your Honor, that there is a

16  couple of fairly thorny legal issues that we're going to need

17  some guidance on, and I think those are ones that I'm sure the

18  plaintiff would like the opportunity to brief once they have

19  time to digest.  And the Court may want to take a little bit of

20  time looking at some of these statutes and some of these cases

21  cited in our brief before definitively ruling on this request

22  under Rule 50.

23      So that said, the thrust of this case been about three

24  different business entities that are all different.  The first

25  is NovaSys Health.  NovaSys Health is a Delaware corporation.

It is authorized to do business in Arkansas.  Its principal
place of business is here in Arkansas.

Importantly, Judge, NovaSys Health, Inc., is not an
insurance company.  It is not licensed by the Arkansas
Insurance Department, and it does not actually transact
insurance business.

Before 2014 -- and this is what the proof has shown to
date -- NovaSys Health served as a third party administrator
for certain health plans.  We talked about the Choice Network,
the Select Network.  We talked about the public school
employees.  A third party administrator is a group that an
insurance company, the risk bearing entity, hires to manage
claims.

And when they manage claims, they do so pursuant to an
agreement.  They manage those claims by accepting them, by
processing them.  And in the case of NovaSys Health, with
respect to the NovaSys Health members, they actually paid the
claims, they were the payor, but they weren't using their own
money.  I think Mr. Zavitsanos used the analogy of getting
money to go to the movies and taking money from mom and dad and
going to the movies.  It's not your money.  And that's is what
a third party administrator does -- is they take the money from
the risk bearing entity, and they pay the claim.  And they, of
course, make a fee for doing it.

Now in 2011, of course, NovaSys entered the 2011 LOA, or

1  the NovaSys contract with the plaintiff.  The parties agree on

2  that.  The contract says, "75 percent of billed charges."  The

3  important thing in that contract, Judge, that I don't think

4  we've spent enough time talking about, is the payment-related

5  obligation in that contract.

6      In that payment-related obligation, imposed on NovaSys, is

7  to pay the plaintiff for covered services for NovaSys Health

8  members.  I'm not going to argue about what the meaning of that

9  is, Judge.  But to get there -- and we'll get there in just a

10 minute -- that's what the language says, "NovaSys agrees to

11 provide payment to provider for covered services provided to

12 member within 30 days following receipt of a complete claim."

13 That's what it says.

14     Two years after that agreement, the general assembly

15 passed Medicaid expansion legislation.  As part of that, we end

16 up with a new health insurance marketplace.  And Arkansas

17 Health & Wellness says, "We're going to participate."

18     We talked about NovaSys over here, Judge.  Now, we're

19 going to talk about Arkansas Health & Wellness.  Arkansas

20 Health & Wellness is the dba for Celtic Insurance Company.

21 Celtic Insurance Company is an insurance company.  They do hold

22 a license from the Insurance Department.

23     In one of the things that we've glossed over in the last

24 four and a half days, as the Court knows, this is a highly

25 regulated environment.  You can only do, as an insurer or a

1   participant in the insurance industry, what the law says you
2   can do and the regulations of the Insurance Department.  So
3   Arkansas Health & Wellness decides to offer this product on the
4   insurance exchange.  As the Court knows, it's called Ambetter.
5   And they obtain the necessary regulatory approvals from the
6   Insurance Department to do so.
7         Pursuant to that, they collect the premiums, they
8   adjudicate the claims, and they pay the money.  They're the
9   payor on those claims.  Celtic is the risk bearing entity.  So
10  the only relationship between NovaSys and Ambetter is the lease
11  agreement for the network we've been talking about.  The lease
12  agreement, Your Honor, is defense Exhibit 8.  I think the
13  plaintiff actually put it in as well.
14        And the lease agreement in it has a critical provision
15  that begins with "NovaSys is not and will not be directly or
16  indirectly responsible for the payment from its own funds of
17  any claims or billings for the provision of health care
18  services, items, and accommodations."  So that's the connection
19  between NovaSys and Ambetter for these claims.
20        As the Court knows, beginning January 1st, 2014, Ambetter
21  goes on the market.  At some point shortly thereafter, in '14,
22  plaintiff's contract doctors start providing ER services to
23  Ambetter members.  And the Court is certainly well-informed
24  after that fact.
25        So let's get to where we are today.  Following the Court's

1   summary judgment order, there are -- there is just a breach of

2   contract claim left.  That breach of contract claim is pleaded

3   against NovaSys, against Arkansas Health & Wellness, and

4   against Centene, which I'll note for the record, Your Honor,

5   Centene is actually an indirect owner of those two entities,

6   which they're actually owned by an entity called Celtic

7   Group -- or Celtic Insurance group, Inc.

8        So for purposes of this motion, I don't think that matters

9   that much, but I'll start with what I think is the simplest

10  piece of this argument.  And that is for Arkansas Health &

11  Wellness and Centene, those breach of contract claims are

12  subject to dismissal now.  And the reason is quite

13  straightforward.  They're not parties to this contract.

14       And we filed a motion on that earlier this week.  We put

15  some law in there.  You know -- you know how lawyers are in a

16  case like this.  We're trying to find Judge Miller's decisions

17  on a certain issue, and we did find one Green v. Skyline

18  Highland Holdings LLC.  Judging by the name of that, that was

19  one of those nursing home outfits.

20       They had a breach of contract claim against one of the

21  defendants who wasn't a party to the contract.  Your Honor

22  dismissed that claim for the very simple reason you can't have

23  a breach of contract claim against somebody that is not a

24  party.

25       Also cited was another case from the Eighth Circuit,

1   involved a couple individual defendants and ASU.  Dismissed the

2   breach of contract claim against two individual defendants

3   because they "were not parties to the contract."  That's

4   applying Arkansas law.  It's a pretty straightforward

5   principle.

6        And the reason, Judge, that we need those entities --

7   those entities should be tossed now is because this case is

8   already confusing enough.  And the proper time to dismiss those

9   is as soon as we can to clean up this case in front of the

10  jury.  Quite frankly, Centene has no obligations under this

11  contract.  It's not a party to it.  Same thing for Arkansas

12  Health & Wellness.  And we think the law is just pretty settled

13  on that point, that you simply cannot hold a nonparty

14  responsible to a contract like this.

15       So flipping to -- and I'm going to get to this veil

16  piercing theory that plaintiff has.  That's going to also be

17  kind of a thorny legal issue, I think, for the Court, based on

18  what I've seen so far in the case.

19       Now, let's talk a little bit about NovaSys in this

20  contract.  Like I said earlier, NovaSys distinct entity under

21  Delaware law.  There is plenty of strong Arkansas law out there

22  that holds, just because you share owners, just because you

23  share operators doesn't mean one entity is going to be totally

24  disregarded.  That's the law in Arkansas.  It's the law

25  everywhere else.

1      Now, distinct entity, Delaware incorporation, and it's not
2  an insurance company.
3      On the other hand, you have Celtic, or Arkansas Health &
4  Wellness.  Arkansas Health & Wellness is an insurance company,
5  licensed to transact insurance business in the State of
6  Arkansas.
7      What the plaintiff wants to do in this case, through the
8  NovaSys contract, is it wants to hold a noninsurance company
9  responsible for the insurance business of another entity that
10  is a licensed insurance company.  You can't do that.  And there
11  is a couple of reasons why.  First, the contract mentions
12  "payment-related obligations for covered services provided to
13  members."
14      The only way a noninsurance company, like NovaSys Health,
15  could have payment-related obligations for insurance claims of
16  another entity is if the two parties entered an agreement for
17  NovaSys to be the third party administrator for Ambetter
18  claims.  That's the only way, and there is a statute that says
19  so.  Arkansas Code, annotated, Set 23-92-202: "A third party
20  administrator may act in that capacity only if he or she has a
21  written agreement."
22      It's a regulated environment, Judge.  And the only way to
23  connect Ambetter claims to a noninsurance company would be
24  through a TPA arrangement.  That's what Arkansas law says.
25  Same thing, if you're doing that, if you're going to have a

1    written TPA agreement between an insurance company or a risk

2    bearing entity and a TPA, you've got to file that with the

3    Insurance Department.  You've got to tell the Insurance

4    Department that you're doing that.  Again, it's a regulated

5    environment.

6        I think the Court already knows that it didn't see a TPA

7    agreement like that in the plaintiff's case because one wasn't

8    introduced, because one doesn't exist.

9        And more importantly, Judge, defense Exhibit 8, that lease

10   agreement, includes this provision that expressly disclaims any

11   payment-related obligation on the part of NovaSys for Ambetter

12   claims.  It's on Page 5 of Exhibit 8, defense Exhibit 8:

13   "NovaSys is not and will not be directly or indirectly

14   responsible for the payment from its own funds of any claims or

15   billings for the provision of health care services."  That

16   language and the absence of a TPA agreement mean that there

17   cannot be a payment-related obligation on the part of NovaSys

18   for Ambetter claims.  It can't exist.  And, in fact, if it was

19   imposed, it would actually violate Arkansas law, because there

20   is no written agreement.

21       So what I anticipate I am going to hear in response to

22   this is more about the veil piercing theory.  Well, Judge,

23   you've got to disregard the corporate structures of these

24   entities and hold them all up.  Well, as Your Honor knows,

25   you've got to put on proof of that.  And the Arkansas law on

1   that is pretty strong.  Separate business entities do not

2   become a single entity merely because the officers or owners of

3   one are also officers and owners of the other.

4         And this is where I'm getting into what I think might be a

5   little legal wrench in this case.  Your Honor, the Court asked

6   for jury instructions from the parties, asked for verdict forms

7   from the parties.  And the ones submitted by the plaintiff

8   assume the Arkansas law applies to this veil piercing claim,

9   and it doesn't.  The entity that they want disregarded is

10  NovaSys.  They want to get through NovaSys to Centene, its

11  ultimate owner.

12        NovaSys is a Delaware corporation.  And as the Court

13  knows, sitting in diversity, it's obligated to look to

14  Arkansas's Choice of Law rules to decide an issue like this.

15  The Arkansas Supreme Court has not addressed the Choice of Law

16  question on veil piercing claims.

17        What are we going to apply?

18        But Judge Dawson, over in the Western District, did look

19  at that about two months ago.  I'll give you the citation here

20  in a minute.

21        As the Court knows, when Arkansas Supreme Court hasn't

22  spoken on an issue of state law, you're tasked with predicting

23  what they're going to do.  And Judge Dawson looked at this

24  question a couple months ago in a case that -- let me see if I

25  can grab the citation for you.  It's 2020 Westlaw 284-32-24,

1 | caption is Container Life Cycle Management LLC v. Safety
2 | Management Services Company.
3 |     And in that case, Judge, Judge Dawson walks through -- I
4 | think he does a very nice job.  And I, quite frankly, have
5 | taken a lot of his hard work in pulling it into this brief.
6 |     He looked at, first off, the Arkansas statute about how we
7 | can handle out of state companies, foreign businesses.  And
8 | under Arkansas Code, annotated, 475105(c), the State of
9 | Arkansas cannot regulate the organization or internal affairs
10 | of a foreign corporation, even if that company is licensed to
11 | do business in the state.
12 |     It's what the Court, I'm sure, is familiar with is the
13 | Internal Affairs Doctrine.  You don't hold corporations subject
14 | to all kinds of different laws when you're talking about their
15 | internal arrangements.  And that statute, in the Internal
16 | Affairs Doctrine, Judge Dawson took that, looked at it, and
17 | predicted that Arkansas Supreme Court would apply the law of
18 | the state of incorporation to a veil piercing claim.
19 |          THE COURT:  Huh.
20 |          MR. TALLEY:  It's what the majority of jurisdictions
21 | do.  His opinion looks not just at other jurisdictions, it
22 | looks at other courts in the Eighth Circuit.  And where he
23 | ended up was applying the law of the state of incorporation,
24 | which is Delaware.
25 |     And under Delaware law, to pierce the corporate veil, the

1   plaintiff has to show that its owner, in this case Centene,

2   "created a sham entity designed to defraud investors or

3   creditors."  The Judge has ruled on the fraud claim in this

4   case and dismissed it.

5        It's five -- kind of a five-part test that I think is

6   fairly straightforward on our facts based on the proof the

7   plaintiff pulled out in its case.  And that five-part test

8   looks to whether the company was adequately capitalized for the

9   undertaking, whether the company was solvent, whether corporate

10  formalities were observed, whether the shareholders siphoned

11  company funds, whether the company simply functioned as a

12  facade.

13       I am not going to spend a lot of time on this, Judge,

14  because the plaintiff put on no proof about the capitalization

15  of NovaSys, put on no proof of whether NovaSys was solvent or

16  insolvent, put on no proof of whether NovaSys regarded or

17  disregarded corporate formalities, put on no proof whatsoever

18  of whether funds were siphoned off by Centene, put on no proof

19  of whether NovaSys was just a "facade" for something else.

20  There is no proof at all of that in the plaintiff's case, so

21  this veil piercing claim is subject to dismissal as to Centene

22  and Arkansas Health & Wellness, which, frankly, is a horizontal

23  company within the structure.  There is simply no obligations

24  there -- or no proof there that could pave the way for a veil

25  piercing claim.

1    And the final point on this, Judge, is, when we're

2   applying Delaware law to a veil piercing claim, as the Court

3   knows, Delaware is one of those goofy states that still has

4   courts of law and courts of equity.  They've got chancery

5   courts.  And as the Court probably predicts, jurisdiction of

6   veil piercing claims, as an equitable remedy, is one that hangs

7   out in chancery court in Delaware, which is significant because

8   it means that the judge, and not the jury, decide that issue.

9    So in the event that the veil piercing claim were to

10   survive, which we don't think it should, Your Honor should take

11   that away from the jury, because it can't go there under

12   Delaware law.

13    So I'll wrap it up with this:  The way this proof has

14   shaken out, over four and a half days, can be somewhat

15   confusing, but at the end of the day, what the plaintiff is

16   trying to do is hold NovaSys Health responsible for the

17   payment-related insurance obligations of an actual insurance

18   company pursuant to the contract, which talks about payment,

19   about covered services.

20    The only way they could do that is if Arkansas Health &

21   Wellness entered a contract for NovaSys Health to provide TPA

22   services and become the payor on those claims, like it did

23   pre-2014 with these other employer-sponsored groups and this

24   ARHealthNetworks program.  It can do that legally under the

25   statute.  But the plaintiff didn't put on proof of that, and

1   it's fatal to the case, Your Honor.

2       So for those reasons, we ask the Court direct a verdict in

3   favor of the defendants under Rule 50 of the Federal Rules of

4   Civil Procedure.  Thank you, Judge.

5           THE COURT:  All right.  Mr. Thompson?

6           MR. THOMPSON:  Your Honor, there are ways things are

7   supposed to be done in court.  And it's not hiding behind the

8   law with all of these legal arguments.

9       Now, let's talk about their illegality claims that they

10  just put before this Court.  They just moved for judgment, as a

11  matter of law, arguing that this NovaSys contact that we've

12  talked about all week is void against public policy; it

13  violates an Arkansas statute.

14      I'm looking at Rule 8(c), 8(c)(1), and we've got bullet

15  points here.  And right underneath "Fraud," which they didn't

16  plead in their answer, is "Illegality."

17      Their affirmative defenses:  First affirmative defense,

18  you can't have implied contracts because there are express

19  contracts that govern this claim.  And I'm looking at docket

20  document No. 99, their answer to the Second Amended Complaint.

21      Second affirmative defense, you failed to join an

22  indispensable party.  Third affirmative defense, you lack

23  standing to bring claims pursuant to agreements between Celtic

24  and its insurers.  Fourth, you hadn't stated a claim for

25  punitive damages.  Fifth, latches, labor, estoppel, judicial

1    estoppel, abandonment, and unclean hands.  Sixth, accord and

2    satisfaction.  Seventh, credit, recoupment, and settlement.

3        Eight, preemption under the Affordable Care Act.  Nine,

4    you have no private right of action under the Arkansas

5    Insurance Trade Practices Act.  Ten, Statute of Limitations.

6    Eleven, the boilerplate affirmative defense people put in

7    whenever there is a punitive damages claim.  That's it.  Those

8    are those affirmative defenses.

9        So the right way to raise this illegality defense was to

10   put it in their answer, not to wait until the close of our

11   proof.  But, now, I've got an argument of a statute that's

12   never been cited to this Court.  We've had zero time to

13   research.  I don't know what they're talking about.

14       Now, Your Honor, as a preliminary -- preliminary matter,

15   they shouldn't be allowed to pursue that defense at all by

16   letting us get to the end of our case before the very first

17   time they claim this contract was voided against public policy.

18       And I would ask you to stop there.  But taking it away

19   from the jury would be even worse, because I don't have -- I

20   don't have a thing I can say here.  They haven't raised it.  I

21   haven't researched it.

22           THE COURT:  I understand that.  Let me -- let me

23   raise this before you continue.  Mr. Talley said that he was

24   going to file something.  Let me speak so everybody can hear

25   me.

1      Mr. Talley said he was going to follow-up his oral

2   argument with a filing that would list everything out with --

3   one of the -- one of the problems in a case like this -- if

4   it's a personal injury case, then you know the issue is

5   liability or you know the issue is -- whatever the issue is.

6   And it's pretty simple.

7      And so at the motion for judgment, as a matter of law,

8   stage, you can always prepare all of your arguments in response

9   without even knowing what the arguments are going to be.

10      We just had about 20 minutes of straight argument on very

11   detailed issues.

12      And I thought it was very well done, Mr. Talley.  But that

13   doesn't give -- for the first time, Mr. Thompson is sitting

14   there hearing what all of your arguments are going to be.  You

15   should have anticipated that.

16         MR. TALLEY:  I will tell you the truth, Your Honor.

17   I don't anticipate that they are able to respond to that on the

18   fly.

19      THE COURT:  And so what I was going to do, anyway,

20   Mr. Thompson, is I was going to take it under advisement.  I

21   will let you make your record now, but what I will ask

22   Mr. Talley to do is file whatever he is going to file and give

23   you a chance to look it and respond so you can detail point to

24   point.

25      I am going to let you continue arguing.  I am going to let

1    you make your argument.  I am not going to take it away from
2    you.  But what I am going to say, before you continue though,
3    is to -- and this is shout-out to Mr. Ryan and Mr. Bristow and
4    to Dr. Thompson, because they're the parties here.  I think I
5    told the lawyers, as we got started -- and y'all might not have
6    picked up on that.  Mr. Bristow, you weren't in the courtroom.
7    I am probably not going to grant a dismissal or a judgment, as
8    a matter of law, and take it from the jury, anyway.  I will
9    take it under advisement.

10          We are going to get a jury verdict in this case.  And then
11   I'm going to tell you, Ms. Henry, I might grant a judgment, as
12   a matter of law, afterwards.  I don't know yet.  I might take
13   it from the jury and take the verdict away, if you get one.  I
14   don't know that.  But then what happens there is the Eighth
15   Circuit looks at it, and if it says that my view of the law is
16   wrong, it reinstates the verdict.

17          And I am not saying I am going to there.  I see Mr. Z.
18   has this pained looked on his face.

19          You have this pained look on your face.

20          I am not saying I am going to do it.  I am saying, if I
21   were to do it, it would be after we get a jury verdict, and you
22   had a jury say, "Here's what we think."  And then the Eighth
23   Circuit, if they reverse me, they can reinstate the verdict,
24   and you have your verdict, and you don't have to come back to
25   Arkansas and try this case again.

 1          And so we're going to hear the defendants' case, and we're
 2     going to get a verdict.  And so if I grant the motion or if I
 3     don't -- but if I grant it, if I were to determine that, as a
 4     matter of law -- as a matter of law, the Ambetter product was
 5     not a subject of the contract of September 1st, 2011 -- if I
 6     were to make that determination, well, then the Eighth Circuit
 7     can say, "Judge Miller, you are wrong."  And it wouldn't -- it
 8     wouldn't hurt my feelings.
 9          And if I said, "No, that is not the case," and the jury --
10     it was ambiguous, and the jury had an opportunity to rule on
11     it, and they looked at it, and they said, "No.  The Ambetter
12     product is -- or that that contract covers the Ambetter
13     product," then that's fine, too.
14          Finish your argument.  But I just want the parties to know
15     I'm not taking the case away from the plaintiff --
16          MR. THOMPSON:  Well --
17          THE COURT:  -- at this point of the trial.
18          MR. THOMPSON:  Your Honor, I've had the pleasure of
19     arguing in front of Tim Fox in Pulaski County Circuit Court a
20     number of times.  And Judge Fox always -- he only lets the
21     parties losing argue.  And then he'll look at the party --
22     after he's told the party they're losing their -- why they're
23     losing, and then he looks at the other side and says, "Now, do
24     you want to change my mind?"
25          If you've reached a decision on this motion for now, at

1    the close of plaintiff's case --

2            THE COURT:  Yes, and that's the point.  I just wanted

3    to let you know you can continue arguing and you can make your

4    record, but I don't know that you have a record to make right

5    now.

6            MR. THOMPSON:  If I don't have a record to make --

7            THE COURT:  I am denying the motion -- well, I am

8    taking the motion for judgment, as a matter of law, under

9    consideration.  I am going to look at the filed motion by the

10   defendant.  I will entertain -- of course, would want to see

11   your response to it.  And then I am not going to rule on this

12   until we receive the jury's verdict.

13           MR. THOMPSON:  Yes, Your Honor.  Well, the only

14   record I will make is I will object vigorously until my dying

15   day if they're allowed to pursue an illegality defense that

16   wasn't in their answer.  But for now --

17           MR. TALLEY:  And I think I can respond to that,

18   Judge.  The defendants' position on this issue is not that the

19   2011 NovaSys contract is illegal or void against public policy.

20   It's that it does not extend and cannot extend to Ambetter

21   claims.

22           THE COURT:  I think that's been the defense all

23   along.

24           MR. TALLEY:  Yeah.  No argument on illegality.

25           THE COURT:  Mr. Thompson wants to make sure that you

1  don't start putting on evidence of something they did not have

2  notice of before the trial.

3        MR. THOMPSON:  And, Your Honor, what his argument is

4  is this Arkansas statute says the claims we're making in the

5  case would violate that Arkansas statute.  That is little bit

6  different than saying it doesn't apply.  If we want to talk

7  about contract interpretation, I'm happy to talk about that all

8  day.

9        THE COURT:  I think he was saying as to veil

10  piercing.

11        MR. TALLEY:  Well, that -- some of the Arkansas

12  law -- the plaintiff -- the defense position on this issue,

13  Judge, is that to connect a noninsurance company, life NovaSys,

14  which is a TPA and network builder -- to connect that with an

15  actual risk bearing entity that does pay claims, that does have

16  its insurer's license and offers the product, the only way you

17  can connect those two is through an agreement for the NovaSys

18  to be the TPA.

19      And that is what the plaintiff was obligated to come

20  forward with, because those other folks -- the public school

21  employees, the ARHealthNetworks, NovaSys was paying claims --

22  was the payor for those claims in its capacity as a licensed

23  third party administrator.  It can do that under Arkansas law.

24  It has a license to do it.  You've got to put up a bond.

25  You've got to go to the Insurance Department.  And you've got

 1   to tell the Insurance Department what you're doing.  It makes
 2   sense.  It's a regulated industry.
 3       But NovaSys is not an insurance company.  It's not
 4   licensed as one.  And as the Court knows, in the insurance
 5   industry, you've got to be adequately capitalized.  You've got
 6   to -- you've got to come forward with all of your product
 7   offerings and what your rates are going to be and get approval
 8   from the regulatory body to do that, to offer insurance
 9   products, whether it's life, whether it's health, whether it's
10   auto in the State of Arkansas.  NovaSys doesn't do that.
11              THE COURT:  File your brief.
12              MR. TALLEY:  It's been filed, Judge.
13              THE COURT:  Mr. Thompson, take a look at and get me a
14   response by Tuesday, if you can.
15              MR. THOMPSON:  By Tuesday, too.
16              THE COURT:  That will give you a chance to look at it
17   this weekend and maybe do your work on Monday and start writing
18   it.  Get me something by Tuesday.  And if there are things I
19   need to rule on before we get started when we come back, I
20   will.  Otherwise, we're going to continue putting on
21   defendants' case.
22       But I think your point, Mr. Talley, is that there are
23   certain things I need to rule on and let you know what
24   direction you can go in.  And then at least I need to rule on
25   some things before we have -- before we have determined what

1    the jury instructions are going to be because you're saying

2    there are certain --

3            MR. TALLEY:  Yeah.

4            THE COURT:  -- issues that I need to take and deal

5    with myself and not leave to the jury.  And I just need to -- I

6    need to read the briefs and know where I go.

7            MR. TALLEY:  Your Honor, when I argued that piece,

8    the big issue we've been debating here is whether NovaSys

9    breached the 2011 NovaSys contract, and that's one issue.

10        But there is also these ancillary issues.  Is there a

11   breach of contract claim against Centene?  Is there a breach of

12   contract claim against Arkansas Health & Wellness?  We briefed

13   that.  These veil piercing theories that they've pursued.

14        We think this week-long break and written submissions by

15   the parties might be of assistance to help clean the case up as

16   we go into the second part of this.

17        Even if the Court is inclined to take the primary issue in

18   the case, whether NovaSys breaches this contract and whether

19   the NovaSys contract applies to Ambetter claims -- if the Court

20   wants to submit that to the jury, while the motion is under

21   advisement, I understand that.

22        But I think some of these ancillary pieces could be

23   cleaned up as we have a, you know, nine-day break.  In the

24   interim, of course, I think Mr. Thompson is entitled to respond

25   to these arguments.  I think the plaintiff, with their many

1   lawyers, it will do a very nice job defending themselves or

2   countering these arguments.  But I think this provides a decent

3   opportunity to look at some of those issues.  And I also think,

4   if the veil piercing theory were to continue in the case, that

5   we probably need to make a decision on whether that is a claim

6   that can go to the jury.

7           THE COURT:  Okay.

8           MR. THOMPSON:  Your Honor, since I'm filing a written

9   response, I am going to keep my pattern on that, if that's all

10  right.

11          THE COURT:  Okay.  Let's do that.

12          MR. TALLEY:  Thank you, Your Honor.

13          THE COURT:  Y'all ready to bring the jury back in?

14  Do you have your witness ready?

15          MR. CADY:  I'll go get her.  She's right down the

16  hall.

17          THE COURT:  Bring them in.

18          MR. THOMPSON:  Your Honor, if you'll give me just a

19  second, I've got to go back to the kiddie table.

20          MR. CADY:  Your Honor, you want Ms. Suggs back in the

21  witness box?

22          THE COURT:  I think, Ms. Suggs, here's what we'll do,

23  so we can have the effect of calling her as a witness.

24          MR. CADY:  Sounds great.

25          THE COURT:  We'll seat you in the front row.  I'll

1    say, "Call your first witness," and you call her back up.

2              MR. CADY:  Perfect.

3              THE COURT:  And, Ms. Suggs, what I'll do is, instead

4    of you swearing in, you just come and sit down, and I'll ask

5    you, "Do you understand you're still under oath?"

6              THE WITNESS:  Okay.

7              THE COURT:  Are we still waiting on them?

8              THE DEPUTY:  They're in line.

9              THE COURT:  All right.  Bring them on in.

10        (whereupon the jury entered the courtroom.)

11             THE COURT:  All right.  You can be seated.

12        Mr. Cady, call your first witness.

13             MR. CADY:  Your Honor, the defense calls Ms. Kim

14   Suggs.

15             THE COURT:  Ms. Suggs, come on down.  Have a seat on

16   the witness stand.

17        Ms. Suggs, you understand you're still under oath?

18             THE WITNESS:  Yes.

19             MR. CADY:  Your Honor, may I begin?

20             THE COURT:  Yes, sir.

21                         DIRECT EXAMINATION

22   BY MR. CADY:

23   Q.   All right.  Ms. Suggs, will you remind us -- we met you

24   yesterday, but remind us who you are and where you work.

25   A.   Sure.  I'm Kim Suggs, and I work for Centene Corporation.

1   Q.   What's your title at Centene Corporation?

2   A.   I am the senior VP of operations.

3   Q.   All right.  Where did you grow up?

4   A.   I grew up here in Arkansas.  I was pretty much born and

5   raised in Saline County, Bryant area, went to school at Bryant

6   High -- all of my years, Bryant Elementary, all the way through

7   high school.  And I attended college here in Little Rock at the

8   University of Arkansas, Little Rock.

9   Q.   You have a family here?

10  A.   I do.  I have a husband, that's also born and raised from

11  the same area, and then I have two daughters that are 24 and

12  17.

13  Q.   After school, Ms. Suggs, walk us through your job history.

14  We know you end up at NovaSys, but tell us how you get there.

15  A.   Sure.  Again, I went to school at University of Arkansas,

16  Little Rock.  And I received an accounting degree.  So out

17  of -- out of college, I went to work in public accounting here

18  in downtown Little Rock at firm called Baird, Kurtz & Dobson.

19  And I was a staff accountant for BKD, as they were called at

20  the time, for a couple of years.

21       From there, I went to another smaller local public

22  accounting firm, also downtown Little Rock, and I did staff

23  accounting for them.

24       And from there, I had made some -- had a relationship --

25  friends with someone I had gone to work for at Blue Cross in

1    their accounting department, and so they had a job opening.

2    And so he asked if I would be interested.  And at that time I

3    decided to go to Blue Cross and was a staff accountant at Blue

4    Cross for a few years.

5         And then I had the opportunity to go to NovaSys.  So I

6    moved to NovaSys, again, in that same role.  I started as a

7    staff accountant for NovaSys back 1997, I believe.

8    Q.   In 1997, how many employees did NovaSys have?

9    A.   About eight, I think.  So it was a very small company, a

10   start-up company, very different, obviously, from Blue Cross.

11   It is a large, established insurance company in Little Rock.

12   And so I saw a nice opportunity to get kind of in on the ground

13   level of a small company.  I was pretty new -- pretty new in my

14   career as an accountant and felt that if the opportunity for me

15   didn't work out, I had a lot of other opportunities in my

16   field.

17   Q.   All right.  Let's jump right into what I think matters in

18   this case, which is that NovaSys contract, that we've all been

19   talking about, we've held from 2011.

20        Graham, if you'll just put up defense Exhibit No. 1.

21        Ms. Suggs, in connection with preparing for your testimony

22   today, did you have a chance to look at defense Exhibit No. 1,

23   which is a NovaSys contract from 2011?

24   A.   I did.

25   Q.   In the first line -- or first section of this NovaSys

1    contract --

2         Graham, if you'll just call out the first paragraph in

3    Number 1, below there.

4         Ms. Suggs, the first section of this NovaSys contract

5    reads, "NovaSys will agree to reimburse provider at 75 percent

6    of billed charges for services provided to NovaSys Health

7    members."

8         Do you see that, ma'am?

9    A.   I do.

10   Q.   Do you know what a NovaSys Health member is?

11   A.   Yes.

12   Q.   How do you know what a NovaSys Health member is?

13   A.   So in 2011, NovaSys Health was a third party

14   administrator, so they processed claims for various NovaSys

15   Health members.  And so anyone that we would have been

16   processing claims for at the time, back in 2011, we would have

17   considered a NovaSys Health member.

18   Q.   Ms. Suggs, I'm wondering --

19        Your Honor, can I ask Ms. Suggs to come and write on the

20   board here a list who the NovaSys Health members are?  I tried

21   it yesterday, but my handwriting is not that good.

22             THE COURT:  I don't mind.  You can stand down,

23   Ms. Suggs.

24   BY MR. CADY:

25        Ms. Suggs, let me -- all right.  Ms. Suggs, will you write

1   "NovaSys Health members" and then list and explain for us who

2   NovaSys Health members are.

3   A.   So NovaSys Health members in 2011 would have been members

4   of ARHealthNetwork.  And ARHealthNetwork was an actual State of

5   Arkansas 1115 waiver project that NovaSys Health did the

6   administration for.  So we would have paid the claims.  We

7   would have answered the calls.  We would have provided the

8   network for all -- any member that was underneath Arkansas

9   HealthNetwork.

10  Q.   Ms. Suggs, would those people have had a NovaSys Health ID

11  card?

12  A.   They would have, yes.  They would have an ID card -- I

13  believe it had the ARHealthNetwork work logo and also the

14  NovaSys Heath logo on the card.

15  Q.   And where was the NovaSys Health logo on the card?  On the

16  front?  On the back?

17  A.   On the front.  On the front.  And then there were also

18  what we would call a TPA client, so a third party

19  administration client.  Again, those would be maybe employer

20  groups that wanted to be, what we call, self-funded, meaning

21  they were at risk for the health insurance risk for the members

22  within their group, but they needed someone to process the

23  claims or provide it in the network.  So an example of that

24  would be Hendrix College was a TPA client as well.

25       So all the members that would have -- you know, employees

1  of Hendrix College would have received an ID card as well from

2  NovaSys that said, "NovaSys" on it.  And they would have gotten

3  a letter, "Here's your ID card."  It would have said,

4  "NovaSys," and they would then go to their doctor, submit that

5  card, and then those claims would be filed to NovaSys, for

6  NovaSys's members to process and pay.

7  Q.    All right.

8  A.    Another example would be what we referred to as ASE/PSE,

9  which were the Arkansas school employees and the public school

10  employees, very similar to the other clients here -- is that

11  individuals that worked for the Arkansas state or public school

12  employees that had chosen NovaSys as its administrator, there

13  were -- it could be multiple providers of services for ASE/PSE.

14  Blue Cross was also a provider.  So if they chose NovaSys, we

15  would issue a card again that had our NovaSys logo on it.

16  Claims would be mailed to us, and we would process those

17  claims, and then we would also service those members through

18  customer service and things such as that.  So these would all

19  be considered NovaSys members.

20  Q.    Okay.  And what year are we talking, just so we can orient

21  ourselves?

22  A.    This is 2011 time frame.  That's what we were talking

23  about.  I mean, there are others, too.  I mean, I can continue

24  to list some more.  Monroe Shoe was another NovaSys client.

25  And then the list goes on.  There were -- there were several,

1    ARHealthNetwork work was, by far, our largest client, had the

2    most members participating with that particular client.

3    Q.   Okay.  Did there come a time when the NovaSys Health

4    members got phased out, and there became no more; there were no

5    more NovaSys Health members?

6    A.   Yes.  So over time, all of these clients and others

7    eventually terminated and were no longer, you know, NovaSys

8    members.

9         So ARHealthNetwork work was probably one first -- well,

10   ASE/PSE was probably the first one to terminate.  And then

11   ARHealthNetwork, they actually terminated all of their members

12   effective 12/31 of '13.

13        And then I believe Hendrix College was sometime after

14   12/31 of '13.  Maybe 20 -- sometime maybe in 2015 or so, they

15   terminated.

16        But by around 2016, I believe every NovaSys Health member

17   had truly terminated their services with NovaSys Health.  So

18   NovaSys Health would no longer be processing and paying their

19   claims.

20   Q.   Okay.  Jumping forward a little bit.  NovaSys Health

21   members, is it true -- well, Ms. Suggs, can you tell the jury

22   whether all of the claims for the NovaSys Health members, when

23   they saw an SEP doctor, would have been -- those claims would

24   have been paid pursuant to this NovaSys Health member contract?

25   A.   Yes, that would be my expectation -- is they would have

1   been paid pursuant to this contract, because this contract

2   indicated that NovaSys Health members would be subject to the

3   75 percent of billed charge.  And in 2011, that's who the

4   NovaSys Health members were at the time.

5   Q.   Okay.  Thank you, Ms. Suggs.  Thank you.  I'll take the

6   marker.

7            MR. DRENNON:  Are you done with that?

8            MR. CADY:  I'm done with the board right now.

9   Q.   Ms. Suggs, take us -- so we're in 2011.  We're signing

10  this agreement.  Tell us what NovaSys Health looked like in

11  2011.  We know it had about eight employees when you started in

12  1997.  In 2011, tell us about NovaSys Health.

13  A.   So at that time, if -- we probably had around 85 employees

14  for NovaSys Health that was doing all the work for just

15  NovaSys.  There wasn't -- there wasn't any of the other

16  companies at that time.  Because in 2011, Centene had just

17  purchased NovaSys Health in 2010.  So in 2011, it was still

18  continuing as a third party administration company doing the

19  administrative services we talked about.

20       But there wasn't any of the additional things that are

21  there today.  So Ambetter or Allwell or Arkansas Health &

22  Wellness -- those entities weren't in existence in 2011.  They

23  didn't even come along or until a couple years later in 2013.

24       So in 2011, NovaSys Health and its members, that I've

25  represented there, that's all there in was, in 2011.

1  Q.   Okay.  So in 2011, I think -- I want to make sure I heard
2  you right.  Arkansas Health didn't even exist; is that right?
3  A.   That's correct.  Arkansas Health & Wellness evolved as a
4  result of the exchange, commercial exchange, and the Affordable
5  Care Act and wanting to offer an insured product through
6  another entity on that commercial exchange in 2013.
7       So it wasn't until late 2012 that Centene had even made a
8  decision that they were going to enter the commercial exchange
9  product or the market in -- with effective date of January
10 2014.  So then in the beginning of 2013, a lot of activity
11 started to get ready to be able to process claims and offer
12 those exchange products in several dates that Centene was going
13 to offer those in.
14 Q.   Ma'am, in 2011, when this NovaSys contract was entered
15 into, did Ambetter exist?
16 A.   No.  The Ambetter did not exist at all, because Ambetter
17 is actually a commercial exchange product.  So in 2011, we
18 really weren't even thinking about commercial exchange at that
19 point.  It was not effective until January of 2014.  Really, we
20 weren't solid that the Affordable Care Act was even going to be
21 in existence until after the Supreme Court ruled, and then
22 there was a presidential election.
23       And after that was all settled, then it became apparent
24 that, yes, the Affordable Care Act and the exchange products
25 were going to happen.

1        And so in 2013, we really started, as an organization, to

2   prepare.  And it wasn't until probably after mid-2013 that the

3   Ambetter product name even evolved.  So it was definitely not

4   around or even thought about in 2011.

5   Q.   You mentioned products, Ms. Suggs, and I know you haven't

6   been here, but we've actually talked about a lot of products in

7   this case.  Tell me what products existed in 2011.

8   A.   So there really wasn't a product, per se, in 2011.

9   NovaSys offered TPA services.  So that's what NovaSys sold --

10  was its service, which wasn't a product like Ambetter or a

11  product like Allwell, where we're marketing a product.  We

12  would have gone to an employer or to the state and offered our

13  services, and that's what we were selling, was our services at

14  that point, not necessarily an insurance product at all.

15  Q.   Do I understand correctly that in 2011, when this contract

16  was entered into, there were -- there were no other products.

17  So you wouldn't define a contract limited to certain products;

18  is that right?

19  A.   That's correct.  There were no other products.

20  Q.   Ms. Suggs, tell us about the networks that existed in

21  2011.  We've heard a lot about networks in this case.  What

22  existed back when this contract was entered into?

23  A.   There were two networks, a Choice Network and then a

24  select -- or I sometimes refer to it as "Preferred."  But it's

25  the same thing, Select Preferred.  It was two networks.  Choice

1   had more providers than the Select or Preferred network.  It

2   was a smaller set of providers in that network.  A lot of them

3   overlapped, but there was definitely a distinction between

4   these two networks.  And so those were the only two networks in

5   existence in 2011.

6   Q.    And the people that you spoke of those networks, they were

7   all called "NovaSys Health members"; is that right?

8   A.    Yes.  We would have referred to them as "NovaSys Health

9   members," because that's -- that's what they were to us.  They

10  were the members that we were processing claims for.

11  Q.    Did those NovaSys Health members, you told us they have a

12  NovaSys Health ID card, but did they know they were NovaSys

13  Health members?  Well, let me ask a better question.

14       How would they have known that they were NovaSys Health

15  members?

16  A.    All right.  So there's several ways they would have known

17  that they were NovaSys Health members.  Their ID card certainly

18  had a NovaSys logo on.  And when we process a claim, we're

19  going to send a remittance of things to the member.  We call it

20  an "EOB."  I don't know if you heard that terminology, but it

21  stands for explanation of benefits.

22       So a member is going to get that in the mail.  I get that

23  in the mail today from my insurance carrier that pays my

24  claims.  And it's going to say "NovaSys" on the top of it.  So

25  it's very clear that it says "NovaSys."  And there is also

1    going to be customer service phone number listed on it so that,

2    if they need to call and ask questions, they know that they

3    will call that number for NovaSys.  And that is where they'll

4    be able to get their questions answered.

5    Q.   Ms. Suggs, I think we've got the document -- or the

6    document you're referring to in, that's plaintiff's exhibit.

7         Graham, if we can pull it up and see if we can see an

8    example, plaintiff's Exhibit 148 at Page 4?

9         And, Ms. Suggs --

10        Graham, if you can just pull up -- call out maybe the

11   first paragraph of this document.

12        And, Ms. Suggs, is this what you're talking about, the

13   type of explanation of payment?

14   A.   Sort of.  So this is the explanation of payment that the

15   provider receives.  So there's two pieces.  So there's -- when

16   we pay a claim, a piece goes to the provider with their

17   payment, and that is what this is.  And see, it says "NovaSys"

18   at the top, TPA account.

19        And then the member also receives a very similar document

20   that also lets them know exactly what we would have processed

21   and paid for their claim as well, so that they are also

22   informed of that payment.

23   Q.   Got it.  So do I understand correctly that the providers,

24   the doctors' groups, when they saw, "NovaSys Health member,"

25   they would submit that claim to NovaSys, and they would receive

1  something like this in the mail; is that right?

2  A.   Yes.  This is an example of a remittance that would have

3  come along with their payment.  So what this does is it tells

4  the provider who we're paying them for.  So it would list all

5  the claims that were paid on this particular check that they

6  received.  And it would give the details about who the member

7  is and the date of service, so they can post their account for

8  their payment.

9      So when the provider bills us, obviously, they create,

10  like, an accounts receivable.  So when they are paid, they

11  would post their payment from this remittance advice against

12  that accounts receivable.

13  Q.   So an Ambetter member, when Ambetter member goes to a

14  doctor and the doctor sends a health insurance claim to

15  Arkansas Health & Wellness and that gets paid, does the doctor

16  receive something that looks like this or something that looks

17  different?

18  A.   Well, they receive an explanation of payment, but it does

19  not look like this because it would not have the NovaSys Health

20  logo on it.  You will actually have the Ambetter logo and the

21  Arkansas Health & Wellness indication on that EOP, because it's

22  totally separate.  So this came from NovaSys Health.  And

23  Ambetter would have came out of a different environment, a

24  different claims system.  And it would have been an Ambetter

25  explanation of payment.

1    Q.    Ms. Suggs, are Ambetter members NovaSys Health members?

2    A.    No.

3    Q.    Is that why you didn't write "Ambetter members" on the

4    list when you were creating the list of NovaSys Health members?

5    A.    Yes.  Ambetter -- Ambetter members would be totally

6    separate, because NovaSys Health members would be members that

7    we were processing claims for, paying claims out of the NovaSys

8    accounts, the NovaSys's systems.  Those members would actually

9    be loaded in NovaSys's systems.  So when a claim came in, we

10   know who that member is.  We know when they were eligible.  And

11   so when the claim processes in the NovaSys's system, it's going

12   to know all of that kind of thing.  It's already preloaded in

13   the system.

14         Ambetter has a similar system, where its information is

15   all loaded, and so Ambetter members have their own system.

16   They're set up in a completely different system with their

17   benefits and plan designs and reimbursement schedules, et

18   cetera, in their system.  So two totally different systems.

19   Q.    Are the rates schedules that -- let's take NovaSys in the

20   NovaSys system.  Are rates that NovaSys's reimburses doctors at

21   programmed into the NovaSys system?

22   A.    Yes.

23   Q.    So when a NovaSys Health member went to see an SEP

24   contracted doctor, how would the NovaSys system know to pay --

25   well, first, what rate would the NovaSys system pay to the SEP

1   doctor?

2   A.    So the NovaSys system would be set up to pay whatever that

3   agreement for the NovaSys members indicated.  So in the case of

4   SEP, it should have been set up to process the 75 percent of

5   billed charges per the agreement on how NovaSys members were to

6   be paid.

7        So that would have -- when we have a contract or a Letter

8   of Agreement signed, then our configuration came payment -- we

9   have individuals, that's what they do.  That's their job is to

10  go into that system, and they set up what we call a "payment

11  arrangement."  And they process -- they key all of that in.

12  And so when a claim comes in and we attach it to a provider

13  that's attached to that payment arrangement, it pays

14  accordingly.  So that would have been set up in NovaSys.

15  Q.    Ms. Suggs, you say, "We," can you tell me:  Have you

16  actually done this work yourself?

17  A.    Over the years, I've done a little of everything.  So

18  today, I am the VP of operations.  But over the years, from '97

19  forward, I've held different roles where I've actually

20  configured the system to pay, contract.  I've configured

21  benefits.  I've loaded eligibility.  I've even processed claims

22  at one point in my career.  So I've done a little of all of it

23  along the way.

24       I don't do that today.  I oversee a lot of those

25  functions, but I don't actually perform the detailed functions,

1   but I have over the years, yes.

2   Q.   Let's fast-forward to Ambetter because I know Ambetter

3   didn't exist at the time.  But once Ambetter came online, you

4   said there is a separate system for Ambetter; is that right?

5   A.   Correct.

6   Q.   And would you tell us how the Ambetter system is

7   configured to know what rates to pay doctors?

8   A.   Sure.  In a similar way, there are Ambetter or commercial

9   exchange agreements.  And so as those are signed, those rates

10  are built into the system, configured.  A whole separate team

11  of individuals, not the same people that configured NovaSys, a

12  different configuration team, configures Ambetter.

13       And so they, again, would go in and set up those payment

14  arrangements that then get tied to the providers.  And so when

15  the claim comes in and it attaches to a provider, it knows what

16  payment to reimburse.

17  Q.   Ms. Suggs, we had talked about -- when we were listing

18  NovaSys members, you didn't list the Ambetter members.  But

19  there were some other members we talked about in this case,

20  like Allwell members.

21       Will you tell us what an Allwell member is?

22  A.   Sure.  So Allwell came about after Ambetter.  So Ambetter

23  started in 2014.  And then around 2017, we decided -- we, as in

24  Arkansas Health & Wellness -- that they wanted to create a

25  product to offer what we called Medicare Advantage product, so

1   to seniors, as an alternative to traditional Medicare.  And so

2   that product name is Allwell, and we began, I believe, in

3   January 2018 with our Allwell product in Arkansas.

4   Q.   What about the -- we've heard about TotalCare members --

5   well, let's stick with Allwell for a second.

6        Are Allwell members NovaSys Health members?

7   A.   No.  They're not Ambetter members.  They're Allwell

8   members.  And they have their own system as well.  So Allwell

9   members' claims all processed in Allwell environment or system

10  for -- it's same thing.  Benefits and pricing arrangements are

11  all separate as well.

12  Q.   Did NovaSys build a network for Allwell?

13  A.   Yes.

14  Q.   And is that a similar network to the network that NovaSys

15  built for Ambetter?

16  A.   It could have the -- some of the same providers, yes, but

17  it was different.  It would have a different rate, and there

18  would also be a completely separate rate agreement for

19  participation in that product.

20  Q.   What about TotalCare?  Are TotalCare members NovaSys

21  Health members?

22  A.   No.

23  Q.   What are TotalCare members?

24  A.   So TotalCare members are -- we -- Arkansas TotalCare is

25  one of what we call "the past."  So provider-led shared savings

1   entity that has Medicaid members associated with it.  So we

2   have those members for Arkansas TotalCare, again, kind of

3   separate from everyone else, in their own side letter, very

4   similar, in that they have their own benefits, they have their

5   own rates, they have their own agreement to provide those

6   reimbursement arrangements for Arkansas TotalCare members.  So,

7   again, a different type of member.

8       So we have a commercial exchange in Ambetter, a Medicare

9   in Allwell, and a Medicaid member in TotalCare.

10  Q.   Did NovaSys help build the TotalCare network?

11  A.   Yes.

12  Q.   But that doesn't make the TotalCare members NovaSys Health

13  members?

14  A.   No, because none of those -- none of the TotalCare members

15  would be paid out of NovaSys Health and claims environment.

16  NovaSys Health didn't have an agreement or an administrative

17  service agreement at all to pay claims for a TotalCare member.

18  That is completely separate and paid out of a different account

19  or a different environment.

20  Q.   How about Ambetter?  Because NovaSys helps build a network

21  for Ambetter, does that make Ambetter members NovaSys Health

22  members?

23  A.   No.  Again, because we're -- NovaSys did not have an

24  agreement to provide claims administration services at all to

25  an Ambetter member.  It would have only paid claims -- NovaSys

1    members would be paid out of NovaSys's account; Ambetter's pay

2    out of Ambetter's account.

3    Q.    Let's look at an Ambetter ID card and talk through why the

4    ID card is important and how it helps doctors know what to do

5    and how it helps the insured, the person that has got the

6    health insurance, know what it --

7          Graham, can we pull up plaintiff's Exhibit 108, which is a

8    color copy of the Ambetter ID card.  And, Graham, would you

9    call that out?  The whole thing would be great.

10         All right.  Ms. Suggs, would you walk us through this?  We

11   see -- at the -- on the bottom of the card.  It, like the top

12   card, has information about of who the -- who the member is.

13   It says, "Ambetter for Arkansas Health & Wellness" up on the

14   top.

15         And what is that information on the top which, I guess, is

16   the front of the ID card; is that right?

17   A.    That's right.  So what you would see at the top would be

18   the front of the ID card.  And then when you flipped it over,

19   what you see on the bottom would be the back of the ID card.

20   Q.    Okay.  So would you explain this to us.  Health insurance

21   is something we always use --

22   A.    Sure.

23   Q.    -- and don't really always understand.  Explain that for

24   us.  What is on the ID card, and why does it matter?

25   A.    Sure.  When a member goes and sees their provider or their

1  doctor, they will most always ask to see a copy of your

2  insurance card, and that's what this would be.  And so when a

3  member presents this to a provider, that would have been

4  recognized, that this Ambetter logo, as a product that they're

5  participating in or not, and then they would get the

6  information off the top of the card about who the member is,

7  what's their policy number, their ID number, and a little bit

8  of information about co-pays, so that they know what maybe to

9  collect at the time of the service or with members in the

10  office.  And so that is what would be on the front of the card.

11      And then, typically, on the back of the card, is going to

12  give information about further so the provider to knows how to

13  get paid.  Where do I submit my claim?  If you went to submit

14  your claim electronically, you can see kind of the -- on the

15  bottom of the card, there is the thing that says, "EDI payor

16  ID."  That is so that providers can submit claims to us

17  electronically, and they use that ID number to know where those

18  claims come -- kind of like an e-mail address.  If you want to

19  send claims, that's how claims transport electronically, from

20  the provider to the insurance company -- is that that payor ID

21  is kind of like the way to get it there, to the right place for

22  payment.

23      And then if you want to mail a claim, you can do that.

24  You can mail a paper claim to us, and you can see the address

25  there on the card where the paper claim can be mailed to there

1   in Farmington, Missouri.

2        And then, lastly, what you see at the very bottom down

3   there is a little NovaSys logo that says, "Marketplace

4   Network."  To indicate to the provider that this particular

5   member -- and they can expect to get paid from their

6   reimbursement agreement for the Marketplace Network or the

7   commercial exchange product under that NovaSys agreement.

8   Q.   Now, explain that to us a little bit, Ms. Suggs.  When you

9   say the provider can expect to get paid pursuant to their

10  contract with the NovaSys Health Marketplace Network, what do

11  you mean?

12  A.   So it's -- we talked about NovaSys built the network for

13  the commercial exchange marketplace.  They built the network

14  for Allwell.  They built the network for Arkansas TotalCare.

15       So when a member presents their ID card, we want to be

16  sure it's clear that the provider knows which one of those

17  contract amendments that they would be reimbursed under, and

18  that's why the logo is placed on the back of the card, so it's

19  clear.

20  Q.   Does that logo on the back of the card mean that Ambetter

21  members are NovaSys Health members?

22  A.   No.  It really is an indication of the actual network

23  piece that providers can be -- expect that reimbursement under

24  their contract.

25  Q.   Graham, can we blow that up a little bit and see -- I had

1    trouble reading it, but I want to make sure that we can see

2    what that says.

3         All right.  Well it's a little -- it's a little fuzzy,

4    Ms. Suggs.  But is this what you're referring to?  It says,

5    "NovaSys Health Marketplace Network."

6    A.   Yes.

7    Q.   That is -- that would be an indication that this is a

8    network and not -- this isn't suggesting they were a NovaSys

9    Health member; is that right?

10   A.   Correct.

11   Q.   This ID card -- and we've got it blown up just

12   perfectly -- for Ambetter members says, "Medical claims:"  And

13   I guess this is where -- tell us what is this.  This is where

14   the provider should send the medical claims; is that right?

15   A.   That's correct.  That's the address to the Centene mail

16   center in Farmington, Missouri where they accept all paper

17   claims mailed.  And they open the claims there and scan them in

18   and turn them into data so that they can then flow into the

19   claims systems for processing.

20   Q.   Okay.  Now, is this address specific to a certain product?

21   A.   Yes, it's specific to Ambetter.

22   Q.   Okay.  What happens -- well, does there -- let's walk

23   through the flow here.  So when you go to see a doctor, the

24   doctor asks for your ID card.  I think you told us that.

25   A.   Yes.

1   Q.   And the doctor sees you and submits a bill, basically, to

2   the health insurance company; is that right.

3   A.   Yeah, they submit what we call a "claim."  So they would

4   submit -- if it's a medical provider, doctor, they're going to

5   submit what we call a 1500 form.  So it's a standard form that

6   has the information that we need to be able to pay that claim

7   that is submitted to us.

8        And there is -- there is also a standard form for

9   facilities that we call a "UB" or sometimes a CMS -- a member

10  CMS form, but it's a little different.  So facilities bill on

11  one type of form, and then practitioners or medical doctors

12  bill on a different -- for their medical services on a

13  different form.

14  Q.   What information is submitted on that form that gets sent

15  to the insurance company either sent -- in this case, if it's

16  Ambetter, it would get sent to this Ambetter P.O. Box.

17       What information is on that form?

18  A.   So the form contains -- in both forms would contain

19  similar type of information.

20  Q.   What do you mean by "both forms?"  I am just making sure I

21  am following.

22  A.   So the form that the practitioner services are billed on

23  versus the facility services.  So in the health care world, you

24  heard us talk about a CMS 1500 form or the old term is HCFA.

25  So that goes around -- even though they kind of changed the

1    name through the years -- or a UB form, which is sometimes also

2    a CMS 1450, I believe.  But -- a technical term.

3         So the forms look a little bit different, but they

4    contain, basically, the same types of information.  So they're

5    going to contain information about the member, so -- very

6    important, but the information from the ID card, so the

7    member's ID number is presented to us on the claim.  So we know

8    exactly who they're billing us for.  There will be demographic

9    information about the member, their name, their address,

10   information.

11        And then you'll also have that information about the

12   provider.  So the provider information will be there.  It will

13   include, like, their tax ID.  It will also include some other

14   information about the provider, what we call "NPI number."

15   National practitioner identifier number will be on there.

16        So we know very clearly who the member is you're billing

17   us for -- am I going too far?

18   Q.   No.  Slow down, a little bit so Suzanne can type.

19        Judge, I thought you were talking to me, but I realized

20   you were probably --

21             THE COURT:  Her fingers over here are smoking.

22             THE WITNESS:  I'll slow down.

23             THE REPORTER:  Thank you, Judge.

24             MR. CADY:  Thank you, Your Honor.

25             Sorry, Suzanne.

Q.   So anyway -- so the provider data is on there.  So when
the claim comes in, we know exactly the member and exactly the
provider billing us, that information.

     And then also on that claim is going to be information
about the service that the member received.  So it's going to
indicate a code, a billing code, so it will tell us exactly so
we know, oh, the member had an office visit, and it's specific
codes that are used to tell us about the service.  So when
someone goes to their doctor, they typically have what we call
a visit with the doctor.  But the doctor may also perform some
other services, maybe a lab, an X-ray.  And all of those codes
will be listed on that claim with a bill charge that the
provider is submitting.

     In addition, we will also have diagnosis codes listed on
the claim, so it's going to tell us a lot of information about
that service.  It's going to say, you know, the member went to
this provider, this is the member's information, this is what
their diagnosis was, in a fee multiple up to 12, and then these
are the services that were performed on that day.

Q.   Ms. Suggs, does it ever happen that a provider sees
what -- we've got this up here, sees an Ambetter member but
sends the claim to NovaSys?  Does that happen?

A.   Yes, it could happen.  If the provider potentially had the
wrong address or the wrong EDI number in place, they could
potentially send the claim to the -- to the wrong place.  And

1    we get claims even for Ambetter from other providers that not

2    Ambetter members, too.  So we could get claims submitted to us

3    that really weren't meant to be for that particular product.

4    Q.   Okay.  What happens -- let's focus on the Ambetter NovaSys

5    example.  What happens if an Ambetter claim is submitted to

6    NovaSys?

7    A.   Okay.  If an Ambetter claim is submitted to NovaSys,

8    NovaSys can't process that claim, or even associate the member

9    information, because those Ambetter members aren't in the

10   NovaSys system.

11        So when the claim presents, any claim, to whichever

12   system, the first thing it's going to do is try to associate

13   that claim to that system.  And when it can't, it's going to

14   reject it back to the provider, either electronically or in a

15   letter that says not -- basically, nonmember for this -- for

16   this product -- for this system that it was submitted to them.

17   Q.   How does it detect whether the person -- the claim is

18   being submitted on behalf of, like the person that goes into

19   doctor's office, how would the NovaSys system know that, no,

20   that is an Ambetter member not a NovaSys Health member?  How

21   would it know?

22   A.   Well, it really doesn't know it's an Ambetter member.  It

23   only knows it's a not NovaSys member, because it can't find the

24   match on the member that was billed on the claim.  It was

25   looking for it.  It was looking for to see "Do I see this ID

1   number?" with the one that matches with the date of birth and

2   the member information.  And when it can't find the match, it

3   says, "Okay, no match, we need to reject, because this is not

4   our member."  Or the information provided is not accurate to

5   allow us to say it is our member.

6        So in the event that it's an Ambetter claim or any other

7   claim, this system just really is going to say, "This is not an

8   NovaSys member," and reject it back to the provider.

9   Q.   Is this true for -- well, do mistakes happen in this

10  industry?

11  A.   Sure.

12  Q.   And you get sometimes claims for -- well, let me ask you:

13  Do you ever get an Ambetter member claim submitted to Allwell?

14  A.   Sure.  We could potentially get Ambetter claims submitted

15  to Allwell.  And a very similar process would occur because, if

16  the claim was submitted and it was submitted under an Allwell

17  ID or address and it was attempting to process that claim under

18  Allwell, it couldn't find the member again.  Because the

19  Allwell members are in their own system.  And when it can't

20  find the member, it's, again, going to reject that as not an

21  Allwell member.

22  Q.   So you're able to keep separate what is an Ambetter member

23  and a NovaSys member and an Allwell member and a TotalCare

24  member because you've got lists in different systems; is that

25  right?

1    A.    That's correct.  Each system has a list of who those

2    members are.

3    Q.    And do each of those members have an ID number assigned to

4    them?

5    A.    Yes.  A unique ID number for that particular product.  So

6    Ambetter members all have an ID number.  And, for example, they

7    all start with, like, a "U9," I believe.  Where our Allwell

8    members, they have their own IDs, and I think most of those

9    start with a "C" and then a Number 4 or 2 or something like

10   that.  So very distinctly different IDs associated with the

11   member for that particular product they're under.

12   Q.    What about NovaSys Health members?  Do you remember what

13   their IDs started with?

14   A.    I believe -- it's been a while.  But I believe -- I do not

15   believe they started with, like, a "U" or a "C," like Allwell

16   or Ambetter.  I believe maybe our ARHealthNetwork may have

17   started, like, AR, and I think our -- potentially, our TPA

18   might have started with, like, "TP."

19         We tried to create an ID that would let us know, when we

20   saw the ID number -- be able to quickly identify maybe what --

21   where -- you know, what client they were associated with or

22   something like that.  But they didn't -- certainly didn't start

23   with the "U" or the "C," like we have with our Ambetter,

24   Allwell members.

25   Q.    How many providers or, you know, doctors' groups and the

1  like were in the networks that supported the NovaSys Health

2  members?

3  A.    I can't give an exact number.  Obviously, it's -- I would

4  have to research that data, but thousands -- I believe

5  somewhere in the -- 12,000 providers and doctors distinctly

6  were in the network.

7  Q.    In the old NovaSys networks that were supporting NovaSys

8  Health members; is that right?

9  A.    Yes.

10  Q.    Do I understand you correctly that, today, there are no

11  more NovaSys Health members in Arkansas; is that right?

12  A.    That's right.  All of the NovaSys Health members that were

13  associated in NovaSys Health have all terminated.  So as they

14  would term from their service agreement with NovaSys, we would

15  then term the member in the system so they had a distinct end

16  date so that we didn't accidentally pay claims after that

17  member had termed.

18      So for ARHealthNetwork, as an example, when they termed

19  12/31 of '13, we would have termed all the members of 12/31 of

20  '13.  So then if a claim happened to come to us after 12/31 of

21  '13, for a date of service after that date, we would deny for

22  no coverage.

23      So we would always, as a group left and no longer, you

24  know, was seeking NovaSys to pay their claims, we would term

25  those members.

1    Q.   Once there were no more NovaSys Health members, did you go

2    back to those 12,000 or so providers that were in the NovaSys

3    Health networks that were supporting those members and

4    terminate the agreements with those providers?

5    A.   I don't believe so.  I don't think the agreements were

6    terminated with the providers.

7    Q.   Ms. Suggs, explain why not.  Explain how that process

8    works, why you wouldn't terminate agreements that NovaSys had

9    for the NovaSys networks that supported the NovaSys Health

10   members.  And maybe we should back up --

11       (Whereupon the court reporter interrupted the proceedings

12       and a short recess was taken.)

13           THE COURT:  You can be seated.  Mr. Cady, you may

14   continue.

15           MR. CADY:  Thank you, Your Honor.

16           THE COURT:  You may continue.

17   BY MR. CADY:

18   Q.   Ms. Suggs, when we left off, we were talking about those

19   old NovaSys Health networks that were supporting the NovaSys

20   Health members.

21       Will you remind us the name of those two networks?

22   A.   The Choice Network or the Select/Preferred Network.

23   Q.   Are there -- and you told us earlier today, there are no

24   NovaSys Health members left; is that right?

25   A.   That's correct.

1   Q.   So are there any claims being sent through the NovaSys
2   Select and the NovaSys Choice, Preferred Networks?
3   A.   No, not under those networks, no.  There are no claims
4   that come in, and all the members have been termed that would
5   have been using those networks in that system.
6   Q.   All the claims that would come on in on those networks
7   would get paid at the rates that are loaded into those
8   networks; is that right?
9   A.   Correct.
10  Q.   And for the NovaSys Health members, the contract at issue
11  in this case, is what would control the level of payment for
12  NovaSys Health members; is that right?
13  A.   That's right.
14  Q.   Because today there are no NovaSys Health members left and
15  no claims being submitted through those NovaSys networks that
16  supported the NovaSys Health members, have you reached out to
17  the 12,000 or so providers in those old networks to terminate
18  their agreements?
19  A.   I don't believe so, no.
20  Q.   Why haven't you done that?
21  A.   Well, because there are no members still accessing those
22  networks, it's kind of irrelevant to actually terminate those
23  provider agreements because, if there is no members accessing
24  those services under the old NovaSys system and the NovaSys
25  members, it -- kind of by default, no one is using the network,

1   so not necessarily a need to issue a termination on the

2   network, because no one is using them.

3   Q.   Ms. Suggs, one of the things I started with, since I tried

4   started understanding this, is the word "access," you're

5   accessing the network.

6        Will you just break that down for us?  What does that mean

7   in, like, very simple terms, the way you would explain it to

8   your daughter?

9   A.   Sure.  So using a doctor that is associated with that

10  network, so I would explain it to my daughter as you would look

11  to see who is listed to be in that network for NovaSys, either

12  the Choice or the Select.  And then when we say "accessing

13  services," you are going to see that doctor because they're in

14  that network.

15  Q.   We talked earlier about the payment of claims and how

16  claims payment works.  Do you know, ma'am, that at issue in

17  this case is 11- or 12,000 Ambetter member claims?  Do you know

18  that?

19  A.   The Ambetter claims, yes.

20  Q.   Can you tell us who has paid -- well, is there a single

21  entity that has paid all Ambetter claims since Ambetter member

22  started existing?

23  A.   Yes.  Centene Corporation has a shared services claim

24  shop, and they processed all of those Ambetter claims.  They

25  have multiple locations around the United States, but that

1  Ambetter claim shop has been responsible for those Ambetter
2  claims.
3  Q.   Is it fair to say that Ambetter pays Ambetter member
4  claims?
5  A.   Yes.
6  Q.   And NovaSys pays the NovaSys member claims; is that right?
7  A.   Correct.
8  Q.   What's the difference between NovaSys's role for the
9  NovaSys Health members and NovaSys's role for the Ambetter
10  members?  Does that question make sense to you?
11  A.   I think so.  So the NovaSys's role for the NovaSys's
12  members would have included processing the claims, answering
13  phone calls about those claims, providing the network, Choice
14  or Select, for those claims for the NovaSys members.
15       The NovaSys's role for the Ambetter members is really
16  limited to the commercial exchange network that NovaSys
17  contracted specifically for Ambetter.  That's their only role
18  in the Ambetter product.
19  Q.   Graham, would you put defense Exhibit No. 1 back up on the
20  board?
21       Ms. Suggs, we had looked just a short while ago at
22  Paragraph Number 1 here --
23       And, Graham, if you'll pull that out.
24       -- which says, "NovaSys will agree to reimburse provider
25  at 75 percent of billed charges for services provided to the

1   NovaSys Health members."  But I think our discussion has been

2   about "What is a NovaSys Health member?"; is that right, ma'am?

3   A.   Yes.

4   Q.   Is there anything else we should know about NovaSys Health

5   members that we haven't covered?

6   A.   I don't think so.

7   Q.   Let's look at Paragraph 4, because I think you were

8   explaining this, in part.  Paragraph 4 reads, "NovaSys agrees

9   to provide payment to provider for covered services provided to

10  member within 30 days of receipt of a complete claim."

11        Do you see that, ma'am?

12  A.   Yes.

13  Q.   What does it mean for NovaSys to provide the payment?

14  A.   So NovaSys would pay the claim in the NovaSys system, and

15  then generate that EOP, that we saw earlier, with a payment for

16  those member claims in the NovaSys system.

17  Q.   And that EOP, that's the evidence of payment.  That's that

18  letter with the NovaSys logo in the upper left-hand corner that

19  we looked at earlier?

20  A.   Correct.  That remittance advice that would go with the

21  payment to explain who we were paying the claims for on that

22  payment, on that check.

23  Q.   Now, does NovaSys provide payment to providers for

24  Ambetter members?

25  A.   No.

Q.   Who provides the payment to providers for Ambetter member claims?

MR. DRENNON:  Your Honor, this has been asked and answered.

THE COURT:  I'll overrule it.

You can go ahead.

THE WITNESS:  Centene provides payment to the Ambetter.  They process the claims, they provide payment, and then an Ambetter remittance advice goes out to the provider for the claims processed on the Ambetter explanation of payment, and it also would list all the individual members that we were paying the claim for on that payment run.

BY MR. CADY:

Q.   To your knowledge, has NovaSys ever provided payment to Ambetter members for an Ambetter member claim?

A.   NO.  NovaSys has never paid any of the Ambetter claims on the -- out of its NovaSys's system because the Ambetter members aren't loaded there.  The benefits aren't loaded there.  So there is no possibility that you could actually pay a claim out of the NovaSys system for an Ambetter member.

Q.   Does NovaSys have any responsibility for paying claims to Ambetter members?

A.   NO.

Q.   We talked about earlier having a different network for the different types of products, and I think you had explained

1    that, back in 2011 when this was signed, there were no

2    different types of products.  This is all new; is that right?

3    A.    Correct.

4    Q.    Will you list the different types of products we have

5    today and the dates that they came about?

6    A.    Yes.  So we have Ambetter.  That began in January of 2014.

7          We have Allwell.  That began in January of 2018.

8          And then we have Arkansas TotalCare, which began in March

9    of 2019.

10   Q.    Okay.  Does this Letter of Agreement apply to those

11   different products?

12   A.    No.

13   Q.    Do those -- each of those different products, are they

14   different -- they're different types of insurance; is that

15   right?

16   A.    Yes.

17   Q.    And tell me:  Are the doctors that are in-network, in

18   those different networks that support those different products,

19   are they in those networks at different rate -- at different

20   rates?

21   A.    Yes.  each of those -- Ambetter, Allwell, and Arkansas

22   TotalCare -- would have a different rate for the provider for

23   the same type of service.  So an office visit for Ambetter

24   would not pay the same amount that it would pay for an office

25   visit with the same code for an Allwell member, and then the

1    same for an Arkansas TotalCare member.  That amount that would

2    be paid for that same type of service, if it was a TotalCare

3    member, would be a different amount.

4    Q.   Will you explain to us why it is that you would have

5    different rate structures for different types of insurance

6    products?

7             MR. DRENNON:  Your Honor, relevance.

8             THE COURT:  I'll overrule it.

9        You can answer the question.

10            THE WITNESS:  So each product has its own rate

11   agreement with the provider as to what would be reimbursed.  So

12   they're very different types of products.  So Ambetter is a

13   commercial exchange insurance product, so we consider that our

14   commercial-type product.

15       And then Medicare is very similar to traditional Medicare,

16   except ours is what we call a Medicare Advantage Plan, which

17   basically means it's Medicare-like coverage, but it's offered

18   by an insurance and not the federal government under the

19   traditional Medicare.  And so it has a reimbursement structure

20   very close to traditional Medicare.

21       And then Medicaid also has its own reimbursement structure

22   that is very different, because of its government-sponsored

23   insurance.  And Medicaid reimburses a different level than

24   Medicare or commercial insurance would.

25   Q.   Why is it that different types of insurance pay different

1   rates to doctors?

2   A.   It's -- various -- so a commercial member is a very

3   different buyer.  They're out.  They're buying on the

4   commercial exchange individual products.  They're purchasing

5   it, and the rates are set more industry standard than what a

6   commercial reimbursement would be.

7        And then Medicare sets their own rate for what they're

8   willing to pay for that type of service for, typically, a

9   senior.  And then similar to Medicaid, Medicaid is --

10  obviously, it's being paid by the state government, for the

11  most part.  And so those reimbursements are set at a lower

12  level as well.

13  Q.   Do you know how SEP, the plaintiff in this case, has been

14  reimbursed or paid for all of the 11- or 12,000 Ambetter claims

15  at issue in this case?

16  A.   Yes.

17  Q.   And explain that to us.  How have been they paid for those

18  claims?

19  A.   I believe they've been paid for those claims at what we

20  would consider our payor -- what we call "payor fee schedule,"

21  which is what the majority of the providers that are

22  emergency -- provide emergency services are being paid at, and

23  that's primarily because a nonpar provider, the Affordable Care

24  Act established --

25            MR. DRENNON:  Your Honor --

```
1              THE WITNESS:  -- some of the rules.
2              MR. DRENNON:  Your Honor --
3              THE COURT:  I'll sustain the objection to the
4    discussion to the Affordable Care Act, but she can explain what
5    they have paid.
6    BY MR. CADY:
7    Q.   Does that make sense to you, Ms. Suggs?
8    A.   I think so.  So they were paid off of our payor fee
9    schedule, which is the same fee schedule that the majority of
10   the emergency services are reimbursed from.
11   Q.   Do I understand when you say, "They were paid," do you
12   mean these claims -- all the claims at issue have already been
13   paid at that rate?
14   A.   Yes.
15   Q.   In your regular course of business, do your teams monitor
16   claims that are coming in for integrity and medical necessity
17   and appropriateness?
18   A.   Yes.
19   Q.   Tell me how -- tell me how you do that.
20   A.   So there is multiple ways that claims are monitored for
21   appropriateness.  And so there's edits that are built into our
22   claims payment system, for one, that would look for certain
23   appropriateness on a claim.  It might be an age edit, because
24   certain codes have certain ages that they're appropriate to be
25   billed for.  So our claims system might apply an age edit.
```

1      Then we have what we would call "NCCI edits."  So these
2 are edits that are established by the federal government that
3 says certain things should be or shouldn't be billed together
4 or separately or what we would call "unbundled."  So that might
5 be one code means three things, or you can unbundle it and bill
6 those codes separately.
7      So then we also have post-payment type of reviews, and a
8 lot of those are really looking at trends in billing and
9 comparisons of one provider's billing habits to their peers to
10 look for outlier billing scenarios, et cetera.
11      So a variety of edits throughout multiple systems that are
12 applied against claims both before we pay and then even after
13 payment is made because a lot of times we -- you need to see
14 trends over a period of time.  So we look at it from beginning
15 until after.
16 Q.   In your ordinary work, do you sometimes get involved in
17 doing these types of reviews, yourself, with your team?
18 A.   Sure.  From time to time, I certainly would review myself,
19 you know, a pattern or a specific provider or something like
20 that, if there was a reason to question them.
21 Q.   In preparation for this case, did you have occasion to
22 review SEP claims data?
23           MR. DRENNON:  Your Honor, may we approach?
24           THE COURT:  You may.
25      (whereupon a bench conference commenced.)

1          MR. DRENNON:  Your Honor, I guess Mr. Cady is not
2     going to come.
3          THE COURT:  They're right there.  He's walking off.
4          MR. DRENNON:  I'm sorry I forgot my mask.
5          THE COURT:  No.  That's okay.  You can if you want
6     to.  I mean, just keep a little distance between --
7          MR. DRENNON:  Your Honor -- I think Mr. Cady -- I
8     tried to catch it before the question.  I think Mr. Cady is
9     going to ask her about any reviews she did.  In her deposition
10    testimony, she was not allowed to answer this question because
11    the information had been provided to her by an attorney -- an
12    attorney.  I cannot impeach her with her deposition testimony
13    because privilege was asserted over that.  No sort of review or
14    documents related to that have ever been provided.  So if she
15    now testifies that she did a review and found something
16    negative, I don't have the ability to impeach her because they
17    asserted privilege over that.
18          THE COURT:  What is your response?
19          MR. CADY:  Well, I think it's fair, factual testimony
20    about whether she did work to prepare to testify today on this
21    case.
22          MR. DRENNON:  You can't assert a privilege --
23          THE COURT:  When you say a "review," what do you
24    mean?  Is there some -- is that an industry term that means
25    something, or are they just preparing for the trial?

1    MR. DRENNON:  No.  He was -- he was clearly setting

2  up some sort of questions about the propriety of our claims.

3  And we asked her a similar question during her deposition.

4    Mr. Zeigler instructed her not to answer that question and

5  assert a privilege over it because she stated it was

6  information that she had obtained through him in the course of

7  this trial.

8    And so if she had answered "Yes, in the normal course of

9  business, I did an investigation, and I found these things,"

10 then I could impeach her or would have had notice of that

11 before today.  But when we asked the question, they asserted

12 the privilege.

13   THE COURT:  So the question was:  What did you look

14 at, or what did you review in preparation for your deposition,

15 or what did -- or for this litigation?  What is the

16 question-specific issue?

17   MR. DRENNON:  Well, the problem is --

18   THE COURT:  No.  I know what the problem is.

19 I'm just saying -- I'm trying to think of what was being

20 reviewed.  What did -- what was the question?  What did -- what

21 review was she asked about in the deposition?

22   MR. DRENNON:  About the -- I mean, she was asked

23 about any coding issues with our claims.  So I think it's a

24 little broader than that.  But if you ask about issues with our

25 claims, they may assert a privilege over the answer.

1          THE COURT:  Is that what you're going to ask about?

2          MR. CADY:  Yeah, I don't think that's right, Baxter.

3    Do you have the transcript to that?

4          MR. DRENNON:  I have to get it out.  But just give me

5    a second, Your Honor.

6          THE COURT:  Yeah, let's take a quick look at it.

7        (A discussion was held off the record.)

8          MR. DRENNON:  So, Your Honor, on Page 12 of the

9    deposition transcript, Ms. Suggs was asked:

10      "Are you aware of any claims issues with Southeast

11   Physicians?

12      "Only through conversations that I heard that there were

13   concerns.  I have personally not looked or seen any -- seen or

14   had any directed to me.

15      "Conversations with who?

16      "Conversations with Mr. Zeigler," who was the lawyer --

17   is, I guess -- frankly, is the lawyer.

18          THE COURT:  Let me see.  Okay.  And so she's asked

19   about claims issues --

20          MR. DRENNON:  Yes, Your Honor.

21          THE COURT:  -- at Southeast?

22          MR. DRENNON:  Yes, Your Honor.

23          THE COURT:  And Zeigler objects to the question.

24      And then she says, "I don't, except through conversations

25   with counsel."

```
1            MR. DRENNON:  That's right, Your Honor.
2            THE COURT:  Where are you going to go?
3            MR. CADY:  She spends time -- she spends time
4    firsthand looking into claims, like she does every day for her
5    regular job.  And it was a foundation.  This is not unusual for
6    her.  It's right over her own plate.  I mean, it's what she
7    does.  And she's done that.
8            THE COURT:  You know, this happens from time to time,
9    when somebody goes to a deposition and then they don't have the
10   information and then they go through the information, but the
11   problem is it blind sides the lawyer who cross-examined the
12   witness.  It doesn't mean -- and I don't see --
13           MR. DRENNON:  Your Honor, she also has not been
14   disclosed as an expert.
15           THE COURT:  Hold on just a second.  And it
16   doesn't -- his only objection here -- and the record doesn't
17   indicate it was an attorney-client type of objection, just
18   object to the form.
19        How far down this path are you trying to go?
20           MR. CADY:  I think not that far.  I wanted to explore
21   the work she's done and, you know --
22           THE COURT:  That she went out and looked into it
23   after?
24           MR. CADY:  What she did, what she saw.
25           THE COURT:  Well, do you have another witness who can
```

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter

1    testify that?

2             MR. DRENNON:  It is Mr. O'Brien.

3             MR. CADY:  She's the data person, basically.  She's

4    done this for --

5             MR. DRENNON:  If you want to say they pulled the

6    claims and gave them to the lady who did the work for

7    Mr. O'Brien, that's a different deal.  But she was not

8    disclosed as an expert in any capacity.

9             THE COURT:  I don't think she needs to be an expert

10   to have gone through the claims and say, "Here's what the

11   claims are."  The problem I have is one that you raised that

12   she says, "I don't know anything," in the deposition.  "The

13   only thing I have learned it from Counsel."

14        And then after, she goes out and looks through everything,

15   and she comes in and testifies all about it.  That is not --

16   but we get that from time to time, where somebody doesn't know

17   anything, and then they go and do the research and come back.

18   But she didn't supplement her answer so that Counsel could

19   prepare for it.

20            MR. LEYENDECKER:  Or seek a follow-up deposition on

21   what she did so we can ask her --

22            THE COURT:  Yeah, and I think that is what you would

23   have done.

24            MR. LEYENDECKER:  Absolutely.

25            THE COURT:  Here's the thing.  I want the defendant

1   to be able to put on the defense.  And I get it.  She's a

2   likeable witness.  And so you want her to tell the story --

3   right? -- more so than an expert.  But they have to have a way

4   to prepare for it.

5            MR. CADY:  They can redirect them.

6            MR. DRENNON:  I can't.

7            MR. CADY:  This is what she does for her job, you

8   know.

9            MR. LEYENDECKER:  It's why Your Honor allowed me to

10  take a last-minute deposition for the person they did designate

11  on the thirteenth hour.  They could have easily made the same

12  disclosure, and I would have asked for the same thing.

13           THE COURT:  I guess I am trying to figure out how

14  critical this little piece of testimony is.  I was saying I am

15  trying to figure out just how critical this piece of testimony

16  is.  Is she going to say anything other than what we're going

17  to hear from the expert?

18           MR. CADY:  Yeah, yeah.  She looks at it from a

19  different perspective, the way she usually looks at these

20  things just in her ordinary course of business, as she's

21  looking at data distributions.

22           MR. DRENNON:  Your Honor, can I respond to that?

23           MR. CADY:  And I'll lay a foundation for that.

24           THE COURT:  But it's not a foundation issue.  It's a

25  preparation issue.  When they -- if they had not asked the

1    question and she's up here testifying about it, I wouldn't be

2    entertaining this.  I wouldn't entertain it at all because you

3    had your chance.  But if they asked her a question and she

4    said, "No.  I just learned it from counsel," and afterward she

5    goes out and does some research and they're never told that she

6    has additional information that they asked for specifically,

7    how can they be prepared, Mr. Cady?  They can't.

8              MR. CADY:  Well, I think, Your Honor, this is just --

9    this is just truthful testimony of work she's done firsthand.

10             THE COURT:  It is.  I get that.

11             MR. CADY:  It is factual testimony of stuff she knows

12   about and would know about in the ordinary course of her work.

13   Just because she hadn't --

14             MR. DRENNON:  Except, Your Honor, he can't claim --

15             MR. CADY:  Just because she hadn't done it at the

16   time when she was deposed a year or so ago, I don't think --

17             MR. DRENNON:  She told the jury yesterday she had not

18   looked at SEP claims.

19             MR. CADY:  No.  She -- she --

20             MR. DRENNON:  Yes, I've got the transcript, sir.

21             MR. CADY:  I do, too.

22             THE COURT:  Hold on.  Hold on.

23             MR. CADY:  She did say -- she told you yesterday she

24   had looked at them.

25             THE COURT:  Hold on a minute.  But that is just

1   cross-examination, and you say she was inconsistent, and she

2   testified one way with you and one way with him, and so,

3   therefore, you have to discount her testimony.

4          MR. DRENNON:  Sure.

5          THE COURT:  Here's what I'm dealing with is I don't

6   think specifically that there is any requirement to exclude

7   this testimony because witnesses do this sometimes.  I am

8   thinking in fairness.

9          MR. LEYENDECKER:  Fundamentally unfair.

10          THE COURT:  I am thinking of fairness now, not that

11   there is a rule it should be excluded, because I don't think

12   there is.  And from time to time we do see witnesses who give

13   depositions and then in the deposition say, "Well, "I didn't

14   look at that," and then they go look at it.

15       And they said, "Well, I told you at the deposition that I

16   didn't look at it, but then I've had a chance to go look at

17   it."

18       But, here, it is not quite that easy.  She says, "The only

19   thing I know is what counsel has told me," and so you don't

20   pursue it.  And then she comes in, and she has a stack of

21   information to go through and say, "I've done it since."

22          MR. DRENNON:  And, Your Honor, this is a little

23   further compounded because in discovery we asked for what

24   defenses they had to our claims, and they did not identify

25   this.

```
1            THE COURT:  Well, let me say this:  When you ask for
2    a defense, that doesn't necessarily mean every little piece of
3    testimony.  In the interrogatory, you'll say who your witnesses
4    are going to be and what are they going to say.  I get that.
5            But then you normally would take your depositions after
6    that.  And I am sure she was identified as a witness who would
7    testify about all types of things.  And I would imagine this is
8    probably with the scope of major areas that she would testify
9    to.
10           I am thinking about this particular issue right here.  But
11   I don't want to shut off the defendant from being able to have
12   a witness who has the information from putting on her case.
13           MR. LEYENDECKER:  You have given him that chance,
14   Judge, by letting the expert testify even though he came in at
15   the thirteenth hour.
16           Judge, you've given him just that.
17           THE COURT:  Can you hear, Suzanne?
18           MR. LEYENDECKER:  You've given him just that, Judge,
19   when you allowed them to bring an expert that was disclosed
20   with opinions after the pretrial order was filed.  And then
21   when I said, "I think it's not fair, but at the minimum, I
22   should be able to depose her," you agreed.  This is so far
23   beyond the pale, it's not even close in terms of unfairness.
24           THE COURT:  And that's all I'm trying to figure.  But
25   like I said, I like to give everybody a chance to put on cases
```

1    that they want to put on.  And sometimes, I would like to err

2    on the side of letting more in and letting the jury figure it

3    out than me keeping the stuff out.  Because if it's kept out,

4    they can't even consider it.

5         As far as your questions of her, I am trying to give you a

6    chance to put on something, but I don't know that I'll let you

7    go into great detail about all the different cases.

8         Is there some point you wanted to make with this?

9              MR. CADY:  Yeah.

10             THE COURT:  Some questions that would allow you to

11   make your point but that would not go into great detail?

12             MR. CADY:  Let's do this, Your Honor:  Rather than

13   get into great detail on the medical records, we can pull it

14   back and talk about data distribution.  She did say just

15   yesterday that she's looked at claims data.  And I think -- and

16   that is what she told the jury.  I am following up on that.

17   What did you do to look in the claims data?  Like, basically,

18   what did you do, and what did you see?

19             MR. DRENNON:  Your Honor, may I further supplement

20   this?

21             THE COURT:  Yes.

22             MR. DRENNON:  In the pretrial disclosure sheets filed

23   by the defendants -- and I've got it for the Court, but I'll

24   also read it.  "As it relates to the review of 'plaintiff's

25   overbilling,' defendants will provide additional information to

1  plaintiff regarding defendants' review of plaintiff's
2  overbilling.  Defendants will do this through a supplemental
3  expert report.  Defendants already have provided a supplemental
4  expert report in this regard, dated July 10th, 2020.
5  Defendants believe discovery is complete, although plaintiff
6  has not provided medical records supporting many of the health
7  insurance claims the plaintiff has put at issue in this case."
8         There is nothing about the review by an employee of these
9  claims.
10        THE COURT:  And is this going to be the information
11 about the overbilling that you were going to have come through
12 her?
13        MR. CADY:  Yeah.  This is going to be -- this going
14 to be a big part of it.  I am not suggesting it's ten minutes.
15 I think it's less than ten minutes.
16        MR. DRENNON:  Judge, I don't care if it's one
17 question.
18        THE COURT:  Here's what I'll do:  I'll let you allow
19 her to testify -- get her testimony -- elicit her testimony
20 regarding the process.  And even if you want to say they turned
21 bills over -- well, no, about process.  But as far as the
22 overbilling issue, that was a highly contentious issue, that I
23 am not going to let you get into it with this particular
24 witness.  That is going to be something that comes in through
25 your expert.

1        MR. CADY:  Your Honor, I think I need to do it with

2  this witness for strategic reasons.  I think we can't reserve

3  this for the expert.  This is a witness who's an employee of

4  the company, who has job responsibilities to look after stuff

5  like this, and she has a regular process of doing this.  And I

6  am trying to get truthful testimony about what that process is,

7  how she applied it here --

8        THE COURT:  Well, as far as process -- how would you

9  have her testify about the process, what the process is?  And

10  what she went through in determining, I guess, what to pay.

11  But you want to go that next step --

12        MR. CADY:  I do, Your Honor.  I think I need to.

13        THE COURT:  And show she was alerted at some point

14  that they were billing and underbilling.

15        MR. DRENNON:  Let me just tell you what it is.  It is

16  data distribution.

17        MR. LEYENDECKER:  Respectfully, Judge.

18        THE COURT:  Hold on one second.

19        MR. LEYENDECKER:  You Were polite with us earlier on

20  and said, "At some point respect my rulings.  Okay?  Stop

21  coming back at me."

22    You made a very fair ruling.  This is a total ambush

23  moment.  You've allowed an expert out of nowhere.  You gave me

24  a chance to cross-examine in a deposition.  And, believe me,

25  I'm loaded to bear.  And now, they're anxious about what is

1  going to happen when they bring him.

2      This is a way out -- this is so far beyond the grounds

3  of -- your ruling here is appropriate on this.

4          THE COURT:  Let me -- let me hear what's going on.

5          MR. CADY:  It is pretty crucial to the defense, Your

6  Honor.

7          THE COURT:  And I get -- I get you want to bring this

8  out.  I understand that.

9          MR. CADY:  It's pretty crucial to the defense to talk

10  about just our employees' analysis of the distribution claims.

11  And all we're talking about is pretty high level -- as she said

12  yesterday, she's -- this is what she told the jury in response

13  to Mr. Drennon's questions:

14      "I've looked at the claims data.  I've looked at the

15  claims data."

16      And I want to follow-up on it.  What did you do, and what

17  did you see?

18      And I will preview it for you because I think it's so

19  crucial.  I want you to know what it is.

20          THE COURT:  Yeah.

21          MR. CADY:  And I want a record of it.  She looks at

22  the claims data and can tell, based on what she does in her

23  regular business of the distribution of when claims come in, as

24  to whether high or low or minimum.  And she looks at

25  distributions but she compares that to other similar-type

1    providers, and it is just fundamental.

2              THE COURT:  Hold on.  Hold on.

3              MR. CADY:  It's crucial, because we do have to -- I

4    mean, in fairness, we've got to be able to put on evidence to

5    support our unclean hands, recoupment, affirmative defenses we

6    disclosed in our answer.  And I told the jury that we looked

7    into this, and we would be telling them about it, and this is

8    our witness.

9              THE COURT:  I thought the -- I thought the expert was

10   going to be the witness who deals with this.

11             MR. DRENNON:  Your Honor, she can't hear you.

12             THE COURT:  I thought the expert was going to be the

13   witness who deals with this.  I know you would have to have

14   some fact witness who hands the information over.

15             MR. CADY:  The expert did.  The expert had a little

16   different analysis.  They entered claims distribution analysis,

17   which is what she does.  The expert did a coding analysis,

18   looked at medical records, which we just recently got and

19   figured out if, basically, the claims that would have been

20   billed --

21             MR. DRENNON:  Your Honor, if she looked at claims --

22             THE COURT:  Let me hear Mr. Cady.

23             MR. CADY:  Those are two different analyses, and this

24   is -- I mean, this is crucial, and I need to do this with this

25   witness for important strategic reasons.

1      THE COURT:  The problem is this is the first time I'm

2  hearing this.  And the problem is I don't know if this is the

3  first time.

4      MR. LEYENDECKER:  It is.

5      MS. HENRY:  It is.

6      MR. DRENNON:  It certainly is.  I wouldn't be up

7  here, Judge.

8      MR. CADY:  Well, I've got it highlighted here.

9      MR. DRENNON:  Your Honor, it is a 702 issue --

10      THE COURT:  Well --

11      MR. DRENNON:  If she is providing expert testimony,

12  something beyond the scope of the jury, they've got only

13  litigation to disclose it.

14      THE COURT:  I don't know think this is 702.  I don't

15  think it is an expert issue.

16      MR. DRENNON:  He says she's going to analyze claims

17  in a different analysis but in the same fashion as an expert.

18  They're paying him.

19      THE COURT:  I think What he is saying is that her

20  testimony is going to be fact testimony, that she went through

21  the record, and here is what she found.  And that she was the

22  one who found it.  But the problem is is that I am hearing

23  this -- or we're hearing this for the first time on the fifth

24  day of trial.

25      And how do you prepare for that?

1     And if they can't prepare for it, then how do I allow it?

2  I mean, how -- I guess, they could scramble and come up with a

3  cross for her.

4          MR. DRENNON:  No.

5          THE COURT:  But that's not fair.  And I'm trying to

6  think of my rulings earlier in the trial, where I've let

7  plaintiff get into areas or put on people to testify about

8  things that they weren't identified as going to testify about,

9  and I don't think I've done it.

10          MR. LEYENDECKER:  You haven't.

11          THE COURT:  So I don't think I can do that, Mr. Cady.

12  I think that would be unfair.  I think your -- you essentially

13  read into the record what her testimony would be.  I don't

14  think this is an appealable issue.  I think the Eighth Circuit

15  would affirm me on it, but that is not the reason why I would

16  rule this way.  I am trying to think of what is the right thing

17  to do and a fair thing to do.

18          MR. CADY:  Well, if I may, let me just do a few

19  minutes of it because what I think the jury is entitled to know

20  is that we do have -- I mean, we've got a lot of testimony

21  elicited by them about our protections against everybody.

22  Remember that?  I mean --

23          THE COURT:  Yeah, I heard that,

24          MR. CADY:  -- that's why we have these systems in

25  place, and that is a real problem, because that leaves the jury

1   with the impression, of course, there could be overbilling.  We

2   would catch them ourselves.

3       And witness Ms. Suggs will explain that's not right.  They

4   didn't catch this.  She can tell us an issue, through her

5   normal process, and she can explain why those systems, that

6   were told to the jury, that applied didn't catch this.  And

7   it's just -- I've got to be able to do it to correct the

8   misimpression that there can't be a problem with the claim.

9           MR. DRENNON:  If they didn't follow their manual, all

10  she had to do -- if they didn't follow their manual, all she

11  had to do was say, "We didn't follow this manual."

12          MR. LEYENDECKER:  Judge, fundamentally here, you've

13  allowed them to put on this evidence that we upcoded through

14  their expert.  You are not depriving them of that right.

15  They're asking to do something that would put us in an

16  untenable position.  This can come -- this defense of upcoding

17  comes in with the expert.  You've allowed that.  Beyond that,

18  completely unfair and beyond the pale.

19          MR. CADY:  Judge, I've think I've got to be able to

20  control what witnesses I put on and what truthful testimony

21  they get.

22          MR. DRENNON:  Disclose it in the course of discovery,

23  and we won't be up here.

24          MR. CADY:  And they did call her in their case, and

25  she did say, in response to their question, that she's looked

1  at all kinds of stuff.  And, I mean, they called her adversely.

2  I've got to be able to rebut all this stuff that they've

3  introduced about the processes we have in place --

4        THE COURT:  But those were issues that you knew were

5  tied to the trial.  And this is a relatively new issue.  And I

6  understand you didn't figure it out until late -- I think it

7  was that you got some documents and you realized it.

8        MR. CADY:  Yep.  Got the medical records.

9        MR. DRENNON:  No, no.

10        THE COURT:  Or at least that's what the argument has

11  been.

12        MR. LEYENDECKER:  Time out.

13        MR. DRENNON:  Two different things.  He's talking

14  about they reviewed their claims internally.  He's not talking

15  about she reviewed medical records.

16        MR. LEYENDECKER:  That's correct.  There is nothing

17  new about this.  There is nothing new about this.  Your ruling

18  on this is right on the spot.  It's time we get back.  At some

19  point he has to respect your ruling.  We can't -- we could

20  argue all day long over this.  You made what, I believe, is a

21  fair and correct ruling.

22        THE COURT:  I am here for life.  I mean, I could sit

23  here and really -- really, to be very honest with you, we could

24  sit here for the next five weeks, and it doesn't matter, and my

25  check stays the same, so it doesn't matter.  I understand.

1          MR. LEYENDECKER:  Well --

2          THE COURT:  I'm just being facetious.  I am being

3   facetious.  I am being facetious.

4          MR. CADY:  Your Honor, there are important strategic

5   reasons I need to do this with this witness.  It is pretty

6   brief.  I'm not going to belabor the point.

7          THE COURT:  I'll --

8          MR. CADY:  She did look at data.  And I think she's

9   entitled to offer truthful testimony about looking at data --

10         MR. DRENNON:  Your Honor, I don't have any data she

11  looked at.  I can't ask her about it.

12         THE COURT:  I'm going to sustain the objection to

13  her -- to this line of questioning.  But if you want to ask

14  some of the high-level questions, but getting -- digging into

15  her having gone back and looked at the files and determine that

16  there was some upbilling or overbilling, in this particular

17  case with SEP, I am going to sustain the objection to the

18  question.  If you need a few seconds to regroup to come a

19  different way, I'll let you have a couple seconds.

20         MR. DRENNON:  May I have that page back here?

21         THE COURT:  I just think it would be unfair.

22         MR. CADY:  Your Honor, I do think you're coming from

23  another -- I guess I've got to be clear.  I think it is so

24  fundamental to the defense.  I think I've got to object to it.

25  But maybe after we release the jury, we can get some guidance

1    as to -- because when we come back, I don't want to hit this
2    same issue.
3              THE COURT:  Are you thinking about -- are you
4    thinking about having this issue come in with other witnesses?
5              MR. CADY:  I think it has got to come in, and I don't
6    think I can be hamstrung about --
7              THE COURT:  How it comes in?
8              MR. CADY:  -- how to deal with it.  So I need some
9    guidance.  I don't want to run afoul of the Court's ruling.
10   And we have a week, I guess, but it -- it's really just factual
11   testimony for the work she does every day for the truth
12   offered.
13             THE COURT:  Ms. Henry, I -- okay.  Let's move on for
14   now.
15        How much more time do you have with this witness?
16             MR. CADY:  You know, Your Honor, I might not have any
17   more with her if I --
18             THE COURT:  If you can't into --
19             MR. CADY:  -- can't go into this area.
20             THE COURT:  Okay.  All right.
21             MR. CADY:  For planning purposes, if I've got any
22   more with her, I don't know if they have got any redirect.  And
23   then we were thinking of going into the videotape, Your Honor,
24   although I do not want to torture the jury very long.
25             THE COURT:  How long is the video?

1          MR. CADY:  It's a one-hour video deposition.

2          MS. HENRY:  Ours is 10 minutes.

3          MR. CADY:  That's your rebuttal.

4          MS. HENRY:  Ten minutes.  But maybe a couple minutes

5    over, but 10 to 15 minutes over.  But 10 to 15 minutes max.

6          MR. CADY:  Is that your Tibbits rebuttal, Ms. Henry?

7          THE COURT:  So you're saying you have an hour?

8          MR. CADY:  Yeah, and I guess I'm thinking I don't

9    think we should punish the jury like that.

10         THE COURT:  You want to come back because you want to

11   have an opportunity --

12         MS. HENRY:  Uh-huh.

13         THE COURT:  -- after the break?

14         MR. CADY:  I hadn't thought about that.  But that

15   actually would be wonderful, yeah.

16         THE COURT:  Okay.  I'll be very honest with you.  I'm

17   not -- I'm not -- I'm not sure about this ruling.  I want -- I

18   am not sure about it.  I sustained the objection, as we sit

19   here right now.

20         MS. HENRY:  She has never disclosed it.

21         THE COURT:  I understand, and that is reason why I

22   sustained the objection.

23         MS. HENRY:  When I deposed her, she had no knowledge.

24         THE COURT:  Well, yeah.  We -- yeah, that has been

25   part of the conversation.  That she said everything she got she

1    got from Counsel.

2                MS. HENRY:  So it is a non-issue.

3                THE COURT:  So I'll give you another crack at it.

4                MR. CADY:  Thank you, Your Honor.

5                THE COURT:  I'll sustain to that issue, but he wants

6    to finish up with her.  And then what he wants to do is he

7    wants to use this next week to try to convince me to let her

8    testify.  I'll let him give me -- I'll let him try to convince

9    me, because I am not sure about the ruling.

10                MS. HENRY:  I would like to raise another issue.  If

11   we break for a full week, which I understand we are, when will

12   we know what witnesses they intend to call next week?

13                THE COURT:  Y'all need to get those --

14                MS. HENRY:  Can we know by Wednesday or Thursday?

15                THE COURT:  I would say Thursday.

16                MS. HENRY:  It's just not fair, Judge.  Thursday

17   morning, we would like to know.

18                MR. CADY:  We had a 24-hour advanced rule, but I

19   would give them more.  I mean, they gave us 24 hours.

20                MS. HENRY:  That's not fair when we've got a week

21   break, and they're preparing all of their witnesses for a week.

22   That's just not fair.

23                THE COURT:  Let them know early.

24                MR. CADY:  Yeah, I'll give them to you --

25                THE COURT:  Let them know by Thursday.

1            MS. HENRY:  Thursday morning.

2            MR. CADY:  We can do that.

3            MS. HENRY:  Thursday morning.

4            MR. ZAVITSANOS:  What's that?

5            MS. HENRY:  They will provide their witnesses for the

6    upcoming continuance of the trial by Thursday morning of this

7    next week.

8            MR. ZAVITSANOS:  We have more witnesses?

9        Michael, what were you saying?

10           MS. HENRY:  He sustained the objection so they can

11   argue it.

12           THE COURT:  I sustained the objection.  Mr. Cady --

13   but I'll be very honest with you I'm not -- I understand his

14   position that he needs to try to prove his case.  The reason

15   for sustaining the objection is fairness.  There is no rule I'm

16   pointing to that would prohibit him from asking questions of

17   this witness.  But the fact that he didn't designate her to

18   answer these questions so he had a chance to --

19           MR. ZAVITSANOS:  Right.

20           THE COURT:  -- ask the questions or depose her on

21   this particular issue.

22           MR. ZAVITSANOS:  And I know people have said this

23   already, Your Honor, but they have an expert on this very

24   point.

25           THE COURT:  I understand that.

1          MR. ZAVITSANOS:  And we had -- we had a

2    knock-down-drag-out --

3          THE COURT:  About the expert.

4          MR. ZAVITSANOS:  -- about this very issue.

5          MS. HENRY:  Yeah.

6          THE COURT:  And that's the reason I sustained the

7    objection.

8          MR. DRENNON:  Can we get back going, Your Honor?

9          THE COURT:  Huh?

10          MR. DRENNON:  Can we get back going?

11          THE COURT:  No, because I'm going to deal with this

12    issue first.  And so what we're going to do is we're going to

13    let him finish up today.

14          MR. ZAVITSANOS:  Okay.

15          THE COURT:  He wants an opportunity to try to

16    convince me that my ruling is wrong, and we have a whole week

17    to do that.  He can try to convince me.

18      You need to let them know who your witnesses are going to

19    be by Thursday.

20          MR. CADY:  Will do, Your Honor.

21          THE COURT:  So they can start preparing.

22          MS. HENRY:  Thursday morning, please.

23          THE COURT:  The close of business Wednesday.

24          MS. HENRY:  Thank you.

25          THE COURT:  And then that way you have --

1          MS. HENRY:  Appreciate you.  Thank you, Judge.

2          THE COURT:  Thursday and Friday to prepare your

3   witnesses.  And how long will the cross-examination of this

4   witness take?

5          MR. DRENNON:  It's getting longer by the minute,

6   Judge.

7          THE COURT:  Finish up your examination of the

8   witness, and then he'll cross.

9       I'll sustain the objection to that line of testimony.  But

10  if -- but if they get me to reconsider, you put her back on,

11  and we get back.

12         MR. ZAVITSANOS:  If, Your Honor -- I don't want to

13  overcomplicate this.  Any chance you can let us know if you're

14  gonna -- if you're going to reconsider what you're saying now

15  before we resume trial?

16         THE COURT:  I'll let you know.

17         MR. ZAVITSANOS:  Because --

18         THE COURT:  I'm just going to give him a chance to

19  try to convince me, to change my mind.  Here's the thing:  This

20  witness -- he needs this witness to try to prove this

21  particular defense that you overbilled and to reduce the amount

22  of whatever damages you get.  At least that's what he said.

23      He said he needs this witness to testify to that.  So I

24  have a key witness, and I have no rule-based reason not to

25  allow the testimony.  I am not allowing it because she was

1    asked the questions in her deposition whether she had

2    information about this.  She said, "The only information I have

3    comes from my lawyer."  She didn't then answer the question.

4        She goes out and does this investigation afterwards.  Now,

5    she has information.  But at no point was the discovery

6    supplemented to let you know that she now has new information.

7            MR. ZAVITSANOS:  So the problem?

8            THE COURT:  And so your ability to prepare for today

9    is compromised by not having that information that they should

10   have known you needed.  And so at the same time we've all had

11   cases where he asked the witnesses in deposition, "Do you know

12   something?"  And the witness says, "No," and then the witness

13   goes out and learns stuff and comes to trial and says, "Well, I

14   didn't know then, but I know."

15       And judges let it in all day.  So this one could go either

16   way.  The reason I sustained the objection was you didn't have

17   the time to prepare for her.

18           MR. ZAVITSANOS:  Here's the problem, Judge.  You know

19   for -- you said you don't have a rule.  Actually, you do, and

20   that is, you know -- I should leave the state, and they'll

21   starting laughing, and that's why I should probably shut up.

22           THE COURT:  Oh, no, no, no.

23           MR. ZAVITSANOS:  But the reality is the information

24   that she got, that's hearsay -- right? -- and it's speculation.

25   She now allegedly -- allegedly, she went out and did her own

investigation after that, okay, which I think would also be hearsay.  She was not in realtime.  She's not in realtime. She's getting information from other people.

Now, look, I feel like I'm on the beach and just eating all the sand here, because I'm getting hit -- you know, we're getting sandbagged left and right.

THE COURT:  She is the employee who heads up that division.  She could go back and look at the records and come here and tell us what the record say.  And she could do that. And that would be within her area of knowledge and what she does.

And so I don't think the hearsay rule keeps her from testifying about this particular line of questioning.  I think it's simply the fact that she was specifically asked for it, an objection was made at the deposition, she said, "I got it from my lawyer."  So defendants should have known -- and I don't know think you were the judge -- the lawyer at the deposition.

But Counsel at the deposition would have known this is an area of questions they want to know from this witness, and the discovery was never supplemented to let them know that she now has information.

And so you walk into a courtroom, and on the fifth day, you say, "Although we told you one thing at the deposition, now she has all of this information, and the jury should hear it."

Well, how do you prepare for that?  And I don't think you

1    can.

2            MR. ZAVITSANOS:  More recently, Judge, of course,

3    again we had this knock-down-drag-out about this issue; right?

4    And it didn't come up once.  They didn't volunteer one time.

5    And they were trying like the dickens to this get this expert

6    designated on this issue.

7        And guess what happened?  We took his deposition.  And he

8    got destroyed -- destroyed.  And that's why they don't want to

9    bring him in.  And so now, they're just -- they're playing this

10   shell game.  That's really what's going on here.  And the

11   problem is we didn't get a chance to depose this lady to

12   destroy whatever she was going to say on that point.  And so we

13   are totally getting sandbagged.  We had this very issue before

14   you -- this issue.  And the only thing they cared about was

15   getting this expert out.

16           THE COURT:  I would imagine -- and I don't know if

17   this is the case, Mr. Cady.  I would imagine that they hadn't

18   prepared to call this expert.

19           MR. ZAVITSANOS:  That's right.

20           THE COURT:  I would imagine if they had prepared to

21   call this expert and now -- she's a good witness.  I think

22   she's been a great witness.

23           MR. ZAVITSANOS:  Yeah, agreed.

24           THE COURT:  She is a good witness.  She can explain

25   things.  She's very Arkansan, so the people follow her, and

1    she's nice.  And you would rather have it coming from her that

2    SEP was upbilling than you would from some stale expert,

3    whether he was destroyed or not.  I don't know.  I mean, who

4    knows?  I mean, he might be the best expert --

5              MS. HENRY:  At some point they knew that and didn't

6    tell us.  That's frustrating.

7              THE COURT:  I understand that.  I understand that.

8    And that's the reason I sustained the objection.

9         And so let's get back to her examination.

10             MR. ZAVITSANOS:  Yeah, yeah.

11             MS. PRUITT:  Judge, I just have one more thing if

12   we're finished with that issue.

13             THE COURT:  Yes.  Yes.

14             MS. PRUITT:  Once again, I am sitting out there in

15   the well.  And Mr. Zavitsanos is standing right at the corner

16   of the table with Baxter, preaching about what's going on.

17             MR. ZAVITSANOS:  What did I say?  What did I say?

18             MS. PRUITT:  Pointing up there at the screen.

19             MR. ZAVITSANOS:  No, no.  What did I say?

20             MS. PRUITT:  I don't know what you said.

21             MR. ZAVITSANOS:  Well, that's why.

22             MS. PRUITT:  I saw your body language.

23             MR. ZAVITSANOS:  Because I was whispering -- I was

24   whispering, Your Honor.

25             MS. PRUITT:  No, he's not wasn't.  How could I hear?

```
1              THE COURT:  Continue.  Continue.  Continue the --
2   yes, ma'am.
3              MS. PRUITT:  And so I was watching the jurors, and
4   they -- one of them, at least, was listening to what he was
5   telling Baxter.  We have to guard against this.
6              MR. ZAVITSANOS:  This is false, Your Honor.  I did
7   not -- I did not.  I have been mindful since the court
8   admonished me.  I have -- I have not said anything above a
9   barely audible whisper.
10      I leaned over, and I whispered in his ear with a
11  suggestion on what to do.  Nobody heard me.  I challenge
12  Counsel to tell you what it is that I said, because nobody
13  could hear it except for Mr. Drennon.
14             THE COURT:  Can you hear, Suzanne?  Can you hear
15  right now?
16             THE REPORTER:  I can.
17             MR. ZAVITSANOS:  So, look, I understand emotions are
18  running high, Your Honor.  I have been very mindful.
19             THE COURT:  You almost had a fistfight out there a
20  little earlier.
21             MR. ZAVITSANOS:  I've got a story for you after all
22  of this is done.
23             THE COURT:  No, no, no.  Okay.
24             MS. PRUITT:  I mean, just --
25             THE COURT:  I understand.
```

1          MS. PRUITT:  I've been raising this.  Look --

2          THE COURT:  You have, from the very beginning.

3          MS. PRUITT:  I get it.  I get it that people get

4  animated.  And it's not proper to put --

5          MR. ZAVITSANOS:  We were --

6          MS. PRUITT:  -- the jury to get in on it; right?

7          MR. ZAVITSANOS:  And we were on a break here, Your

8  Honor.

9          MS. PRUITT:  I know.  But we're sitting there.

10          MR. ZAVITSANOS:  Judge, look.  I can't confer with my

11  co-counsel and lean over and whisper in his hear?  This is what

12  you should do.  This is during the break.  I didn't do this

13  during the examination.  I sat there like a potted plant.

14          THE COURT:  No.  I think Ms. Pruitt is sitting there

15  from a distance, and she sees you -- and she's at the wide

16  lens -- looking through a wide lens.  And she sees the jurors

17  back there trying to listen to what you're saying.  I get it.

18  So let's --

19          MR. CADY:  Your Honor --

20          MS. PRUITT:  We need to go home, so everybody can

21  calm down.

22          MR. CADY:  Yeah, Your Honor.  It's almost

23  4:00 O'clock, just for guidance here.  If this gets cut off --

24     Sorry, Suzanne.

25          THE REPORTER:  You're fine.  You're okay.

1          MR. CADY:  I'm basically done with her, and I guess

2   my -- I think my ask would be that we pause here, go home.

3          MR. ZAVITSANOS:  No, no.

4          MS. HENRY:  No.

5          MR. CADY:  Brief this issue.

6          THE COURT:  I'll let you recall her.  I mean, if I

7   decide to reconsider, I'll let you put her back on the stand.

8          MR. CADY:  Okay.

9          THE COURT:  I am not going to tell you you can't put

10  her back on, if I reconsider.  As I sit here right now, I don't

11  think I will, but, you know, who knows?

12         MR. CADY:  We'll brief the issue.

13         MR. KENNEDY:  So are we going to have an opportunity

14  to cross her today?

15         THE COURT:  Yes.  Let's go.

16         MR. ZAVITSANOS:  Thank you, Judge.

17         THE COURT:  Yeah.

18     (The bench conference concluded.)

19         MR. CADY:  May I continue briefly, Your Honor?

20  Q.   Apologies for the break.

21     Ms. Suggs, we talked earlier about payment of claims and

22  the difference between NovaSys providing payment for claims --

23  sorry, Ms. Henry -- for NovaSys Health members, and Arkansas

24  Health & Wellness and Celtic providing claims -- or paying

25  claims for Ambetter members.

1    Do you remember that, Ms. Suggs?

2  A.   Yes.

3  Q.   Will you tell the jury whether that -- do you have an

4  understanding whether this is common in the industry that a

5  different entity would pay claims for different types of

6  insurance?

7  A.   I can't speak to other insurance companies, because I have

8  pretty much worked for the same one my whole entire career, so

9  I definitely believe it's very common that insurance companies

10  issue IDs, and they are associated with a member with a

11  product, et cetera, so that their systems are set up to process

12  claims specifically for, you know, a product that a member

13  might be accessing.

14    So how their systems are set up, I can't speak to that,

15  but certainly have, you know, insight into that.  They would

16  have their system configuration very much like we do where

17  Ambetter is configured to pay Ambetter, Allwell is configured

18  to pay Allwell, TotalCare is configured to pay TotalCare.

19  Q.   And NovaSys was configured to pay NovaSys Health member

20  claims?  Is that right, ma'am?

21         MR. DRENNON:  Objection, Judge.  Leading, Your Honor.

22         THE COURT:  Overruled.

23  I'll let you answer.

24         THE WITNESS:  Yes.

25         MR. CADY:  No further questions for Ms. Suggs.

1          THE COURT:  Okay.

2          MR. DRENNON:  Just a minute to set up, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. DRENNON:

5    Q.   Ms. Suggs, while I'm setting up, you've given testimony

6    under oath in this case -- what? -- four times -- April 11th,

7    2019, April 12th, 2019, yesterday, and today; right?

8    A.   Yes.

9    Q.   You were under oath each time?

10   A.   Yes.

11   Q.   You put your right hand up.  You swore to tell the truth,

12   the whole truth, and nothing but the truth; right?

13   A.   Yes.

14   Q.   So when you were here yesterday, the jury heard you.  You

15   swore to tell the truth, the whole truth, and nothing but the

16   truth?

17   A.   Yes.

18   Q.   Is that what you did?

19   A.   Yes.

20   Q.   So look at the some of the things we talked about

21   yesterday.  Do you remember I took some time to go through what

22   you didn't do; right?

23   A.   Yes.

24   Q.   And I did that to what I thought was to streamline things,

25   to make it easier for our conversation.  Okay?

```
1    A.    Okay.

2    Q.    Do you remember that?

3    A.    Yes.

4    Q.    Yesterday, you told the jury that you have not done any

5    work on behalf of NovaSys since 2010; correct?

6    A.    Since 2010 would not be --

7    Q.    Since Centene purchased NovaSys.

8    A.    In 2010, I was still working on the NovaSys accounts when

9    Centene purchased NovaSys.

10   Q.    Yes, ma'am.

11   A.    Working on the NovaSys accounts.  I'm sorry.

12   Q.    And you have not done any work, for or on behalf, of any

13   NovaSys entity since you sold your interest in the entity to

14   Centene; correct?

15   A.    Any work on behalf of NovaSys since NovaSys sold its

16   entity to Centene would be -- I was still, at the time in 2010,

17   even 2011, NovaSys was the -- still the entity that I was

18   working for because we didn't have anything additional at that

19   time.  So I was still, yes, working on NovaSys business.

20   Q.    So when I asked you that question yesterday and you agreed

21   with me you had not done work, that was incorrect; right?

22   A.    I must have misunderstood the question.

23   Q.    And you must have misunderstood that question when we took

24   your deposition, too; right?

25   A.    I don't --
```

1  Q.   Ms. Rivers, if we could look at Volume I of Ms. Suggs's
2  deposition, Page 21 of the deposition.  Hold up, real quick.
3       Kimberly Suggs, April 11th, 2019; right?
4  A.   Correct.
5  Q.   This one of the days where you swore to tell the truth,
6  the whole truth, and nothing but the truth; right?
7  A.   Yes.
8  Q.   Page 21, please.
9       First question "Have you done any work for or on behalf
10  any of these NovaSys entities since you sold your interest in
11  the entity to Centene?"
12       And you answered "No"; right?
13  A.   As it relates to the NovaSys entity that I sold, no.
14  Q.   Okay.
15  A.   I had not.
16  Q.   Ma'am, that says any work for or on behalf of any of these
17  NovaSys entities.  That's what the question says; right?
18  A.   That's the question, yes.  And I took that to mean the
19  entity that was sold to Centene.
20  Q.   Again, you swore to tell the whole truth that day, and
21  that day you said you hadn't done it.
22       Okay.  Have you looked at books of any NovaSys entity, any
23  of these records since you sold your interest in it?  We can
24  see right there how you answered; right?
25  A.   Yes.

```
1   Q.    And you said "No"; correct?
2   A.    Correct.
3   Q.    And you have not done any work on behalf of a NovaSys
4   entity since 2010.  That's what you said; right?
5   A.    That's what I said, yes.
6   Q.    Okay.  You don't know what happened to the NovaSys
7   contracts that existed before January 1st, 2014; right?
8         We can take that down.  You don't know what happened to
9   them, do you?
10  A.    I have -- I don't know what happened to them.
11  Q.    No, ma'am.  That is what you testified to that you did not
12  know what happened to the NovaSys contracts that existed before
13  January 1st, 2014?
14  A.    Correct.
15  Q.    But, today, you start talking about contracts being
16  canceled, not canceled, all of those things; right?
17  A.    I did not believe that they had been termed, yes.
18  Q.    Okay.  But back January 12th -- or excuse me, April 12th,
19  2019 --
20        Can you pull that up, Ms. Rivers?
21            THE IT TECH MICHELLE:  Which one is that?
22            MR. DRENNON:  The second volume.  Page 18.
23  Q.    So we'll start -- let me see.  You can look through your
24  Page 18, Line 6, we ask you, "What is magic about the date of
25  January 1st, 2014?
```

1      "That's the date that Celtic doing business as Arkansas
2  Health & Wellness had members that were active in the
3  commercial exchange product.
4      "Any of these members the same?
5      "I don't know.
6      "What happened to the third party administrator agreements
7  that you referenced?
8      "I don't know."
9      Right?
10  A.   Right.  The third party administrator agreements would be
11  different than the provider contracts.
12  Q.   I asked you about contracts.  Are these agreements not
13  contracts, or are we playing semantics with that word?
14  A.   Well, I would have interpreted third party administrator
15  agreements to be the agreement between NovaSys and its clients
16  to provide third party administration services.
17  Q.   So, yesterday, you answered the question simply; today,
18  there is more things; is that right?
19  A.   Third party administrator agreement, to me, is different
20  than a provider contract, yes.
21  Q.   Okay.  You don't know what happened to the provider
22  contracts, do you?
23  A.   I do not know.  I am not aware that they've been termed.
24  Q.   You don't know one way or the other; right?
25  A.   Correct.  I am not aware that they've been termed.

1  Q.   Exhibit 1, please, letter of Agreement.

2       Again, today you have information about what terms mean,

3  what things mean.  Yesterday, you'd agree you had never looked

4  at it before this lawsuit?

5  A.   I had not looked at it yesterday.

6  Q.   You had not looked at it before yesterday?

7  A.   No.

8  Q.   So you learned a lot between yesterday and today?

9  A.   I was -- looked at it this morning, yes.

10 Q.   Fair enough.  Your lawyer walked you through it, talked

11 with you about it?

12 A.   Yes.

13 Q.   So did you learn things, or did your lawyer learn things?

14 A.   I'm confused by that question.

15 Q.   All right.  Fine.  I'll move on.

16      Ma'am, you --

17      Can we look at the card, Number 41.

18      You talked briefly about the card.  You talked about other

19 cards, old cards; right?

20 A.   Yes.

21 Q.   You don't know what cards look like -- what? -- 2013, the

22 year before these Ambetter cards came in; right?  You don't

23 know what those look like?

24 A.   Before 2013, there were no Ambetter cards.

25 Q.   Yes, ma'am.  Do you know what the cards looked like then?

1    A.   Yes.

2    Q.   You do now?

3    A.   I know what NovaSys's cards look like, yes.

4    Q.   Okay.  Well, let's look at this one real quick.  You

5    talked about those old cards, and you said they have two logos;

6    right?  All of those old cards, two logos?  That's what you

7    told the jury today, isn't it?

8    A.   I don't recall saying, "two logos."  There were two

9    networks.  There was a NovaSys logo, yes.

10   Q.   Okay.  So you didn't earlier say that there were two

11   logos, one on the front and one on the back of the card.  That

12   is not what your testimony was, was it?

13   A.   There was a NovaSys logo on the front of the card.  On the

14   Ambetter card, there is a NovaSys logo on the back of the card.

15   Q.   Front of the card, back of the card; right?

16   A.   Yes.

17   Q.   All right.  You made a point.  You talked about this

18   address, P.O. Box 5010, Farmington, Missouri; right?

19   A.   Yes.

20   Q.   And you said that was something that was specific for the

21   claims from Ambetter Arkansas?

22   A.   Yes.

23   Q.   You know that's not true; right?

24   A.   I believe it to be true, yes.

25   Q.   You know that Ambetter claims from -- let's see.  Sunshine

1    Health in Florida go to that P.O. Box, don't you?

2    A.    Yes.  Those are also Ambetter members.

3    Q.    So this is not specific to Ambetter of Arkansas, this

4    address?

5    A.    No.  It's specific to Ambetter.

6    Q.    Yes, ma'am.  They go to -- the claims from Peach State

7    Health claims go there; right?

8    A.    For Ambetter, right, yes.

9    Q.    Buckeye Health plan, they go to this same address?

10   A.    For their Ambetter product, yes.

11   Q.    They all go to the company that you said pays the claims,

12   Centene; right?

13   A.    Yes.

14   Q.    And the reason that Ambetter of Arkansas claims go to

15   Centene instead of NovaSys, because NovaSys is broke; right?

16   A.    Broke?

17   Q.    Yes, ma'am.  Its balance sheet and equitably insolvent;

18   correct?

19   A.    I would not know that.

20   Q.    Okay.  If Mr. Ryan testified to that in his deposition, as

21   the president of NovaSys Health, would you have any reason to

22   disagree with him?

23   A.    I have no insight into that at this time.

24   Q.    Okay.  I want to show you something and see if it will

25   help with your insight.

1        Your Honor, may I approach?

2              THE COURT:  You may.

3              MR. TALLEY:  Judge, can we approach the bench?

4        (Whereupon a bench conference commenced.)

5              MR. TALLEY:  Not sure exactly what he's got to offer.

6              MR. DRENNON:  I haven't offered anything yet, Your

7  Honor.

8              MR. TALLEY:  But I anticipate it is going to be some

9  kind of financial-regulated document.  2.2, Number 1, motion in

10  limine about the defendants' finances was granted.

11        Number 2, this is trying to get a second bite at the apple

12  for not offering it during the plaintiff's case in chief.  They

13  had an affirmative obligation to bring forth this during their

14  case, and they didn't do so, and they even called her during

15  their case.

16        It is beyond the scope of our direct examination, and

17  they're just trying to introduce this per the defense case

18  because they failed to put it on in theirs, and that's not

19  fair, Judge.

20        They're trying to introduce these financial documents in

21  the defense case in order to remedy a failure during

22  plaintiff's case.

23              THE COURT:  I will overrule you on the second point,

24  but on the first point, you said that this is part of a motion

25  in limine keeping out documents or records about financial

1   condition of the company.

2       What is the purpose of that?

3           MR. DRENNON:  She said she knows a little bit about

4   everything.  She went into accounting.  All I'm going to do is

5   remind her, refresh her recollection, she if knows these

6   things.  If she doesn't, I'm going to sit down

7           THE COURT:  I guess what I am saying is:  You're

8   asking her about Centene being broke or something?

9           MR. DRENNON:  She made a -- she made a big deal about

10  who paid the claims, and I am going to show why that company

11  pays the claims because NovaSys has no money.

12          MR. TALLEY:  Well, Your Honor, the reasons NovaSys

13  doesn't pay the claims is because it's not an insurance

14  company.

15          MR. DRENNON:  It wasn't an insurance company in 2011,

16  '12, '13.

17          MR. TALLEY:  It was a third party administrator.  And

18  pursuant to an agreement with its clients, it paid claims as

19  Arkansas law allows.  We crossed that bridge today.

20          THE COURT:  Yes, right.

21          MR. TALLEY:  Judge --

22          MR. DRENNON:  Judge, she said it was a flow through.

23          MR. TALLEY:  Judge, we've addressed this in motions

24  in limine, and now they are trying to violate that with

25  evidence of the defendants' finances.

```
1              THE COURT:  You asked her the question whether
2    Centene was solvent or had money --
3              MR. DRENNON:  NovaSys.
4              MR. KILLINGSWORTH:  NovaSys.
5              THE COURT:  And she said she didn't know anything
6    about that.
7              MR. DRENNON:  All I am trying to do is refresh her.
8              THE COURT:  I'll let you -- I'll let you show her the
9    document.  She can look at it.  Does that reflect -- refresh
10   her recollection as to whether they have money, and she will
11   have to say "Yes," I guess, and then we'll move on.  We'll
12   accept her answer, whatever it is.
13             MS. PRUITT:  Hang on.  Hang on, Baxter.  I may be
14   wrong about what I think, but it sounded like he was getting
15   ready to show her somebody else's deposition.
16             MR. DRENNON:  No, ma'am.  Uh-uh.
17             MS. PRUITT:  Okay.  I thought you said:  "Can I show
18   her a deposition?"
19             MR. KILLINGSWORTH:  No.  He was making the point that
20   she doesn't disagree with it.
21             THE COURT:  What is it?  A financial document for
22   NovaSys.
23             MR. DRENNON:  Yep.
24             THE COURT:  Okay.  You can show it to her.
25             MS. PRUITT:  I'll be quiet.
```

1    MR. DRENNON:  You're good.

2    (The bench conference concluded.)

3  BY MR. DRENNON:

4  Q.   Ma'am, real quick, before we get back to the line I was

5  on, I asked you about the membership cards.  I was asking about

6  the membership cards in 2013 today.  You're unable to describe

7  those.

8    I want to look at Volume 2 of your deposition, Page 115,

9  Ms. Rivers.

10   Question, Line 19, "I'm glad you mentioned ID cards.  What

11  did the member ID cards look like in 2013 for NovaSys?

12   "I would have to go and look at an ID card to know what it

13  looked like."

14   That's right?  That's what you testified to; right?

15  A.   Yes.

16  Q.   I want to show you what has been marked as Exhibit 54 for

17  identification purposes.

18   May I approach, Your Honor?

19    THE COURT:  You may.

20  BY MR. DRENNON:

21  Q.   Before this -- before I got to the question on the

22  membership card, I had asked you if you knew and understood

23  that NovaSys was balance sheet and equitably insolvent.

24   Do you remember those questions, ma'am?

25  A.   Yes.

1    Q.    And you, with your accounting background, do you
2    understand what "equitably insolvent" means?
3    A.    Yes.
4    Q.    Tell the jury what "equitably insolvent" means.  It means
5    you can't pay your bills; right?
6    A.    If the company was insolvent, yes, correct.
7    Q.    You can't pay your bills.  That's a lawyer, nonaccountant
8    definition?
9    A.    Right.  You just -- I meant you didn't have the income to
10   cover your expenses.
11   Q.    And then balance sheet insolvent.  Undercapitalized is
12   that a fair way to describe it?
13   A.    Yes.
14   Q.    Invite you to look at Page 14.  If you go by page numbers,
15   it's actually 11, but the bottom right is 14 of this document.
16             MR. TALLEY:  Judge, can we approach again?
17             THE COURT:  You may.
18        (Whereupon a bench conference commenced.)
19             MR. TALLEY:  My understanding of what we were just up
20   here talking about, and the Court's ruling on it, was this
21   document was going to be handed to the witness.  The question
22   was going to be asked whether she was familiar with it, and we
23   skipped to Page 14 or whatever without that question coming in.
24             MR. DRENNON:  I was going to ask if it refreshed her
25   recollection for my question.  There is a paragraph that

1   addresses it.  I am going to have her read it and see if it
2   refreshes her recollection, Judge.
3           THE COURT:  Have her read it, but not out loud, and
4   then ask the question if it refreshed her recollection.
5           MR. DRENNON:  Okay.
6           MR. TALLEY:  And I would like to review this new
7   concern with the two things he asked, capitalized and
8   insolvency.  It goes to what they failed to offer in the
9   plaintiff's case, and it's now irrelevant in the plaintiff's
10  case.
11          THE COURT:  Okay.  I'll overrule it.
12      (The bench conference concluded.)
13  BY MR. DRENNON:
14  Q.   Are you ready, ma'am?
15  A.   Yes.
16  Q.   While we were up talking to the Judge, I am not sure if
17  you had a chance to read the Paragraph 8.  If you haven't, will
18  you please read it, just to make sure we're talking about the
19  same thing?  It's the paragraph entitled "Continuing
20  Operations."
21  A.   Okay.
22  Q.   And as an accountant, you understand what that paragraph
23  means; correct?
24  A.   Yes.
25  Q.   Okay.  Has it now refreshed your understanding about

1  whether NovaSys 2014, 2015 was equitably in balance sheet

2  insolvent?

3  A.   I have never seen these financial statements before.  At

4  this time I was not in a role where I would be reviewing

5  financial statements for NovaSys.  So I can't say that it's

6  refreshed my memory.  But I have read this paragraph, yes.

7  Q.   And you agree that's what it says; correct?

8  A.   It says that it would require funding from Centene

9  Corporation to honor its obligations.

10  Q.   Yes, ma'am.  And that would honor its obligations.  That

11  would go towards equitably insolvent we discussed earlier;

12  correct?

13  A.   At this point in time, yes.

14  Q.   Yes.  Do you have any reason to believe that, as we move

15  through future financial statements, that NovaSys Health's

16  financial condition improved?

17  A.   I would not know.

18  Q.   No reason to believe that; correct?

19  A.   I have no information about the financial statements of

20  NovaSys Health beyond before this time frame.

21  Q.   Okay.  And to be clear, the document that you looked at

22  are financial statements dated December 31st, 2015 and 2014;

23  correct?

24  A.   Correct.

25  Q.   All right, ma'am.  I'll take that back from you just so --

1  thank you.

2      All right, ma'am.  You were shown Exhibit 48, excuse me --

3  148 earlier.  Do you recall that?

4  A.   You might need to refresh me as to which exhibit that was.

5  Q.   Ms. Rivers, put it up.

6  A.   I see it, yes.

7  Q.   Page 5, please.

8      Yesterday, we talked about NovaSys being a pass-through,

9  using money from its clients to pay claims; right?

10 A.   Yes.

11 Q.   Do you recall that?  And this document here is effectively

12 a check in the bottom half -- right? -- showing a canceled

13 check?

14 A.   Yes.

15 Q.   This shows that exact relationship.  NovaSys Health on its

16 Arkansas Network's check is paying claims to SE Physicians?

17 A.   Yes.

18 Q.   Using Arkansas HealthNetworks' money?

19 A.   No.

20 Q.   It was not using money that was paid for premiums for

21 Arkansas HealthNetworks?

22 A.   No.  It was -- it was paying out of the funds that had

23 been made on behalf of the client.  So if -- once we determined

24 how much we were going to pay on a check run for a particular

25 client, it was submitted to that client for funding, and then

1    that client would actually transfer funds into this account so
2    that we had a clear distinction those funds were available to
3    pay those claims.
4    Q.   Client funds transferred to your account on a --
5    A.   It was for a specific amount for a payment run.
6    Q.   277.95 in this case; right?
7    A.   That would have been one of probably many cut out the
8    same, what we call, "batch payment."
9    Q.   Sure.
10   A.   Yes.
11   Q.   I'm sorry.  Whether it was 277.95 or a million dollars'
12   worth of claims that were paid for ARHealthNetworks members,
13   they put the money in your account.  You paid it out in batches
14   to providers; right?
15   A.   For the exact amount that they funded, yes.
16   Q.   For the exact amount, because NovaSys didn't make money
17   off of the premiums directly; right?
18   A.   No.
19   Q.   And it wouldn't lose money if the cost providers exceeded
20   the amounts of the premiums; right?
21   A.   Correct.
22   Q.   Just like now?
23   A.   For NovaSys members or for Ambetter.
24   Q.   Just like now with NovaSys in 2020, it's not going to make
25   or lose money based on premiums?

1  A.   NovaSys would not be the third party administrator, not an
2  insured.
3  Q.   It was not an insurer in 2011-12; right?
4  A.   Right.
5  Q.   Not an insurer now; right?
6  A.   Correct.
7  Q.   Just to put a fine point on that, NovaSys has never been
8  an insurance company; right?
9  A.   Right.
10 Q.   We talked a little bit, I think -- or you did earlier
11 about evidence of coverage.
12 A.   Yes.
13 Q.   And that's the contract between an insurance company and
14 its insured; correct?
15 A.   Correct.
16 Q.   It's sort of the document that submits the relationship
17 between an insurance company and its members; correct?
18 A.   Correct.
19 Q.   NovaSys has never issued EOCs, or evidences of coverage;
20 correct?
21 A.   I do not believe so.
22 Q.   Okay.  Before 2014, it did not issue evidences of
23 coverage; correct?
24 A.   I do not believe so, correct.
25 Q.   So for the folks that you identified as NovaSys Health

1  members, Arkansas HealthNetwork, NovaSys did not issue an EOC?

2  A.   I cannot recall honestly if there was an evidence of

3  coverage document or not for those members.

4  Q.   Okay.  Your client issued evidence of coverage before

5  January 1, 2014; is that right?

6  A.   I believe that's correct.

7  Q.   The clients who's listed on this paper?

8  A.   For their employee -- or members.

9  Q.   For their members; right?

10  A.   Right.

11  Q.   Okay.  And NovaSys doesn't issue evidence of coverage to

12  members now; right?

13  A.   That's correct.

14  Q.   The member is defined by the insurance company; correct?

15  A.   I am not sure what you mean.

16  Q.   Let me use a different word.  Who the members were were

17  the folks that had signed up with your clients?

18  A.   Correct.

19  Q.   Before 2014?

20  A.   NovaSys members, yes, were signed up under their client,

21  whoever the client was, yes.

22  Q.   Whoever the clients were signed up the members; right?

23  A.   Yes.

24  Q.   And now, the clients, post-2014, the groups that you've

25  identified, Ambetter is one we're here about -- it's still

1   determining who the members are.  It's their -- your clients

2   determine who the members are; correct?

3   A.   The members purchase the product.

4   Q.   Yes, ma'am.  The members are being provided health care

5   coverage; right?

6   A.   Right, because they purchased the products, yes.

7   Q.   And they were being provided health care coverage before

8   2014?

9   A.   I don't know if the Ambetter members were any of those

10  same individuals, if that's what you're asking.

11  Q.   Fair enough.  I apologize.  And that's a very good

12  question.

13       The members of Arkansas HealthNetwork, Hendrix College,

14  these were folks that were being provided health care coverage?

15  A.   Through their employer, yes.

16  Q.   And they had that contract, that EOC, that made them

17  members?

18  A.   NovaSys had a contract with the client to cover or provide

19  administration services for the individuals that were

20  underneath each of those clients.

21  Q.   Yes, ma'am.  And a few minutes ago, you told me that EOC

22  was that contract document that made a person an insurance

23  company member; right?

24  A.   On Ambetter side, the insurance -- there is an EOC for

25  each member for Ambetter, yes.

1  Q.  And there were EOCs for each member of Arkansas

2  HealthNetwork?

3  A.  I am not aware if there were EOCs for each member or not.

4  Q.  Okay.  Let's look at your deposition, Page 17; Volume 2,

5  Page 17.

6      Line 16, do you see here "NovaSys third party

7  administrator," and then go on down.  "The EOCs would have been

8  specifically for the clients.  NovaSys did not issue EOCs";

9  right?

10 A.  Right.  So if they had one, it would have come from the

11 client.

12 Q.  Well, no, ma'am.  Let's keep reading.  "But the clients

13 would have issued some type of evidence of coverage documents."

14     That's what you said; right?

15 A.  I would expect so, yes.  The member knew what their

16 benefits were from their employer.

17 Q.  Ma'am, you testified earlier that the rate pay to

18 Southeastern Emergency Physicians for the Ambetter claims was

19 the rate that is paid in the Marketplace for emergency

20 services; right?

21 A.  Yes.

22 Q.  Okay.  Let's look at defendants' Exhibit 14, please.  And

23 this is an e-mail that the jury is familiar with, so I won't

24 belabor it.  Page 2.

25     And if you can pull out the top.

1    Ma'am, just read with me, "The other ACA plans in the
2    Arkansas market that we are par, so have contracts with, Blue
3    Cross Blue Shield, low locates; UHC" -- do you know that to be
4    United Health?
5    A.    I would believe that would be United Health.
6    Q.    Pays 75 percent of the billed charges; right?
7    A.    Yes.
8    Q.    And that's the amount in the NovaSys Letter of Agreement
9    that this case is about; correct?
10   A.    Yes.
11   Q.    QualChoice, 374 percent of Medicare; right?
12   A.    Yes.
13   Q.    So for you to pay what is being paid by Ambetter to my
14   clients is the market rate, this e-mail shows that that is not
15   consistent ; right?
16   A.    I said it was the same rate that we paid our other
17   emergency providers.
18   Q.    You don't set the market, do you?
19   A.    I have no personal responsibility for setting those rates.
20   Q.    No, ma'am.  That's not my question.  Your company does not
21   set the market rates for emergency services in Little Rock,
22   Arkansas statewide, does it?
23   A.    Our company sets the rates, but it will reimburse
24   providers submitting claims for our products.
25   Q.    Again, ma'am, that is not my question.  Your company does

1   not set the market -- the market rate for those services?

2   A.   Not that I'm aware.

3   Q.   And so you can't testify that the rate that it paid my

4   clients is the market rate?

5   A.   I cannot, and I did not.

6   Q.   Ms. Rivers, bring up Exhibit 1.

7        All right.  Ma'am, you were asked a series of questions to

8   distinguish -- well, let's go --

9        Let's do Paragraph 1 through Paragraph 4.

10       All right.  NovaSys agrees to provide payment.  That's

11  Paragraph 4; right?

12  A.   Yes.

13  Q.   And did you see that?  Completely different than

14  Paragraph 4, two different things; right?

15  A.   Yes.

16  Q.   The question in this case is about NovaSys Health members;

17  right?

18  A.   Yes.

19  Q.   And "members" there, it's not a defined term; correct?

20  A.   There's no definition, no.

21  Q.   And certainly, lawyers define terms.  It's sort of

22  maddening how many things we define.  Do y'all do that in the

23  accounting?  Have defined terms?

24  A.   There are defined terms in accounting, yes.

25  Q.   You know what I'm talking about?  "Members" there, it's

1    not capitalized.  It's not something where we have limited what

2    the words "members" means; right?

3    A.   It's not defined, yes.

4    Q.   Yeah.  And if y'all wanted to, when you drafted this

5    contract, you could have defined members as ARHealthNetwork

6    work; right?

7    A.   It's not there ARHealthNetwork doesn't appear in this

8    document, does it?

9    A.   I don't -- I do not see that, no.

10   Q.   Well, you said you studied it this morning with your

11   lawyer, ma'am.

12   A.   Yes, I did.  I don't see that in the document, no.

13   Q.   And when you studied it this morning, you didn't see it,

14   did you?

15   A.   No.

16   Q.   It doesn't say Hendrix College anywhere in the document,

17   does it?

18   A.   No.

19   Q.   Doesn't say ASE/PSE?

20   A.   No.

21   Q.   Okay.  And I'm sorry, you have to help me with the bottom

22   one.  My writing is not very good, but I can't read that one

23   either.

24   A.   It's Monroe Shoe.

25   Q.   "Monroe"?

```
1    A.   Yes.
2    Q.   Monroe Shoe is nowhere in this document?
3    A.   It doesn't say "Monroe Shoe."
4    Q.   So "members," according to y'all, means all of these
5    things in 2011, 2012, 2013; right?
6    A.   Yes.
7    Q.   Okay.  "Members," in this document, is not limited by what
8    computer system it's loaded in; correct?
9    A.   "Members" in this document I would take to indicate
10   NovaSys members that NovaSys was providing administration
11   services to.
12   Q.   Nowhere in this document does it define members as
13   something that NovaSys -- somebody, someone, anybody that
14   NovaSys was providing admin services to, does it?
15   A.   No.
16   Q.   I'm sorry?
17   A.   It doesn't say, "Admin specific services."
18   Q.   It doesn't say that anywhere.  Nowhere in this document is
19   "members" defined or limited to a specific network; correct?
20   A.   Not defined in this document, no.
21   Q.   Okay.  This is the document?
22   A.   Right.
23   Q.   This is what the case is about; right?
24   A.   Yes.
25   Q.   Nowhere in this document is it limited by time; correct?
```

1   A.   Correct.

2   Q.   Doesn't say this thing is like Cinderella and ends at

3   midnight, does it?

4   A.   No.

5   Q.   No, ma'am.

6        Nowhere in this document does it say it's limited by the

7   address that you send claims to, does it?

8   A.   No.

9   Q.   Nowhere in this document does it say that it's limited by

10  where you place your phone calls to complain about some sort of

11  service, does it?

12  A.   No.

13  Q.   Those are all distinctions that you made between Ambetter

14  members, as you call them, and then the NovaSys Health members;

15  right?

16  A.   Correct.

17  Q.   None of those distinctions you made are defined or put

18  into this document; correct?

19  A.   Correct.

20  Q.   This document that your company drafted; right?

21  A.   Yes, I believe so.

22  Q.   And when your company drafted it, if it wanted to limit

23  who the members were, it could have defined it by computer

24  system, by the role you played, by the network, by time, by

25  addresses, by phone calls?  It could have done that; correct?

1    A.   I assume.  I suppose, yes.

2    Q.   Okay.  It chose not to do that, for whatever reason;

3    right?

4    A.   I had no part of that.  So apparently, it's not there, no.

5    Q.   And you're not telling this jury that, instead of

6    "75 percent of billed charges," it would have said, "75 percent

7    of Medicare"?  You are not telling this jury your company

8    wouldn't be here trying to enforce this contract, are you?

9    A.   Can you repeat that question?

10   Q.   Sure.  If the shoe was on the other foot and this said,

11   "75 percent of Medicare," a low rate, I think you would agree;

12   right?

13   A.   I can't speculate on that.  It doesn't say that.

14   Q.   Yes, ma'am.  You don't know if 75 percent of Medicare

15   would be a low rate reimbursement for emergency services?

16   A.   75 percent of Medicare --

17   Q.   Yes, ma'am.

18   A.   -- for Ambetter or for --

19   Q.   I am just saying for everything, just like this contract.

20   If it said 75 percent of Medicare for everything, you are not

21   telling me that your company wouldn't be in here right now

22   trying to enforce it against my clients?

23   A.   Again, I can't speak to that.

24   Q.   Okay.  Thank you, ma'am.  I don't have any other

25   questions.

1          THE COURT:  Mr. Cady?

2          MR. DRENNON:  Bear with me just a second to move out

3    of your way.

4          THE COURT:  I was going to say, "Let's take our break

5    now."

6          MR. CADY:  Okay.

7          THE COURT:  And I want to say this to the jury.  We

8    have an issue.  We had a long bench conference, as you noticed,

9    the last one, and I made a ruling about some evidence.  And the

10   parties are going to convince me that my ruling might not be

11   correct.  And so it's one of those issues that would be better,

12   I think, if I take it up during the week so we know whether I'm

13   right or wrong, because I could go either way, if you

14   understand what I mean.

15       I made the ruling because I have to, but I could be

16   convinced either way.  So instead of forcing the answer now,

17   I'm going to give the lawyers a chance to convince me one way

18   or the other.  And so instead of requiring Mr. Cady to finish

19   up and be done, I'm going to let him come back and finish up

20   when we get back.

21       Okay.  Now, you have a long break.  You have a break until

22   August the 17th at 8:30.  If you've had a hard time not talking

23   about the case during the week, you can pretty much imagine

24   people are going to be asking you, "What was the case about?

25   What was the evidence about?"

```
 1        Don't talk to them.  Just wait.  You have the rest of your
 2   lives to talk about this case.
 3        Don't make a hard decision.  Don't go home and start
 4   thinking so hard that you make a hard decision one way or the
 5   other until you get a chance to talk to your fellow jurors.
 6   Listen to the closing arguments.  Listen to the rest of the
 7   defendants' case.
 8        I don't think anybody will try to contact you about it.  I
 9   will ask you not to do any independent research.  You might
10   start thinking about the names of the case and don't start
11   Googling it and figure it out.  Don't do that.  Because if I
12   find out you did it or if there is any inclination you did it,
13   then I have to declare a mistrial, and we would have to start
14   all back over.  I don't want to do that.
15        Any issues or questions for me before we recess?
16        (The jury did not respond.)
17             THE COURT:  I think -- hopefully, Mr. Estell's plans
18   are still in the works.  And if they are, congratulations.  I
19   wish the best for you.  I hope you get a good response.  You're
20   not doing this on a Megatron or anything anywhere, are you?
21   You're not doing that.
22             MR. DRENNON:  The flyover with the banner.
23             THE COURT:  So -- all right.  What were you saying?
24             JUROR ESTELL:  I don't think they're aware of the
25   whole situation.
```

1          THE COURT:  So I won't say anything.

2          JUROR ESTELL:  I'll let them know --

3          THE COURT:  You have to let me know.

4          JUROR ESTELL:  -- now.

5          THE COURT:  I thought you let them know.  I'm sorry.

6          UNIDENTIFIED SPEAKER:  Hopefully, she says, "Yes."

7          THE COURT:  Okay.  All right.  Let's recess, and

8    we'll come back at 8:30 on the 17th.

9          (whereupon the jury exited the courtroom.)

10          THE COURT:  All right.  Let's recess until the 17th.

11   File whatever documents you're going to file, and I'll get your

12   rulings, and we'll come back and keep moving.

13          (Proceedings adjourned at 4:32 p.m.)

14

15                      REPORTER'S CERTIFICATE

16

17

18          I certify that the foregoing is a correct transcript of

19   proceedings in the above-entitled matter.

20

21   /s/ Suzanne M. McKennon, CSR, CRR, RMR
                                              Date:  August 10, 2020
22   United States Court Reporter

23

24

25

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter